

**FILED**
2011 Oct-07  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA



AlaFile E-Notice

01-CV-2011-903218.00

To:  BOEING AEROSPACE OPERATIONS, INC.
C/O CSC LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL
01-CV-2011-903218.00

The following complaint was FILED on 9/9/2011 2:52:37 PM

Notice Date:      9/9/2011 2:52:37 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
BIRMINGHAM, AL 35203

205-325-5355
anne-marie.adams@alacourt.gov

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>01-CV-2011-903218.00 |
|---|---|---|

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

NOTICE TO    BOEING AEROSPACE OPERATIONS, INC., C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY RICHARD SCOTT WILLIAMS

WHOSE ADDRESS IS 1400 PARK PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____
    pursuant to the Alabama Rules of the Civil Procedure

| 9/9/2011 2:52:37 PM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested _____

    Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____

Date     Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**01-CV-201**<br>Date of Filing:<br>09/09/2011 | ELECTRONICALLY FILED<br>9/9/2011 2:52 PM<br>CV-2011-903218.00<br>CIRCUIT COURT OF<br>JEFFERSON COUNTY, ALABAMA<br>ANNE-MARIE ADAMS, CLERK |

## GENERAL INFORMATION

### IN THE CIRCUIT OF JEFFERSON COUNTY, ALABAMA
### ALABAMA AIRCRAFT INDUSTRIES, INC. v. THE BOEING CO. ET AL

**First Plaintiff:** ☑ Business  ☐ Individual  **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☐ Other  ☐ Government  ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonnes
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture
    Appeal/Enforcement of Agency Subpoena/Petition to
    Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP-Contempt of Court
☑ CONT-Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND- Equity Non-Damages Actions/Declaratory
    Judgment/Injunction Election Contest/Quiet Title/Sale For
    Division
☐ CVUD-Eviction Appeal/Unlawfyul Detainer
☐ FORJ-Foreign Judgment
☐ FORF-Fruits of Crime Forfeiture
☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB-Protection From Abuse
☐ FELA-Railroad/Seaman (FELA)
☐ RPRO-Real Property
☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP-Workers' Compensation
☐ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING   A ☐ APPEAL FROM   O ☐ OTHER
                                    DISTRICT COURT

           R ☐ REMANDED   T ☐ TRANSFERRED FROM
                                    OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ Yes  ☐ No

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   WIL167      9/9/2011 2:47:45 PM      /s/ RICHARD SCOTT WILLIAMS

**MEDIATION REQUESTED:**   ☐ Yes  ☐ No  ☑ Undecided

ELECTRONICALLY FILED
9/9/2011 2:52 PM
CV-2011-903218.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| **ALABAMA AIRCRAFT INDUSTRIES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **CASE NO:** |
| **vs.** ) | |
| ) | |
| **THE BOEING COMPANY,** ) | |
| **BOEING AEROSPACE** ) | |
| **OPERATIONS, INC. and** ) | |
| **BOEING AEROSPACE** ) | |
| **SUPPORT CENTER,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

COMES NOW Plaintiff Alabama Aircraft Industries, Inc., by and through, Joseph Ryan as the trustee of the Litigation Trust established on September 8, 2011 pursuant to the order entered by the United States Bankruptcy Court for the District of Delaware on September 6, 2011 in the case of Alabama Aircraft Industries, Inc., et al. (the "Debtors") as a representative of the Debtors' estates and for the benefit of the Debtors and Kaiser Aircraft Industries, Inc. ("AAI," "Alabama Aircraft" or "Plaintiff") and files its complaint for damages and equitable relief against Defendants The Boeing Company, Inc. ("Boeing"), Boeing Aerospace Operations, Inc. ("BAOI"), and Boeing Aerospace Support Center ("BASC") (collectively, "Defendants").

1

## I.    INTRODUCTION

1.    Boeing Company, the world's second largest government contractor, has throughout the period of 2005 to the present, exerted its massive financial power and position upon AAI, a relatively small military aircraft maintenance expert of long standing and good repute for its quality work, and tapped into AAI's proprietary secrets, thereby causing substantial harm to AAI.  Boeing's actions harmed AAI in two principal ways, detailed below, and were undertaken in order to deprive AAI of one half of a $1.3 billion government contract, and the revenues and earnings therefrom, and in order to cheat AAI out of millions of dollars on a second government contract, when Boeing forced AAI to work for minimal prices under false pretenses, and Boeing then inflated AAI's costs when it billed the government.    As described hereafter, Boeing's actions violated its promises (promissory estoppel), breached its contracts, involved the conversion of (and trespass to) AAI's intellectual property and proprietary information, and unjustly enriched this behemoth.  Boeing was throughout the relevant time period a law-breaker and a chiseler of the government and its business partner, and engaged in patterns of misconduct that were found in its dealings with AAI here.

## II.    **PARTIES**

2.    Plaintiff AAI (formerly known as Pemco Aviation Group, Inc., prior to September 17, 2007, and sometimes herein referred to as "Pemco" for historical

recitation purposes, especially because older documents use the Pemco name) is and throughout the relevant time period has been a Delaware corporation with its principal place of business in Birmingham, Alabama, at the Birmingham airport site. As used herein, "AAI" and "Alabama Aircraft" each means and includes AAI's subsidiary, "AAI-Birmingham," formerly known as Pemco Aeroplex, Inc. AAI was founded in 1983 and provides aircraft maintenance, repair and modification services for the government and military customers, focusing on Programmed Depot Maintenance ("PDM") on large transport aircraft, and designs and manufactures a range of proprietary aerospace products. AAI has facilities in Birmingham which it believes are the largest for third-party maintenance in North America, with approximately 1.9 million square feet under roof. AAI and its predecessors have been performing PDM for the KC-135 Stratotanker fleet since 1969, and have processed over well over 2,400 such aircraft, more than any other provider of these services, and far more than Defendants. AAI (under its Pemco name) provided KC-135 PDM services as a prime contractor under a contract with the Air Force awarded in August 1994 and performed through 2001. During that time, AAI was the only commercial prime contractor providing KC-135 PDM services (except that after 1998 Boeing, who had a contract, was also performing some such work). In 2008, as detailed hereafter, AAI was still providing KC-135 PDM services but as Boeing's subcontractor, and its government subcontracts with

3

Boeing for KC-135 PDM services represented approximately 83% of AAI's total revenue from continuing operations.

3.    Defendant Boeing is a major aerospace and defense corporation organized under the laws of the state of Delaware with its international headquarters located at 100 North Riverside, Chicago, Illinois 60606-1596. Boeing is, on information and belief, the second-largest aerospace and defense contractor in the world, with 2009 revenues in excess of $68 billion, of which virtually half ($33.6 billion) came from the "Boeing Defense, Space & Security" line of business. At the end of 2009, Boeing had a Contractual Backlog in its "Boeing Defense, Space & Security" line of business of more than $46 billion, of which Military Aircraft comprised $26.3 billion in government military aircraft contracts (not counting "unobligated backlog" of government definitive contracts for which funds have not yet been authorized). Boeing is, and for many years has been, qualified to do business in Alabama; its registered agent is CSC Lawyers Incorporating Service, 57 Adams Avenue, Montgomery, AL 36104-4001. Boeing has during the relevant time period had offices or places of business, and employees and agents residing or working in the Birmingham, Alabama and Huntsville, Alabama areas. Defendant Boeing has done business in Birmingham, Alabama with plaintiff AAI both itself and through BASC, BAOI, and other Boeing affiliates.

4.     Defendant BAOI, a Delaware corporation, is, or during the relevant time period was, a corporate wholly-owned subsidiary of Defendant Boeing and, on information and belief, was an alter ego of defendant BASC (or, alternatively, BAOI did business as and under the name of BASC), and was used by Boeing in order to enter into various agreements and business dealings with Plaintiff AAI, and to bid on Air Force defense contracting work.  On information and belief, BAOI operated in, and during the relevant time period has had employees resident and/or working in, Birmingham, Alabama, among other places in Alabama.  BAOI has its headquarters at the same place listed below for defendant Boeing, and has also been qualified to do business in Alabama.

5.     Defendant BASC is, or during the relevant time period was, a wholly-owned subsidiary or division of Defendant Boeing, used by Boeing in order to enter into various agreements with Plaintiff AAI.  On information and belief, BASC was the "d/b/a" entity or name under or by which defendant BAOI and/or defendant Boeing operated during the relevant time period, at least with respect to the KC-135 related activities and Pemco/AAI related activities that are the subject of this action.  BASC has also been referred to as Boeing Logistics Support System and currently operates as Boeing's Global Services and Support.  BASC operated in, and during the relevant time period has had employees residing and/or working in, Birmingham, Alabama, among other places in Alabama.  BASC has its

headquarters at the same place listed below for defendant Boeing, and has also been qualified to do business in Alabama. Plaintiff alleges that BASC was an alter ego for defendants Boeing and BAOI. If Plaintiff is mistaken as to the nature, identity or organization of BASC, Plaintiff seeks leave to amend to correct or supplement such facts.

6.     Unless otherwise specified herein, the term "Boeing" shall be deemed to mean and include Boeing, BAOI, and BASC, together, especially since, as more particularly shown hereafter, The Boeing Company was the entity which controlled and caused its divisions and subsidiaries to enter into agreements with AAI and which acted to interfere with and to terminate arrangements and agreements between plaintiff AAI and various of The Boeing Company's wholly-owned and controlled subsidiaries.   Numerous actions material to the causes of action herein were taken by Boeing personnel under or in the name of The Boeing Company.

### III.   <u>JURISDICTION AND VENUE</u>

7.     This Court has subject matter jurisdiction as well as personal jurisdiction over the parties.  The defendants have sufficient minimum contacts in this state to provide personal jurisdiction over them.  Defendants entered into contracts with AAI for services to be performed in Alabama, obtained substantial profits from work performed by AAI in Alabama, and submitted joint proposals

with AAI to the United States Government with AAI as its prime subcontractor. Defendants maintained offices and places of business in Alabama, particularly in this County, with agents and employees working and/or residing in this County. Defendants were doing business in Alabama or with persons situated in Alabama and in this County during the relevant time period, and defendants caused tortious damage by act or omission in this state and this County.  Each Defendant either directly or through agents, who were at the time acting with actual and/or apparent authority and within the scope of such authority, separately but also acting in concert or conspiracy and materially aiding each other in respects set forth herein, has:  (i) transacted business in and from this state; (ii) contracted to supply or obtain services or goods in and from this state; (iii) caused tortious damage by act or omission in and from this state; (iv) caused tortious damage by act or omission in and outside this state, while such defendant regularly does or solicits business in and from this state or engages in other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered or capital raised in and from this state; (v) caused damage in this state to AAI by breach of covenant, representation, promise and/or warranty when defendants reasonably expected AAI to be affected thereby in this state, while such defendant regularly does or solicits business in and from this state or engages in other persistent course of conduct or derives substantial revenue from goods used or consumed or services

7

rendered or capital raised in and from this state; and/or (vi) otherwise had the requisite minimum contacts with this state, and, under the circumstances, it is fair and reasonable to require defendants to come to this state and this County to defend this action.

8.     Venue is proper in this Court by reason of the foregoing and the facts set forth hereafter.

## IV.   FACTS

### A.   Background

9.     As aforesaid, Alabama Aircraft (including its predecessors) has been performing PDM for the KC-135 Stratotanker fleet since approximately 1969, and has processed well over 2,400 such aircraft, more than Boeing or any other provider of these services. The KC-135 Stratotanker is used primarily for refueling Air Force long-range bombers, although it is also used by other Air Force, Navy, and Marine Corps aviation units for aerial refueling support. AAI has performed many major upgrades of the KC-135 fleet in the past as part of its PDM services, including wing re-skin, major rewire, corrosion prevention control, auto pilot, and fuel savings advisory system modifications. In 2006, Boeing (as primary contractor on the KC-135 PDM program, see below) was by far AAI's largest customer, accounting for 74% of AAI revenues, and in AAI's fiscal year ended 31

December 2008, Boeing's KC-135 PDM contract revenues amounted to approximately 83% of AAI's revenues.

### B.    History of the KC-135 PDM Program

10.    In or about August 1994, after a competitive bidding process, the United States Air Force ("USAF" or "Air Force") awarded Pemco (as AAI was known at that time) the 1994 PDM Contract to perform maintenance on its KC-135 aerial refueling tanker aircraft ("KC-135 PDM Contract"), for a period of one base year and six option years. Pemco was the prime contractor under the 1994 KC-135 PDM Contract and was the only commercial prime contractor providing KC-135 PDM services at that time. AAI completed work on the final aircraft inducted for PDM under this contract during 2003.

11.    In 1998, the United States Air Force issued a Request for Proposals (often known as a "RFP") that combined KC-135 PDM with work on the A-10 aircraft and other services. The USAF procurement officer overseeing such activity was Darleen Druyun. On information and belief, in 1993 Congress investigated Druyun for alleged involvement in a plan to speed up payments by the USAF to a Boeing predecessor, McDonnell Douglas. Although other personnel were discharged from the Air Force, Druyun kept her position.

9

12.     Pemco, then, in 1998 as the prime contractor for KC-135 PDM under the 1994 KC-135 PDM Contract, could perform the KC-135 PDM work but was not able to perform the other services bundled in the RFP. Pemco took proper steps to protest the bundling of the KC-135 PDM with the other services, and the U.S. Government Accountability Office (the "GAO"), known as "the congressional watchdog" sustained Pemco's protest. *See Pemco Aeroplex, Inc.*, B-280397, 98-2 CPD ¶ 79 (Sept. 25, 1998).

13.     Despite the GAO's finding in Pemco's favor on its 1998 protest, the Air Force (through the direction of said senior USAF procurement officer, Darleen Druyun) on information and belief acting in concert or conspiracy with Boeing, permitted the bundled RFP to go forward, and she awarded or allowed to go forward the bundled contract with Boeing.

14.     Druyun's history with Boeing was long, sordid and eventually proved to be criminal in nature. In 2000, Druyun sent resumes of her daughter (only recently graduated from college) and her daughter's fiancé, an aeronautical engineer, to Boeing, which hired both. At about that same time, Druyun agreed to pay $412 million to Boeing in settlement of a claim related to a C-17 aircraft contract, later admitting that she recommended the payment because her daughter's fiancé was seeking the above-mentioned Boeing job. In 2001, Druyun supervised

a $4 billion contract award to Boeing for modernization of avionics on C-130 J aircraft, in which (she later admitted) she favored Boeing over four competitors because of Boeing having given her son-in-law his job.

15.   In May 2001, Boeing submitted a $119 million request for equitable adjustment ("REA") to the Air Force for the 1998 KC-135 PDM Contract.  The Air Force, at the urging of Darleen Druyun, quickly settled the REA for $35.8 million – significantly more than was appropriate.[1]  Then, in 2002, Druyun (as she later has admitted) assisted Boeing to obtain a $100 million NATO AWACS contract, at what later was said to have been inflated in favor of Boeing.  On information and belief, in that same time period, when Druyun's daughter was at risk of job termination for poor performance, Druyun interceded with Boeing, and her daughter kept her job.  Druyun has eventually admitted providing Boeing with assistance on many contracts.

16.   On information and belief, as early as September 2002, Druyun and Boeing engaged secretly for a period of time in discussions about Boeing hiring Druyun herself, during a period of time she was responsible to the Air Force for supervision of its dealings with Boeing.  As a result of Druyun's discussions with

---

[1]   In addition to the REA, Boeing requested, and the Air Force issued, a modification to the contract that eliminated the Air Force's review of Over and Above work requests for less than 75 hours.  The elimination of the work request review led to abuses.  Boeing began to "task split," so that its work requests would be for less than 75 hours and Boeing could avoid having to justify the reasonableness of work to the Air Force.  *Id.* at 5.  Boeing also substantially marked up Pemco's prices which further increased government costs.  Boeing's practices lead to a huge increase in cost for the Air Force in connection with the KC-135 PDM program.

Boeing, Boeing hired Druyun and she joined Boeing in January 2003 as deputy general manager of Boeing's Missile Defense Systems unit, obtaining a $50,000 signing bonus and an annual salary of $250,000.

17.    Then, later in 2003, questions arose concerning Druyun's role in a proposed $23 billion deal with Boeing for a lease-purchase of 100 new refueling KC-767 tankers.  Boeing fired Druyun on November 24, 2003.  Subsequently, in December 2003, the government announced a freeze on the KC-767 tanker project while an investigation was conducted into corruption charges involving Druyun and Boeing.  Druyun was subsequently arrested and pleaded guilty on April 20, 2004 to having done a number of matters, including inflating the price of the KC-767 contract to favor Boeing and to passing information to Boeing on its competitor's bid, all while she was negotiating employment for herself with Boeing.  In October 2004, Druyun was sentenced to nine months in federal prison (she was released on or about September 30, 2005).  As part of her guilty plea and plea agreement, Druyun admitted that she did "favor the Boeing Company in certain negotiations as the result of her employment negotiations and other favors provided by Boeing to [her]."

18.    As a result of facts learned during the Druyun investigation, Boeing's CFO, Michael M. Sears was also fired at Boeing on November 24, 2003, and later,

12

on February 18, 2005, was sentenced to four months in prison.  Additionally, Boeing's CEO, Phil Condit, was forced to resign his position on December 1, 2003, and Boeing ultimately paid a $615 million fine, the largest financial penalty ever levied on a military contractor.

19.     Pemco incurred substantial losses as a result of the actions of the Air Force (whose activity regarding the tanker contract was being directed by Druyun) and Boeing regarding the award of the 1998 KC-135 PDM Contract.

20.     Moreover, the Druyun/Boeing Affair was and is emblematic of not only Boeing's "MO" (Method of Operation) in securing government contracting work, but contains pertinent examples of Boeing's **pattern and practices** of conduct, and of its **motives and plans,** of using insider contacts and communications, and improper influences and dealings, and obtaining and misusing competitors' proprietary information, to prevail over competitors (especially AAI/Pemco, but not limited to AAI/Pemco) in securing and renewing government contract work (*see* Ala. R. Evid. 404(b) and 406), all as more particularly alleged hereafter.

21.     Plaintiff alleges that Boeing's said pattern and practices of conduct, and said motives and plans, continued and were wrongfully used by Boeing with the USAF after the Druyun/Boeing Affair, in order to defeat AAI/Pemco's

13

opportunities and frustrate its rights, in and about the KC-135 PDM Program, as more particularly hereinafter alleged.

### C.    AAI's Initial Agreement with Boeing

22.    After obtaining the 1998 contract award, nevertheless, Boeing had significant performance problems of its own making, on the 1998 KC-135 PDM Contract that it managed to obtain under such questionable circumstances. For example, in or about August 2000, the Federal Aviation Agency (the "FAA") fined Boeing $1.6 million for failing to hold its suppliers accountable for their failures to adhere to quality control practices. *See FAA Fines Boeing Lax in Scrutiny of Suppliers*, Seattle Times, Aug. 3, 2000, at A1.

23.    Due to Boeing's failure to adequately perform its obligations under the 1998 KC-135 PDM Contract and the impending end to Pemco's 1994 KC-135 PDM Contract, the Air Force itself directed Boeing and Pemco to enter into a teaming arrangement where Pemco as subcontractor would perform KC-135 PDM work *for Boeing* under the 1998 KC-135 PDM Contract for fiscal years 2002 through 2007.

24.    In compliance with this government request, on or about October 7, 2000, Pemco and Boeing entered into a Memorandum of Agreement ("MOA")

wherein Pemco agreed to serve as a subcontractor to Boeing for the 1998 KC-135 PDM contract for fiscal years 2002 through 2007.

25.    Boeing continued to have problems within its own ranks during the performance of the 1998 KC-135 PDM contract. On or about October 31, 2000, it was reported that Boeing manufacturing facilities failed to meet FAA quality regulations resulting in proposed fines totaling $892,000. *See Findings of FAA's Special Audit of Boeing Factories*, Seattle Times, Oct. 31, 2000, at A11. On or about March 27, 2002, it was reported that the FAA proposed fining Boeing $350,000 for failure to adhere to quality control standards in the 1990s, arising from improper conduct, including accepting defective parts from a supplier. *See FAA Fine Proposed Against Boeing Faulty Quality Control in Mid-1990s Alleged*, Seattle Times, March 27, 2002, at E1.

26.    In or about July, 2003, the Air Force suspended Boeing Launch Services after the Air Force found that Boeing had committed "serious and substantial violations of federal law" in connection with the 1998 competition for a U.S. Air Force Evolved Expendable Launch Vehicle (EELV) contract. The violations included the fact that Boeing employees obtained more than 25,000 pages of documents belonging to Lockheed that helped Boeing win the

15

procurement competition. As a result of the suspension, many of the EELV contracts were taken away from Boeing and transferred to Lockheed.

27. Boeing's misconduct jeopardized AAI's own prospects, given that AAI was a subcontractor on the KC-135 PDM contract and was thus dependent on Boeing keeping the business. As a result of Boeing's failure to meet minimum quality standards, on or about November 30, 2004 (after the Druyun investigation and after Druyun's guilty plea), the Air Force elected not to exercise the final two option years of the 1998 KC-135 PDM. Accordingly, rather than extend the 1998 KC-135 PDM Contract with Boeing until 2007, the Air Force terminated the contract.[2] When the USAF elected to not exercise the final two option years of this contract to Boeing, it instead awarded a "bridge" contract for government fiscal year 2006 and 2007 inductions followed by two six-month options, which could result in inductions through September 2008.

28. Meanwhile, the repercussions of the Boeing/Druyun Affair were still coming to light. In or about February, 2005, the GAO sustained a protest of an award of a contract for the small diameter bomb (SDB) program to Boeing as a result of Darleen Druyun's involvement in changing the evaluation criteria which

---

[2] The decision to terminate the contract was not based on Pemco's performance as a subcontractor. Pemco satisfied its quality standards under the contract. Pemco's quality, as measured by defects per aircraft over the previous five years, was superior to Boeing's. In fact, Pemco's quality was significantly higher than Boeing's, in spite of the fact that Pemco was being sent aircraft with more major structural problems than were being sent to Boeing. Pemco's quality was sufficient for it to retain the contract.

appeared to favor Boeing. *See Lockheed Martin Corporation*, B-295402, 2005 CPD ¶ 24 (February 18, 2005).

29.     On or about February 24, 2005, the GAO sustained a protest against an award to Boeing of a contract for the avionics modernization upgrade program (AMP) for C-130 aircraft as a result of Darlene Druyun's bias toward Boeing and her effort to elevate Boeing's ratings and downgrade the ratings of its competitors. *See Lockheed Martin Aeronautics Company; L-3 Communications Integrated Systems L.P.; BAE Systems Integrated Defense Solutions, Inc.*, B-295401 et. al., 2005 CPD ¶ 41 (February 24, 2005).

**D.     The USAF 2008 Recompete KC-135 PDM RPP and the 2005 Boeing/Pemco Agreement to Jointly Bid for Such 2008 PDM**

30.     Boeing and AAI commenced conversations about teaming up, and jointly entering into teaming agreements for the government KC-135 PDM work, as early as the period of February to March, 2004, in meetings held by Pemco (AAI) personnel with Pat Finneran, Vice President and General Manager of BASC, and others, that continued into 2005.  For example, a meeting with Boeing and Boeing subsidiary personnel, by Pemco officers and personnel, on strategic planning to teaming on projects and including a "partnership" approach and strategy on the FY08 KC-135 PDM, was held on June 24, 2004.

17

31.     On August 13, 2004, Finneran and a number of other personnel of Defendants came to Alabama, visited and inspected Pemco's operations, and further discussed KC-135 PDM work.   On September 1, 2004, two Boeing representatives (including Finneran) and Pemco's President and CEO Ron Aramini jointly made a briefing presentation to representatives of Alabama Senators Shelby and Sessions in which, among other things, it was represented that "Boeing intends to continue a long-term relationship with Pemco."   Further discussions about "partnering" and "teaming" were held in early 2005 between Defendants and Plaintiff.   In one communication on February 8, 2005, Pemco pointed out to Boeing some cost data and summarized, "[i]t certainly appears that the Pemco contribution to the [Boeing/Pemco] blended rate is significant and that, without the lower cost from Pemco, the Boeing cost would be prohibitive."

32.     As part of an April 6, 2005 meeting between Pemco and Boeing on teaming concepts and issues, Boeing's officer, Pat Finneran, related his conversations with Lt. Gen. Donald J. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics, who was responsible for logistics readiness, aircraft maintenance and setting logistics policy.   Lt. Gen. Wetekam had asked Finneran how Boeing – if a two repair-facility team were involved – would handle the situation where PDM quantities declined in certain "out" years.   Finneran told Pemco that he advised General Wetekam (who was satisfied with this response)

18

that in such an instance, Boeing would send all the PDM work to Pemco and Boeing would perform the parts management and engineering, and that by the time this happened, Boeing would have other work to keep the rates under control at Boeing's San Antonio facility.   Finneran also informed Pemco representatives that Boeing recognized that Pemco's favorable, low rates were needed by Boeing in order to make a Boeing PDM contract proposal "affordable."

33.     By May 1, 2005, Boeing, as drafter, had provided to Pemco a draft of the 2005 Memorandum of Agreement with its related Workshare Agreement and Non-Disclosure Agreement. The draft was sent by Boeing's Roger J. Witte, Jr. The Boeing draft of the Workshare Agreement provided for 50% of the work to go to Pemco.  Within a few days thereafter, Pemco, which was suffering from an inferior bargaining position overall but which did have a lower cost structure than Boeing (and Boeing knew it), sent back its requested revision of such draft Memorandum of Agreement.  Pemco attempted to cut down on some of the more onerous Boeing provisions in Pemco's proposed revisions, but in many respects Boeing rejected these with an ultimatum to take it or leave it (*see infra*).

34.     On or about May 20, 2005, the Air Force released its draft RFP for the FY08 Recompete KC-135 PDM Contract, with a RFP number of FA8105-05-R-0014 (hereafter, the "RFP") for the FY08 KC-135 PDM work.

35.     The RFP contemplated a **Best Estimated Quantity ("BEQ")** of 44 KC-135 aircraft per year, delivered to private industry contractors for PDM work, would be involved under the Contract.[3]  On June 2, 2005, on letterhead of The Boeing Company with an address shown as being BASC's facility in San Antonio, Texas, Boeing officer, Roger J. Witte, Jr., transmitted to Pemco, on basically a "take it or leave it" basis, a revised Memorandum of Agreement, for Pemco to sign.  Referring to the Boeing meeting with Pemco on April 6, 2005, *supra*, Witte said, in his transmittal:

> Attached is Boeing's final offer for the Re-compete MOA for KC-135 PDM.  Boeing requests that Pemco acknowledge by accepting the changes as written, signing and returning to Boeing, via Fax, the attached MOA and Exhibits A and B thereto, no later than 4:30 PM CST Friday, June 3, 2005.
>
> Boeing believes that the attached MOA meets all of the criteria offering by Mr. Pat Finneran to Mr. Ron Aramini during their meeting on April 6, 2005, and is a good faith offer pursuant to those discussions.
>
> If Pemco does not acknowledge by signing and returning via Fax the attached MOA and Exhibits A and B thereto, as written, by 4:30 PM CST on Friday, June 3, 2005, Boeing's offer is officially withdraw for consideration. ...

36.     In reliance upon the representations made to it by Boeing and the foregoing long course of discussions, and recognizing that Boeing had (as stated above in Witte's letter) made its final offer of a MOA, Pemco decided to team with

---

[3]   Plaintiff believes the original RFP called for one aircraft in base period 1, eight aircraft in base period 2, 28 in base period 3, and 44 aircraft in base period 4 through option period 5.

Boeing rather than to submit an independent proposal as a prime contractor for the FY08 Recompete KC-135 PDM Contract or else team with another company besides Boeing. On June 3, 2005, as directed by Boeing, Pemco (acting through its wholly-owned subsidiary, Pemco Aeroplex) and Boeing (who caused the agreements to be placed through BAOI and BASC) entered into a Memorandum of Agreement ("6/2005 MOA") to submit a joint proposal for the KC-135 PDM Contract under a "teaming" arrangement in which Boeing would be the prime contractor and Pemco would be the principal subcontractor. The 6/2005 MOA required that the parties "use their best, combined efforts to secure the prime contract" anticipated by that MOA. *Id.* at Section 2.2.

37.     The 6/2005 MOA required Pemco to provide to Boeing (and to BASC, which was fronting for BAOI and Boeing) proprietary "technical and cost proposal information" and the cost proposal was required to "contain sufficient supporting data to permit BASC evaluation of the cost proposal." *Id.* at Section 3.4. Pemco, for its part, complied with such contract requirement, and in reliance upon Boeing's representation that it would be kept confidential, Pemco provided Boeing with Pemco's proprietary technical and cost proposal information.

38.     However, there was not an equal and reciprocal flow of all of Boeing's proprietary information back to Pemco. Pemco was the subcontractor,

and Boeing (and the USAF, apparently) required Pemco to provide all its proprietary information; but Boeing, as the Prime Contractor, was not required to (nor did it) reciprocally provide to Pemco all of Boeing's proposed unit prices or other amounts and levels of detail of proprietary information (and methodology) as was being given to Boeing by Pemco.

39.    The 6/2005 MOA also contained a Non-Disclosure Agreement, as Exhibit "B." Under the Non-Disclosure Agreement, the proprietary business and financial information provided by Pemco to Boeing was to be used solely "for the purpose of negotiating a Memorandum of Agreement leading to a long-term subcontracting relationship relating to the [KC-135 PDM] program." *Id.* at ¶ 1. The Non-Disclosure Agreement also provided that "each party shall safeguard the Proprietary Information exchanged up to the date the relationship ends, and ensure that such data is not used against the disclosing party's interests." *Id.* at ¶ 12.

40.    The 6/2005 MOA also contained a Work Share Agreement, attached as Exhibit A thereto, that recognized the possibility that the BEQ of 44 was only an estimate and that the actual number of planes involved in the Program was subject to change. The Work Share Agreement provided that in the event the number of aircraft involved in the FY08 Recompete KC-135 PDM program "drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties

22

that the touch labor would be performed entirely at Pemco with the engineering and procurement remaining at BASC." The Work Share Agreement provided that if KC-135 inductions awarded on the contract began to be reduced, the parties would mutually agree on the financial feasibility point at which reductions of BEQ had reached such as to trigger the shift of 100% of touch labor to Pemco (*i.e.*, the point at which "the number of aircraft drops below a quantity that sustains two Sources of Repair"). The 6/2005 MOA thus included contingencies for performance with as few as 24 aircraft undergoing KC-135 PDM per year. Thus, Boeing (including its affiliates) knew and expected that the KC-135 PDM contract that was being jointly bid for with Pemco, as a joint project and undertaking of theirs, could be for as few as 24 aircraft per year, and, nevertheless, committed to and agreed with Pemco that it would accept Pemco's proprietary information and use it to proceed with obtaining the USAF contract and business for both companies, on the KC-135 PDM.

41. Such express contractual recognition of the potential substantial drop in BEQ and the consequent shifting of touch labor to Pemco, entirely if necessary, was in keeping with Defendants' representations, made through Finneran on April 6, 2005, that: (1) Boeing knew Pemco's costs were substantially lower than Boeing's, and Boeing needed Pemco's lower costs; (2) the PDM job with the USAF would be "affordable" for Boeing with Pemco involved; and (3) Boeing had

23

explained to the senior USAF general that in the event of a drop in supplied aircraft, Boeing would handle the situation by shifting the PDM work to Pemco, with Boeing retaining the parts management and engineering work.

42.     As aforesaid, under the terms of the 6/2005 MOA and based upon the protection provided by the Non-Disclosure Agreement contained therein, Pemco provided to Boeing cost and pricing information for the FY08 Recompete KC-135 PDM Contract, which, among other things, necessarily included and revealed Pemco's bidding methodology. Boeing required Pemco to provide it with detailed proprietary data, including information about Pemco's labor rates, estimates of required labor hours, detailed unit costs, learning curves on hours expended, other material costs, and material usage estimates. Pemco would not have provided this information absent Boeing's explicit agreement – which Boeing in fact gave to Pemco in this contract – that this information would be protected and not be used against it for competitive purposes.

43.     On July 20, 2005, a month and a half after signing the 6/2006 MOA, Boeing and Pemco representatives held an executive level meeting regarding implementation of the contractual teaming arrangements, at which (among other things) a lengthy PowerPoint presentation, prepared by Boeing, was made, entitled, "KC-135 Program Depot Maintenance Source Selection Campaign – Boeing and

24

Pemco Joint Executive Review."   Such presentation reflected that the "total program value" of the jointly-sought contract for Boeing/Pemco was $1.3 billion, with a "contract value" of $175 million per year to the two companies, and that the type of contract with the USAF would be "Firm Fixed Price, Award Fee." Substantial attention was devoted to the downside risks – and handling such risks – of reduced numbers of KC-135 aircraft being provided by the USAF for industry PDM.

44.    An analysis of "Current Environment" noted that "budget pressures in the Air Force have caused 4 aircraft inductions to be reduced in fourth quarter FY05." Further in the presentation, it was discussed that the KC-135 "E" models would be retired and that during the government contract period, the number of aircraft per year that the USAF provided to private industry (*i.e.*, Boeing/Pemco) could only be 28 aircraft.  Boeing's presentation said, "Expect RFP [from the USAF] to have a range of 25 – 40 aircraft per year to accommodate KC-135 E/D retirements."   Another analysis related as a "Threat" whether there would be "Sufficient aircraft for two industry sources."   Therefore, the issues of a considerably reduced supply from the USAF of aircraft to the Boeing/Pemco team was fully vetted and analyzed, and taken into account by Boeing, who led the discussions.  Yet in face of such knowledge and discussion, and most impressively

to Pemco as a result, Boeing knowingly proceeded with its Work Share Agreement with Pemco.

45.    After all the foregoing, and in light of it, effective on September 6, 2005, the 6/2005 MOA was re-issued by Boeing and Pemco, and amended by the addition of another company in the biding venture and the revised MOA (the "9/2005 MOA") was signed for Boeing by BASC, and the other two signatories were Pemco Aviation Group, Inc. (the plaintiff) and the other company. Specifically, the other company signed the 9/2005 MOA on August 31, 2005, Pemco signed it on September 2, 2005, and Boeing signed it on September 6, 2005, and dated the agreement with the date of September 6, 2005.

46.    With the exception of adding the other company as a co-venturer, the material terms of the 9/2005 MOA as they bear upon the Boeing/AAI relationship and deal, were essentially the same as the 6/2005 MOA.  As between Boeing and plaintiff AAI (and including their respective subsidiaries), the agreement of the parties was and is embodied in the 6/2005 MOA and 9/2005 MOA, including the stated attachments thereto, one of which was a Work Share Agreement, and such two agreements (including the Work Share Agreement and the other attachments) are hereafter referred to together as the "2005 MOA."  Such 2005 MOA embodies the intentions and promises of Boeing and AAI that they would have a long-term

26

relationship to jointly perform "the Program," which was defined as being "the Program Depot Maintenance for the KC-135 Aircraft."

47.     Thus, the 2005 MOA, as amended through September 2005, stated in its recitals, among other things:

- "... BASC and Pemco are currently working together under ... KC-135 Programmed Depot Maintenance (PDM) to cover Fiscal Year (FY) 2002 through FY05 **and the parties wish to continue their relationship for the Program**..." [*id.,* p. 1, emphasis added].

- "... the Parties recognize they will **maintain an exclusive relationship with each other during** the proposal and **performance of the Program** as described in Exhibit A ..." [*id.,* p. 1, emphasis added]. The reference to "Exhibit A" was a reference to a "Work Share Agreement."

48.     **Under the Work Share Agreement entered into as of September 6, 2005, as a part of the 2005 MOA, Boeing (and the other company) agreed that "[u]pon successful award of a contract for the Program, it is agreed that Pemco will receive 50% of all KC-135 inductions awarded on said contract."** Further, under the Work Share Agreement entered into in September 2005, Boeing (and the other company) expressly contemplated that their relationship with Pemco

27

would continue even if the BEQ dropped to a low level that would not sustain both Boeing and Pemco operating their two facilities: **"In the event that the number of aircraft drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties that the touch labor would be performed entirely at Pemco with the engineering and procurement remaining at BASC."** (Emphasis added).

49.     Further, the 9/2005 MOA provided in section 2.2 that after the award of the PDM contract, "the **intent of the Parties shall be to work together** to enhance the execution of the Program, **enabling equal and coordinated representation** with the Customer [USAF]..." (emphasis added).  Under the general topic, "The Relationship of the Parties," the 9/2005 MOA provided, in section 1.1.1, that Boeing agreed, "notwithstanding the language below, to use all reasonable means to consult with Pemco and ... on material issues or items prior to making any decision."   Section 1.5 reinforced the Workshare Agreement's guarantee of work to Pemco:  "BASC or ... may not perform the Work Share designated for Pemco (as contained in Exhibit A Pemco Work Share Agreement) or subcontract work to others than Pemco so long as Pemco meets its obligations hereunder."

50.     Shortly before putting its signature on the 9/2005 MOA, and in line with earlier discussions, Boeing requested assurances that Pemco would upgrade

its facilities for the FY08 Recompete KC-135 PDM Contract. Following final and complete execution of the 9/2005 MOA, on September 8, 2005, and in reliance on Boeing's representations, and in belief that Boeing was dealing in good faith, Pemco committed in writing to invest, and thereafter did invest, $5 million on facility information systems and implementation of Boeing's programs at Pemco's site, in response to Boeing's request. Further, Pemco executives and employees expended a substantial amount of money, in the form of officer and employee effort and expenditures, between September 6, 2005 and June 2006, on complying with Pemco's commitments as a Team member under the 2005 MOA and in carrying out the necessary groundwork for "hitting the ground running" when the USAF issued its RFP. Pemco would not have restricted itself as it did in the 2005 MOA, nor spent such large amounts of moneys in implementation of the 2005 MOA after it was signed, but for Boeing's continuing inducements and representations, that extended past the date of September 6, 2005.

51. In the April 2006 issue of *Boeing Frontiers* online, the Defendants recognized the substantial amount of investment that Pemco was making under the 2005 MOA:

> Boeing and its supplier-partner Pemco Aeroplex Inc. are transforming the programmed depot-level maintenance (major overhaul) processes for the U.S. Air Force KC-135 tanker fleet.
>
> Through a series of Lean initiatives implemented at Boeing Support Systems in San Antonio earlier this year and scheduled for full

implementation at Pemco's Birmingham, Ala. Facility this fall, the team is accelerating the aircraft's return, thereby enhancing the customer's capabilities.

\* \* \*

Boeing is investing $6.5 million to implement Lean improvements on the KC-135 PDM program in San Antonio. Pemco is making similar investments in its facility; once completed in September, that site's KC-135 PDM line will look exactly like the one in San Antonio.

52.   Meanwhile, on or about August 19, 2005, i.e., during the interval between the 6/2005 MOA and the 9/2005 MOA, the Air Force formally released the FY08 Recompete KC-135 PDM Contract RFP, number FA8105-05-R-0014. Boeing and Pemco jointly worked under the 2005 MOA to bid in response to such RFP.

53.   Also, with respect to the ongoing KC-135 PDM being carried out under the 1998 contract, on or about October 1, 2005, the Air Force awarded a "Bridge Contract" for KC-135 PDM to Boeing, with Pemco as Boeing's subcontractor, pending award of the FY08 Recompete KC-135 PDM Contract.

54.   In compliance with its contractual obligations, and in reliance on Boeing's representations, Pemco did not submit a separate bid for the FY08 Recompete KC-135 PDM Contract in response to the RFP.   Instead, Pemco assisted Boeing in preparing a proposal for the FY08 Recompete KC-135 PDM Contract and, as part of such process and in order to further the joint enterprise, Pemco provided Boeing with a substantial amount of Pemco's confidential and

30

proprietary information in connection with the proposal. On or about October 31, 2005, and using Pemco's data and proprietary information in order to do so, Boeing submitted the joint bid proposal in response to the RFP as a prime contractor, with Pemco acting as its principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

55.    As part of Boeing's pattern and practice conduct, it regularly had ex parte communications with Air Force representatives about the subject of KC-135 PDM work in which Pemco held a joint interest with Boeing, without Pemco being either a party to such communications or being advised of the existence or content thereof. For example, in March 2006, Pemco employees, while at Boeing's St. Louis facility working on the joint Boeing-Pemco proposal for the FY08 Recompete KC-135 PDM Contract, observed Mike Wright of Boeing take a call from Diana Petross, the Source Selection Evaluation Team co-chair, regarding the proposal process. A Pemco employee also overheard Ben Robinson of Boeing discussing how he would be talking about the FY08 Recompete KC-135 PDM Contract with Air Force officials in Oklahoma City including Col. Kenneth Moran.

56.    Ben Robinson was a KC-135 Program executive employed by Boeing. Mike Wright was a KC-135 PDM Capture Team Leader for Boeing. Diana Petross worked for the USAF and served as Chair of the KC-135 Source Selection Team from 2005 to 2006; she is now retired from Air Force employment, and serves as a

31

lecturer at the Naval Postgraduate School.   Col. Moran was and had been commander of the Tanker Sustainment Group at Tinker Air Force Base.

57.   Pemco was constrained by circumstances to have to trust that Boeing was not abusing, and would not abuse or misuse, its considerable and ongoing contacts and influence with such Air Force personnel and decision-makers, in any way that would operate to undermine the Pemco/Boeing partnership or Pemco's rights under the 2005 MOA, on the FY08 Recompete KC-135 PDM Contract.

58.   On May 1, 2006, Donald J. Vietor, Senior Principal Specialist, Contract & Pricing, of The Boeing Company, wrote to USAF representative Jim Stephens concerning a "Letter of Intent" (LOI) dated April 26, 2006, in which the government had proposed changes to the RFP # FA8105-05-R-0014 for the KC-135 PDM work.   Boeing's primary area of concern caused by the LOI was the proposed reduction of the BEQ to a baseline of 24 aircraft, from the original proposed 44 aircraft per year.  Boeing did not tell the USAF, however, nor Pemco, that the PDM contract would be infeasible at 24 aircraft per year, nor did it tell the USAF (or Plaintiff) that its arrangement with Pemco would be infeasible.  Instead, Boeing stated,

> Finally, with respect to the new LOI language revising requirements for handling large increases in aircraft quantities beginning in Basic Period IV, Boeing firmly believes our current single source/dual site approaching, involving both Boeing and Pemco, provides the best value solution for accommodating those levels of increased quantity.  Boeing and

Pemco both currently possess the necessary infrastructure and experienced personnel needed for such adjustments; further, our team continues to make substantial investments in the development and implementation of Lean techniques designed for high performance and flexible operations.

* * *

The Boeing/Pemco team's commitment to the ongoing success of the KC-135 PDM program has never been stronger.

59.    On May 11, 2006, Pemco's president Ron Aramini spoke by phone with Pat Finneran of Boeing.  Finneran represented that Defendants had heard no response from the USAF on the BEQ reduction issues (which, in retrospect, Pemco believes and avers on information and belief was a misrepresentation or involved suppression of facts).  Instead, Finneran told Pemco that Defendants were getting "rumors" that the entire RFP for FY08 would be cancelled by the USAF (which did not occur, *see infra*).  The two men then discussed the teaming arrangement at a BEQ level of 24 aircraft per year.  Pemco advised Finneran it thought it would be beneficial for both Boeing and Pemco if Pemco did the work on the 24 minimum aircraft and Boeing moved other work into its San Antonio facility (which, after all, was provided for in the 2005 MOA provision); Finneran was noncommittal on Boeing's plans.

60.    On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft, which was consistent with its April 26, 2006 LOI upon which Boeing

had commented on May 1, 2006, and was a foreseeable eventuality for which the 2005 MOA had expressly provided, especially in the September 2005 Work Share Agreement quoted above.[4]   As previously alleged, Boeing and Pemco had long discussed this kind of possible reduction, in conversations before the 6/2005 MOA, and in the executive level meeting and other discussions before the 9/2005 MOA, and the parties' agreements were reached in light of such known BEQ reduction risks.

### E.    Boeing's Breach of the 2005 MOA with Plaintiff

61.    On June 6, 2006, Boeing breached, in its entirety (as opposed to breaching merely one internal provision, such as a portion of the Work Share Agreement), its 2005 MOA with Pemco, including the September 2005 Work Share Agreement, regarding the FY08 Recompete KC-135 PDM Contract, by terminating the entire set of teaming arrangements.[5]   On that date, Boeing unilaterally issued a purported termination of all the 2005 agreements, citing the reduced BEQ as the excuse for its actions.  In other words, Boeing did not assert any deficiency in Pemco's qualifications or Pemco's performance as the basis for Boeing's abrupt and complete termination of the contract.  Instead, Boeing said

---

[4]   Technically, the BEQ was modified to six aircraft in base period 1 and 24 aircraft in base period 2 through option period 5.
[5]   Boeing promised at the time of terminating the 2005 MOA that it would make Pemco whole by providing Pemco with replacement work, but Boeing breached its said second promise and rejected Pemco as its subcontractor on the CH-47 Chinook Reset program.  Specifically, on August 11, 2006, pursuant to Boeing's promise, Pemco submitted to Boeing a bid for work as a subcontractor on the CH-47 Chinook Reset (Boeing RFP dated July 20, 2006 (JHB-RESET RFP)).  Despite Boeing's promises made in June 2006, on August 22, 2006 Boeing notified Pemco that it had not been selected for work as Boeing's sub-contractor on the CH-47 Chinook Reset.

this, in its June 6, 2006 letter written on the letterhead of The Boeing Company and

signed by Roger Witte:

      1.     On May 31, 2006, The Boeing Company received notice of an amendment (Enclosure 1) to the Request for Proposal for the KC-135 Recompete Program. The reduction in requested quantities is so unfavorable to Boeing that further participation in the Program pursuant to the MOA is no longer practical or financially viable.

      2.     Effective immediately, the Memorandum of Agreement (MOA) dated 6 September 2005 is hereby terminated in its entirety pursuant to the following clause, Paragraph 5c, which states:

> "After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving such notice."

      62.     Boeing's proffered reason was nothing more than a pretext to prevent

Pemco from submitting a competing bid for the work or otherwise sharing in the

contract pursuant to the MOA. Boeing's proffered termination reason was a total

sham, because, among other things: (1) it was untrue; (2) the RFP reduction

circumstances were fully taken into account a year earlier by Boeing and actually

covered by MOA provisions, and Boeing's use of said Paragraph 5c was directly

contrary to the Work Share Agreement and other provisions above cited from the

9/2005 MOA; (3) Boeing never provided any data analysis or documentary support

for its bald, unsupported statement that it would not be "financially viable" for

Boeing after such reduction; and (4) it is illogical, given the fact that Boeing's costs were higher than Pemco's, yet Boeing now, after such termination, was going to do the USAF contract by itself, alone. Further, Boeing violated its contractual obligation to consult first with Pemco – instead, it sent this unilateral declaration of infeasibility out of the blue, as it were, with no consultation or effort to have any negotiations with Pemco.

63.     Worse, Boeing and Pemco already had their bid pending with the USAF, in response to the August 2005 formal RFP, when Boeing made this termination in June 2006.

64.     Boeing was well aware when it terminated the MOA that Pemco could not at that time get together sufficient resources and make arrangements with another partner of Boeing's size and USAF contacts in sufficient time in order to make a separate teaming bid on the FY08 Recompete KC-135 PDM Contract, and that Pemco would have to go it alone, and that Boeing had Pemco over the proverbial barrel. Further, Boeing held and knew Pemco's proprietary pricing data and assumptions and pricing methodology, but Pemco did not have equal access to Boeing's plans, data and methodology, which Boeing was adjusting to fit the circumstances. Moreover, Boeing knew that the MOA set out a plan for the distribution of work should just such a BEQ reduction occur. Finally, Boeing had for some time period preceding June 2006 possessed inside knowledge through its

other relationships with the Air Force that the BEQ reduction was unlikely to occur due to the Air Force's inability to conduct its own "organic" maintenance, which knowledge Boeing did not share with Pemco. By terminating the agreement, Boeing was unfairly attempting to remove Pemco as a competitor and to enhance Boeing's bidding position, especially after extracting Pemco's proprietary information which the 2005 MOA had required Pemco to provide to Boeing.

65.     At June 6, 2006, when Boeing issued its termination letter, Pemco was not aware of Boeing's insider activity with the USAF and of Boeing's plans, and of Boeing's "firewall" violations (*see* below) involving misuse of Pemco's proprietary information, and could not, by the exercise of reasonable diligence, have learned of such matters sooner than two years before the filing of this action.

### F.     Boeing Goes After the FY08 Recompete KC-135 PDM Contract on Its Own, without Pemco as a Bidding Partner.

66.     On July 19, 2006, the USAF announced that it was throwing open the RFP FA8105-05-R-0014, for the FY08 KC-135 PDM work, to both new bidders and existing bidders to submit (or re-submit, in the case of Boeing) a proposal or a changed proposal from that which was currently pending.

67.     As background for this July 19, 2006 event: on June 12, 2006, Pemco had filed an agency-level protest asking the USAF to allow submissions of new proposals. Jim Stephens, the USAF procurement head on this RFP, contacted Pemco's division president and personally asked Pemco to withdraw such a

37

protest, because, he said, it would create paperwork, would require Stephens to make a determination, and would slow down the process. So, in reliance on Stephens' statements, including a promise to open the bidding (which was now important to Pemco now that it was shut out by Boeing from Boeing's team that had been going on for a year), Pemco withdrew its agency-level protest.

68.     After the USAF threw open the RFP for new and changed submissions on July 19, 2006, and demonstrating that Boeing's stated excuse (as given for its termination of the 2005 MOA) was hollow, on September 18, 2006, Boeing submitted its own bid or its own changed bid to the USAF in response to the amended RFP, which proposed doing all the FY08 Recompete KC-135 PDM work at Defendants' San Antonio facility.

69.     Looking forward, for a minute here, as is stated elsewhere herein, on September 7, 2007, the USAF accepted Boeing's revised bid, even though it found that Pemco was as well qualified as Boeing, in matters such as ratings for depot maintenance, transition, program management and small business. The USAF found in 2007 that Pemco (now AAI) had a better past performance record than Boeing (which is also borne out by facts alleged herein); Pemco's past performance was at the high end of satisfactory, whereas Boeing's past performance was considerably poorer. The USAF was, however, impressed by Boeing's lower total evaluated price difference of $15 million, even though that

38

was less than 1.3% over the long potential life of the overall contract (and, clearly, the USAF did not know that Boeing was low-ball bidding, aided by its conversion of and trespass to Plaintiff's proprietary information). On information and belief, Boeing materially misrepresented their bid cost to the USAF so that the actual cost ultimately resulted in a price higher than Pemco's bid because Boeing re-characterized their bid as a cost-plus.

70. Forced by circumstances to fend for itself alone, and lacking numerous tactical advantages the Defendants possessed (including one-sided knowledge of proprietary information of the other bidder like Boeing held with regard to Pemco data and methodology, and including special access to USAF information, as alleged elsewhere herein), Pemco also submitted its own bid on September 18, 2006 to serve as prime contractor on the FY08 Recompete KC-135 PDM program. But Pemco could not overcome certain advantages Boeing used, especially the pricing advantage which was the stated basis for the USAF award of the work to Defendants, as in 2006 and thereafter Boeing misused for its own benefit the knowledge of the proprietary information that Pemco had provided Boeing under the 2005 MOA.

39

**G.     Boeing's Conversion of Plaintiff's Proprietary Information, and Plaintiff's Exhaustion of Administrative Avenues, After 2006 Contract Breach by Boeing**

71.     As previously mentioned, on or about June 12, 2006, Pemco filed an agency-level protest with the Air Force challenging the decision to reduce the BEQ and to bar new bidders to the competition for the FY08 Recompete KC-135 PDM Contract.  One month later, on or about July 19, 2006, the Air Force amended the RFP for the FY08 KC-135 PDM Contract to permit additional bidders.  As a result, Pemco received a 60-day window to make a proposal.

72.     Pemco complied with its obligations under the 2005 MOA despite Boeing's failure to do so.  In that regard, on or about August 2006, Pemco sent Boeing a formal certification and document log of Pemco's "firewall" and efforts to protect Boeing's proprietary information.   Pemco reasonably and actually expected, reciprocally, that Boeing would institute and fully respect firewall procedures to protect Pemco's proprietary information which it knew certain Boeing personnel now held at that time.

73.     On or about September 18, 2006, Pemco and Boeing each submitted separate competing proposals for the FY08 Recompete KC-135 PDM Contract.  In compliance with the bidding guidelines, on or about February 23, 2007, Pemco and Boeing each submitted separate Final Proposal Revisions ("FPRs") for the FY08 Recompete KC-135 PDM Contract. At that point in time, the USAF procurement

40

officer in charge of the Recompetiton (i.e., the Source Selection Authority or "SSA,") was Ronald Poussard, a person with considerable relevant experience to the KC-135 PDM Program. Mr. Poussard had oversight responsibility for the KC-135 PDM program for many years, was very familiar with Boeing's and Pemco's performance of KC-135 PDM work, and served as the SSA for this specific procurement until a few weeks before the award decision.

74.   Pemco avers that Mr. Poussard was involved in and largely responsible for the Air Force's decision not to extend Boeing's 1998 PDM Contract, and on information and belief, Boeing was not pleased with Mr. Poussard serving as the SSA on the FY08 Recompete KC-135 PDM Contract. In Boeing's FPR submitted in February 23, 2007, it substantially dropped its labor hours per aircraft, especially in key years of the contract. Such last minute changes by Boeing resulted in a substantial price reduction in Boeing's bid, which was more than large enough to account for the $15 million difference in the evaluated prices used by the USAF in its 2007 award decision. Very suspiciously, as it now turns out, Boeing failed to submit any technical justifications or explanations for its mysterious decision to change its labor hour assumptions; Plaintiff alleges on information and belief that the real reason was Boeing's conversion and use of Pemco's proprietary information.

75.    In May 2007, while the Pemco and Boeing proposals had been pending for about four months and no award had been made, the Air Force without explanation replaced said Ronald Poussard in the SSA position and substituted one Charles Riechers as the new SSA.  Charles Riechers was new to his procurement position in the Air Force, new to the KC-135 PDM contract and new to the tanker community generally.  Riechers had been in USAF flight operations until October 2002, and between December 2002 and November 2006, he was assigned to various "Concept" projects at the Pentagon (i.e., non-procurement positions). Between November 2006 and January 2007, Riechers was not a USAF employee, and ostensibly worked as an adviser to the "Commonwealth Research Institute" in Jonestown, PA, a subsidiary of Concurrent Technologies Corporation (together, "CRI"), a purported not-for-profit organization where, on information and belief, Boeing has provided a material amount of support, was a client of CRI, and wielded considerable influence.  Although CRI is registered with the Internal Revenue Service as a tax-exempt organization, it is known for engaging in lobbying activities and for taking on Department of Defense work.

76.    Once again, as with the Druyun/Boeing Affair, *supra*, Pemco was presented with an ugly Air Force procurement situation, involving apparent misconduct and involving what Plaintiff AAI believes to have been improper Boeing influence and activity.  What is known is that while Riechers was

42

ostensibly employed by CRI, he actually performed no services for CRI, and the Air Force secretly arranged for Riechers to be paid about $13,400 per month (for at least two months) by CRI while Riechers awaited clearance from the White House for his appointment as principal deputy assistant secretary for acquisition (a position that did not require Senate confirmation).[6]  Riechers got that job in January 2007. Riechers committed suicide in mid-October of the same year, very shortly after awarding the FY08 Recompete KC-135 PDM Contract to Boeing (*see* below).

77.    Subsequently, on or about June 18, 2007, Pemco and Boeing each submitted separate Second Final Proposal Revisions for the FY08 KC-135 PDM Contract.  On information and belief, Boeing continued to substantially deviate from its original price and approach taken in its initial bid.  Pemco is informed and believes, and therefore alleges, (i) that Boeing reduced its proposal prices in its revised bids by approximately 20% during the RFP process in order to beat Pemco's price (which it could calculate using the proprietary data it obtained from Pemco during the time they worked together and as part of the earlier joint proposal); and (ii) that Boeing made an unrealistically low price proposal based upon both (a) what Boeing knew about Pemco's pricing methodology and

---

[6]  The *Washington Post* reported on or about October 1, 2007, before Riechers committed suicide later that month, that Riechers admitted in an interview, "I really didn't do anything for C.R.I. I got a paycheck from them." He is also reported to have said, "We needed some way to kind of gap me," referring to his temporary CRI position.  CRI reportedly received about two-thirds of its government funding in fiscal 2006 from the USAF.

proprietary information, all of which was to have been firewalled off at Boeing, and (b) information it received as a technical consultant to the Air Force regarding future changes to the scope of work covered by the contract that would enable Boeing to later adjust its pricing upward. Specifically, the FY2008 Recompete identified "Boeing Aerospace Operations, Inc." (i.e., defendant BAOI) as one of three consultants to provide "nongovernment advisor support," and the contracting officer likewise identified "Boeing Aerospace Operations" as a consultant. Moreover, Boeing provided technical assistance under a separate Sustaining Engineering Services Contract, as the original equipment manufacturer. Pemco believes, and alleges upon information and belief, that through its Sustaining Engineering Services Contract, Boeing had – and willingly used – unfair and unequal access to non-public information related to the actual quantities of PDM work that might be performed by a contractor over the term of the new contract. By awarding Boeing contracts to provide architect and engineering services for the KC-135, the Air Force employed Boeing to assist in the development of the PDM process, giving Boeing inside knowledge of the development of a new PDM approaches that the Air Force did not publicly announce could be applicable to current PDMs until March 11-13, 2008, long after the closing date for receipt of proposals and eight days after the reevaluated award had been made to Boeing.

44

78.    The possession of inside information, especially along with Boeing's one-sided knowledge of Pemco's pricing approach and methodology and proprietary data, at a time when Pemco did not enjoy the same knowledge advantage, allowed Boeing to structure its bid to take advantage of an anticipated change in the PDM program, through which it could undercut Pemco's bid and then make up the difference based on the then unannounced program changes. Boeing had a contractual and partner-like fiduciary duty to disclose this information to Pemco, but failed to do so and instead, used this information to obtain an unfair competitive advantage in the bid process.

79.    Pemco believes, and alleges upon information and belief, that Boeing at the last minute during the bid review process, when the opportunity was presented it, drew and capitalized upon its knowledge of Pemco's proprietary information that related to how Pemco would structure its bid and how it would price its services, and then Defendants (without any other justifying rationale) deliberately tweaked their own bid in light of such knowledge so as to come in with a reduced load of hours on PDM work that was just sufficient to achieve about a 1% lower cost edge for Defendants, as compared with Pemco's bid, which, in turn, was a principal factor announced by the USAF for its award of the FY08 contract to Defendants.

80.     Regarding the Pemco proprietary information, on or about August 31, 2007, Boeing finally (as it was required to do) provided Pemco with some incomplete, redacted documents regarding Boeing's efforts to comply with its obligations under the June 3, 2005 MOA to implement a firewall and take other precautions to protect the Pemco proprietary information that Boeing had received while Boeing and Pemco were working together and in connection with making the original joint proposal for the FY08 Recompete KC-135 PDM Contract.

81.     A review of the material that was provided established, for the first time insofar as Pemco had known, that Boeing had not prevented Boeing personnel with specific knowledge of detailed Pemco pricing and proprietary information from continuing to work on Boeing's proposal to the USAF, which was in direct competition with Pemco's proposal back in September 2006.  This failure to carry out full and complete, proper firewall procedures and to return Pemco's proprietary and intellectual property information and material, violated Boeing's contractual and ethical obligations and violated Pemco's common law rights.  These facts further support Pemco's belief and allegations that Boeing underbid Pemco's proposal through use of Pemco's confidential and proprietary data, as well as other improper communications and influence, as part of Boeing's pattern and practice and improper motivations.

82.     As a result of Boeing's continued breaches of its fiduciary duties concerning non-use and protection of Pemco proprietary information and mounting concerns about Boeing's likely misconduct (primarily, conversion to Defendants' own use of Pemco's proprietary information), on or about September 6, 2007, Pemco notified the Contracting Officer, Jim Stephens, responsible for the FY08 Recompete KC-135 PDM Contract, of the possible procurement integrity violations by Boeing and Pemco's concerns that Boeing personnel with specific knowledge of detailed Pemco pricing information from the preparation of the previous joint proposal had continued also worked on Boeing's individual proposal which was in direct competition with Pemco's independent proposal. The USAF contracting officer talked Pemco out of pursuing the complaint for misuse or conversion of proprietary information, at that time.[7]

83.     Almost immediately thereafter, on or about September 7, 2007, the Air Force awarded the FY08 Recompete KC-135 PDM Contract to Boeing, pursuant to Requests for Proposals No. FA8105-05-R-0014, and on September 10, 2007 notified Pemco that it had awarded,  Charles Riechers, of course, was the SSA on such Air Force decision.  The next day, September 11, 2007, Pemco requested a debriefing, which was conducted on September 14, 2007, at Tinker Air

---

[7] Pemco withdrew its September 6, 2007 complaint after being advised that the complaint was holding up the award of the contract and Pemco was led by the USAF representative, Jim Stephens, to believe it had submitted the winning proposal.  In other words, under a sort of "no harm no foul" principle, if as Stephens indicated to Pemco, the USAF was going to award the work to Pemco, then it made no difference that Defendants had been misusing the Pemco proprietary information.

47

Force Base in Oklahoma City, Oklahoma.  At the September 14, 2007 debriefing, the Air Force informed Alabama Aircraft that the competition had been very tight, reporting identical scores between Alabama Aircraft and Boeing in the areas of Proposal Risk and Past Performance, and in four of the five areas under Mission Capability, as alleged earlier herein. Further, Alabama Aircraft's evaluated price of $1.18 billion was only about $15 million (less than 1.3%) higher than Boeing's evaluated price.  Pemco was also informed that (a) the Air Force had not performed a review of the cost data provided by the offerors to check for price/cost reasonableness or realism; (b) the Air Force did not conduct any review into possible procurement integrity violations by Boeing; and (c) the Air Force did not have a mitigation plan or waiver regarding the issues of organizational conflicts of interest related to Boeing and one of its subcontractors.

84.    During the debriefing, Pemco asked the Air Force about the change in SSA personnel, voicing its concern that Mr. Poussard's last-minute removal "reflected an effort to remove an individual very familiar with Boeing's past failings from the decision making process." The Contracting Officer reportedly responded that the decision was made "above my pay grade" and provided no further information on the issue.[8]

---

[8]   Also at such September 14, 2007 debriefing, Pemco raised the subject of the failure of the USAF to investigate the allegations of Pemco's September 6, 2007 letter about Defendants' conversion and misuse of proprietary information.  The USAF representative, Jim Stephens, said the USAF had not investigated because Pemco had withdrawn the letter. (Of course, such withdrawal had been at Stephens' own request!) Stephens admitted he was

48

85.    Shortly thereafter, on or about September 19, 2007, Pemco filed a protest at the GAO regarding the award by Charles Riechers of the FY08 Recompete KC-135 PDM Contract to Boeing.

86.    A week and a half later, on or about October 1, 2007, The Washington Post reported that Charles Riechers (the SSA on the FY08 Recompete KC-135 PDM Contract) had been hired by the Commonwealth Research Institute ("CRI") at the request of the Air Force and was being paid $13,400 per month while awaiting approval of his nomination even though he was performing no work for CRI. As previously alleged, Boeing was a client of Concurrent Technologies Corporation, CRI's parent company. On information and belief, the GAO was investigating the potential connection into these relationships when, on October 14, 2007, Mr. Riechers was found dead in his garage after an apparent suicide attempt. Press reports indicated that Riechers left a suicide note to his boss, Air Force Acquisition Chief Sue Payton, in which Riechers wrote that he "expressed remorse" at having created a new acquisition scandal for the Air Force reminiscent of the earlier one involving Darleen Druyun. The USAF has never made public as of this time the full story or facts about the Riechers situation, especially the facts

---

the USAF representative who asked Pemco to withdraw the request. At that point, the USAF attorney present stopped the debriefing and took all government personnel out of the room to confer privately. When the debriefing resumed, Stephens would only say that he told Pemco the letter was going to delay the award and that it would speed up the process if Pemco would withdraw the letter. Thereafter, the USAF refused to discuss further the matter of conversion or misappropriation of proprietary information.

of his dealings with Boeing and with other supporters of Concurrent Technologies Corporation or CRI.

87.   On or about December 27, 2007, the GAO issued a decision sustaining Pemco's protest of the award to Defendants of the Contract on the ground that the Air Force failed to perform an adequate price realism evaluation. The GAO acknowledged that over the course of the competition, Boeing made changes to its proposal that had a significant effect on Boeing's pricing: "the effect of this change reduced Boeing's proposed price by more than the [redacted amount] difference between Boeing's and Pemco's final total evaluated prices, on which the source selection decision was based."

88.   On January 7, 2008, the Air Force requested that the GAO reconsider its decision sustaining Pemco's protest of the award of the FY08 Recompete KC-135 PDM Contract, but the GAO denied the request on February 1, 2008.  Despite this ruling, on March 3, 2008, the Air Force issued a notice to Pemco of a "new award decision," which remarkably again selected Boeing for award of the FY08 Recompete KC-135 PDM Contract.  **The Boeing bid came in just $15 million below Pemco's bid spread out over a ten year potential contract period, on an overall approximate $1.7 billion PDM Contract; specifically, Boeing (improperly using Pemco proprietary information to aid it) submitted a bid for a Total Evaluated Price ("TEP") of $1,165,138,187, as compared with**

50

Pemco's bid of at TEP of $1,180,186,789, the dollar difference being $15,048,062. Boeing's bid was thus a slim 1.28% lower than Pemco's bid over the entire ten-year period (5 year base period plus 5 one-year extension options). <u>Pemco alleges on information and belief that a material and determining factor in Boeing's being able to effectuate such 1.28% difference in the bids was Boeing's possession and conversion and misuse of Pemco proprietary information, as well as insider knowledge that Boeing acquired but never shared with Pemco.</u>

89.    In light of Boeing's repeated and continued problems in meeting its contractual obligations and its inability to maintain adequate quality standards, and its admitted malfeasance in connection with obtaining government contracts, the USAF's March 3, 2008 decision to award the FY08 Recompete KC-135 PDM Contract to Boeing is suspect at best, though the thrust of this civil suit is not to obtain recompense or any relief from the Air Force or the GAO or any other government agency, but, instead, to obtain redress from Boeing, which is alleged to have led the Air Force (or certain individuals) into several of its scandals or errors, and which:  (i) misappropriated, converted and misused for its own profit, benefit and unjust enrichment the proprietary costing and bidding information Boeing had obtained from Pemco, in order to bid the FY08 Recompete KC-135 PDM Contract; and (ii) in violation of the 2005 MOA, refused to include Pemco as

Boeing's subcontractor and joint PDM project operator for a minimum of one-half of the PDM touch labor under the Work Share Agreement (the integral part of the 2005 MOA).

90.     After receiving from the USAF its March 3, 2008 notice of a "new award decision" and that such "new award" was again made to Defendants, on March 11-13, 2008, Pemco attended a Program Management Review ("PMR") set of briefings by the USAF regarding the KC-135 PDM program, which addressed in some detail the problems the USAF was having with its own performance of PDM on KC-135s that the USAF was not sending to contractors like Boeing or Pemco to perform. The bottom line was a set of indications that the likelihood was that the USAF would actually increase quantities of KC-135 aircraft to be sent to outside contractors for PDM work. Over the period from mid-March 2008 to late July 2008, other indications to the same effect were observed or heard by Pemco personnel. The result was to confirm to Defendants the success of their strategy of (i) ditching Pemco as a contracting partner, and then (ii) bidding unreasonably low (using their knowledge of Pemco proprietary data and thus taking calculated risks that were not really so risky), and (iii) making up the difference subsequently through recharacterization of its bid as cost-plus.

**H.    Boeing's Patterns and Practices of Misconduct Applicable to the Events of this Case.**

91.    Boeing had no excuse for its punitive actions against Pemco.  For example, unlike Pemco, Boeing was repeatedly sanctioned for its poor work quality. As a result, Boeing relied on Pemco for reliable quality work product.  In August of 2000, the FAA fined Boeing $1.6 million for failing to hold suppliers accountable for their failures to adhere to quality control practices. *See FAA Finds Boeing Lax in Scrutiny of Suppliers,* Seattle Times, August 3, 2000, at A1. Boeing's manufacturing facilities failed to meet FAA quality regulations resulting in proposed fines totaling $892,000.  *See Findings of FAA's Special Audit of Boeing Factories,* Seattle Times, October 31, 2000, at A11.  Not surprisingly, the Air Force requested during this time period that Pemco enter into a teaming arrangement with Boeing so that Pemco could handle a large share of the work awarded to Boeing on the 1998 KC-135 PDM Contract.  Boeing's problems were widespread, and the FAA fined Boeing for failure to adhere to quality control standards in the 1990s, including accepting defective parts from a supplier. *FAA Fine Proposed Against Boeing Faulty Quality Control in Mid-1990s Alleged,* Seattle Times, March 27, 2002, at E2.

92.    Boeing's problems were not limited to quality issues, however. Boeing has been involved in, and in some cases admitted to, substantial improper conduct in connection with procuring and servicing government contracts, all as

53

part of Boeing's aforesaid patterns and practices of misconduct in securing government contracting work and business and in using methods of unfair competition. Some examples of these conflicts of interest and improprieties and unfair competition, besides those already cited above, are set out in the following paragraphs.

93. In July 2007, Boeing agreed to repay the United States more than $1 million to settle government charges that Boeing overbilled the government between 1998 and 2003 for materials used to install new engines in KC-135 aircraft. *Department of Justice press release* (U.S. Attorney's office, District of Kansas), July 16, 2007.

94. Separately but also involving KC-135 aircraft, according to a federal *qui tam* action filed in San Antonio, Texas in 2007, during the period from 2002 leading up to 2006, in the Boeing Logistics Support System facility at San Antonio (formerly known as Boeing Aerospace Support Center, the same one as Boeing placed its work under the agreements here involved), Boeing devised and implemented a deliberate schedule to fraudulently inflate its labor charges for "non-routine" work performed on USAF contracts for KC-135 aircraft repair and maintenance, and falsified the records of work performed on such KC-135 aircraft in accomplishing those tasks in order to correspond to its inflated charges, resulting in false claims being submitted to the United States. *See* unsealed Plaintiff's First

Amended Complaint under 31 U.S.C. §3730, in *United States of America, ex rel. Edward Quintana, v. The Boeing Company*, No. SA-06-CA-1029-FB (W.D. Tex. April 16, 2007) (listing specific details of methodology used by Boeing and specific aircraft, among other details). It was announced on or about August 11, 2009 that Boeing agreed to settle such KC-135 false claims charges for $2 million.

95.     In yet another federal case against Boeing for overbilling practices at Boeing's aforesaid San Antonio facility, the Department of Justice on August 13, 2009 announced that Boeing would repay the United States $25 million to resolve charges that Boeing both overcharged the government and performed defective work, while performing depot maintenance work at the Boeing Aerospace Support Center on the KC-10 aerial refueling aircraft. As with the *qui tam* action above, it was Boeing employees who brought this to the government's attention. This time, by former Boeing employees Anthony Rico and Fernando de la Garza, in a False Claims Act *qui tam* action, who reported, among other Boeing misconduct, that "Auditors found that Boeing inflated estimates of the number of hours needed to perform the blanket kit-work and charged an excessive hourly rate for the work." *See Department of Justice press release* (DOJ, Washington), August 13, 2009 (DOJ     Civil     Division,     no.     09-civ-798),     reported     at http://www.justice.gov/opa/pr/2009/August/09-civ-798.html.

96.    Plaintiff alleges that Boeing has been forced in other cases and instances, besides the instances listed above, to repay the United States for violations of the False Claims Act in relation to billings on government contract work, and that all of such instances, taken with the foregoing, show a culture at Boeing, and a pattern and practice, to engage in strategies to low-ball-bid government work and then overbill, overcharge, and inflate billings and falsify records later, in order to recoup the impact of deliberate low-ball bidding.

97.    Such practices, coupled with Boeing's deliberate misuse and misappropriation of Plaintiff's proprietary information here (and its similar conduct elsewhere), were part of Boeing's pattern and practice of unfair competition and gaining awards of government contracts and business through improper means.

98.    Boeing's pattern and practice and history of misconduct of the type involved here is also shown in other events.  In July 2003, in a case of Boeing's improper use of another company's proprietary information, the Air Force suspended Boeing Launch Services after it discovered that Boeing had committed "serious and substantial violations of federal law" in connection with the 1998 competition for a U.S. Air Force Evolved Expendable Launch Vehicle ("EELV") contract.  Specifically, Boeing employees obtained more than 25,000 pages of documents belonging to Lockheed that helped Boeing win the procurement

competition.  In June 2006, Boeing entered into a $615 million settlement with the government regarding the federal crimes.  *See Department of Justice press release* (DOJ, Washington), June 30, 2006 (DOJ Civil Division, no. 06-civ-412), reported at http://www.justice.gov/opa/pr/2006/June/06_civ_412.html.

99.    As part of Boeing's admissions against interest, on August 1, 2006, Boeing CEO W. James McNerney testified to the Senate Armed Services Committee regarding the settlement announced June 30 and acknowledged Boeing's failure to live up to the legal and ethical standards required of companies doing business with the United States.  During that testimony, McNerney also admitted that Boeing's hiring of a former Air Force official was under investigation.  Admitting Boeing's weaknesses in ethics, McNerney claimed that Boeing was now fully committed to operating at the highest standards of ethics and compliance, as well as devoted to conducting its work ethically and in the best interests of its customers and the country.

100.  Boeing's pattern and practice of misconduct in procurements involving at least one USAF official who was involved in the events of this case is well established, in which the official clearly did not take into account Boeing's long history of misconduct and malfeasance described throughout this complaint. In February 2005, the GAO sustained a protest of an award of a contract for the small diameter bomb ("SDB") program to Boeing, because of Darleen Druyun's

involvement in changing the evaluation criteria which appeared to favor Boeing. *See Lockheed Martin Corporation,* B-295401, 2005 CPD ¶ 24 (February 18, 2005).

101. Also in February 2005, the GAO sustained a protest against an award to Boeing of a contract for the avionics modernization upgrade program ("AMP") for C-130 aircraft, because of the aforesaid Darlene Druyun's bias toward Boeing and her effort to elevate Boeing's ratings and downgrade the ratings of the protestors. *Lockheed Martin Aeronautics Company; L-3 Communications Integrated Systems L.P.; BAE Systems Integrated Defense Solutions, Inc.,* B-295401, et al., 2005 CPD ¶ 41 (February 24, 2005).

102. In May 2006, the Department of Defense Inspector General issued a report finding that the influence exerted by the aforesaid Darleen Druyun caused the Air Force to rush the settlement of a $119 million Request for Equitable Adjustment ("REA") submitted by Boeing to the Air Force for the 1998 KC-135 PDM Contract. At the urging of Druyun, the Air Force quickly settled the REA for $35.8 million − significantly more than was appropriate − and the approval of Boeing's request to "task split" under the Contract which allowed Boeing to overcharge the government. *See* DODIG Report at 4-5. Druyun later admitted to taking actions to favor Boeing, both vis-à-vis the government and vis-à-vis other competitors.

103. The Pentagon requested the Government Accountability Office to investigate a wide range of Air Force contracts that involved Darleen Druyun, a former senior official who admitted giving special treatment to Boeing during bidding and negotiations. One congressional investigation reported by the Seattle Times on June 4, 2004 focused on a proposed $23 billion deal for the Air Force to buy and lease 100 Boeing 767 aerial-refueling tankers. The article stated: "Critics contend the deal was laden with conflicts of interest and that the planes may not be needed. The Boeing deal, which for a time looked like it was heading for a fast passage through Congress, descended into scandal when it was revealed that the Air Force's chief negotiator with Boeing on the deal, Darleen Druyun, also had negotiated a vice president's job for herself with the aircraft manufacturer. Druyun last month pleaded guilty to federal conspiracy charges, and a grand jury in northern Virginia is investigating." Reference is made to earlier allegations in this complaint, for more details of the Druyun/Boeing Affair, which extended over a long period of years. Druyun, of course, was the senior USAF official in charge of procurements during much of the relevant time concerning Boeing's contracts and proposals, in which Pemco was a subcontractor or provider to Boeing, and Plaintiff alleges that the Boeing/Druyun improper relationship played a material role in Boeing's plans and activities as regards the Plaintiff.

### I.     The December 2008 Bridge Contract, and Boeing's Patterns and Practices of Misconduct Continue to the Present.

104.   On April 1, 2005, Defendant BASC and Pemco entered into a MOA for continuing their contractual relationship (separately existing from the 2005 MOA described previously in this Complaint), for obtaining and sharing KC-135 PDM work for FY06 and FY07 (a "follow-on contract") on a PDM contract that had covered Fiscal Years 2002 through 2005. ("Follow-On MOA") This Follow-On MOA contemplated a basic 50/50 split of aircraft between BASC and Pemco. On July 22, 2005, the USAF issued a pre-solicitation notice for a Bridge Programmed Depot Maintenance for two years and two six month options to perform PDM on a maximum of 119 aircraft.

105.   On October 18, 2005, pursuant to such Follow-On MOA and the USAF notice, the Boeing Company through its wholly-owned subsidiary McDonnell Douglas Corp., and Pemco (through its subsidiary, Pemco Aeroplex, Inc.), entered into a contract titled "Repair Agreement No. 06-003," for a "Long Term Requirements Contract" (or "LTRC"), under Government Price Contract Proposal number FA8105-05-D-0004, for the performance of PDM on KC-135 aircraft, calling for Pemco to perform PDM for Boeing on KC-135 aircraft. The LTRC was basically cast as a purchase order, with Pemco as the "seller," for a base period of 1 October 2005 through 30 September 2007 and two six-month option periods effective 1 October 2007 through 30 September 2008. The LTRC

provided that if the USAF extended the prime contract FA8105-05-D-0004, then the LTRC with Pemco would be extended by the same period of time. The LTRC provided for a 50/50 split of aircraft between Boeing and Pemco, provided that the USAF itself put out 34 aircraft for FY06, 38 aircraft for FY07 and 12 aircraft for FY08.

106. On October 30, 2007, Boeing (again through its wholly-owned subsidiary, McDonnell Douglas) and AAI entered into an extension or amendment to the 2005 LTRC to take into account the extensions and options the USAF had in the FA8105-05-D-0004 contract with Boeing. Again, the principle of 50/50 split of the KC-135 aircraft for PDM work as between AAI and Defendants was preserved.

107. Initially, in the fall of 2007, Boeing and AAI held a series of conversations and email communications, wherein Boeing was soliciting AAI to agree, as Boeing's subcontractor or "seller," to perform PDM work on up to 10 KC-135 Aircraft for Boeing's fulfillment of the 2008 Bridge Contract, and the parties were in discussion of pricing of such aircraft. By October 2007, such discussions progressed to the point where Boeing and AAI were in agreement that the fair value of AAI's PDM work on such a volume of KC-135 aircraft would be approximately $6 million per aircraft, per contract. Again, the premise was that AAI's work would be on half the total aircraft that Boeing was awarded under the

61

FA8105-05-D-0004 contract that Boeing had with the USAF. This LTRC has subsequently been extended to cover later aircraft that Boeing was awarded under the FA8105-05-D-0004 contract that Boeing had with the USAF.

108. Thereafter, Boeing called AAI and informed AAI that it had learned from the USAF that the USAF only had $26 million available to fund PDM work on 8 KC-135 aircraft, and that AAI would have to do the PDM work for that extremely low price, equal to $3.25 million per aircraft, far below prices that had been agreed upon in the fall of 2007.

109. AAI was in a quandary; it had lost its bargaining power; it needed the work; and Boeing knew those facts. Boeing forced AAI to accept the engagement as subcontractor to do such PDM work for the aforesaid $26 million on 8 aircraft.

110. On March 17, 2008, Boeing wrote AAI in regard to the 2008 Bridge Contract work and provided in writing such "revised pricing for FY08 Bridge inducted aircraft," of $26 million for 8 aircraft, and required that AAI accept this pricing by the following day. On the next day, March 18, 2008, AAI wrote back to Boeing and accepted the $26 million pricing. In that letter, AAI made it crystal clear that it was doing so in reliance on Boeing's representations: "We accept the revised pricing, as it has been represented to us that it is being requested by the customer (*i.e.*, USAF) to provide for flexibility in moving forward with the contract within government funding/budgetary constraints."

62

111. Boeing had its discussions on the 2008 Bridge Contract, and such funding matters, with the USAF to the exclusion of AAI, which did not participate therein. AAI did not know, or have reason to know, of pricing facts and "funding/budgetary constraints" any differently than as were represented by Boeing. Nor did Boeing share with AAI what Boeing would do, and was planning to do, and did do, about its own pricing to the USAF on the 2008 Bridge Contract.

112. Eventually, the number of aircraft the USAF allocated to Boeing increased, and, therefore, the number of aircraft that AAI received also increased, but AAI performed the PDM work on all such aircraft at approximately $3.5 million per aircraft, consistent with the March 2008 correspondence. AAI ultimately received and has performed PDM work on 14 aircraft under such terms.

113. On December 18, 2008, the USAF modified its contract with Boeing, number FA8105-05-D-0004, through Defendant BAOI, in the form of a bridge contract (the "2008 Bridge Contract"), modification P00024, exercising Option III for six months from October 1, 2008 through March 31, 2009 and Option IV for six months from April 1, 2009 through September 30, 2009. Such modification covers the time period of the work done, and the aircraft serviced for PDM, by AAI. This action had the effect under the LTRC above, of extending or applying to the LTRC between Defendants and Pemco. The total contract value to Boeing of such 2008 Bridge Contract was eventually found to be $154.9 million.

63

114.   AAI subsequently, by accident, obtained a copy of the 2008 Bridge Contract and thereby learned that Boeing was charging the USAF $4,769,460 per KC-135 aircraft (in total quantities above 16 aircraft) and would have been charging the USAF $5,350,695 per aircraft if there had been 16 aircraft, *i.e.*, 8 done by AAI and 8 done by Defendants.   Even allowing for approximately $750,000 in parts per aircraft supplied by Boeing, the effect of such pricing to USAF by Boeing was to allow Boeing to pocket at least $750,000 to $769,000 per aircraft that AAI was delivering from PDM work, which facts were concealed from AAI and which represents money that AAI should have been paid by Boeing, but for Boeing's misrepresentations and suppressions of material fact.

115.   In addition to Boeing's inequitable, unfair and improper conduct with respect to its pricing treatment with AAI in the 2008 Bridge Contract and its previous bridge contracts, Boeing systematically caused parts and materials to be sent late to AAI, which delayed deliveries of completed KC-135 aircraft, causing AAI to lose valuable performance based fees (or "delivery fee awards") under these contracts.

116.   Pursuant to the 2008 Bridge Contract and the previous bridge contracts, the USAF provides delivery fee awards to AAI for KC-135 PDM for aircraft delivered on or before the target delivery date. ·Prior to the sixth airplane induction of FY08 (on July 24, 2008), AAI had received an early delivery award

64

fee on every KC-135 PDM delivery for the previous two years, which typically came from deliveries in less than 205 days.

117.   On information and belief, following the USAF's March 3, 2008 decision selecting Boeing for the FY08 Recompete KC-135 PDM, Boeing deliberately and systematically caused multiple instances of Customer Furnished Materials Type 2 ("CFM2") deliveries to be later to AAI.  CFM2 include parts fabricated and/or supplied by Boeing to AAI used in KC-135 PDM work.

118.   The instances of delays of CFM2 parts following March 3, 2008 to the present are drastically greater than prior to this date.  The late delivery of CMF2 parts affected and continues to affect AAI's critical path schedule.  The net effect of Boeing's tardy delivery numerous CFM2 parts materially delayed AAI from completing PDM work in a timely fashion, thereby causing multiple late deliveries of KC-135 aircraft and preventing AAI from obtaining performance based compensation under the bridge contracts.

119.   On information and belief, Boeing favored its own San Antonio, Texas facility in the delivery of CFM2 parts over AAI in an effort to harm AAI and in anticipation of Boeing's facility performing work under the newly awarded FY08 Recompete KC-135 PDM, which had the effect of preventing AAI from receiving performance bonuses based upon completed delivery dates of aircraft.

120. In addition to causing CFM2 parts to be delayed, Boeing's conduct has attributed and continues to attribute the timely delivery of serviceable Government Furnished Material ("GFM"). Prior to FY09, AAI ordered GFM directly through the G009 asset management program, whereby AAI had access to G009 and communicated material needs directly to the government, and in turn, the government communicated with AAI. Beginning in FY09, the USAF required GFM to be ordered through the CAV AF system, whereby AAI must communicate and manage material needs through Boeing. In other words, AAI now has to provide Boeing its GFM orders, who then convey such orders to the government. Because AAI is denied access to CAV AF, AAI has no control over the efficiency and effectiveness of GFM deliveries through CAV AF.

121. Boeing has and continues to inadequately manage the ordering through CAV AF. Boeing has caused material delays in communication of material needs and errors in information shared among AAI, Boeing and the government. Boeing's delays, errors and logistical problems in operating the CAV AF has caused delays of GFM parts, and ultimately, delays of aircraft deliveries following PDM.

122. In an effort to mitigate the harm of delayed aircraft deliveries caused by Boeing's late deliveries of GFM and CMF2 parts, AAI completely overhauled its methods and efficiencies of performing PDM work. Beginning with the 12th

aircraft induction of FY09 (August 26, 2009), AAI moved from a pulsed-line aircraft flow to a docked aircraft approach to perform PDM work.   Under the pulsed-line aircraft flow system,  when a KC-135 aircraft arrived at AAI, it would move from three different locations in AAI's hangers as various crews would complete needed PDM work on the planes.   When the delinquent deliveries first began to become more than a nuisance, AAI would still move aircraft to their next docking station, even if it needed parts yet to arrive.   When the late parts arrived, the work crew from the previous docking station would transfer to the current docket station to perform the delayed work with the tardy parts.   This "work-around" solution caused inefficiencies to the pulsed-line and delays to the ultimate delivery of aircraft.

123.   Ultimately, and in an effort to mitigate the inefficiencies caused by Boeing's systematic and high number of late parts, AAI moved from a pulsed-line system to a docked aircraft approach whereby the plane remained in one location for the duration of the PDM work while various crews rotated to the aircraft depending on the schedule of work tasks.   This was an expensive and disruptive change for AAI.   Although the new docking approach may ultimately provide more flexibility to schedule work around parts availability, it has been both an expensive and disruptive change to AAI.

## V.   CLAIMS

Based upon the foregoing facts, AAI claims against the Defendants, and each of them, separately and severally, for relief on the following several alternative bases:

## COUNT ONE
## BREACH OF CONTRACT – 2005 MOA

124.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

125.   Under the 2005 MOA, Boeing promised, agreed, contracted and committed to making Pemco its 50% or better subcontractor and de facto partner in the FY08 Recompete KC-135 PDM Contract, solicitation number FA8105-05-R-0014, regardless of the number of KC-135 aircraft involved and regardless whether the number of aircraft ultimately involved would support two "touch" work facilities (in which case both Pemco and Boeing would do some of such work) or not (in which case, Pemco would do such work).

126.   As stated above in the "Facts" section of this Complaint, Defendants were the drafters of the 2005 MOA. The principal substantive terms of the 2005 MOA were established in the 6/2005 MOA document, which was not only prepared by Defendants but was then presented by Defendants to Plaintiff on a "take it or leave it" basis, with a 24-hours-to-sign-it ultimatum. Defendants were

68

vastly larger in size and financial capital than Plaintiff. Defendants had a long history and almost incestuous relationship with various USAF personnel or representatives as previously alleged. Defendants were in the driver's seat, and by far the stronger of the parties; the Plaintiff was in a weak and vulnerable position. Under the circumstances, the 2005 MOA was a contract of adhesion, and should be interpreted and construed in accordance with the special rules of construction that apply to contracts of adhesion, in addition to the basic principle of resolving any ambiguities and omissions against the drafter. Moreover, Plaintiff alleges upon information and belief that at the time Boeing submitted the 2005 MOA language, on a take-it-or-leave-it basis, to Plaintiff to sign, Boeing had the intention, which it deliberately suppressed, to induce Plaintiff to enter into the MOA long enough to provide Boeing with Plaintiff's proprietary information and to eliminate Plaintiff as a meaningful opposing bidder, and then to pull out of the MOA, hence the inclusion of contract language intended for Boeing's benefit (solely, under the circumstances). In equity and good conscience, and to prevent injustice, Boeing should be estopped to rely upon or avail itself of exculpatory language or limitations of remedies, under the circumstances.

127. Boeing knowing, willfully and intentionally breached its several agreements and promises with AAI, then known as Pemco.

69

128. In accordance with the 2005 MOA, Pemco assisted Boeing in preparing a proposal for the FY08 Recompete KC-135 PDM Contract and provided Boeing with its confidential and proprietary information in connection with the proposal.

129. On or about October 31, 2005, Boeing submitted the proposal as a prime contractor, with Pemco acting as its principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

130. On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract, solicitation number FA8105-05-R-0014, reducing the annual BEQ from 44 to 24 aircraft.

131. Using the aforesaid amendment as a pretext, Boeing breached its MOA with Pemco regarding the FY08 Recompete KC-135 PDM Contract.

132. Boeing improperly terminated the agreement, citing the reduced BEQ as the basis for its actions, despite the fact that the MOA set out a plan for the distribution of work should just such a BEQ reduction occur and despite the fact that Boeing had long expected (and taken account in its deliberations that) such event may occur. The contract termination was not effectuated on account of, and Boeing never contended that Pemco was guilty of, any breach by Pemco of its obligations, or any lack of qualifications of Pemco, or any failures of performance by Pemco.

70

133. Boeing was aware that Pemco could not at that time effectively make and win its own separate bid on the FY08 Recompete KC-135 PDM Contract and by terminating the agreement Boeing was motivated by considerations of unfairly attempting to remove Pemco as a competitor, after obtaining Pemco's proprietary data.

134. On information and belief, Boeing also possessed non-public information that the Air Force might not implement the BEQ reduction or that additional services could be required due to the Air Force's inability to complete its planned internal PDM which would have resulted in a sufficient quantity of aircraft available for PDM under the MOA.

135. As a result of Boeing's breaches of contract, including but not limited to breaches of the 2005 MOA and the 2005 Work Share Agreement, Pemco has suffered damages that exceed $30 million.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## COUNT TWO
## BREACH OF CONTRACT –
## 2005 MOA NON-DISCLOSURE AGREEMENT
## REGARDING PEMCO'S PROPRIETARY INFORMATION

136.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.  This Count is brought alternatively to Count Four below (the claim for conversion of and indirect trespass to Plaintiff's personal property).

137.   As part of the 2005 MOA with Pemco, Boeing executed a separate Non-Disclosure Agreement.  Pursuant to the Non-Disclosure Agreement, Boeing agreed to hold as confidential all propriety information belonging to Pemco.

138.   The Non-Disclosure Agreement defines "Proprietary Information" as "technical data and other information (including but not limited to descriptions, drawings, compositions, business and financial information, and computer software) which is related to" the subject matter of the 2005 MOA.

139.   Under the Non-Disclosure Agreement, Boeing agreed that:

> a.   Proprietary Information shall be used solely for the purpose stated in Article I [of the MOA] and shall not otherwise be used for the benefit of the recipient or others.
>
> ***
>
> c.   Proprietary Information shall be disclosed only to the employees of the party who have a 'need to know' in connection with the purpose stated in Article I.

140.   The Non-Disclosure Agreement also provides that, upon termination of the MOA, "each party shall safeguard the Proprietary Information exchanged up

72

to the date the relationship ends, and ensure that such data is not used against the disclosing party's interest."

141.   During the period of activities that followed execution of the 2005 MOA, and in the course of fulfilling its requirements and conditions, Pemco disclosed extensive confidential information to Boeing regarding it methods and means of performing work for the United States Government under the MOA, including but not limited to, proprietary business and financial information.  Pemco identified this information to Boeing as Proprietary Information as required by the Non-Disclosure Agreement.

142.   Boeing has breached the Non-Disclosure Agreements by, among other things, improperly disclosing Pemco's proprietary information to its Employees and affiliates without a "need to know" and to others for the purpose of using that information to improperly compete with Pemco for the award of the KC-135 Recompete Program and/or by using the information to the detriment of Pemco's business interests.  Boeing has further breached the Non-Disclosure Agreements by not following (deliberately or otherwise) firewall procedures, and by using Pemco's proprietary information for Boeing's own benefit.

143.   Further, Boeing engaged in activities and a pattern and practice of unfair competition and improper conduct which undermined its promises and

agreements with Plaintiff, both before and after its formal issuance of a notice in 2006 of termination of the 2005 MOA.

144.  As a result of Boeing's breaches of contract and duty, including but not limited to breaches of the 2005 MOA and the 2005 Work Share Agreement, and the Non-Disclosure Agreement and firewall requirements, Pemco has suffered damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## COUNT THREE
## PROMISSORY AND EQUITABLE ESTOPPEL

145.  The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.  This Count is asserted in the alternative to Counts One and Two, and in the event a remedy at law is insufficient to avoid injustice and insufficient to provide adequate relief or remedies.

146.  Defendants, after lengthy discussion and due deliberation on their part, by September 2005 made a promise to Plaintiff that, effectively, even if the BEQ of the upcoming FY 2008 PDM fell to as low half of the USAF's original number set out at the time of the 2005 RFP (*see* paragraph 35) and also paragraph 58 *supra*), nevertheless, Pemco would remain a team member and subcontractor

74

and would perform the "touch labor" on the aircraft for the overall Team consisting of Pemco and the Defendants, regardless if that resulted in Pemco doing the labor on all of the aircraft per year.  In the many months following such promise, Defendants reinforced such promise by their conduct (including their suppression of knowledge and intentions), and Plaintiff relied thereon by expending millions of dollars and a large amount of executive and employee time and effort not merely quantified in such dollar costs expended directly.

147.  The aforementioned promise was sufficiently definite as to its terms as to create or sustain a contract.  Further, the promise was made by Defendants under circumstances that they should reasonably expect would induce Pemco's actions or forebearance of a definite and substantial character.  Such promise in fact did induce Pemco's actions and forebearance of a definite and substantial character.

148.  Once the aforementioned promise was made, and in reliance thereon, particularly in light of Defendants' actions which immediately following the making of the promise reinforced it, Pemco expended considerable moneys (well in excess of $5 million) and substantial effort and officer and employee time, and channeled and allocated resources, over the ensuing many months, toward carrying out its side of the bargain.

149.  Furthermore, the Defendants made their promises while acting deceptively, inequitably and unjustly, concealing their intentions to back out of the teaming arrangements if and when the USAF in fact lowered the BEQ, or even without such an excuse, especially once the Defendants had in hand the proprietary information they obtained from the Plaintiff.  Moreover, Plaintiff alleges upon information and belief that at the time Boeing submitted the teaming arrangement and made its promises, on a take-it-or-leave-it basis, and Plaintiff entered into performance of its side of such bargain and promises, Boeing had the intention, which it deliberately suppressed, to induce Plaintiff to enter into the arrangements long enough to provide Boeing with Plaintiff's proprietary information and to eliminate Plaintiff as a meaningful opposing bidder, and then to pull out of the teaming arrangement, hence the inclusion of language in teaming documents intended for Boeing's benefit (solely, under the circumstances).  In equity and good conscience, and to prevent injustice, Boeing should be estopped to rely upon or avail itself of exculpatory language or limitations of remedies, under the circumstances.

150.  Injustice can be avoided only by enforcement of the promise against the Defendants, who being duly advised, made it.  The purpose of promissory estoppel and equitable estoppel, applicable here, is to prevent the Defendants from asserting technical points in support of their breach of promise and breach of

contract, when their own conduct has rendered (as it has here) the assertion of such technical rights contrary to equity and good conscience.

151. Plaintiff offers to do equity.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined at trial, plus costs and such other relief as may be appropriate.

**COUNT FOUR**
**CONVERSION OF AND INDIRECT TRESPASS**
**TO PLAINTIFF'S PERSONAL PROPERTY**

152. The preceding allegations are incorporated by reference and re-alleged as if fully set out herein. This Count is brought alternatively to Count Two above (the claim for breach of contract as to Plaintiff's proprietary information).

153. Defendants have converted property of Plaintiff, and committed indirect trespass with respect to the personal property of Plaintiff, including, but not limited to, confidential proprietary financial and technical information, and Plaintiff's bidding techniques and computational and bidding methodologies pertaining to performance of KC-135 PDM work, all of which was and is of a unique nature, was not public information, and was "personal property" of the Plaintiff within the meaning of Ala. Code § 6-2-34(2) and (3), belonging to Plaintiff, for Defendants' own use and benefit. The period of time during which

Defendants converted and committed trespass to such property was between June 6, 2005 and at least the summer of 2007, if not subsequent to that time. (Plaintiff, not having present discovery of, nor access to, Defendants' internal records, cannot presently pin down the end date of misuse of Plaintiff's proprietary information more closely than the foregoing.)

154. Defendants have no legal claim or right to such property and certainly did not have any legal claim or right to such property from and after June 6, 2006.

155. Plaintiff has made a demand upon Defendants for the protection and return of all property belonging to Plaintiff, but Defendants have refused to do so.

156. Defendants have indirectly trespassed upon, damaged the proprietary nature of, detained, used, and enjoyed the benefits of, Plaintiff's property in defiance of Plaintiff's ownership rights, and with the motive and intention of making a gain and profit for the Defendants therefrom. Without limiting the generality of the foregoing, Defendants' indirect trespass upon Plaintiff's personal property essentially destroyed its proprietary nature and uniqueness and usefulness to Plaintiff in gaining any advantageous bidding position or any award of the FY08 KC-135 PDM contract.

157. As a proximate result of Defendants' various and collective actions and omissions, Pemco has lost the use, benefit and value of its property, especially its proprietary nature.

158. Defendants' conduct was intentional, willful, and deliberately carried out with the intention to harm Plaintiff through misuse of Plaintiff's own property and for the profit and unjust enrichment of Defendants.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, profits and benefits conferred by the intentional conversion of and indirect trespass to personal property aforesaid, and for amounts by which Defendants have been unjustly enriched, and for other damages, and Plaintiff further is entitled to exemplary and punitive damages of at least three times the compensatory damages of Plaintiff, all in amounts to be determined by a jury, plus costs. Plaintiff also prays for such other and further relief as may be appropriate, premises considered.

## COUNT FIVE
## QUANTUM MERUIT AND UNJUST ENRICHMENT
## ON BOEING'S 2008 BRIDGE CONTRACT

159. The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

160. Boeing requested AAI to perform PDM work on eight (later, 14) KC-135 Aircraft involved in Boeing's 2008 Bridge Contract (#FA8105-05-D-0004). AAI faithfully performed such PDM work on 14 aircraft.

161. Boeing and AAI agreed in 2007 that the fair value of AAI's work would be in the neighborhood of $6 million per aircraft aforesaid.

162.   Boeing subsequently misrepresented to AAI material facts as to the available USAF money to pay for such PDM work, telling AAI that only $26 million was available to pay for PDM work on 8 aircraft, and a correspondingly low $3.25 million on additional aircraft, and through such misrepresentations as well as its exercise of superior bargaining position and a position of superior knowledge about material suppressed facts, Boeing forced AAI to perform the PDM work at a below-fair-value price of $3.25 million per aircraft on a total of 14 aircraft.  AAI believed Boeing, and in reliance on Boeing's representations, AAI accepted the below-fair-value pricing on the PDM work and performed at that low price.

163.   Boeing billed the USAF for such aircraft at a materially higher cost to the USAF, and thereby unjustly benefitted, and reaped the profits and benefits of having forced AAI to do the PDM work at a below-fair-value price level.  AAI claims that it should have been paid such difference, amounting in the aggregate to an estimated $750,000 per aircraft on 14 aircraft.

164.   On a quantum meruit basis, the fair value of AAI's PDM work delivered to Boeing on said aircraft in relation to the 2008 Bridge Contract was at least $4 million, yet AAI only received $3.25 million per aircraft in payment from Boeing.  AAI herewith claims the difference, on 14 aircraft that AAI has worked upon between March 2008 and the present under contract.

165.   The aforesaid conduct also constitutes unjust enrichment of Boeing.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this court utilize its equitable powers and award to AAI just compensation for all damages that it has suffered by virtue of Defendants' unjust and unfair actions, including, but not limited to, monies received by Defendants under the 2008 Bridge Contract (#FA8105-05-D-0004) in respect of the 14 aircraft on which AAI performed PDM work (after crediting Boeing for moneys already paid), and consequential damages, attorney's fees, costs, and any other equitable relief to which Plaintiff is or may be entitled.

## COUNT SIX
## QUANTUM MERUIT AND UNJUST ENRICHMENT
## ON BOEING'S 2008 BRIDGE CONTRACT

166.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

167.   Boeing requested AAI to perform PDM work on eight (later, 14) KC-135 Aircraft involved in Boeing's 2008 Bridge Contract (#FA8105-05-D-0004). AAI faithfully performed such PDM work on 14 aircraft.

168.   Under the 2008 Bridge Contract, Boeing has a good faith obligation to provide CFM2 parts to AAI, as well as a good faith obligation to manage AAI's ordering of GFM parts through the CAV AF system.

169.   The 2008 Bridge Contract provides that AAI is to receive an early delivery award fee for KC-135 PDM deliveries in 205 days or less.

170.   Through its own incompetence, or wrongful preference to its San Antonio facility, or a combination of both, Boeing failed to provide timely delivery of CFM2 parts to AAI.  Boeing also caused delays in GFM parts to AAI through its mismanagement and inadequate operation of the CAV AF system.

171.   The delays of CFM2 parts to AAI created critical path delays and caused AAI deliver late of completed KC-135 aircraft under the 2008 Bridge Contract.  The delivery delays prevented AAI from receiving early delivery fee awards.

172.   Furthermore, Boeing's late delivery of CFM2 and GFM parts to AAI caused AAI to expend considerable time and expense moving its operations from a pulsed-line approach to a docked aircraft approach.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## COUNT SEVEN
## UNJUST ENRICHMENT – 2005 MOA AND
## USAF SOLICITATION # FA8105-05-R-0014

173.    The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

174.    As a result of Defendants' actions, misconduct, deception and suppressions of material fact described herein, with regard to the 2005 MOA, Defendants have been awarded the FY 08 KC-135 PDM solicitation number FA8105-05-R-0014 and have refused to honor their agreements to subcontract a portion of the work contemplated by that contract to Plaintiff.  Defendants have already realized, and stand to continue to realize, a substantial pecuniary gain by virtue of their conduct, and their omissions.

175.    Additionally, Defendants utilized Pemco's confidential and proprietary information obtained through improper, fraudulent and acts of bad faith to unfairly compete against Pemco and deprive it of substantial revenue.

176.    Accordingly, Defendants have been unjustly enriched by their wrongful actions and to the detriment of Plaintiff, which were accomplished through intentional, reckless and wanton conduct.

177.    Defendants are guilty of unclean hands and unfair competition.

178.    Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, and with certain

representatives of the Air Force (or through taking undue advantage of the latter), in both such suppression and misrepresentation of material facts and in the Defendants' scheme to unjustly enrich themselves and as a part of such unjust enrichment, to deprive the Plaintiff of its rightful role in the FY2008 KC-135 PDM Program, solicitation number FA8105-05-R-0014, and of its other rights described herein.

179.   Plaintiff offers to do equity.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this court utilize its equitable powers and award to AAI just compensation for all damages that it has suffered by virtue of Defendants' unjust and unfair actions, including, but not limited to, monies received by Defendants under the FY08 KC-135 PDM solicitation or contract number FA8105-05-R-0014, consequential damages, attorney's fees, costs, and any other equitable relief to which Plaintiff is or may be entitled.

## COUNT EIGHT
## SPECIFIC PERFORMANCE

180.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

181.   In accordance with the 2005 MOA and its several attached agreements and exhibits, Pemco assisted Defendants in preparing a proposal for the FY08 Recompete KC-135 PDM Contract number FA8105-05-R-0014 and provided

84

Defendants with its confidential and proprietary information in connection with the proposal. On or about October 31, 2005, as prime contractor, Defendants submitted the joint proposal, with Pemco acting as their principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

182. On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft. Such a possibility had been specifically contemplated and contracted for between Plaintiff and the Defendants, and the agreements among them were structured to work, and be capable of performance, in such an eventuality.

183. Nevertheless, using this RFP amendment as a pretext, Boeing breached its 2005 agreements (which were already being performed by the parties, including the 2005 MOA and 2005 Work Share Agreement, with Pemco regarding the FY08 Recompete KC-135 PDM Contract number FA8105-05-R-0014. Boeing, itself (not merely BAOI or BASC), improperly terminated the several agreements, citing the reduced BEQ as the basis for its actions, despite the fact that the 2005 MOA and 2005 Work Share Agreement set out a plan for the distribution of work should just such a BEQ reduction occur.

184. Boeing also possessed and used for its own benefit considerable non-public information, and concealed the same from Plaintiff, including material information that the Air Force might not implement the BEQ reduction or that

85

additional services could be required due to the Air Force's inability to complete its planned internal PDM which would have result in sufficient a sufficient quantity of aircraft available for PDM under the MOA.

185. Plaintiff has performed all of its obligations under the 2005 MOA and 2005 Work Share Agreement, and is ready, willing and able to perform all work on the FY08 Recompete KC-135 PDM Contract in accordance with those several agreements.

186. Plaintiff is the owner of Pemco's rights in and under the 2005 MOA and 2005 Work Share Agreement, and related agreements, and offers to do equity.

187. Defendants are guilty of unclean hands and the other misconduct hereinabove alleged. Defendants are not, in equity and under the circumstances, entitled to retain and enjoy 100% of the work and benefits of the 2008 FY Recompete KC-135 PDM Contract.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court exercise its equitable powers and issue a judgment and decree of Specific Performance requiring Boeing and Defendants to fulfill all their obligations to Plaintiff with respect to the 2008 Recompete KC-135 PDM Contract, number FA8105-05-R-0014, and otherwise under the 2005 MOA and the 2005 Work Share Agreement. Plaintiff prays for such other and further equitable relief as may be appropriate to secure Plaintiff's rights and benefits, including without limitation

ordering Defendants to assign or share work on up to 50% of the KC-135 aircraft that Defendants receive for PDM work, and for declaratory relief and injunctive relief.

## COUNT NINE – FRAUD AND
## FRAUDULENT SUPPRESSION

188.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

189.   Defendants made numerous material representations to Plaintiff in 2007 and 2008 during the course of their joint efforts to obtain additional work in relation to the 2008 Bridge Contract (#FA8105-05-D-0004).  These representations include, but are not limited to:

> a. That the USAF only had $26 million of funding available for aircraft that could be sent to AAI, *i.e.*, that the only way the work could be obtained was by agreeing to do the PDM work for $3.25 million per aircraft.
>
> b. That Boeing had done its best to get the most advantageous arrangement with USAF.
>
> c. That Boeing was in the same predicament as AAI in the matter of pricing obtainable.

190.  Defendants made such misrepresentations of material fact, either intentionally, recklessly without regard to their truth or falsity, or innocently or by mistake but with the intention that Pemco rely thereon.

191.  Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, and with representatives of the Air Force, in both such misrepresentation of material facts and in the Defendants' scheme to deprive the Plaintiff of its rightful share of revenues from the 2008 Bridge Contract.

192.  AAI reasonably relied on such material misrepresentations to its detriment and, as a proximate result, has suffered damages.

193.  Boeing was under a duty to disclose the full details of its relationship with the Air Force and the knowledge and information it obtained during and by reason of that relationship.

194.  That duty to disclose arose from Boeing's confidential relationship with Plaintiff and/or the other particular circumstances of the parties' dealings. The duty to disclose further arose from direct requests for information from Plaintiff, and because once Boeing made statements to Plaintiff, it had the duty to disclose the full truth.  The duty to disclose further arose from Defendants' position of superior knowledge derived and resulting from Defendants' superior access to and ex parte contacts with Air Force personnel and representatives, where

88

Defendants deliberately kept communications secret from Plaintiff and did not advise Plaintiff of what Defendants were doing and saying with the Air Force.

195. In addition to such misrepresentations, Boeing intentionally, recklessly or negligently suppressed and failed to disclose material information to Plaintiff, including, but not limited to:

    a. Material information as to the nature and content of Defendants' many communications with Air Force representatives and personnel.

    b. Material information received by Defendants relating to pricing of PDM work on aircraft to be delivered under extensions and modifications of Contract #FA8105-05-D-0004.

    c. Material information as to the prices that Boeing would charge the USAF for PDM work and aircraft serviced by AAI.

196. Instead, Defendants suppressed the aforesaid information from Plaintiff, and by such suppression were able to jam AAI under pressure of time deadlines promulgated by Defendants, forcing AAI down on the PDM work prices per aircraft that AAI was forced to take, the alternative being having no business at all.

197. At all times here relevant, in and about the foregoing conduct, Defendants and each of them acted willfully, intentionally, and maliciously, with

the motivation to harm and disadvantage Plaintiff and its interests, and to advance the Defendants' interests.

198. Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, in both such suppression and misrepresentation of material facts and in the Defendants' scheme to deprive the Plaintiff of its rightful share of revenues from Boeing's Contract #FA8105-05-D-0004.

199. At all relevant times, Plaintiff relied in its conduct upon not knowing of the material suppressed facts.

200. As a proximate result of the forgoing actions or failures to act based on Defendants' suppressions of material facts, Plaintiff has suffered damage.

201. Because of Defendants' active concealment of their activities and of material facts, as well as the fact that the Air Force representatives involved also kept silent about such activities and about communications and dealings between them and the Defendants, and because Plaintiff did not have access to such communications between Defendants and the USAF, the Plaintiff did not know of facts that would provide a sufficient basis to bring the cause of action set forth in this Count, sooner than two years before filing of this claim.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, profits and

90

benefits conferred by the misrepresentations and suppressions of material fact aforesaid, and for amounts by which Defendants have been unjustly enriched, and for consequential damages, and Plaintiff further is entitled to exemplary and punitive damages of at least three times the compensatory damages of Plaintiff, all in amounts to be determined by a jury, plus costs. Plaintiff also prays for such other and further relief as may be appropriate, premises considered.

## STATEMENT APPLICABLE TO ALL COUNTS OF COMPLAINT:

202. Plaintiff does not assert, nor does it attempt or intend to assert, directly or indirectly, explicitly or implicitly, any claim for recovery or relief under any federal statute or federal law or regulatory provision affording any civil remedy or right of recovery. Plaintiff alleges that the law of the State of Alabama, relied upon in and for each of the Counts of this Complaint, provides all the avenues needed by the Plaintiff for ample and complete relief for the Plaintiff. (Even to the extent Missouri law may eventually be determined to apply to interpretation of certain contract documents, which Plaintiff does not concede, nevertheless, such law is also state law, not federal law.) Without limiting the generality of the foregoing, the Plaintiff does not assert, nor does it attempt or intend to assert, directly or indirectly, explicitly or implicitly, advertently or inadvertently, expressly or impliedly, any claim for recovery or relief under or by reason of any federal law or federal regulation (including any agency regulation)

concerning matters such as federal contracting, false claims submitted to the government, racketeering, wire or mail fraud, or any other type of statute or regulation governing or potentially governing the conduct or affairs of any parties hereto or governing the USAF, the GAO or any other agency, nor does this action seek any interpretation of, or declaration or enforcement of rights under, or relief under, any federal law or federal regulation. Nor does this action seek any implicit review or overturning of any federal agency or federal court or USAF decisions. Further, no relief is sought from, and no claims are asserted, against or with respect to, the USAF or any federal employee or federal agency. Plaintiff requests that this Complaint and all prayers for any relief be construed to effectuate the foregoing statements.

### THESE CLAIMS ARE DEEMED UNSUITED FOR A.D.R.

203. Plaintiff has evaluated the long history of discussions between it and Defendants, the many efforts the Plaintiff has made, unsuccessfully, to work out disputes concerning the above issues with the Defendants, and the necessity for pursuing in various situations formal administrative protests or remedies. Moreover, resolution of the parties' disputes over many of the events and facts are or will necessarily involve testimony and recollections of witnesses, and deposition discovery, which is only available or best available through a court forum. Based upon all of the foregoing, Plaintiff has reasonably determined that this action must

be brought in order to resolve the claims set out herein, and that these claims are not suitable for alternative dispute resolution ("ADR").

## JURY DEMAND

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE AS OF RIGHT TO A JURY, AND DEMANDS TRIAL BY ADVISORY JURY OF ALL FACTS RELATING TO ANY EQUITABLE CLAIM.

Dated:  September 9, 2011

_____
One of the Attorneys for Plaintiffs

**OF COUNSEL:**
J. Michael Rediker (RED004)
Roger A. Brown (BRO078)
Patricia C. Diak (DIA005)
R. Scott Williams (WIL167)
Peter J. Tepley (TEP002)
Vincent J. Graffeo (GRA108)
HASKELL SLAUGHTER YOUNG & REDIKER, LLC
2001 Park Place, Suite 1400
Birmingham, Alabama 35303
Phone:  205.251.1000
Facsimile:  205.324.1133
*Attorneys for Alabama Aircraft Industries, Inc.*

93

**<u>Please Serve Defendants by Process Server at:</u>**

The Boeing Company
c/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL 36104

Boeing Aerospace Operations, Inc.
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL 36104

Boeing Aerospace Support Center
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL 36104

4023616_5

94

 Haskell Slaughter Young & Gallion, LLC

Post Office Box 4660

Montgomery, Alabama 36103-4660

Boeing Aerospace Operations, Inc.
Registered Agent
150 South Perry Street
Montgomery, AL 36104



**CORPORATION SERVICE COMPANY**

**null / ALL**
**Transmittal Number: 9093948**
**Date Processed: 09/09/2011**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Cynthia J. Pearson<br>The Boeing Company<br>100 N Riverside MC 5003-1001<br>Chicago, IL 60606-1596 |

| | |
|---|---|
| **Entity:** | Boeing Aerospace Operations, Inc.<br>Entity ID Number  1876240 |
| **Entity Served:** | Boeing Aerospace Operations, Inc. |
| **Title of Action:** | Alabama Aircraft Industries, Inc. vs. The Boeing Company |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Jefferson County Circuit Court, Alabama |
| **Case/Reference No:** | CV-2011-903218.00 |
| **Jurisdiction Served:** | Alabama |
| **Date Served on CSC:** | 09/09/2011 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | R. Scott Williams<br>205-251-1000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>01-CV-2011-903218.00 |
|---|---|---|

## IN THE CIVIL COURT OF JEFFERSON, ALABAMA
### ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

NOTICE TO   BOEING AEROSPACE OPERATIONS, INC., C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY RICHARD SCOTT WILLIAMS

WHOSE ADDRESS IS 1400 PARK PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____
    pursuant to the Alabama Rules of the Civil Procedure

| 9/9/2011 2:52:37 PM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested

_____
Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☑ I certify that I personally delivered a copy of the Summons and Complaint to *Cecelia Russell*
_____ in *Montgomery* County, Alabama on *Sept. 9 2011*

*Sept 9 2011*
Date

*Pal Shoemaker*
Server's Signature
*Process Server*

*PAL SHOEMAKER*
*305 SOUTH LAWRENCE ST.*
*MONTGOMERY, AL 36104*
*(334) 265-8579*

01-CV-2011-903218.00
ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

| C001 - ALABAMA AIRCRAFT INDUSTRIES, INC. | v. | D002 - BOEING AEROSPACE OPERATIONS, INC. |
|---|---|---|
| Plaintiff | | Defendant |

## FILED IN OFFICE

SEP 1 2 2011

**ANNE-MARIE ADAMS**
**Clerk**

## SERVICE RETURN

01-CV-2011-903218.00 D002

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>01-CV-2011-903218.00 |
| --- | --- | --- |

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

NOTICE TO
BOEING AEROSPACE SUPPORT CENTER, C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY RICHARD SCOTT WILLIAMS

WHOSE ADDRESS IS 1400 PARK PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

[✓] You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

[ ] Service by certified mail of this summons is initiated upon the written request of _____
pursuant to the Alabama Rules of the Civil Procedure

| 9/9/2011 2:52:37 PM | /s ANNE-MARIE ADAMS | |
| --- | --- | --- |
| Date | Clerk/Register | By |

[ ] Certified mail is hereby requested  _____
Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

[ ] Return receipt of certified mail received in this office on _____

[✓] I certify that I personally delivered a copy of the Summons and Complaint to *Cecelia Russel*

_____ in *Montgomery* County, Alabama on *Sept 9 2011*

*Sept 9 2011*          *Pal Shoemaker*
Date                      Server's Signature
                           *Process Server*

*PAL SHOEMAKER*
*305 SOUTH LAWRENCE ST.*
*MONTGOMERY, AL 36104*
*(334)·265-8573*

01-CV-2011-903218.00

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

| C001 - ALABAMA AIRCRAFT INDUSTRIES, INC. | v. | D003 - BOEING AEROSPACE SUPPORT CENTER |
| --- | --- | --- |
| Plaintiff | | Defendant |

## FILED IN OFFICE

SEP 1 2 2011

ANNE-MARIE ADAMS
Clerk

SERVICE RETURN

01-CV-2011-903218.00 D003

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>01-CV-2011-903218.00 |
| --- | --- | --- |

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

NOTICE TO   THE BOEING CO., C/O CSC-LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY RICHARD SCOTT WILLIAMS

WHOSE ADDRESS IS 1400 PARK PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____
pursuant to the Alabama Rules of the Civil Procedure

| 9/9/2011 2:52:37 PM | /s ANNE-MARIE ADAMS | |
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☑ I certify that I personally delivered a copy of the Summons and Complaint to *Cecelia Russel*

in *Montgomery* County, Alabama on *Sept 9 2011*

*Sept 09, 2011*
Date

*Pal Shoemaker*
Server's Signature

*Process Server*



*Pal Shoemaker*
*305 South Lawrence St.*
*Montgomery, Al 36104*
*(334) 265-8573*

01-CV-2011-903218.00

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

| C001 - ALABAMA AIRCRAFT INDUSTRIES, INC. | v. | D001 - THE BOEING CO. |
| Plaintiff | | Defendant |

## FILED IN OFFICE

SEP 1 2 2011

**ANNE-MARIE ADAMS**
Clerk

01-CV-2011-903218.00 D001

# SERVICE RETURN

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>01-CV-2011-903218.00 |
| --- | --- | --- |

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

NOTICE TO ___ BOEING AEROSPACE OPERATIONS, INC., C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY RICHARD SCOTT WILLIAMS

WHOSE ADDRESS IS 1400 PARK PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of ___
   pursuant to the Alabama Rules of the Civil Procedure

| 9/9/2011 2:52:37 PM | /s ANNE-MARIE ADAMS | ___ |
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested ___

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ___

☐ I certify that I personally delivered a copy of the Summons and Complaint to ___

___ in ___ County, Alabama on ___

___

Date        Server's Signature

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BOEING AEROSPACE OPERATIONS, INC.
C/O CSC LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

D002
CV11 903218  alias soc

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7010 2780 0002 8185 2915

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

17 SEP 2011 PM 2

FILED IN OFFICE

SEP 1 9 2011

ANNE-MARIE ADAMS
Clerk

• Sender: Please print your name, address in this box •

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD N
BIRMINGHAM, ALABAMA 35203

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BOEING AEROSPACE SUPPORT CENTER
C/O CSC LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 38104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Roxie Bethea_   ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

Roxie Bethea

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

DU03

CU11 903218 Alias Sec

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7010 2780 0002 8185 2922

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

17 SEP 2011 PM 4

**FILED IN OFFICE**

SEP 1 9 2011

ANNE-MARIE ADAMS
Clerk

• Sender: Please print your name, address, and ZIP+4 in this box •

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD. NO.
BIRMINGHAM, ALABAMA 35203

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to:

THE BOEING CO.
C/O CSC-LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Rosia Bethea_  ☐ Agent
☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

Rosia Bethea

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

CV11 90321R ahnsh.
D1

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7010 2780 0002 8185 2908

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

FILED IN OFFICE

SEP 19 2011

ANNE-MARIE ADAMS
Clerk

• Sender: Please print your name, address, and ZIP+4 in this box •

ANNE-MARIE ADAMS
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD  N
BIRMINGHAM, ALABAMA  35203

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ALABAMA AIRCRAFT                        )
INDUSTRIES, INC.,                       )
                                        )
     Plaintiff,                       )
                                        )
                                        )   CASE NO: CV-2011-903218
vs.                                     )
                                        )
THE BOEING COMPANY,                     )
BOEING AEROSPACE                        )
OPERATIONS, INC. and                    )
BOEING AEROSPACE                        )
SUPPORT CENTER,                         )
                                        )
     Defendants.                      )
                                        )

## NOTICE OF SERVICE OF DISCOVERY

TO:   CIRCUIT COURT CLERK

     PLEASE TAKE NOTICE that the following discovery documents have been served on

behalf of Plaintiff Alabama Aircraft Industries, Inc.:

     1.    Plaintiff's First Request for Production of Documents to Defendants.

                           Respectfully submitted,

Dated: September 19, 2011           */s/ Vincent J. Graffeo*
                               One of the Attorneys for Plaintiffs

**OF COUNSEL:**
J. Michael Rediker (RED004)
Roger A. Brown (BRO078)
Patricia C. Diak (DIA005)
R. Scott Williams (WIL167)
Peter J. Tepley (TEP002)
Meredith J. Lees (JOW002)
Vincent J. Graffeo (GRA108)
HASKELL SLAUGHTER YOUNG & REDIKER, LLC
2001 Park Place, Suite 1400
Birmingham, Alabama 35303
Phone:  205.251.1000

Facsimile: 205.324.1133
*Attorneys for Alabama Aircraft Industries, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing on all counsel of record by <u>hand delivery</u> and by <u>certified mail</u> by placing a copy of the same in the U.S. Mail, first class postage prepaid and properly addressed as follows, this the 19th day of September, 2011.

The Boeing Company
c/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Operations, Inc.
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Support Center
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

*/s/ Vincent J. Graffeo*
Of Counsel

4336073_1

2

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| **ALABAMA AIRCRAFT**<br>**INDUSTRIES, INC.,** | )<br>)<br>) |
| **Plaintiff,** | )<br>)<br>) |
| **vs.** | )    **CASE NO: CV-2011-903218**<br>)<br>) |
| **THE BOEING COMPANY,**<br>**BOEING AEROSPACE**<br>**OPERATIONS, INC. and**<br>**BOEING AEROSPACE**<br>**SUPPORT CENTER,** | )<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | )<br>)<br>) |

### PLAINTIFF'S FIRST REQUEST FOR
### PRODUCTION OF DOCUMENTS TO DEFENDANTS

Pursuant to Rule 34 of the Alabama Rules of Civil Procedure, Plaintiffs Alabama Aircraft

Industries, Inc., ("AAI," "Alabama Aircraft" or "Plaintiff") requests that Defendants The Boeing

Company, Inc. ("Boeing"), Boeing Aerospace Operations, Inc. ("BAOI"), and Boeing Aerospace

Support Center ("BASC") (collectively, Defendants") within forty-five (45) days from service

of the Complaint or otherwise within thirty (30) days, produce separately by paragraph of this

request all responsive documents described below, in the form of TIFF images with

accompanying OCR text and a Summation software-compatible load file ("DII" file) (except that

emails, spreadsheets and powerpoint-type presentations shall be produced in their respective

native formats), or as otherwise agreed by the parties or ordered by the Court, to permit Plaintiff

to inspect and copy at a location mutually agreed upon by the parties, the documents described

below.  Documents (copied onto disk or otherwise delivered) can also be sent directly to J.

Michael Rediker, Esq., Haskell Slaughter Young & Rediker, LLC, 2001 Park Place North, Suite

1400 Birmingham, Alabama 35203. Plaintiff is also willing to enter into a reasonable and reciprocal confidentiality stipulation, in customary form, prior to the use, in briefing or discovery, of any such documents.

## DEFINITIONS

As used herein:

1.     "Document" is defined to be synonymous and equal in scope to usage of this term in Ala. R. Civ. P. 34(a), and includes electronically stored information ("ESI"). A copy or duplicate of a document which has any non-conforming notes, marginal annotations or other markings, and any preliminary versions, draft or revision of the foregoing is a separate document within the meaning of this term.   Documents include, by way of example only, any memorandum, letter, envelope, correspondence, electronic mail, text message, report, meeting book or folder, presentation, "powerpoint," note or notes, Post-it, message, telephone message, telephone log, diary, journal, appointment calendar, calendar, group schedule calendar, drawing, blueprint, painting, spreadsheet, database, accounting paper, minutes, working paper, financial report or financial statement, affidavit, statement, contract, invoice, record of purchase or sale, ticket, slip, Teletype message, chart, graph, index, specification, directory, index, computer directory, computer disk, computer tape, videotape, audio tape or recording, or any other written, printed, typed, punched, recorded, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any documents and any drafts of such documents.

The term document also includes ESI and "electronic data" of any kind, which means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations,

2

marks, transmission notations, or highlighting of any kind) of mechanical, facsimile, electronic, magnetic, digital, or other programs (whether private, commercial or work-in-progress); programming notes or instructions; activity listings of electronic mail receipts and/or transmittals; output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines; electronic mail; operating systems; source code of all types; programming languages; linkers and compilers; peripheral drivers; PRF files; batch files; ASCII files; crosswalks; code keys; pull-down tables; logs; file layouts; and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment, including drafts of such documents. Electronic data and ESI includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, zip drives, Bernoulli Boxes and their equivalent, magnetic tape of all types, microfiche, punched cards, punched tape, computer chips (including but not limited to EPROM, PROM, RAM and ROM) on or in any other vehicle for digital data storage and/or transmittal. The term ESI and electronic data also includes the files, folder tabs, and/or containers appended to, or associated with, any physical storage device associated with each original and/or copy. ESI and electronically-stored emails, spreadsheets, memos, reports and correspondence shall be produced with, and include, their metadata.

2.      "You" and "yours" mean the Defendant (and each such Defendant) answering these Interrogatories, your agents, employees, attorneys, representatives, consultants, accountants and all other persons purporting to act or to have acted on your behalf. "Pemco" means and includes Pemco Aviation Group, Inc., Pemco Aircraft Engineering Services, Inc., and their

3

affiliates and successors in name or interest, including without limitation, AAI and Alabama Aircraft Industries Inc. - Birmingham.

3.    "Relating to," "relate to," "concern" or "concerning," mean reflecting, referring to, having any relationship to, pertaining to, evidencing, or constituting, in whole or in part, the subject matter of the particular Interrogatory.

4.    "Communication," "communicate," and "communicated," mean any oral or written utterance, notation or statement of any nature whatsoever, by or to whomsoever made, including, but not limited to correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings, between two or more persons.

5.    "Meeting," "meet," or "met" means any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether planned or not planned, arranged or scheduled in advance during which a communication of any kind occurred and shall include, but not be limited to, formal and informal gatherings, conversations, video conferences and telephone calls.

6.    "Policy" means any practice, procedure, directives, routine, rules, courses of conduct or code of conduct, written or unwritten, formal or informal, recorded or unrecorded, which were recognized, adopted, issued or followed by you.

7.    "Describe" means to state with particularity each date, fact, event, occurrence and to identify each person who can testify as to such stated dates, facts, events, occurrences and documents.

8.    "Person" includes natural persons, groups of natural persons acting in a collegial capacity (e.g., a committee or council or panel or board), corporations, partnerships, joint ventures, associations, trusts, and any other incorporated or unincorporated business,

4

governmental, public or legal entity.  A reference to any person shall include, when applicable, its subsidiaries, control persons, controlling persons, partners, shareholders, officers, directors, employees, agents, or other persons acting or purporting to act on its behalf.

9.      Any reference to AAI, Alabama Aircraft and/or Plaintiff shall be deemed to mean and include a reference to Alabama Aircraft Industries, Inc., Alabama Aircraft Industries, Inc. – Birmingham and/or Pemco Aircraft Engineering Services, Inc.

10.      Any reference to a Defendant by name (including any short-hand reference to a defendant's name) shall be deemed to mean and include a reference to such Defendant as well as to its predecessors, successors, parents, subsidiaries, divisions, affiliates, operating units, financing entities, controlling persons, controlled persons, partners, principals, members, shareholders, officers, directors, employees, and representatives or agents.

11.      "Financial statements" means, but is not limited to, the following (whether audited or unaudited, and whether final, interim, *pro forma*, complete, or partial): consolidated and non-consolidated balance sheets, statements of earnings, additional paid-in capital, retained earnings, source and application of funds, cash flow, projections, and notes that pertain to the designated entity's past or present financial condition, including accountant's workpapers.

12.      Terms and names or short-hand references, including the names of and abbreviations of names of and short-hand references to any Defendant or alleged co-conspirator or other person or entity, that are defined in the Complaint (as from time to time amended) in this action shall have the same meanings in this discovery request as are defined or referenced in the Complaint.

13.      "Requests" or "requests" refers to the interrogatories and document requests propounded herein.

14.     Words used in the plural include the singular, and words used in the singular include the plural.  The words "and" and "or" shall be used interchangeably and interpreted in the most inclusive manner possible.

15.     "Relevant Time Period" refers to the period encompassed by the allegations of the Complaint, from the earliest date of a Defendant's acts or conduct set forth therein, through the date of your full response to these requests.

16.     For purpose of responding to these requests, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual request.

## INSTRUCTIONS

1.     If you claim that any document or oral communication that is required to be identified or produced by you in response to any of these requests is privileged or protected as attorney work product, deliver to the Plaintiff within the time required to answer these discovery requests a Privilege Log, in which you:

a.     Identify the portion of the request to which the document or communication is otherwise responsive;

b.     If a document, state:

(i)     Its nature, e.g., agreement, letter, memorandum, tape, etc.;

(ii)     The date it was prepared;

(iii)     The date it bears;

(iv)     The date it was sent;

(v)     The date it was received;

(vi)     The identity of the person preparing it;

6

      (vii)    The identity of the person sending it;

      (viii)   The identity of all persons to whom it was sent or given, or was to have been sent or given, including all addressees and all recipients of any copies; and

      (ix)    A statement as to whom each identified person represented or purported to represent, or by whom each such person was employed, at all relevant times;

      (x)     A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file;

    c.     If an oral communication, identify all persons present at the time of the oral communication;

    d.     State the nature of the privilege (including work product doctrine) claimed; and

    e.     State in detail each and every fact upon which you base your claim of privilege (or work product).

    2.     All documents shall be produced in the order they are kept in the ordinary course of business, and shall be produced in their original folders, binders, covers or containers, or facsimile thereof.  Documents which are, or encompass, spreadsheets, powerpoint or similar presentations, or emails (including their attachments) shall be produced in their respective native formats, unless and only to the extent Plaintiffs agree otherwise in writing.  Emails which have attachments shall be produced together, without disconnecting or disassociating and separating the email from its attachments.

3. These requests relate to all documents that are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or your respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

4. Except in the cases where you make production via images on disk, you shall produce the original of each document described below or if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies that differ from the original or from the other copies produced for any reason, including, but not limited to, the making of notes thereon. If any documents you produce via images on disk shall prove, upon review, to be smudged, faint, obscured, or otherwise difficult to read from images, AAI reserves the right to request access to inspect the original(s) thereof.

5. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each document's custodian(s).

6. Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

7. If a document responsive to these requests was at any time in your possession, custody or control, but is no longer available for production, as to each such document state the following information:

      (a) Whether the document is missing or lost;

(b)     Whether the document has been destroyed;

(c)     Whether the document has been transferred or delivered to another person and, if so, at whose request;

(d)     Whether the document has been otherwise disposed of; and

(e)     A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

8.      These requests shall be deemed continuing so as to require further and supplemental responses as specified in Ala. R. Civ. P. 26.

## **REQUESTS FOR PRODUCTION**

1.      Produce documents sufficient to show all offices (by address), places of business, employees (by name and title) and agents (including attorneys and other representatives) of any Defendant that were during the relevant time period located anywhere in the State of Alabama, including Birmingham and Huntsville.

2.      Produce all documents evidencing the organization and ownerships of BAOI and of BASC, respectively, during the relevant time period.

3.      Produce all documents relating to the United States Air Force's ("USAF") award of the 1998 KC-135 PDM Contract, including but not limited to:

  a. Any documents and information of Plaintiff furnished to any Defendant or any representative thereof;

  b. Any documents and information of Plaintiff used in submitting any response to any government Request for Proposal ("RFP");

  c. Any documents and information of any other aircraft maintenance, repair and modification company;

9

    d.  All communications between any Defendant and the USAF;

    e.  All draft bids and proposals;

    f.  All draft contracts.

4.    Produce all documents relating to any Communications between You and any Person, including, but not limited to, the following Persons, concerning the USAF's decision to go forward with a 1998 Request for Proposal that combined KC-135 PDM with work on the A-10 aircraft and other services, as described in the Complaint at ¶ 11):

    a.  Darleen Druyun;

    b.  Michael M. Sears;

    c.  Phil Condit;

    d.  Any employee, officer, director, affiliate, agent or representative of the USAF;

    e.  Any employee, officer, director, affiliate, agent or representative of any Defendant;

    f.  Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

5.    Any files You created or possess concerning, including complete personnel files of, Darleen Druyun, Darleen Druyun's daughter Heather McKee, Darleen Druyun's son-in-law Michael McKee, Michael M. Sears and Phil Condit.

6.    All documents You or any Defendant or its affiliate provided to the United States Government, including the General Accounting Office, regarding its investigation of Darleen Druyun during the relevant time period.

7.     All documents related to Boeing's performance problems on the 1998 KC-135 PDB Contract, including the $1.6 million Federal Aviation Agency ("FAA") fine issued in or about August 2000.

8.     All documents related to or resulting from the USAF action directing Boeing and Plaintiff (then known as Pemco) to enter into a teaming arrangement where Pemco as subcontractor would perform KC-135 PDF work for Boeing under the 1998 KC-135 PDM Contract for fiscal years 2002-2007.

9.     Produce all drafts and differing counterparts of the October 7, 2000 Memorandum of Agreement ("MOA") wherein Pemco agreed to serve as subcontractor to Boeing for the 1998 KC-135 PDM contract for fiscal years 2002 through 2007.

10.     Produce all documents relating to any Communications between You and any Person, including, but not limited to, the following Persons, concerning the October 7, 2000 MOA:

        a.     Any employee, officer, director, affiliate, agent or representative of the USAF;

        b.     Any employee, officer, director, affiliate, agent or representative of any Defendant;

        c.     Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

11.     All documents related to Boeing's performance problems on the 1998 KC-135 PDB Contract, including the $892,000 FAA fine issued as reported on or about October 31, 2000.

11

12.     All documents related to the FAA fine issued as reported on or about March 27, 2002 for Boeing's failure to adhere to quality control standards in the late 1990, along with improper conduct.

13.     All documents related to Boeing's July 2007 repayment to the Untied States more than $1 million to settle charges of overbilling between 1998-2003 for materials used to install new engines in KC-135 aircraft.

14.     All documents evidencing any judgments or orders against Boeing in favor of the United States, or any agency thereof, for violations of overbillings, ethics, False Claims Acts, misuse of competitor information or quality controls.

15.     All documents evidencing any settlements with the United States, or any agency thereof, or any qui tam action plaintiff, for violations of overbillings, ethics, False Claims Acts, misuse of competitor information, or quality control issues.

16.     All documents related to the USAF's suspension of Boeing Launch Services due to the USAF's discovery of Boeing's commission of serious and substantial violations of federal law in connection with the 1998 competition for a USAF Evolved Expendable Launch Vehicle contract.

17.     All documents evidencing Boeing's obtaining of or using more than 25,000 pages of documents belonging to Lockheed related to the USAF Evolved Expendable Launch Vehicle contract.

18.     All documents related to the USAF's decision not to exercise the final two option years of the 1998 KC-135 PDM contract, or effective termination, made on or about November 30, 2004.

19.    All documents related to the USAF's "bridge" contract with Boeing for government fiscal years 2006 and 2007 for the KC-135 PDM.

20.    All documents related to the GAO's February 2005 sustaining of a protest against an award to Boeing of a contract for the small diameter bomb program.

21.    All documents related to the GAO's February 24, 2005 sustaining of a protest against an award to Boeing of a contract for the avionics modernization upgrade program for C-130 aircraft.

22.    All documents related to Boeing and AAI's discussions and any plan to jointly enter into teaming agreements for the government KC-135 PDF work referenced in government RFP number FA8105-05-R-0014, beginning as early as February 2004 and continuing into 2005.

23.    Produce all documents relating to any Communications to or from any Person, including, but not limited to, to or from or by any of the following Persons, concerning Boeing and AAI's plan or any proposal to jointly enter into teaming agreements for the government KC-135 PDF work referenced in government RFP number FA8105-05-R-0014:

> a.  Ron Aramini;
>
> b.  Bob Barber;
>
> c.  Larry P. Barger;
>
> d.  Otis Beaty;
>
> e.  David Berrio;
>
> f.  John T. Bioiocchi;
>
> g.  Skip Bowling;
>
> h.  Dustin Cantley;
>
> i.  Norma Clayton;

13

j.   Timothy G. Coyle;

k.   Casey Cox;

l.   Jerry Dunmire;

m.  Harold E. Emery;

n.   Larry Heath;

o.   Glenn Hess;

p.   Fred Hilbrand;

q.   Patrick W. Holden;

r.   Pat Finneran;

s.   Gregory Kowlaski;

t.   Doug Lundy;

u.   John R. Matthew;

v.   Keith McCallister;

w.  Gil McSheehy;

x.   James Miller;

y.   Eddie Moore;

z.   Col. Kenneth J. Moran

aa.  Gary Mosier;

bb.  Larry A. Myers;

cc.  Col. Kevin J. Nally;

dd.  Curt Nothstine;

ee.  David Ott;

ff.  Joe Peters;

14

gg. Tom Peterson;

hh. Ralph Petrosky.

ii.  Diana Petross;

jj.  Ronald Poussard;

kk. Andy Reheis;

ll.  Charles Riechers;

mm.    Tom Richards;

nn. Gen. Charles T. Robertson, Jr.

oo. Ben Robinson;

pp. George Roman;

qq. Phil Ruder;

rr.  Michael Salerno;

ss. Senator Richard Shelby or any of his representatives;

tt.  Senator Jeff Sessions or any of his representatives;

uu. Jim Stephens (at Tinker AFB)

vv. Melinda Stock;

ww.    Gerald M. Stonebreaker;

xx. Arnold Swanson;

yy. Jim Tuck;

zz. Tim Walker;

aaa.    Lt. Gen. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics;

bbb.    John Wiecezak;

ccc.    Roger J. Witte;

ddd.    Michael Wright;

eee.    Donald J. Vietor;

fff. Ron Yates;

ggg.    Tom Zeller;

hhh.    Any employee, officer, director, affiliate, agent or representative of the USAF;

iii. Any employee, officer, director, affiliate, agent or representative of any Defendant;

jjj. Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

24.    All documents related to and provided at and leading up to the June 24, 2004 and August 13, 2004 meetings between with Boeing (and/or its affiliated companies and subsidiaries) and Pemco.

25.    All documents related to and provided at and leading up to the September 1, 2004 meetings between with Boeing (and/or its affiliated companies and subsidiaries) and Pemco.

26.    All documents related to and provided at and leading up to the April 6, 2005 meetings between with Boeing (and/or its affiliated companies and subsidiaries) and Pemco.

27.    All drafts of the 2005 MOA, including any drafts of the related Workshare Agreement and any drafts of the Non-Disclosure Agreement.

28.    Produce all documents relating to any Communications  to or from any Person, including, but not limited to, to or from or by any of the following Persons, concerning the 2005 MOA, between January 1, 2004 and December 31, 2009:

a. Ron Aramini;

b. Bob Barber;

c. Larry P. Barger;

d. Otis Beaty;

e. David Berrio;

f. John T. Bioiocchi;

g. Skip Bowling;

h. Dustin Cantley;

i. Norma Clayton;

j. Timothy G. Coyle;

k. Casey Cox;

l. Jerry Dunmire;

m. Harold E. Emery;

n. Larry Heath;

o. Glenn Hess;

p. Fred Hilbrand;

q. Patrick W. Holden;

r. Pat Finneran;

s. Gregory Kowlaski;

t. Doug Lundy;

u. John R. Matthew;

v. Keith McCallister;

w. Gil McSheehy;

17

x.  James Miller;

y.  Eddie Moore;

z.  Col. Kenneth J. Moran

aa. Gary Mosier;

bb. Larry A. Myers;

cc. Col. Kevin J. Nally;

dd. Curt Nothstine;

ee. David Ott;

ff.  Joe Peters;

gg. Tom Peterson;

hh. Ralph Petrosky.

ii.  Diana Petross;

jj.  Ronald Poussard;

kk. Andy Reheis;

ll.  Charles Riechers;

mm.   Tom Richards;

nn. Gen. Charles T. Robertson, Jr.

oo. Ben Robinson;

pp. George Roman;

qq. Phil Ruder;

rr.  Michael Salerno;

ss. Senator Richard Shelby or any of his representatives;

tt.  Senator Jeff Sessions or any of his representatives;

18

uu. Jim Stephens (at Tinker AFB)

vv. Melinda Stock;

ww.    Gerald M. Stonebreaker;

xx. Arnold Swanson;

yy. Jim Tuck;

zz. Tim Walker;

aaa.    Lt. Gen. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics;

bbb.    John Wiecezak;

ccc.    Roger J. Witte;

ddd.    Michael Wright;

eee.    Donald J. Vietor;

fff. Ron Yates;

ggg.    Tom Zeller;

hhh.    Any employee, officer, director, affiliate, agent or representative of the USAF;

iii. Any employee, officer, director, affiliate, agent or representative of any Defendant;

jjj. Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

29.    Any documents from your records (including any post-employment or retirement records) which are sufficient to provide the current, most recent or last-known address, telephone number and job position information about each of the following Persons:

19

   a.  Rick Abbas;

   b.  Bob Barber;

   c.  Larry P. Barger;

   d.  Otis Beaty;

   e.  David Berrio;

   f.  John T. Bioiocchi;

   g.  Dustin Cantley;

   h.  Brian Cioli;

   i.  Norma Clayton;

   j.  Larry Cohen;

   k.  Phil Condit;

   l.  Timothy G. Coyle;

   m. Casey Cox;

   n.  Klaus G. Cox;

   o.  Jerry Dunmire;

   p.  Darleen Druyun;

   q.  Henry Gilson;

   r.  Veronica Harden;

   s.  Larry Heath;

   t.  Fred Hilbrand;

   u.  Patrick W. Holden;

   v.  Cheryl Holzum;

   w. Pat Finneran;

x.   Gregory Kowlaski;

y.   Lawrence Lawton;

z.   Pat Leahy;

aa. Doug Lundy;

bb. Tim Marshall;

cc. John R. Matthew;

dd. Keith McCallister;

ee. James Miller;

ff.  Eddie Moore;

gg. Col. Kenneth J. Moran;

hh. Larry A. Myers;

ii.  Col. Kevin J. Nally;

jj.  Curt Nothstine;

kk. David Ott;

ll.  Patricia Pena;

mm.    Joe Peters;

nn. Tom Peterson;

oo. Ralph Petrosky;

pp. Diana Petross;

qq. Ronald Poussard;

rr.  Andy Reheis;

ss.  Charles Riechers;

tt.  Gen. Charles T. Robertson, Jr.

21

uu. Ben Robinson;

vv. George Roman;

ww.    Phil Ruder;

xx. Michael Salerno;

yy. Michael M. Sears;

zz. Jim Stephens  (at Tinker AFB);

aaa.    Melinda Stock;

bbb.    Gerald M. Stonebreaker;

ccc.    Arnold Swanson;

ddd.    Tommy Thompson;

eee.    Randy Weatherford;

fff. Lt. Gen. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics;

ggg.    John Wiecezak;

hhh.    Roger J. Witte;

iii. Michael Wright;

jjj. Donald J. Vietor;

kkk.    Tom Zeller.

30.    All documents and communications related to the May 20, 2005 USAF draft RFP for FY08 Recompete KC-135 PDM Contract, with a RFP number of FA8105-05-R-0014 (the "RFP") for the FY08 KC-135 PDM work.

31.    All documents and communications related to the June 2, 2005 letter to Pemco regarding the revised MOA, as entered into on June 3, 2005 (the 6/2005 MOA).

22

32. All documents and communications related to and provided at and leading up to the July 20, 2005 meetings between with Boeing (and/or its affiliated companies and subsidiaries) and Pemco.

33. All drafts of and communications related to the PowerPoint presentation entitled "KC-135 Program Depot Maintenance Source Selection Campaign – Boeing and Pemco Joint Executive Review" presented at the July 20, 2005 meeting.

34. All documents and communications related to the reissuance of the 6/2005 MOA effective September 6, 2005 (the "9/2005 MOA").

35. Produce all documents relating to any Communications between You and any Person, including, but not limited to, the following Persons, concerning the 9/2005 MOA:

      a. Ron Aramini;

      b. Bob Barber;

      c. Larry P. Barger;

      d. Otis Beaty;

      e. John T. Bioiocchi;

      f. David Berrio;

      g. Skip Bowling;

      h. Dustin Cantley;

      i. Norma Clayton;

      j. Timothy G. Coyle;

      k. Casey Cox;

      l. Jerry Dunmire;

      m. Harold E. Emery;

n.  Larry Heath;

o.  Glenn Hess;

p.  Fred Hilbrand;

q.  Patrick W. Holden;

r.  Pat Finneran;

s.  Gregory Kowlaski;

t.  Doug Lundy;

u.  John R. Matthew;

v.  Keith McCallister;

w.  Gil McSheehy;

x.  James Miller;

y.  Eddie Moore;

z.  Col. Kenneth J. Moran

aa. Gary Mosier;

bb. Larry A. Myers;

cc. Col. Kevin J. Nally;

dd. Curt Nothstine;

ee. David Ott;

ff.  Joe Peters;

gg. Ralph Petrosky.

hh. Diana Petross;

ii.  Tom Peterson;

jj.  Ronald Poussard;

24

kk. Andy Reheis;

ll. Charles Riechers;

mm.   Tom Richards;

nn. Gen. Charles T. Robertson, Jr.

oo. Ben Robinson;

pp. George Roman;

qq. Phil Ruder;

rr. Michael Salerno;

ss. Senator Richard Shelby or any of his representatives;

tt. Senator Jeff Sessions or any of his representatives;

uu. Jim Stephens (at Tinker AFB)

vv. Melinda Stock;

ww.   Gerald M. Stonebreaker;

xx. Arnold Swanson;

yy. Jim Tuck;

zz. Tim Walker;

aaa.   Lt. Gen. Wetekam, USAF, Deputy Chief of Staff for Installations and
Logistics;

bbb.   John Wiecezak;

ccc.   Roger J. Witte;

ddd.   Michael Wright;

eee.   Donald J. Vietor;

fff. Ron Yates;

ggg.   Tom Zeller;

hhh.   Any employee, officer, director, affiliate, agent or representative of the USAF;

iii. Any employee, officer, director, affiliate, agent or representative of any Defendant;

jjj. Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

36.   Produce all documents and communications regarding Boeing's requests for assurances that Pemco would upgrade its facilities for the FY08 Recompete KC-135 PDM Contract.

37.   Produce all documents and communications relating to the October 1, 2005 USAF "Bridge Contract" for the KC-135 to Boeing, with Pemco or AAI as Boeing's subcontractor.

38.   Produce all communications between any Defendant and the USAF, including those of which Plaintiff was not a party to, relating to the KC-135 PDM.

39.   Produce all documents and communications relating to the May 1, 2006 Letter of Intent ("LOI") written by Donald J. Vietor of Boeing to USAF representative Jim Stephens regarding government proposed changes to the RFP # FA8105-05-R-0014 for the KC-135 PDM work.

40.   Produce all documents and communications related to the May 310, 2006 USAF amendment to the FY08 Recompete KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft.

41.    Produce all documents and communications related to Boeing's purported termination of its 2005 MOA with Pemco and termination of the entire set of teaming arrangements.

42.    Produce all documents and communications related to the RFP FA8105-05-R-0014, for the FY08 KC-135 PDM work, as announced by the USAF on July 19, 2006, including Boeing's bid submitted on September 18, 2006.

43.    Produce all documents and communications related to Pemco's June 12, 2006 agency-level protest regarding the USAF's decision to open new bids on RFP FA8105-05-R-0014.

44.    Produce all documents and communications related to proprietary pricing information of Plaintiff used in Boeing's bid and Final Proposed Revisions ("FPRs") on RFP FA8105-05-R-0014.

45.    Produce all documents and communications related to Boeing's price reduction from its original bid and its FPRs submitted on February 23, 2007.

46.    Produce all documents and communications related to Boeing's price reduction from its original bid and its Second FPRs submitted on June 18, 2007.

47.    Produce all documents relating to any Communications between You and any Person, including, but not limited to, any communications involving, or to or from or by, the following Persons, concerning Boeing's bids and its proposals in response to, or pursuant to, RFP FA8105-05-R-0014 for FY08 KC-135 PDM Contract:

      a.  Ron Aramini;

      b.  Bob Barber;

      c.  Larry P. Barger;

d.  Otis Beaty;

e.  John T. Bioiocchi;

f.  David Berrio;

g.  Skip Bowling;

h.  Dustin Cantley;

i.  Norma Clayton;

j.  Timothy G. Coyle;

k.  Casey Cox;

l.  Jerry Dunmire;

m.  Harold E. Emery;

n.  Larry Heath;

o.  Glenn Hess;

p.  Fred Hilbrand;

q.  Patrick W. Holden;

r.  Pat Finneran;

s.  Gregory Kowlaski;

t.  Doug Lundy;

u.  John R. Matthew;

v.  Keith McCallister;

w.  Gil McSheehy;

x.  James Miller;

y.  Eddie Moore;

z.  Col. Kenneth J. Moran

aa. Gary Mosier;

bb. Larry A. Myers;

cc. Col. Kevin J. Nally;

dd. Curt Nothstine;

ee. David Ott;

ff. Joe Peters;

gg. Ralph Petrosky.

hh. Diana Petross;

ii. Tom Peterson;

jj. Ronald Poussard;

kk. Andy Reheis;

ll. Charles Riechers;

mm.   Tom Richards;

nn. Gen. Charles T. Robertson, Jr.

oo. Ben Robinson;

pp. George Roman;

qq. Phil Ruder;

rr. Michael Salerno;

ss. Senator Richard Shelby or any of his representatives;

tt. Senator Jeff Sessions or any of his representatives;

uu. Jim Stephens (at Tinker AFB)

vv. Melinda Stock;

ww.   Gerald M. Stonebreaker;

xx. Arnold Swanson;

yy. Jim Tuck;

zz. Tim Walker;

aaa.  · Lt. Gen. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics;

bbb.   John Wiecezak;

ccc.   Roger J. Witte;

ddd.   Michael Wright;

eee.   Donald J. Vietor;

fff. Ron Yates;

ggg.   Tom Zeller;

hhh.   Any employee, officer, director, affiliate, agent or representative of the USAF;

iii. Any employee, officer, director, affiliate, agent or representative of any Defendant;

jjj. Any employee, officer, director, affiliate, agent or representative of the Plaintiff.

kkk.   Any employee, officer, director, affiliate, agent or representative of Concurrent Technologies Corporation ("CRI") or its parent, subsidiary or affiliate;

48.   Produce all documents evidencing, embodying, referring or relating to any communications between You and any employee or agent or officer or representative of the USAF or any U.S. Government agency, since January 1, 2004, in reference to KC-135 PDM

30

work or contracts or bids, or in reference to Pemco or AAI or any of their personnel, including without limitation any communications to, from or by anyone connected in any way with You, with, to or from any of the following Persons:

      a.  Bob Barber;

      b.  Otis Beaty;

      c.  David Berrio;

      d.  Dustin Cantley;

      e.  Casey Cox;

      f.  Darlene (Darleen) Druyun;

      g.  Larry Heath;

      h.  Col. Kenneth J. Moran

      i.  Col. Kevin J. Nally;

      j.  Joe Peters;

      k.  Ralph Petrosky.

      l.  Diana Petross;

      m.  Ronald Poussard;

      n.  Charles Reichers;

      o.  Gen. Charles T. Robertson, Jr.

      p.  Jim Stephens;

      q.  Arnold Swanson;

      r.  John Wiecezak;

49. Produce all documents and communications relating to BAOI's consulting work performed pursuant to a Sustaining Engineering Services Contract under the FY2008 Recompete.

50. Produce all documents and communications relating to Boeing's efforts or lack of efforts to comply with its obligations under the June 3, 2005 MOA to implement a firewall and take other precautions to protect Plaintiff's proprietary information.

51. Produce all documents and communications relating to Plaintiff's September 6, 2007 complaint to USAF Contracting Officer Jim Stephens regarding possible procurement integrity violations by Boeing.

52. Produce all documents and communications relating to Plaintiff's September 19, 2007 protest at the GAO regarding the USAF award of the FY08 Recompete KC-135 PDM to Boeing.

53. Produce all documents and communications relating to the GAO's December 27, 2007 decision sustaining Pemco's protest of the award to Boeing.

54. Produce all documents and communications relating to the USAF's March 3, 2008 new award decision again selecting Boeing for award of the FY08 Recompete KC-135 PDM Contract.

55. Produce all documents and communications related to the April 1, 2005 the bridge contract entered into between BASC and Pemco through a MOA for obtaining and sharing KC-135 PDM work for FY06 and FY07 on a PDM contract.

56. Produce all documents and communications related to the October 18, 2005 Repair Agreement No. 06-003 for a Long Term Requirements Contract ("LTRC") under Government Price Contract Proposal number FA8105-05-D-0004 between Boeing and Pemco.

57.     Produce all documents and communications related to the contract between the USAF and Boeing, in relation to number FA8105-05-D-0004 (the "2008 Bridge Contract"), modification P00024, including all records of aircraft worked on and all billings to the USAF.

58.     Produce all documents and communications related or referring to the October 18, 2005 Repair Agreement No. 06-003 for a Long Term Requirements Contract ("LTRC") under Government Price Contract Proposal number FA8105-05-D-0004 between Boeing and Pemco.

59.     All documents produced by any Defendant pursuant to Government Accountability Office proceedings relating to any and all bid protests by the Plaintiffs relating to the KC-135 PDM.

60.     All documents (without redactions) produced by any Defendant, or produced by the USAF and obtained by any representative of any Defendant (including its counsel), pursuant to discovery requests or subpoenas, in, or offered in any trial, hearing, appeal, motion or brief in, or used by any Defendant for any purpose or any manner, in the United States Court of Federal Claims case, *Alabama Aircraft Industries, Inc.-Birmingham v. United States and The Boeing Company*, Docket No. 08-470C (United States Court of Federal Claims), and/or in the appeals therefrom to the United States Court of Appeals for the Federal Circuit

61.     All documents evidencing, embodying, referring or relating in any way to the basis or grounds for, or support or justification for, and any calculations, computations or data relating to, Your termination (or Boeing's termination) of the 2005 MOA on June 6, 2006, pursuant to paragraph 5c of the 2005 MOA, wherein Roger Witte asserted in sum or substance that the contents of the USAF's RFP were "so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable."

62.    All documents evidencing any Communications of any kind between You and the USAF and/or any affiliate or representative thereof, regarding the new maintenance program for KC-135.

63.    All documents evidencing any critical path analysis of government Customer Furnished Materials Type 2 and/or Government Furnished Materials used by Boeing pursuant to 2008 Bridge Contract (#FA8105-05-D-0004), including but not limited to evidencing PDM days per aircraft and late materials deliveries.

64.    All documents evidencing any critical path analysis of government Customer Furnished Materials Type 2 and/or Government Furnished Materials used by Boeing pursuant to FY08 Recompete KC-135 PDM solicitation or contract number FA8105-05-R-0014, including but not limited to evidencing PDM days per aircraft and late materials deliveries.

65.    All documents evidencing any Communications of any kind between You and Plaintiff and/or Pemco, and/or the USAF and/or any affiliate or representative thereof, regarding assurances, status and or improvements related to the delivery of Customer Furnished Materials Type 2 and/or Government Furnished Materials to Plaintiff, without limitation any communications to, from or by anyone connected in any way with You, with, to or from any of the following Persons:

       a.   Rick Abbas;

       b.   Brian Cioli;

       c.   Larry Cohen;

       d.   Klaus G. Cox;

       e.   Veronica Harden;

       f.   Henry Gilson;

34

g.  Cheryl Holzum;

h.  Lawrence Lawton;

i.  Pat Leahy;

j.  Tim Marshall;

k.  Eddie Moore;

l.  Patricia Pena;

m.  Tommy Thompson;

n.  Randy Weatherford;

o.  Michael Wright,

66.    All documents evidencing any "over and above" work performed by AAI under the 1998 KC-135 PDM (and its extensions), the FY08 Recompete KC-135 PDM and 2008 Bridge Contract, including but not limited to repair/replacement work for uneven fuel burn, replacement of incorrectly-sized fasteners (rivets) and 200 plus man-hours for work on wing planks.

67.    All documents evidencing any Communications of any kind between You and Plaintiff and/or Pemco, and/or the USAF and/or any affiliate or representative thereof, regarding any "over and above" work performed by AAI under the 1998 KC-135 PDM (and its exertions), the FY08 Recompete KC-135 PDM and 2008 Bridge Contract, including but not limited to repair/replacement work for uneven fuel burn, replacement of incorrectly-sized fasteners (rivets) and 200 plus man-hours for work on wing planks, without limitation any communications to, from or by anyone connected in any way with You, with, to or from any of the following Persons:

a.  Rick Abbas;

35

b. Brian Cioli;

c. Larry Cohen;

d. Klaus G. Cox;

e. Veronica Harden;

f. Henry Gilson;

g. Cheryl Holzum;

h. Lawrence Lawton;

i. Pat Leahy;

j. Tim Marshall;

k. Eddie Moore;

l. Patricia Pena;

m. Tommy Thompson;

n. Randy Weatherford;

o. Michael Wright,

68.   Produce a copy of all insurance policies, settlement agreements, and indemnity agreements under which a person may be liable or obligated to provide you with a defense in this lawsuit and/or to satisfy all or part of a judgment, which may be entered in this action, or to indemnify, or to reimburse you for payments made to satisfy such a judgment.

69.   All documents evidencing any Communications of any kind between You and Plaintiff and/or AAI or Pemco or any affiliate or representative thereof, between January 1, 2000 and the date of your full response to this request.

70.     Any document You intend to use, or may use, or reserve the right to use, in support of any defense asserted by You, or on which your Answer to the Complaint is based or supported.

71.     Any documents you provide to any expert witness or consulting expert in connection with this case.

72.     All documents (without redactions) which refer or relate to AAI, Pemco or any of their affiliates, and all documents which you submitted to the General Accounting Office ("GAO"), and all pleadings and filings you made or submitted, in connection with those several and certain administrative proceedings sometimes styled as GAO File B-310372 (*Matter of: Pemco Aeroplex, Inc.*), including unredacted versions, and including all branches and stages of such GAO proceeding (such as File B-310372.1, B-310372.2, B-310372.3, B-310372.4, etc.).

73.     All documents (without redactions) which refer or relate to AAI, Pemco or any of their affiliates, and all documents which you submitted to the U.S. Government Accountability Office, and all pleadings and filings you made or submitted, in connection with, or which refer to, that certain administrative proceeding sometimes styled as *Bid Protest of Pemco Aeroplex, Inc. in Connection with RFP No. FA8105-05-R-0014.*

74.     All documents (including unredacted versions) which refer or relate to AAI, Pemco or any of their affiliates, which you provided to any party (or the court), and all pleadings and filings you made, in connection with that certain case, *In re Alabama Aircraft Industries, Inc.*, Case No. 11-10452 (PJW) (U. S. Bankruptcy Court, District of Delaware).

Dated: September 19, 2011                    */s/ Vincent J. Graffeo*
                                                      One of the Attorneys for Plaintiffs

**OF COUNSEL:**
J. Michael Rediker (RED004)

37

Roger A. Brown (BRO078)
Patricia C. Diak (DIA005)
R. Scott Williams (WIL167)
Peter J. Tepley (TEP002)
Vincent J. Graffeo (GRA108)
HASKELL SLAUGHTER YOUNG & REDIKER, LLC
2001 Park Place, Suite 1400
Birmingham, Alabama 35303
Phone: 205.251.1000
Facsimile: 205.324.1133
*Attorneys for Alabama Aircraft Industries, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing on all counsel of record by hand delivery and by certified mail by placing a copy of the same in the U.S. Mail, first class postage prepaid and properly addressed as follows, this the 19th day of September, 2011.

The Boeing Company
c/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Operations, Inc.
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Support Center
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

/s/ Vincent J. Graffeo
Of Counsel

3440093_6

39



Haskell Slaughter Young & Gallion, LLC

Post Office Box 4660

Montgomery, Alabama 36103-4660

Boeing Aerospace Operations, Inc.
C/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL 36104

ELECTRONICALLY FILED
9/22/2011 11:37 AM
CV-2011-903218.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC. – BIRMINGHAM, and PEMCO AIRCRAFT ENGINEERING SERVICES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> THE BOEING COMPANY, BOEING AEROSPACE OPERATIONS, INC. and BOEING AEROSPACE SUPPORT CENTER, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO: 01-CV-2011-903218.00

### FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Alabama Aircraft Industries, Inc., Alabama Aircraft Industries, Inc. – Birmingham, and Pemco Aircraft Engineering Services, Inc., by and through, Joseph Ryan as the trustee of the Litigation Trust established on September 8, 2011 pursuant to the order entered by the United States Bankruptcy Court for the District of Delaware on September 6, 2011 in the Chapter 11 bankruptcy case of Alabama Aircraft Industries, Inc., et al. (the "Debtors") as a representative of the Debtors' estates and for the use and benefit (1) of the Debtors

1

(who are also the Plaintiffs) and (2) of Kaiser Aircraft Industries, Inc. (the Plaintiffs being hereinafter, together, referred to for convenience as either "AAI," "Alabama Aircraft" or "Plaintiff") and file their first amended complaint for damages and equitable relief against Defendants The Boeing Company, Inc. ("Boeing"), Boeing Aerospace Operations, Inc. ("BAOI"), and Boeing Aerospace Support Center ("BASC") (collectively, "Defendants").

## I.   INTRODUCTION

1.     AAI brings this case to hold Boeing accountable for the deceptive, underhanded, fraudulent and unfair business practices that Boeing utilized to cripple AAI's business.  Consistent with its sordid history and pattern of corrupt practices, Boeing lured AAI into contractual arrangements with Boeing for joint bidding and completion of vital work on the U.S. Air Force's KC-135 Tanker Fleet. Boeing used those arrangements to obtain access in confidence to AAI's trade secrets and proprietary information.  Boeing then wrongfully terminated the joint-work agreements on a false pretext and without just cause, and misused AAI's proprietary information to win entirely for itself the Air Force's billion-dollar KC-135 maintenance/repair work, and, as a result, captured for itself tens of millions of dollars of profits that justly belong to AAI.  Thereafter, Boeing, which found it still was constrained by circumstances to use Plaintiff's services in order to fulfill contracts with the Air Force, engaged in further duplicity and deception of

2

AAI (and, incidentally, the Air Force), in the course of KC-135 repair and maintenance work, thus creating further damages to AAI and unjust enrichment of Boeing.   The ultimate effect of Boeing's unlawful activity described in the following complaint was essentially to destroy the profits of AAI's business.   AAI estimates damages in excess of One Hundred Million Dollars.

Thus, this case involves, among other Boeing misconduct:

(1)    Boeing's breaches of the teaming agreement between Boeing and AAI which occurred during a period beginning in 2006 and continuing thereafter.

(2)    Boeing's unauthorized, secret and wrongful conversion, appropriation and misuse for its own continuing profit and benefit of AAI's proprietary information in breach of confidentiality agreements with AAI, which, among other things, enabled Boeing to win the Air Force work on the KC-135 tankers which work Boeing is now performing and is contracted to perform for many years.

(3)    Boeing's unjust enrichment (and AAI's claims for disgorgement thereof) arising from Boeing's deception, breaches of duty and breaches of agreements, and its conversion and misappropriation of AAI proprietary information, which Boeing has enjoyed and will for the approximate next ten years be enjoying under its agreements with the Air Force, by reason of its misconduct.

(4)    Boeing's deception, fraud and wrongdoing relating to pricing of maintenance services provided to the Air Force (and its underpayments to AAI and

3

its unjust enrichment relating thereto or arising therefrom) in connection with the 2008 Bridge Contract for KC-135 tanker aircraft.

(5)   Boeing's repeated, and systematic, pattern of causing parts and materials, vital to the performance of contracts, to be sent late to AAI, and AAI's loss of valuable performance-based fees and delivery fee awards as a consequence thereof.

(6)   Boeing's crippling its competitor, AAI, in its ability to earn profits and continue its business.

(7)   Boeing's unfair competition and fraud, arising out of its contracting practices and arrangements with AAI.

(8)   Boeing's tortious interference and attempted interference with existing and prospective contracts and financing arrangements (such pattern and practices of wrongful conduct, extending even to the present date, as evidence of its *modus operandi*).

2.   In sum, Boeing Company, the world's second largest government contractor, has throughout the period of the 2000s to the present, exerted its massive financial power and position upon AAI, a relatively small military aircraft maintenance expert of long standing and good repute for its quality work, and tapped into AAI's proprietary secrets, thereby causing substantial harm to AAI. Boeing's actions harmed AAI in several ways, detailed below, and were

4

undertaken in order to deprive AAI of one half of a $1.3 billion government contract, and the revenues and earnings therefrom, and in order to cheat AAI out of millions of dollars on a second government contract, when Boeing forced AAI to work for minimal prices under false pretenses, and Boeing then inflated AAI's costs when it billed the government. As described hereafter, Boeing's actions violated its promises (promissory estoppel), breached its contracts, involved the conversion of (and trespass to) AAI's intellectual property and proprietary information, and unjustly enriched this behemoth. Boeing was throughout the relevant time period a law-breaker and a chiseler of the government and its business partner, and engaged in patterns of misconduct that were found in its dealings with AAI here.

## II.   **PARTIES**

3.     Plaintiff AAI (formerly known as Pemco Aviation Group, Inc., prior to September 17, 2007, and sometimes herein referred to as "Pemco" for historical recitation purposes, especially because older documents use the Pemco name) is and throughout the relevant time period has been a Delaware corporation with its principal place of business in Birmingham, Alabama, at the Birmingham airport site. As used herein, "AAI" and "Alabama Aircraft" each means and includes AAI's subsidiary, Plaintiff Alabama Aircraft Industries, Inc. – Birmingham ("AAI-Birmingham," formerly known as Pemco Aeroplex, Inc.), as well as AAI's

5

subsidiary/affiliate, Plaintiff Pemco Aircraft Engineering Services, Inc. ("PAES"). AAI was founded in 1983 and provides aircraft maintenance, repair and modification services for the government and military customers, focusing on Programmed Depot Maintenance ("PDM") on large transport aircraft, and designs and manufactures a range of proprietary aerospace products. AAI has facilities in Birmingham which it believes are the largest for third-party maintenance in North America, with approximately 1.9 million square feet under roof. AAI and its predecessors have been performing PDM for the KC-135 Stratotanker fleet since 1969, and have processed over well over 2,400 such aircraft, more than any other provider of these services, and far more than Defendants. AAI (under its Pemco name) provided KC-135 PDM services as a prime contractor under a contract with the Air Force awarded in August 1994 and performed through 2001. During that time, AAI was the only commercial prime contractor providing KC-135 PDM services (except that after 1998 Boeing, who had a contract, was also performing some such work). In 2008, as detailed hereafter, AAI was still providing KC-135 PDM services but as Boeing's subcontractor, and its government subcontracts with Boeing for KC-135 PDM services represented approximately 83% of AAI's total revenue from continuing operations.

4.     Defendant Boeing is a major aerospace and defense corporation organized under the laws of the state of Delaware with its international

6

headquarters located at 100 North Riverside, Chicago, Illinois 60606-1596. Boeing is, on information and belief, the second-largest aerospace and defense contractor in the world, with 2009 revenues in excess of $68 billion, of which virtually half ($33.6 billion) came from the "Boeing Defense, Space & Security" line of business. At the end of 2009, Boeing had a Contractual Backlog in its "Boeing Defense, Space & Security" line of business of more than $46 billion, of which Military Aircraft comprised $26.3 billion in government military aircraft contracts (not counting "unobligated backlog" of government definitive contracts for which funds have not yet been authorized). Boeing is, and for many years has been, qualified to do business in Alabama; its registered agent is CSC Lawyers Incorporating Service, 57 Adams Avenue, Montgomery, AL 36104-4001. Boeing has during the relevant time period had offices or places of business, and employees and agents residing or working in the Birmingham, Alabama and Huntsville, Alabama areas. Defendant Boeing has done business in Birmingham, Alabama with plaintiff AAI both itself and through BASC, BAOI, and other Boeing affiliates.

5.     Defendant BAOI, a Delaware corporation, is, or during the relevant time period was, a corporate wholly-owned subsidiary of Defendant Boeing and, on information and belief, was an alter ego of defendant BASC (or, alternatively, BAOI did business as and under the name of BASC), and was used by Boeing in

7

order to enter into various agreements and business dealings with Plaintiff AAI, and to bid on Air Force defense contracting work. On information and belief, BAOI operated in, and during the relevant time period has had employees resident and/or working in, Birmingham, Alabama, among other places in Alabama. BAOI has its headquarters at the same place listed below for defendant Boeing, and has also been qualified to do business in Alabama.

6.     Defendant BASC is, or during the relevant time period was, a wholly-owned subsidiary or division of Defendant Boeing, used by Boeing in order to enter into various agreements with Plaintiff AAI. On information and belief, BASC was the "d/b/a" entity or name under or by which defendant BAOI and/or defendant Boeing operated during the relevant time period, at least with respect to the KC-135 related activities and Pemco/AAI related activities that are the subject of this action. BASC has also been referred to as Boeing Logistics Support System and currently operates as Boeing's Global Services and Support. BASC operated in, and during the relevant time period has had employees residing and/or working in, Birmingham, Alabama, among other places in Alabama. BASC has its headquarters at the same place listed below for defendant Boeing, and has also been qualified to do business in Alabama. Plaintiff alleges that BASC was an alter ego for defendants Boeing and BAOI. If Plaintiff is mistaken as to the nature,

8

identity or organization of BASC, Plaintiff seeks leave to amend to correct or supplement such facts.

7.     Unless otherwise specified herein, the term "Boeing" shall be deemed to mean and include Boeing, BAOI, and BASC, together, especially since, as more particularly shown hereafter, The Boeing Company was the entity which controlled and caused its divisions and subsidiaries to enter into agreements with AAI and which acted to interfere with and to .terminate arrangements and agreements between plaintiff AAI and various of The Boeing Company's wholly-owned and controlled subsidiaries.   Numerous actions material to the causes of action herein were taken by Boeing personnel under or in the name of The Boeing Company.

### III.   JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction as well as personal jurisdiction over the parties.  The defendants have sufficient minimum contacts in this state to provide personal jurisdiction over them.   Defendants entered into contracts with AAI for services to be performed in Alabama, obtained substantial profits from work performed by AAI in Alabama, and submitted joint proposals with AAI to the United States Government with AAI as its prime subcontractor. Defendants maintained offices and places of business in Alabama, particularly in this County, with agents and employees working and/or residing in this County.

Defendants were doing business in Alabama or with persons situated in Alabama and in this County during the relevant time period, and defendants caused tortious damage by act or omission in this state and this County. Each Defendant either directly or through agents, who were at the time acting with actual and/or apparent authority and within the scope of such authority, separately but also acting in concert or conspiracy and materially aiding each other in respects set forth herein, has: (i) transacted business in and from this state; (ii) contracted to supply or obtain services or goods in and from this state; (iii) caused tortious damage by act or omission in and from this state; (iv) caused tortious damage by act or omission in and outside this state, while such defendant regularly does or solicits business in and from this state or engages in other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered or capital raised in and from this state; (v) caused damage in this state to AAI by breach of covenant, representation, promise and/or warranty when defendants reasonably expected AAI to be affected thereby in this state, while such defendant regularly does or solicits business in and from this state or engages in other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered or capital raised in and from this state; and/or (vi) otherwise had the requisite minimum contacts with this state, and, under the circumstances, it is fair

and reasonable to require defendants to come to this state and this County to defend this action.

9.     Venue is proper in this Court by reason of the foregoing and the facts set forth hereafter.

## IV.   FACTS

### A.     Background

10.     As aforesaid, Alabama Aircraft (including its predecessors) has been performing PDM in Jefferson County, Alabama for the KC-135 Stratotanker fleet since approximately 1969, and has processed well over 2,400 such aircraft, more than Boeing or any other provider of these services.  The KC-135 Stratotanker is used primarily for refueling Air Force long-range bombers, although it is also used by other Air Force, Navy, and Marine Corps aviation units for aerial refueling support.  AAI has performed many major upgrades of the KC-135 fleet in the past as part of its PDM services, including wing re-skin, major rewire, corrosion prevention control, auto pilot, and fuel savings advisory system modifications.  In 2006, Boeing (as primary contractor on the KC-135 PDM program, see below) was by far AAI's largest customer, accounting for 74% of AAI revenues, and in AAI's fiscal year ended 31 December 2008, Boeing's KC-135 PDM contract revenues amounted to approximately 83% of AAI's revenues.

11

**B.** **History of the KC-135 PDM Program**

11.     In or about August 1994, after a competitive bidding process, the
United States Air Force ("USAF" or "Air Force") awarded Pemco (as AAI was
known at that time) the 1994 PDM Contract to perform maintenance on its KC-135
aerial refueling tanker aircraft ("KC-135 PDM Contract"), for a period of one base
year and six option years.  Pemco was the prime contractor under the 1994 KC-135
PDM Contract and was the only commercial prime contractor providing KC-135
PDM services at that time.  AAI completed work on the final aircraft inducted for
PDM under this contract during 2003.

12.     In 1998, the United States Air Force issued a Request for Proposals
(often known as a "RFP") that combined KC-135 PDM with work on the A-10
aircraft and other services.   The USAF procurement officer overseeing such
activity was Darleen Druyun.   On information and belief, in 1993 Congress
investigated Druyun for alleged involvement in a plan to speed up payments by the
USAF to a Boeing predecessor, McDonnell Douglas.  Although other personnel
were discharged from the Air Force, Druyun kept her position.

13.     Pemco, then, in 1998 as the prime contractor for KC-135 PDM under
the 1994 KC-135 PDM Contract, could perform the KC-135 PDM work but was
not able to perform the other services bundled in the RFP.  Pemco took proper

steps to protest the bundling of the KC-135 PDM with the other services, and the U.S. Government Accountability Office (the "GAO"), known as "the congressional watchdog" sustained Pemco's protest. *See Pemco Aeroplex, Inc.*, B-280397, 98-2 CPD ¶ 79 (Sept. 25, 1998).

14.     Despite the GAO's finding in Pemco's favor on its 1998 protest, the Air Force (through the direction of said senior USAF procurement officer, Darleen Druyun) on information and belief acting in concert or conspiracy with Boeing, permitted the bundled RFP to go forward, and she awarded or allowed to go forward the bundled contract with Boeing.

15.     Druyun's history with Boeing was long, sordid and eventually proved to be criminal in nature. In 2000, Druyun sent resumes of her daughter (only recently graduated from college) and her daughter's fiancé, an aeronautical engineer, to Boeing, which hired both. At about that same time, Druyun agreed to pay $412 million to Boeing in settlement of a claim related to a C-17 aircraft contract, later admitting that she recommended the payment because her daughter's fiancé was seeking the above-mentioned Boeing job. In 2001, Druyun supervised a $4 billion contract award to Boeing for modernization of avionics on C-130 J aircraft, in which (she later admitted) she favored Boeing over four competitors because of Boeing having given her son-in-law his job.

16.     In May 2001, Boeing submitted a $119 million request for equitable adjustment ("REA") to the Air Force for the 1998 KC-135 PDM Contract.  The Air Force, at the urging of Darleen Druyun, quickly settled the REA for $35.8 million – significantly more than was appropriate.[1]  Then, in 2002, Druyun (as she later has admitted) assisted Boeing to obtain a $100 million NATO AWACS contract, at what later was said to have been inflated in favor of Boeing.  On information and belief, in that same time period, when Druyun's daughter was at risk of job termination for poor performance, Druyun interceded with Boeing, and her daughter kept her job.  Druyun has eventually admitted providing Boeing with assistance on many contracts.

17.     On information and belief, as early as September 2002, Druyun and Boeing engaged secretly for a period of time in discussions about Boeing hiring Druyun herself, during a period of time she was responsible to the Air Force for supervision of its dealings with Boeing.  As a result of Druyun's discussions with Boeing, Boeing hired Druyun and she joined Boeing in January 2003 as deputy general manager of Boeing's Missile Defense Systems unit, obtaining a $50,000 signing bonus and an annual salary of $250,000.

---

[1]  In addition to the REA, Boeing requested, and the Air Force issued, a modification to the contract that eliminated the Air Force's review of Over and Above work requests for less than 75 hours.  The elimination of the work request review led to abuses.  Boeing began to "task split," so that its work requests would be for less than 75 hours and Boeing could avoid having to justify the reasonableness of work to the Air Force.  *Id.* at 5.  Boeing also substantially marked up Pemco's prices which further increased government costs.  Boeing's practices lead to a huge increase in cost for the Air Force in connection with the KC-135 PDM program.

18.     Then, later in 2003, questions arose concerning Druyun's role in a proposed $23 billion deal with Boeing for a lease-purchase of 100 new refueling KC-767 tankers.  Boeing fired Druyun on November 24, 2003.  Subsequently, in December 2003, the government announced a freeze on the KC-767 tanker project while an investigation was conducted into corruption charges involving Druyun and Boeing.  Druyun was subsequently arrested and pleaded guilty on April 20, 2004 to having done a number of matters, including inflating the price of the KC-767 contract to favor Boeing and to passing information to Boeing on its competitor's bid, all while she was negotiating employment for herself with Boeing.  In October 2004, Druyun was sentenced to nine months in federal prison (she was released on or about September 30, 2005).  As part of her guilty plea and plea agreement, Druyun admitted that she did "favor the Boeing Company in certain negotiations as the result of her employment negotiations and other favors provided by Boeing to [her]."

19.     As a result of facts learned during the Druyun investigation, Boeing's CFO, Michael M. Sears was also fired at Boeing on November 24, 2003, and later, on February 18, 2005, was sentenced to four months in prison.  Additionally, Boeing's CEO, Phil Condit, was forced to resign his position on December 1, 2003, and Boeing ultimately paid a $615 million fine, the largest financial penalty ever levied on a military contractor.

15

20.     Pemco incurred substantial losses as a result of the actions of the Air Force (whose activity regarding the tanker contract was being directed by Druyun) and Boeing regarding the award of the 1998 KC-135 PDM Contract.

21.     Moreover, the Druyun/Boeing Affair was and is emblematic of not only Boeing's "MO" (Method of Operation) in securing government contracting work, but contains pertinent examples of Boeing's **pattern and practices** of conduct, and of its **motives and plans,** of using insider contacts and communications, and improper influences and dealings, and obtaining and misusing competitors' proprietary information, to prevail over competitors (especially AAI/Pemco, but not limited to AAI/Pemco) in securing and renewing government contract work (*see* Ala. R. Evid. 404(b) and 406), all as more particularly alleged hereafter.

22.     Plaintiff alleges that Boeing's said pattern and practices of conduct, and said motives and plans, continued and were wrongfully used by Boeing with the USAF after the Druyun/Boeing Affair, in order to defeat AAI/Pemco's opportunities and frustrate its rights, in and about the KC-135 PDM Program, as more particularly hereinafter alleged.

16

### C.   AAI's Initial Agreement with Boeing

23.   After obtaining the 1998 contract award, Boeing had significant performance problems of its own making on the 1998 KC-135 PDM Contract that it had managed to obtain under questionable circumstances.  For example, in or about August 2000, the Federal Aviation Agency (the "FAA") fined Boeing $1.6 million for failing to hold its suppliers accountable for their failures to adhere to quality control practices.  *See FAA Fines Boeing Lax in Scrutiny of Suppliers*, Seattle Times, Aug. 3, 2000, at A1.

24.   Due to Boeing's failure to adequately perform its obligations under the 1998 KC-135 PDM Contract and the impending end to Pemco's 1994 KC-135 PDM Contract, the Air Force itself directed Boeing and Pemco to enter into a teaming arrangement where Pemco as subcontractor, in Jefferson County, Alabama, would perform KC-135 PDM work *for Boeing* under the 1998 KC-135 PDM Contract for fiscal years 2002 through 2007.

25.   In compliance with this government request, on or about October 7, 2000, Pemco and Boeing entered into a Memorandum of Agreement ("MOA") wherein Pemco agreed to serve as a subcontractor to Boeing for the 1998 KC-135 PDM contract for fiscal years 2002 through 2007.

17

26.     Boeing continued to have problems within its own ranks during the performance of the 1998 KC-135 PDM contract.  On or about October 31, 2000, it was reported that Boeing manufacturing facilities failed to meet FAA quality regulations resulting in proposed fines totaling $892,000.  *See Findings of FAA's Special Audit of Boeing Factories*, Seattle Times, Oct. 31, 2000, at A11.  On or about March 27, 2002, it was reported that the FAA proposed fining Boeing $350,000 for failure to adhere to quality control standards in the 1990s, arising from improper conduct, including accepting defective parts from a supplier.  *See FAA Fine Proposed Against Boeing Faulty Quality Control in Mid-1990s Alleged*, Seattle Times, March 27, 2002, at E1.

27.     In or about July, 2003, the Air Force suspended Boeing Launch Services after the Air Force found that Boeing had committed "serious and substantial violations of federal law" in connection with the 1998 competition for a U.S. Air Force Evolved Expendable Launch Vehicle (EELV) contract.  The violations included the fact that Boeing employees obtained more than 25,000 pages of documents belonging to Lockheed that helped Boeing win the procurement competition.  As a result of the suspension, many of the EELV contracts were taken away from Boeing and transferred to Lockheed.

18

28.     Boeing's misconduct jeopardized AAI's own prospects, given that AAI was a subcontractor on the KC-135 PDM contract and was thus dependent on Boeing keeping the business.  As a result of Boeing's failure to meet minimum quality standards, on or about November 30, 2004 (after the Druyun investigation and after Druyun's guilty plea), the Air Force elected not to exercise the final two option years of the 1998 KC-135 PDM.  Accordingly, rather than extend the 1998 KC-135 PDM Contract with Boeing until 2007, the Air Force terminated the contract.[2]  When the USAF elected to not exercise the final two option years of this contract to Boeing, it instead awarded a "bridge" contract for government fiscal year 2006 and 2007 inductions of aircraft followed by two six-month options, which could result in inductions continuing through September 2008.

29.     Meanwhile, the repercussions of the Boeing/Druyun Affair were still coming to light.  In or about February, 2005, the GAO sustained a protest of an award of a contract for the small diameter bomb (SDB) program to Boeing as a result of Darleen Druyun's involvement in changing the evaluation criteria which appeared to favor Boeing.  *See Lockheed Martin Corporation*, B-295402, 2005 CPD ¶ 24 (February 18, 2005).

---

[2] The decision to terminate the contract was not based on Pemco's performance as a subcontractor.  Pemco satisfied its quality standards under the contract.  Pemco's quality, as measured by defects per aircraft over the previous five years, was superior to Boeing's.  In fact, Pemco's quality was significantly higher than Boeing's, in spite of the fact that Pemco was being sent aircraft with more major structural problems than were being sent to Boeing.  Pemco's quality was sufficient for it to retain the contract.

30.     On or about February 24, 2005, the GAO sustained a protest against an award to Boeing of a contract for the avionics modernization upgrade program (AMP) for C-130 aircraft as a result of Darlene Druyun's bias toward Boeing and her effort to elevate Boeing's ratings and downgrade the ratings of its competitors. *See Lockheed Martin Aeronautics Company; L-3 Communications Integrated Systems L.P.; BAE Systems Integrated Defense Solutions, Inc.*, B-295401 et. al., 2005 CPD ¶ 41 (February 24, 2005).

**D.     The USAF 2008 Recompete KC-135 PDM RPP and the 2005 Boeing/Pemco Agreement to Jointly Bid for Such 2008 PDM**

31.     Boeing and AAI commenced conversations about teaming up, and jointly entering into teaming agreements for the government KC-135 PDM work, as early as the period of February to March, 2004, in meetings held by Pemco (AAI) personnel with Pat Finneran, Vice President and General Manager of BASC, and others, that continued into 2005.  For example, a meeting with Boeing and Boeing subsidiary personnel, by Pemco officers and personnel, on strategic planning to teaming on projects and including a "partnership" approach and strategy on the FY08 KC-135 PDM, was held on June 24, 2004.

32.     On August 13, 2004, Boeing's Finneran and a number of other personnel of Defendants came to Alabama, visited and inspected Pemco's operations here in Jefferson County, Alabama, and further discussed KC-135 PDM

20

work.  On September 1, 2004, two Boeing representatives (including Finneran) and Pemco's President and CEO Ron Aramini jointly made a briefing presentation to representatives of Alabama Senators Shelby and Sessions in which, among other things, it was represented that "Boeing intends to continue a long-term relationship with Pemco."  Further discussions about "partnering" and "teaming" were held in early 2005 between Defendants and Plaintiff.  In one communication on February 8, 2005, Pemco pointed out to Boeing some cost data and summarized, "[i]t certainly appears that the Pemco contribution to the [Boeing/Pemco] blended rate is significant and that, without the lower cost from Pemco, the Boeing cost would be prohibitive."

33.     As part of an April 6, 2005 meeting between Pemco and Boeing on teaming concepts and issues, Boeing's officer, Boeing's Pat Finneran, related his conversations with Lt. Gen. Donald J. Wetekam, USAF, Deputy Chief of Staff for Installations and Logistics, who was responsible for logistics readiness, aircraft maintenance and setting logistics policy.  Lt. Gen. Wetekam had asked Finneran how Boeing – if a two repair-facility team were involved – would handle the situation where PDM quantities declined in certain "out" years.  Boeing's officer, Finneran, told Pemco that he advised General Wetekam (who was satisfied with this response) that in such an instance, Boeing would send all the PDM work to Pemco in Alabama, and Boeing would perform the parts management and

engineering, and that by the time this happened, Boeing would have other work to keep the rates under control at Boeing's San Antonio facility. Boeing's Finneran also informed Pemco representatives that Boeing recognized that Pemco's favorable, low rates were needed by Boeing in order to make a Boeing PDM contract proposal "affordable."

34.     By May 1, 2005, Boeing, as drafter, had provided to Pemco a draft of the 2005 Memorandum of Agreement with its related Workshare Agreement and Non-Disclosure Agreement. The draft was sent by Boeing's Roger J. Witte, Jr. The Boeing draft of the Workshare Agreement provided for 50% of the work to go to Pemco. Within a few days thereafter, Pemco, which was suffering from an inferior bargaining position overall but which did have a lower cost structure than Boeing (and Boeing knew it), sent back its requested revision of such draft Memorandum of Agreement. Pemco attempted to cut down on some of the more onerous Boeing provisions in Pemco's proposed revisions, but in many respects Boeing rejected these with an ultimatum to take it or leave it (*see infra*).

35.     On or about May 20, 2005, the Air Force released its draft RFP for the FY08 Recompete KC-135 PDM Contract, with a RFP number of FA8105-05-R-0014 (hereafter, the "RFP") for the FY08 KC-135 PDM work.

36.     The RFP contemplated a **Best Estimated Quantity ("BEQ")** of 44 KC-135 aircraft per year, delivered to private industry contractors for PDM work, would be involved under the Contract.[3]   On June 2, 2005, on letterhead of The Boeing Company with an address shown as being BASC's facility in San Antonio, Texas, Boeing officer, Roger J. Witte, Jr., transmitted to Pemco, on basically a "take it or leave it" basis, a revised Memorandum of Agreement, for Pemco to sign.  Referring to the Boeing meeting with Pemco on April 6, 2005, *supra*, Witte said, in his transmittal:

> Attached is Boeing's final offer for the Re-compete MOA for KC-135 PDM.  Boeing requests that Pemco acknowledge by accepting the changes as written, signing and returning to Boeing, via Fax, the attached MOA and Exhibits A and B thereto, no later than 4:30 PM CST Friday, June 3, 2005.
>
> Boeing believes that the attached MOA meets all of the criteria offering by Mr. Pat Finneran to Mr. Ron Aramini during their meeting on April 6, 2005, and is a good faith offer pursuant to those discussions.
>
> If Pemco does not acknowledge by signing and returning via Fax the attached MOA and Exhibits A and B thereto, as written, by 4:30 PM CST on Friday, June 3, 2005, Boeing's offer is officially withdraw for consideration. ...

37.     In reliance upon the representations made to it by Boeing and the foregoing long course of discussions, and recognizing that Boeing had (as stated above in Witte's letter) made its final offer of a MOA, Pemco decided to team with

---

[3]   Plaintiff believes the original RFP called for one aircraft in base period 1, eight aircraft in base period 2, 28 in base period 3, and 44 aircraft in base period 4 through option period 5.

23

Boeing rather than to submit an independent proposal as a prime contractor for the FY08 Recompete KC-135 PDM Contract or else team with another company besides Boeing. On June 3, 2005, as directed by Boeing, Pemco (acting through its wholly-owned subsidiary, Pemco Aeroplex) and Boeing (who caused the agreements to be placed through its controlled divisions, BAOI and BASC) entered into a Memorandum of Agreement ("6/2005 MOA") to submit a joint proposal for the KC-135 PDM Contract under a "teaming" arrangement in which Boeing would be the prime contractor and Pemco would be the principal subcontractor, performing the PDM work at Pemco's Birmingham facility. The 6/2005 MOA required that the parties "use their best, combined efforts to secure the prime contract" anticipated by that MOA. *Id.* at Section 2.2.

38.     The 6/2005 MOA required Pemco to provide to Boeing (and to BASC, which was fronting for BAOI and Boeing) proprietary "technical and cost proposal information" and the cost proposal was required to "contain sufficient supporting data to permit BASC evaluation of the cost proposal." *Id.* at Section 3.4. Pemco, for its own part, complied with such contract requirement, and in reliance upon Boeing's representation that it would be kept confidential, Pemco provided Boeing with Pemco's proprietary technical and cost proposal information.

24

39.    However, there was not an equal and reciprocal flow of all of Boeing's proprietary information back to Pemco.  Pemco was the subcontractor, and Boeing (and the USAF, apparently) required Pemco to provide all its proprietary information; but Boeing, as the Prime Contractor, was not required to (nor did it) reciprocally provide to Pemco all of Boeing's proposed unit prices or other amounts and levels of detail of proprietary information (and methodology) as was being given to Boeing by Pemco.  (Thus, if any separate bidding process were later to occur (as eventually occurred), Boeing possessed critically important and advantageous non-public, proprietary information about Pemco's pricing, costing and bidding methodology, but Pemco did not have equivalent information about Boeing.)

40.    The 6/2005 MOA also contained a Non-Disclosure Agreement, as Exhibit "B."  Under the Non-Disclosure Agreement, the proprietary business and financial information provided by Pemco to Boeing was to be used solely "for the purpose of negotiating a Memorandum of Agreement leading to a long-term subcontracting relationship relating to the [KC-135 PDM] program."  *Id.* at ¶ 1. The Non-Disclosure Agreement also provided that "each party shall safeguard the Proprietary Information exchanged up to the date the relationship ends, and ensure that such data is not used against the disclosing party's interests."  *Id.* at ¶ 12.

41.   The 6/2005 MOA also contained a Work Share Agreement, attached as Exhibit A thereto, that recognized the possibility that the BEQ of 44 aircraft was only an estimate and that the actual number of planes involved in the Program was subject to change.   The Work Share Agreement provided that in the event the number of aircraft involved in the FY08 Recompete KC-135 PDM program "drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties that the touch labor would be performed entirely at Pemco with the engineering and procurement remaining at BASC."   The Work Share Agreement provided that if KC-135 inductions awarded on the contract began to be reduced, the parties would mutually agree on the financial feasibility point at which reductions of BEQ had reached such as to trigger the shift of 100% of touch labor to Pemco (*i.e.*, the point at which "the number of aircraft drops below a quantity that sustains two Sources of Repair"). The 6/2005 MOA thus included contingencies for performance with as few as 24 aircraft undergoing KC-135 PDM per year. Thus, Boeing (including its affiliates) from the outset knew and expected (and contracted with reference to such knowledge and expectations) that the KC-135 PDM contract that was being jointly bid for with Pemco, as a joint project and undertaking of theirs, could be for as few as 24 aircraft per year, and, nevertheless, committed to and agreed with Pemco that it would accept Pemco's proprietary

information and use it to proceed with obtaining the USAF contract and business for both companies, on the KC-135 PDM.

42.     Such express contractual recognition of the potential substantial drop in BEQ and the consequent shifting of touch labor to Pemco, entirely if necessary, was in keeping with Defendants' representations, made through Boeing's Finneran on April 6, 2005, that: (1) Boeing knew Pemco's costs were substantially lower than Boeing's, and Boeing needed Pemco's lower costs; (2) the PDM job with the USAF would be "affordable" for Boeing with Pemco involved and doing the work in Birmingham; and (3) Boeing had explained to the senior USAF general that in the event of a drop in supplied aircraft, Boeing would handle the situation by shifting the PDM work to Pemco, with Boeing retaining the parts management and engineering work.

43.     As aforesaid, under the terms of the 6/2005 MOA and based upon the protection provided by the Non-Disclosure Agreement contained therein, Pemco provided to Boeing cost and pricing information for the FY08 Recompete KC-135 PDM Contract, which, among other things, necessarily included and revealed Pemco's bidding methodology. Boeing required Pemco to provide it with detailed proprietary data, including information about Pemco's labor rates, estimates of required labor hours, detailed unit costs, learning curves on hours expended, other

27

material costs, and material usage estimates. Pemco would not have provided this very sensitive, bidding-critical information absent Boeing's explicit agreement – which Boeing in fact gave to Pemco in this contract – that this information would be protected and not be used against it for competitive purposes.

44.     On July 20, 2005, a month and a half after signing the 6/2006 MOA, Boeing and Pemco representatives held an executive level meeting regarding implementation of the contractual teaming arrangements, at which (among other things) a lengthy PowerPoint presentation, prepared by Boeing, was made, entitled, "KC-135 Program Depot Maintenance Source Selection Campaign – Boeing and Pemco Joint Executive Review." Such presentation reflected that the "total program value" of the jointly-sought contract for Boeing/Pemco was $1.3 billion, with a "contract value" of $175 million per year to the two companies, and that the type of contract with the USAF would be "Firm Fixed Price, Award Fee." Substantial attention was devoted to the downside risks – and handling such risks – of reduced numbers of KC-135 aircraft being provided by the USAF for industry PDM.

45.     An analysis of "Current Environment" noted that "budget pressures in the Air Force have caused 4 aircraft inductions to be reduced in fourth quarter FY05." Further in the presentation, it was discussed that the KC-135 "E" models

28

would be retired and that during the government contract period, the number of aircraft per year that the USAF provided to private industry (*i.e.*, Boeing/Pemco) could only be 28 aircraft. Boeing's presentation said, "Expect RFP [from the USAF] to have a range of 25 – 40 aircraft per year to accommodate KC-135 E/D retirements." Another analysis related as a "Threat" whether there would be "Sufficient aircraft for two industry sources." Therefore, the issues of a considerably reduced supply from the USAF of aircraft to the Boeing/Pemco team was fully vetted and analyzed, and taken into account by Boeing, who led the discussions. Yet in face of such knowledge and discussion, and most impressively to Pemco as a result, Boeing knowingly proceeded with its Work Share Agreement with Pemco.

46.    After all the foregoing, and in light of it, effective on September 6, 2005, the 6/2005 MOA was re-issued by Boeing and Pemco, and amended by the addition of another company in the biding venture and the revised MOA (the "9/2005 MOA") was signed for Boeing by BASC, and the other two signatories were Pemco Aviation Group, Inc. (the plaintiff) and the other company. Specifically, the other company signed the 9/2005 MOA on August 31, 2005, Pemco signed it on September 2, 2005, and Boeing signed it on September 6, 2005, and dated the agreement with the date of September 6, 2005. (Plaintiffs do not charge such other company with any misconduct herein.)

29

47.     With the exception of adding another company as a co-venturer, the material terms of the 9/2005 MOA as they bear upon the Boeing/AAI relationship and deal, were essentially the same as the 6/2005 MOA.  As between Boeing and plaintiff AAI (and including their respective subsidiaries), the agreement of the parties was and is embodied in the 6/2005 MOA and 9/2005 MOA, including the stated attachments thereto, one of which was a Work Share Agreement, and such two agreements (including the Work Share Agreement and the other attachments) are hereafter referred to together as the "2005 MOA."  Such 2005 MOA embodies the intentions and promises of Boeing and AAI that they would have a long-term relationship to jointly perform "the Program," which was defined as being "the Program Depot Maintenance for the KC-135 Aircraft."

48.     Thus, the 2005 MOA, as amended through September 2005, stated in its recitals, among other things:

- "... BASC and Pemco are currently working together under ... KC-135 Programmed Depot Maintenance (PDM) to cover Fiscal Year (FY) 2002 through FY05 **and the parties wish to continue their relationship for the Program**..." [*id.*, p. 1, emphasis added].

- "... the Parties recognize they will **maintain an exclusive relationship with each other during** the proposal and **performance**

30

**of the Program** as described in Exhibit A ..." [*id.,* p. 1, emphasis added]. The reference to "Exhibit A" was a reference to a "Work Share Agreement."

49.     **Under the Work Share Agreement entered into as of September 6, 2005, as a part of the 2005 MOA, Boeing (and the other company) agreed that "[u]pon successful award of a contract for the Program, it is agreed that Pemco will receive 50% of all KC-135 inductions awarded on said contract."** Further, under the Work Share Agreement entered into in September 2005, Boeing (and the other company) expressly contemplated that their relationship with Pemco would continue even if the BEQ dropped to a low level that would not sustain both Boeing and Pemco operating their two facilities: **"In the event that the number of aircraft drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties that the touch labor would be performed entirely at Pemco with the engineering and procurement remaining at BASC."** (Emphasis added). Such provisions were consistent with the earlier representations that Boeing's officer, Finneran, told Pemco he had made to the Air Force, that the hands-on work would be performed at Pemco in Birmingham.

50.     Further, the 9/2005 MOA provided in section 2.2 that after the award of the PDM contract, "the **intent of the Parties shall be to work together** to enhance the execution of the Program, **enabling equal and coordinated**

31

**representation** with the Customer [USAF]…" (emphasis added). Under the general topic, "The Relationship of the Parties," the 9/2005 MOA provided, in section 1.1.1, that Boeing agreed, "notwithstanding the language below, to use all reasonable means to consult with Pemco and … on material issues or items prior to making any decision." Section 1.5 reinforced the Workshare Agreement's guarantee of work to Pemco: "BASC or … may not perform the Work Share designated for Pemco (as contained in Exhibit A Pemco Work Share Agreement) or subcontract work to others than Pemco so long as Pemco meets its obligations hereunder."

51.     Shortly before putting its signature on the 9/2005 MOA, and in line with earlier discussions, Boeing requested assurances that Pemco would upgrade its facilities for the FY08 Recompete KC-135 PDM Contract. Following final and complete execution of the 9/2005 MOA, on September 8, 2005, and in reliance on Boeing's representations, and in belief that Boeing was dealing in good faith, Pemco committed in writing to invest, and thereafter did invest, $5 million on facility information systems and implementation of Boeing's programs at Pemco's site, in response to Boeing's request. Further, Pemco executives and employees expended a substantial amount of money, in the form of officer and employee effort and expenditures, between September 6, 2005 and June 2006, on complying with Pemco's commitments as a Team member under the 2005 MOA and in

carrying out the necessary groundwork for "hitting the ground running" when the USAF issued its RFP. Pemco would not have restricted itself as it did in the 2005 MOA, nor spent such large amounts of moneys in implementation of the 2005 MOA after it was signed, but for Boeing's continuing inducements and representations, that extended past the date of September 6, 2005.

52.    In the April 2006 issue of *Boeing Frontiers* online, the Defendants recognized the substantial amount of investment that Pemco was making under the 2005 MOA:

> Boeing and its supplier-partner Pemco Aeroplex Inc. are transforming the programmed depot-level maintenance (major overhaul) processes for the U.S. Air Force KC-135 tanker fleet.
>
> Through a series of Lean initiatives implemented at Boeing Support Systems in San Antonio earlier this year and scheduled for full implementation at Pemco's Birmingham, Ala. Facility this fall, the team is accelerating the aircraft's return, thereby enhancing the customer's capabilities.
>
> * * *
> Boeing is investing $6.5 million to implement Lean improvements on the KC-135 PDM program in San Antonio. Pemco is making similar investments in its facility; once completed in September, that site's KC-135 PDM line will look exactly like the one in San Antonio.

53.    Meanwhile, on or about August 19, 2005, i.e., during the interval between the 6/2005 MOA and the 9/2005 MOA, the Air Force formally released the FY08 Recompete KC-135 PDM Contract RFP, number FA8105-05-R-0014.

Boeing and Pemco jointly worked under the 2005 MOA to bid in response to such RFP.

54.    Also, with respect to the ongoing KC-135 PDM being carried out under the 1998 contract, on or about October 1, 2005, the Air Force awarded a "Bridge Contract" for KC-135 PDM to Boeing, with Pemco as Boeing's subcontractor, pending award of the FY08 Recompete KC-135 PDM Contract.

55.    In compliance with its contractual obligations, and in reliance on Boeing's representations, Pemco did not submit a separate bid for the FY08 Recompete KC-135 PDM Contract in response to the RFP.    Instead, Pemco assisted Boeing in preparing a proposal for the FY08 Recompete KC-135 PDM Contract and, as part of such process and in order to further the joint enterprise, Pemco provided Boeing with a substantial amount of Pemco's confidential and proprietary information in connection with the proposal.  On or about October 31, 2005, and using Pemco's data and proprietary information in order to do so, Boeing submitted the joint bid proposal in response to the RFP as a prime contractor, with Pemco acting as its principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

56.    As part of Boeing's pattern and practice conduct, it regularly had ex parte communications with Air Force representatives about the subject of KC-135 PDM work in which Pemco held a joint interest with Boeing, without Pemco being

either a party to such communications or being advised of the existence or content thereof. For example, in March 2006, Pemco employees, while at Boeing's St. Louis facility working on the joint Boeing-Pemco proposal for the FY08 Recompete KC-135 PDM Contract, observed Mike Wright of Boeing take a call from Diana Petross, the Source Selection Evaluation Team co-chair, regarding the proposal process. A Pemco employee also overheard Ben Robinson of Boeing discussing how he would be talking about the FY08 Recompete KC-135 PDM Contract with Air Force officials in Oklahoma City including Col. Kenneth Moran.

57. Ben Robinson was a KC-135 Program executive employed by Boeing. Mike Wright was a KC-135 PDM Capture Team Leader for Boeing. Diana Petross worked for the USAF and served as Chair of the KC-135 Source Selection Team from 2005 to 2006; she is now retired from Air Force employment, and serves as a lecturer at the Naval Postgraduate School. Col. Moran was and had been commander of the Tanker Sustainment Group at Tinker Air Force Base.

58. Pemco was constrained by circumstances to have to trust that Boeing was not abusing, and would not abuse or misuse, Boeing's considerable and ongoing contacts and influence with such Air Force personnel and decision-makers, in any way that would operate to undermine the Pemco/Boeing partnership or Pemco's rights under the 2005 MOA, on the FY08 Recompete KC-135 PDM Contract.

59.    On May 1, 2006, Donald J. Vietor, Senior Principal Specialist, Contract & Pricing, of The Boeing Company, wrote to USAF representative Jim Stephens concerning a "Letter of Intent" (LOI) dated April 26, 2006, in which the government had proposed changes to the RFP # FA8105-05-R-0014 for the KC-135 PDM work.  Boeing's primary area of concern caused by the LOI was the proposed reduction of the BEQ to a baseline of 24 aircraft, from the original proposed 44 aircraft per year.  Boeing did not tell the USAF, however, nor Pemco, that the PDM contract would be infeasible at 24 aircraft per year, nor did it tell the USAF (or Plaintiff) that its arrangement with Pemco would be infeasible.  Instead, Boeing stated,

> Finally, with respect to the new LOI language revising requirements for handling large increases in aircraft quantities beginning in Basic Period IV, Boeing firmly believes our current single source/dual site approaching, involving both Boeing and Pemco, provides the best value solution for accommodating those levels of increased quantity.  Boeing and Pemco both currently possess the necessary infrastructure and experienced personnel needed for such adjustments; further, our team continues to make substantial investments in the development and implementation of Lean techniques designed for high performance and flexible operations.
>
> * * *
>
> The Boeing/Pemco team's commitment to the ongoing success of the KC-135 PDM program has never been stronger.

60.    On May 11, 2006, Pemco's president Ron Aramini spoke by phone with Pat Finneran of Boeing.  Finneran represented that Defendants had heard no

36

response from the USAF on the BEQ reduction issues (which, in retrospect, Pemco believes and avers on information and belief was a misrepresentation or involved suppression of facts). Instead, Finneran told Pemco that Defendants were getting "rumors" that the entire RFP for FY08 would be cancelled by the USAF (which did not occur, *see infra*). The two men then discussed the teaming arrangement at a BEQ level of 24 aircraft per year. Pemco advised Finneran it thought it would be beneficial for both Boeing and Pemco if Pemco did the work on the 24 minimum aircraft and Boeing moved other work into its San Antonio facility (which, after all, was provided for in the 2005 MOA provision); Finneran was noncommittal on Boeing's plans.

61.    On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft, which was consistent with its April 26, 2006 LOI upon which Boeing had commented on May 1, 2006, and was a foreseeable eventuality for which the 2005 MOA had expressly provided, especially in the September 2005 Work Share Agreement quoted above.[4]  As previously alleged, Boeing and Pemco had long discussed this kind of possible reduction, in conversations before the 6/2005 MOA, and in the executive level meeting and other discussions before the 9/2005 MOA,

---

[4]  Technically, the BEQ was modified to six aircraft in base period 1 and 24 aircraft in base period 2 through option period 5.

and the parties' agreements were reached in light of such known BEQ reduction risks.

**E.     Boeing's Breach of the 2005 MOA with Plaintiff**

62.     On June 6, 2006, Boeing breached, in its entirety (as opposed to breaching merely one internal provision, such as a portion of the Work Share Agreement), its 2005 MOA with Pemco, including the September 2005 Work Share Agreement, regarding the FY08 Recompete KC-135 PDM Contract, by terminating the entire set of teaming arrangements.[5]   On that date, Boeing unilaterally issued a purported termination of all the 2005 agreements, citing the reduced BEQ as the excuse for its actions.  In other words, Boeing did not assert any deficiency in Pemco's qualifications or Pemco's performance as the basis for Boeing's abrupt and complete termination of the contract.  Instead, Boeing said this, in its June 6, 2006 letter written on the letterhead of The Boeing Company and signed by Roger Witte:

> 1.     On May 31, 2006, The Boeing Company received notice of an amendment (Enclosure 1) to the Request for Proposal for the KC-135 Recompete Program.  The reduction in requested quantities is so unfavorable to Boeing that further participation in the Program pursuant to the MOA is no longer practical or financially viable.

---

[5] Boeing promised at the time of terminating the 2005 MOA that it would make Pemco whole by providing Pemco with replacement work, but Boeing breached its said second promise and rejected Pemco as its subcontractor on the CH-47 Chinook Reset program.  Specifically, on August 11, 2006, pursuant to Boeing's promise, Pemco submitted to Boeing a bid for work as a subcontractor on the CH-47 Chinook Reset (Boeing RFP dated July 20, 2006 (JHB-RESET RFP)).  Despite Boeing's promises made in June 2006, on August 22, 2006 Boeing notified Pemco that it had not been selected for work as Boeing's sub-contractor on the CH-47 Chinook Reset.

2.     Effective immediately, the Memorandum of Agreement (MOA) dated 6 September 2005 is hereby terminated in its entirety pursuant to the following clause, Paragraph 5c, which states:

> "After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving such notice."

63.     Boeing's proffered reason was nothing more than a pretext to prevent Pemco from submitting a competing bid for the work or otherwise sharing in the contract pursuant to the MOA. Boeing's proffered termination reason was a total sham, because, among other things: (1) it was untrue; (2) the RFP reduction circumstances were fully taken into account a year earlier by Boeing and actually covered by MOA provisions, and Boeing's use of said Paragraph 5c was directly contrary to the Work Share Agreement and other provisions above cited from the 9/2005 MOA; (3) Boeing never provided any data analysis or documentary support for its bald, unsupported statement that it would not be "financially viable" for Boeing after such reduction; and (4) it is illogical, given the fact that Boeing's costs were higher than Pemco's, yet Boeing now, after such termination, was going to do the USAF contract by itself, alone. Further, Boeing violated its contractual obligation to consult first with Pemco – instead, it sent this unilateral declaration of

infeasibility out of the blue, as it were, with no consultation or effort to have any negotiations with Pemco.

64.   Worse, Boeing and Pemco already had their bid pending with the USAF, in response to the August 2005 formal RFP, when Boeing made this termination in June 2006.

65.   Boeing was well aware when it terminated the MOA that Pemco could not at that time get together sufficient resources and make arrangements with another partner of Boeing's size and USAF contacts in sufficient time in order to make a separate teaming bid on the FY08 Recompete KC-135 PDM Contract, and that Pemco would have to go it alone, and that Boeing had Pemco over the proverbial barrel. Further, Boeing held and knew Pemco's proprietary pricing data and assumptions and pricing methodology, but Pemco did not have equal access to Boeing's plans, data and methodology, which Boeing was adjusting to fit the circumstances. Moreover, Boeing knew that the MOA set out a plan for the distribution of work should just such a BEQ reduction occur. Finally, Boeing had for some time period preceding June 2006 possessed inside knowledge through its other relationships with the Air Force that the BEQ reduction was unlikely to occur due to the Air Force's inability to conduct its own "organic" maintenance, which knowledge Boeing did not share with Pemco. By terminating the agreement, Boeing was unfairly attempting to remove Pemco as a competitor and to enhance

40

Boeing's bidding position, especially after extracting Pemco's proprietary information which the 2005 MOA had required Pemco to provide to Boeing.

66.    At June 6, 2006, when Boeing issued its termination letter, Pemco was not aware of Boeing's insider activity with the USAF and of Boeing's plans, and of Boeing's "firewall" violations (*see* below) involving misuse of Pemco's proprietary information, and could not, by the exercise of reasonable diligence, have learned of such matters sooner than two years before the filing of this action.

**F.     Boeing Goes After the FY08 Recompete KC-135 PDM Contract on Its Own, without Pemco as a Bidding Partner.**

67.    On July 19, 2006, the USAF announced that it was throwing open the RFP FA8105-05-R-0014, for the FY08 KC-135 PDM work, to both new bidders and existing bidders to submit (or re-submit, in the case of Boeing) a proposal or a changed proposal from that which was currently pending.

68.    As background for this July 19, 2006 event: on June 12, 2006, Pemco had filed an agency-level protest asking the USAF to allow submissions of new proposals.  Jim Stephens, the USAF procurement head on this RFP, contacted Pemco's division president and personally asked Pemco to withdraw such a protest, because, he said, it would create paperwork, would require Stephens to make a determination, and would slow down the process.  So, in reliance on Stephens' statements, including a promise to open the bidding (which was now

41

important to Pemco now that it was shut out by Boeing from Boeing's team that had been going on for a year), Pemco withdrew its agency-level protest.

69.    After the USAF threw open the RFP for new and changed submissions on July 19, 2006, and demonstrating that Boeing's stated excuse (as given for its termination of the 2005 MOA) was hollow, on September 18, 2006, Boeing submitted its own bid or its own changed bid to the USAF in response to the amended RFP, which proposed doing all the FY08 Recompete KC-135 PDM work at Defendants' San Antonio facility.

70.    Looking forward, for a minute here, as is stated elsewhere herein, on September 7, 2007, the USAF accepted Boeing's revised bid, even though it found that Pemco was as well qualified as Boeing, in matters such as ratings for depot maintenance, transition, program management and small business. The USAF found in 2007 that Pemco (now AAI) had a better past performance record than Boeing (which is also borne out by facts alleged herein); Pemco's past performance was at the high end of satisfactory, whereas Boeing's past performance was considerably poorer. The USAF was, however, impressed by Boeing's lower total evaluated price difference of $15 million, even though that was less than 1.3% over the long potential life of the overall contract (and, clearly, the USAF did not know that Boeing was low-ball bidding, aided by its conversion of and trespass to Plaintiff's proprietary information). On information and belief,

42

Boeing materially misrepresented their bid cost to the USAF so that the actual cost ultimately resulted in a price higher than Pemco's bid because Boeing re-characterized their bid as a cost-plus.

71.     Forced by circumstances to fend for itself alone, and lacking numerous tactical advantages the Defendants possessed (including one-sided knowledge of proprietary information of the other bidder like Boeing held with regard to Pemco data and methodology, and including special access to USAF information, as alleged elsewhere herein), Pemco also submitted its own bid on September 18, 2006 to serve as prime contractor on the FY08 Recompete KC-135 PDM program.  But Pemco could not overcome certain advantages Boeing used, especially the pricing advantage which was the stated basis for the USAF award of the work to Defendants, as in 2006 and thereafter Boeing misused for its own benefit the knowledge of the proprietary information that Pemco had provided Boeing under the 2005 MOA.

## G.     Boeing's Conversion of Plaintiff's Proprietary Information, and Plaintiff's Exhaustion of Administrative Avenues, After 2006 Contract Breach by Boeing

72.     As previously mentioned, on or about June 12, 2006, Pemco filed an agency-level protest with the Air Force challenging the decision to reduce the BEQ and to bar new bidders to the competition for the FY08 Recompete KC-135 PDM Contract.  One month later, on or about July 19, 2006, the Air Force amended the

RFP for the FY08 KC-135 PDM Contract to permit additional bidders. As a result, Pemco received a 60-day window to make a proposal.

73.     Pemco complied with its obligations under the 2005 MOA despite Boeing's failure to do so. In that regard, on or about August 2006, Pemco sent Boeing a formal certification and document log of Pemco's "firewall" and efforts to protect Boeing's proprietary information. Pemco reasonably and actually expected, reciprocally, that Boeing would institute and fully respect firewall procedures to protect Pemco's proprietary information which it knew certain Boeing personnel now held at that time.

74.     On or about September 18, 2006, Pemco and Boeing each submitted separate competing proposals for the FY08 Recompete KC-135 PDM Contract. In compliance with the bidding guidelines, on or about February 23, 2007, Pemco and Boeing each submitted separate Final Proposal Revisions ("FPRs") for the FY08 Recompete KC-135 PDM Contract. At that point in time, the USAF procurement officer in charge of the Recompetiton (i.e., the Source Selection Authority or "SSA,") was Ronald Poussard, a person with considerable relevant experience to the KC-135 PDM Program. Mr. Poussard had oversight responsibility for the KC-135 PDM program for many years, was very familiar with Boeing's and Pemco's respective performances of KC-135 PDM work, and served as the SSA for this specific procurement until a few weeks before the award decision.

44

75.    Pemco avers that Mr. Poussard was involved in and largely responsible for the Air Force's decision not to extend Boeing's 1998 PDM Contract, and on information and belief, Boeing was not pleased with Mr. Poussard serving as the SSA on the FY08 Recompete KC-135 PDM Contract. In Boeing's FPR submitted in February 23, 2007, it substantially dropped its labor hours per aircraft, especially in key years of the contract. Such last minute changes by Boeing resulted in a substantial price reduction in Boeing's bid, which was more than large enough to account for the $15 million difference in the evaluated prices used by the USAF in its 2007 award decision. Very suspiciously, as it now turns out, Boeing failed to submit any technical justifications or explanations for its mysterious decision to change its labor hour assumptions; Plaintiff alleges on information and belief that the real reason was Boeing's misappropriation, conversion and misuse of Pemco's proprietary information about costs, pricing, bidding methodology, critical assumptions and factors relevant to bidding such work. Such proprietary information was Pemco's property and was unique.

76.    In May 2007, while the Pemco and Boeing proposals had been pending for about four months and no award had yet been made, the Air Force without explanation replaced said Ronald Poussard in the SSA position and substituted one Charles Riechers as the new SSA. Charles Riechers was new to his procurement position in the Air Force, was new to the KC-135 PDM contract and

45

was new to the tanker community generally.  Riechers had been in USAF flight operations until October 2002, and between December 2002 and November 2006, he was assigned to various "Concept" projects at the Pentagon (i.e., non-procurement positions).  Between November 2006 and January 2007, Riechers was not a USAF employee, and ostensibly worked as an adviser to the "Commonwealth Research Institute" in Jonestown, PA, a subsidiary of Concurrent Technologies Corporation (together, "CRI"), a purported not-for-profit organization where, on information and belief, Boeing has provided a material amount of support, was a client of CRI, and wielded considerable influence. (By contrast, Pemco had no connection with or influence at CRI.)  Although CRI is registered with the Internal Revenue Service as a tax-exempt organization, it is known for engaging in lobbying activities and for taking on Department of Defense work.

77.    Once again, as with the Druyun/Boeing Affair, *supra*, Pemco was presented with an ugly Air Force procurement situation, involving apparent misconduct and involving what Plaintiff AAI believes, and avers on information and belief, to have been improper Boeing influence and activity over this specific situation.  What is known is that while Riechers was ostensibly employed by CRI, he actually performed no services for CRI, and the Air Force secretly arranged for Riechers to be paid about $13,400 per month (for at least two months) by CRI while Riechers awaited clearance from the White House for his appointment as

principal deputy assistant secretary for acquisition (a position that did not require Senate confirmation).[6] Riechers got that job in January 2007. Riechers committed suicide in mid-October of the same year, very shortly after awarding the FY08 Recompete KC-135 PDM Contract to Boeing (*see* below).

78.     Subsequently, on or about June 18, 2007, Pemco and Boeing each submitted separate Second Final Proposal Revisions for the FY08 KC-135 PDM Contract.  On information and belief, Boeing continued to substantially deviate from its original price and approach taken in its initial bid.  Pemco is informed and believes, and therefore alleges, (i) that Boeing reduced its proposal prices in its revised bids by approximately 20% during the RFP process in order to beat Pemco's price (which Boeing could calculate using the proprietary data it obtained from Pemco during the time they worked together and as part of the earlier joint proposal); and (ii) that Boeing made an unrealistically low price proposal based upon both (a) what Boeing knew about Pemco's pricing methodology and proprietary information, all of which was required to have been firewalled off at Boeing, and (b) inside information it received as a technical consultant to the Air Force regarding future changes to the scope of work covered by the contract that would enable Boeing to later adjust its pricing upward.  Specifically, the FY2008

---

[6]   The *Washington Post* reported on or about October 1, 2007, before Riechers committed suicide later that month, that Riechers admitted in an interview, "I really didn't do anything for C.R.I.  I got a paycheck from them."  He is also reported to have said, "We needed some way to kind of gap me," referring to his temporary CRI position.  CRI reportedly received about two-thirds of its government funding in fiscal 2006 from the USAF.

Recompete identified "Boeing Aerospace Operations, Inc." (i.e., defendant BAOI) as one of three consultants to provide "nongovernment advisor support," and the contracting officer likewise identified "Boeing Aerospace Operations" as a consultant. Moreover, Boeing provided technical assistance under a separate Sustaining Engineering Services Contract, as the original equipment manufacturer. Pemco believes, and alleges upon information and belief, that through its Sustaining Engineering Services Contract, Boeing had – and willingly used – unfair and unequal access to non-public information related to the actual quantities of PDM work that might be performed by a contractor over the term of the new contract. By awarding Boeing contracts to provide architect and engineering services for the KC-135, the Air Force employed Boeing to assist in the development of the PDM process, giving Boeing inside knowledge of the development of a new PDM approaches that the Air Force did not publicly announce could be applicable to current PDMs until March 11-13, 2008, long after the closing date for receipt of proposals and eight days after the reevaluated award had been made to Boeing.

79.    The possession of inside information, especially along with Boeing's one-sided knowledge of Pemco's pricing approach and methodology and proprietary data, at a time when Pemco did not enjoy the same knowledge advantage, allowed Boeing to structure its bid to take advantage of an anticipated change in the PDM program, through which it could undercut Pemco's bid and

then make up the difference based on the then unannounced program changes. Boeing had a contractual and partner-like fiduciary duty to disclose this information to Pemco, but failed to do so and instead, used this information to obtain an unfair competitive advantage in the bid process.

80.    Pemco believes, and alleges upon information and belief, that Boeing at the last minute during the bid review process, when the opportunity was presented it, drew and capitalized upon its knowledge of Pemco's proprietary information that related to how Pemco would structure its bid and how it would price its services, and then Defendants (without any other justifying rationale) deliberately tweaked their own bid in light of such knowledge so as to come in with a reduced load of hours on PDM work that was just sufficient to achieve about a 1% lower cost edge for Defendants, as compared with Pemco's bid, which, in turn, was a principal factor announced by the USAF for its award of the FY08 contract to Defendants.

81.    Regarding the Pemco proprietary information, on or about August 31, 2007, Boeing finally (as it was required to do) provided Pemco with some incomplete, redacted documents regarding Boeing's efforts to comply with its obligations under the June 3, 2005 MOA to implement a firewall and take other precautions to protect the Pemco proprietary information that Boeing had received

while Boeing and Pemco were working together and in connection with making the original joint proposal for the FY08 Recompete KC-135 PDM Contract.

82.    A review of the material that was provided established, for the first time insofar as Pemco had known, that Boeing had not prevented Boeing personnel with specific knowledge of detailed Pemco pricing and proprietary information from continuing to work on Boeing's proposal to the USAF, which was in direct competition with Pemco's proposal back in September 2006. This failure to carry out full and complete, proper firewall procedures and failure to return Pemco's proprietary and intellectual property information and material violated Boeing's contractual and ethical obligations and violated Pemco's common law rights, and constituted unfair competition and unjustly enriched Boeing. These facts further support Pemco's belief and allegations that Boeing underbid Pemco's proposal through use of Pemco's confidential and proprietary data, as well as other improper communications and influence, as part of Boeing's pattern and practice and improper motivations.

83.    As a result of Boeing's continued breaches of its fiduciary duties concerning non-use and protection of Pemco proprietary information and mounting concerns about Boeing's likely misconduct (primarily, conversion to Defendants' own use of Pemco's proprietary information), on or about September 6, 2007, Pemco notified the Contracting Officer, Jim Stephens, responsible for the FY08

50

Recompete KC-135 PDM Contract, of the possible procurement integrity violations by Boeing and Pemco's concerns that Boeing personnel with specific knowledge of detailed Pemco pricing information from the preparation of the previous joint proposal had continued also worked on Boeing's individual proposal which was in direct competition with Pemco's independent proposal. The USAF contracting officer talked Pemco out of pursuing the complaint for misuse or conversion of proprietary information, at that time.[7]

84.     Almost immediately thereafter, on or about September 7, 2007, the Air Force awarded the FY08 Recompete KC-135 PDM Contract to Boeing, pursuant to Requests for Proposals No. FA8105-05-R-0014, and on September 10, 2007 notified Pemco that it had awarded,   Charles Riechers, of course, was the SSA on such Air Force decision.  The next day, September 11, 2007, Pemco requested a debriefing, which was conducted on September 14, 2007, at Tinker Air Force Base in Oklahoma City, Oklahoma.  At the September 14, 2007 debriefing, the Air Force informed Alabama Aircraft that the competition had been very tight, reporting identical scores between Alabama Aircraft and Boeing in the areas of Proposal Risk and Past Performance, and in four of the five areas under Mission Capability, as alleged earlier herein. Further, Alabama Aircraft's evaluated price of

---

[7] Pemco withdrew its September 6, 2007 complaint after being advised that the complaint was holding up the award of the contract and Pemco was led by the USAF representative, Jim Stephens, to believe it had submitted the winning proposal. In other words, under a sort of "no harm no foul" principle, if as Stephens indicated to Pemco, the USAF was going to award the work to Pemco, then it made no difference that Defendants had been misusing the Pemco proprietary information.

51

$1.18 billion was only about $15 million (less than 1.3%) higher than Boeing's evaluated price. Pemco was also informed that (a) the Air Force had not performed a review of the cost data provided by the offerors to check for price/cost reasonableness or realism; (b) the Air Force did not conduct any review into possible procurement integrity violations by Boeing; and (c) the Air Force did not have a mitigation plan or waiver regarding the issues of organizational conflicts of interest related to Boeing and one of its subcontractors.

85.     During the debriefing, Pemco asked the Air Force about the change in SSA personnel, voicing its concern that Mr. Poussard's last-minute removal "reflected an effort to remove an individual very familiar with Boeing's past failings from the decision making process." The Contracting Officer reportedly responded that the decision was made "above my pay grade" and provided no further information on the issue.[8]

86.     Shortly thereafter, on or about September 19, 2007, Pemco filed a protest at the GAO regarding the award by Charles Riechers of the FY08 Recompete KC-135 PDM Contract to Boeing.

---

[8]   Also at such September 14, 2007 debriefing, Pemco raised the subject of the failure of the USAF to investigate the allegations of Pemco's September 6, 2007 letter about Defendants' conversion and misuse of proprietary information. The USAF representative, Jim Stephens, said the USAF had not investigated because Pemco had withdrawn the letter. (Of course, such withdrawal had been at Stephens' own request!) Stephens admitted he was the USAF representative who asked Pemco to withdraw the request. At that point, the USAF attorney present stopped the debriefing and took all government personnel out of the room to confer privately. When the debriefing resumed, Stephens would only say that he told Pemco the letter was going to delay the award and that it would speed up the process if Pemco would withdraw the letter. Thereafter, the USAF refused to discuss further the matter of conversion or misappropriation of proprietary information.

87. A week and a half later, on or about October 1, 2007, The Washington Post reported that Charles Riechers (the SSA on the FY08 Recompete KC-135 PDM Contract) had been hired by the Commonwealth Research Institute ("CRI") at the request of the Air Force and was being paid $13,400 per month while awaiting approval of his nomination even though he was performing no work for CRI. As previously alleged, Boeing was a client of Concurrent Technologies Corporation, CRI's parent company. On information and belief, the GAO was investigating the potential connection into these relationships when, on October 14, 2007, Mr. Riechers was found dead in his garage after an apparent suicide attempt. Press reports indicated that Riechers left a suicide note to his boss, Air Force Acquisition Chief Sue Payton, in which Riechers wrote that he "expressed remorse" at having created a new acquisition scandal for the Air Force reminiscent of the earlier one involving Darleen Druyun. The USAF has never made public as of this time the full story or facts about the Riechers situation, especially the facts of his dealings with Boeing and with other supporters of Concurrent Technologies Corporation or CRI.

88. On or about December 27, 2007, the GAO issued a decision sustaining Pemco's protest of the award to Defendants of the Contract on the ground that the Air Force failed to perform an adequate price realism evaluation. The GAO acknowledged that over the course of the competition, Boeing made

changes to its proposal that had a significant effect on Boeing's pricing: "the effect of this change reduced Boeing's proposed price by more than the [redacted amount] difference between Boeing's and Pemco's final total evaluated prices, on which the source selection decision was based."[9]   Boeing agreed with Pemco, before the GAO, that the Boeing change was, in and of itself, in a greater amount than the difference between its bid price and Pemco's bid price.   The GAO expressly declined to adjudicate the issue of Boeing's misappropriation, conversion and misuse (to Boeing's own benefit) of Pemco's proprietary information, and thus the GAO stated, "[t]o the extent Pemco believes that Boeing failed to comply with the terms of the parties' NDA [non-disclosure agreement], the matter constitutes a private dispute."

89.    On January 7, 2008, the Air Force requested that the GAO reconsider its decision sustaining Pemco's protest of the award of the FY08 Recompete KC-135 PDM Contract, but the GAO denied the request on February 1, 2008.  Despite this ruling, on March 3, 2008, the Air Force issued a notice to Pemco of a "new award decision," which remarkably again selected Boeing for award of the FY08 Recompete KC-135 PDM Contract.  **The Boeing bid came in just $15 million below Pemco's bid spread out over a ten year potential contract period, on an overall approximate $1.7 billion PDM Contract; specifically, Boeing**

---

[9]   The GAO decision of December 27, 2007 expressly did not delve into, or make any decisions concerning or based upon, issues of Charles Reicher's potential improper conduct with CRI and/or Boeing (i.e., bias), and the GAO in fact stated that it was not possessed of sufficient information to make any decision on such topics.

**(improperly using Pemco proprietary information to aid it) submitted a bid for a Total Evaluated Price ("TEP") of $1,165,138,187, as compared with Pemco's bid of at TEP of $1,180,186,789, the dollar difference being $15,048,062. Boeing's bid was thus a slim 1.28% lower than Pemco's bid over the entire ten-year period (5 year base period plus 5 one-year extension options).** <u>**Pemco alleges on information and belief that a material and determining factor in Boeing's being able to effectuate such 1.28% difference in the bids was Boeing's possession and conversion and misuse of Pemco unique proprietary information (property), as well as insider knowledge that Boeing acquired but never shared with Pemco.**</u>

90.    In light of Boeing's repeated and continued problems in meeting its contractual obligations and its inability to maintain adequate quality standards, and its admitted malfeasance in connection with obtaining government contracts, the USAF's March 3, 2008 decision to award the FY08 Recompete KC-135 PDM Contract to Boeing is suspect at best, though the thrust of this civil suit is not to obtain recompense or any relief from the Air Force or the GAO or any other government agency, but, instead, to obtain redress from Boeing, which is alleged to have led the Air Force (or certain individuals) into several of its scandals or errors, and which: (i) misappropriated, converted and misused for its own profit, benefit and unjust enrichment the proprietary costing and bidding information

55

Boeing had obtained from Pemco, in order to bid the FY08 Recompete KC-135 PDM Contract; and (ii) in violation of the 2005 MOA, refused to include Pemco as Boeing's subcontractor and joint PDM project operator for a minimum of one-half of the PDM touch labor under the Work Share Agreement (the integral part of the 2005 MOA).

91.    After receiving from the USAF its March 3, 2008 notice of a "new award decision" and that such "new award" was again made to Defendants, on March 11-13, 2008, Pemco attended a Program Management Review ("PMR") set of briefings by the USAF regarding the KC-135 PDM program, which addressed in some detail the problems the USAF was having with its own performance of PDM on KC-135s that the USAF was not sending to contractors like Boeing or Pemco to perform. The bottom line was a set of indications that the likelihood was that the USAF would actually increase quantities of KC-135 aircraft to be sent to outside contractors for PDM work. Over the period from mid-March 2008 to late July 2008, other indications to the same effect were observed or heard by Pemco personnel. The result was to confirm to Defendants the success of their strategy of (i) ditching Pemco as a contracting partner, and then (ii) bidding unreasonably low (using their knowledge of Pemco proprietary data and thus taking calculated risks that were not really so risky), and (iii) making up the difference subsequently through recharacterization of its bid as cost-plus.

**H.    Boeing's Patterns and Practices of Misconduct Applicable to the Events of this Case.**

92.    Boeing had no excuse for its punitive actions against Pemco.  For example, unlike Pemco, Boeing was repeatedly sanctioned for its poor work quality.  As a result, Boeing relied on Pemco for reliable quality work product.  In August of 2000, the FAA fined Boeing $1.6 million for failing to hold suppliers accountable for their failures to adhere to quality control practices.  *See FAA Finds Boeing Lax in Scrutiny of Suppliers,* Seattle Times, August 3, 2000, at A1.  Boeing's manufacturing facilities failed to meet FAA quality regulations resulting in proposed fines totaling $892,000.  *See Findings of FAA's Special Audit of Boeing Factories,* Seattle Times, October 31, 2000, at A11.  Not surprisingly, the Air Force requested during this time period that Pemco enter into a teaming arrangement with Boeing so that Pemco could handle a large share of the work awarded to Boeing on the 1998 KC-135 PDM Contract.  Boeing's problems were widespread, and the FAA fined Boeing for failure to adhere to quality control standards in the 1990s, including accepting defective parts from a supplier.  *FAA Fine Proposed Against Boeing Faulty Quality Control in Mid-1990s Alleged,* Seattle Times, March 27, 2002, at E2.

93.    Boeing's problems were not limited to quality issues, however.  Boeing has been involved in, and in some cases admitted to, substantial improper

conduct in connection with procuring and servicing government contracts, all as part of Boeing's aforesaid patterns and practices of misconduct in securing government contracting work and business and in using methods of unfair competition. Some examples of these conflicts of interest and improprieties and unfair competition, besides those already cited above, are set out in the following paragraphs.

94.    In July 2007, Boeing agreed to repay the United States more than $1 million to settle government charges that Boeing overbilled the government between 1998 and 2003 for materials used to install new engines in KC-135 aircraft. *Department of Justice press release* (U.S. Attorney's office, District of Kansas), July 16, 2007.

95.    Separately but also involving KC-135 aircraft, according to a federal *qui tam* action filed in San Antonio, Texas in 2007, during the period from 2002 leading up to 2006, in the Boeing Logistics Support System facility at San Antonio (formerly known as Boeing Aerospace Support Center, the same one as Boeing placed its work under the agreements here involved), Boeing devised and implemented a deliberate schedule to fraudulently inflate its labor charges for "non-routine" work performed on USAF contracts for KC-135 aircraft repair and maintenance, and falsified the records of work performed on such KC-135 aircraft in accomplishing those tasks in order to correspond to its inflated charges, resulting

58

in false claims being submitted to the United States. *See* unsealed Plaintiff's First Amended Complaint under 31 U.S.C. §3730, in *United States of America, ex rel. Edward Quintana, v. The Boeing Company*, No. SA-06-CA-1029-FB (W.D. Tex. April 16, 2007) (listing specific details of methodology used by Boeing and specific aircraft, among other details). It was announced on or about August 11, 2009 that Boeing agreed to settle such KC-135 false claims charges for $2 million.

96.     In yet another federal case against Boeing for overbilling practices at Boeing's aforesaid San Antonio facility, the Department of Justice on August 13, 2009 announced that Boeing would repay the United States $25 million to resolve charges that Boeing both overcharged the government and performed defective work, while performing depot maintenance work at the Boeing Aerospace Support Center on the KC-10 aerial refueling aircraft. As with the *qui tam* action above, it was Boeing employees who brought this to the government's attention. This time, by former Boeing employees Anthony Rico and Fernando de la Garza, in a False Claims Act *qui tam* action, who reported, among other Boeing misconduct, that "Auditors found that Boeing inflated estimates of the number of hours needed to perform the blanket kit-work and charged an excessive hourly rate for the work." *See Department of Justice press release* (DOJ, Washington), August 13, 2009 (DOJ    Civil    Division,    no.    09-civ-798),    reported    at http://www.justice.gov/opa/pr/2009/August/09-civ-798.html.

97.   Plaintiff alleges that Boeing has been forced in other cases and instances, besides the instances listed above, to repay the United States for violations of the False Claims Act in relation to billings on government contract work, and that all of such instances, taken with the foregoing, show a culture at Boeing, and a pattern and practice, to engage in strategies to low-ball-bid government work and then overbill, overcharge, and inflate billings and falsify records later, in order to recoup the impact of deliberate low-ball bidding.

98.   Such practices, coupled with Boeing's deliberate misuse and misappropriation of Plaintiff's proprietary information here (and its similar conduct elsewhere), were part of Boeing's pattern and practice of unfair competition and gaining awards of government contracts and business through improper means.

99.   Boeing's pattern and practice and history of misconduct of the type involved here is also shown in other events.  In July 2003, in a case of Boeing's improper use of another company's proprietary information, the Air Force suspended Boeing Launch Services after it discovered that Boeing had committed "serious and substantial violations of federal law" in connection with the 1998 competition for a U.S. Air Force Evolved Expendable Launch Vehicle ("EELV") contract.  Specifically, Boeing employees obtained more than 25,000 pages of documents belonging to Lockheed that helped Boeing win the procurement

competition.  In June 2006, Boeing entered into a $615 million settlement with the government regarding the federal crimes.  *See Department of Justice press release* (DOJ, Washington), June 30, 2006 (DOJ Civil Division, no. 06-civ-412), reported at http://www.justice.gov/opa/pr/2006/June/06_civ_412.html.

100.  As part of Boeing's admissions against interest, on August 1, 2006, Boeing CEO W. James McNerney testified to the Senate Armed Services Committee regarding the settlement announced June 30 and acknowledged Boeing's failure to live up to the legal and ethical standards required of companies doing business with the United States.  During that testimony, McNerney also admitted that Boeing's hiring of a former Air Force official was under investigation.  Admitting Boeing's weaknesses in ethics, McNerney claimed that Boeing was now fully committed to operating at the highest standards of ethics and compliance, as well as devoted to conducting its work ethically and in the best interests of its customers and the country.

101.  Boeing's pattern and practice of misconduct in procurements involving at least one USAF official who was involved in the events of this case is well established, in which the official clearly did not take into account Boeing's long history of misconduct and malfeasance described throughout this complaint. In February 2005, the GAO sustained a protest of an award of a contract for the small diameter bomb ("SDB") program to Boeing, because of Darleen Druyun's

61

involvement in changing the evaluation criteria which appeared to favor Boeing. *See Lockheed Martin Corporation,* B-295401, 2005 CPD ¶ 24 (February 18, 2005).

102.   Also in February 2005, the GAO sustained a protest against an award to Boeing of a contract for the avionics modernization upgrade program ("AMP") for C-130 aircraft, because of the aforesaid Darlene Druyun's bias toward Boeing and her effort to elevate Boeing's ratings and downgrade the ratings of the protestors. *Lockheed Martin Aeronautics Company; L-3 Communications Integrated Systems L.P.; BAE Systems Integrated Defense Solutions, Inc.,* B-295401, et al., 2005 CPD ¶ 41 (February 24, 2005).

103.   In May 2006, the Department of Defense Inspector General issued a report finding that the influence exerted by the aforesaid Darleen Druyun caused the Air Force to rush the settlement of a $119 million Request for Equitable Adjustment ("REA") submitted by Boeing to the Air Force for the 1998 KC-135 PDM Contract. At the urging of Druyun, the Air Force quickly settled the REA for $35.8 million – significantly more than was appropriate – and the approval of Boeing's request to "task split" under the Contract which allowed Boeing to overcharge the government. *See* DODIG Report at 4-5. Druyun later admitted to taking actions to favor Boeing, both vis-à-vis the government and vis-à-vis other competitors.

104.   The Pentagon requested the Government Accountability Office to investigate a wide range of Air Force contracts that involved Darleen Druyun, a former senior official who admitted giving special treatment to Boeing during bidding and negotiations.  One congressional investigation reported by the Seattle Times on June 4, 2004 focused on a proposed $23 billion deal for the Air Force to buy and lease 100 Boeing 767 aerial-refueling tankers.  The article stated: "Critics contend the deal was laden with conflicts of interest and that the planes may not be needed.  The Boeing deal, which for a time looked like it was heading for a fast passage through Congress, descended into scandal when it was revealed that the Air Force's chief negotiator with Boeing on the deal, Darleen Druyun, also had negotiated a vice president's job for herself with the aircraft manufacturer. Druyun last month pleaded guilty to federal conspiracy charges, and a grand jury in northern Virginia is investigating."  Reference is made to earlier allegations in this complaint, for more details of the Druyun/Boeing Affair, which extended over a long period of years.  Druyun, of course, was the senior USAF official in charge of procurements during much of the relevant time concerning Boeing's contracts and proposals, in which Pemco was a subcontractor or provider to Boeing, and Plaintiff alleges that the Boeing/Druyun improper relationship played a material role in Boeing's plans and activities as regards the Plaintiff.

### I.   The December 2008 Bridge Contract, and Boeing's Patterns and Practices of Misconduct Continue to the Present.

105.  On April 1, 2005, Defendant BASC and Pemco entered into a MOA for continuing their contractual relationship (separately existing from the 2005 MOA described previously in this Complaint), for obtaining and sharing KC-135 PDM work for FY06 and FY07 (a "follow-on contract") on a PDM contract that had covered Fiscal Years 2002 through 2005. ("Follow-On MOA") This Follow-On MOA contemplated a basic 50/50 split of aircraft between BASC and Pemco. On July 22, 2005, the USAF issued a pre-solicitation notice for a Bridge Programmed Depot Maintenance for two years and two six month options to perform PDM on a maximum of 119 aircraft.

106.  On October 18, 2005, pursuant to such Follow-On MOA and the USAF notice, the Boeing Company through its wholly-owned subsidiary McDonnell Douglas Corp., and Pemco (through its subsidiary, Pemco Aeroplex, Inc.), entered into a contract titled "Repair Agreement No. 06-003," for a "Long Term Requirements Contract" (or "LTRC"), under Government Price Contract Proposal number FA8105-05-D-0004, for the performance of PDM on KC-135 aircraft, calling for Pemco to perform PDM for Boeing on KC-135 aircraft.  The LTRC was basically cast as a purchase order, with Pemco as the "seller," for a base period of 1 October 2005 through 30 September 2007 and two six-month option periods effective 1 October 2007 through 30 September 2008.   The LTRC

64

provided that if the USAF extended the prime contract FA8105-05-D-0004, then the LTRC with Pemco would be extended by the same period of time. The LTRC provided for a 50/50 split of aircraft between Boeing and Pemco, provided that the USAF itself put out 34 aircraft for FY06, 38 aircraft for FY07 and 12 aircraft for FY08.

107. On October 30, 2007, Boeing (again through its wholly-owned subsidiary, McDonnell Douglas) and AAI entered into an extension or amendment to the 2005 LTRC to take into account the extensions and options the USAF had in the FA8105-05-D-0004 contract with Boeing. Again, the principle of 50/50 split of the KC-135 aircraft for PDM work as between AAI and Defendants was preserved.

108. Initially, in the fall of 2007, Boeing and AAI held a series of conversations and email communications, wherein Boeing was soliciting AAI to agree, as Boeing's subcontractor or "seller," to perform PDM work on up to 10 KC-135 Aircraft for Boeing's fulfillment of the 2008 Bridge Contract, and the parties were in discussion of pricing of such aircraft. By October 2007, such discussions progressed to the point where Boeing and AAI were in agreement that the fair value of AAI's PDM work on such a volume of KC-135 aircraft would be approximately $6 million per aircraft, per contract. Again, the premise was that AAI's work would be on half the total aircraft that Boeing was awarded under the

FA8105-05-D-0004 contract that Boeing had with the USAF. This LTRC has subsequently been extended to cover later aircraft that Boeing was awarded under the FA8105-05-D-0004 contract that Boeing had with the USAF.

109. Thereafter, Boeing called AAI and informed AAI that it had learned from the USAF that the USAF only had $26 million available to fund PDM work on 8 KC-135 aircraft, and that AAI would have to do the PDM work for that extremely low price, equal to $3.25 million per aircraft, far below prices that had been agreed upon in the fall of 2007.

110. AAI was in a quandary; it had lost its bargaining power; it needed the work; and Boeing knew those facts. Boeing forced AAI to accept the engagement as subcontractor to do such PDM work for the aforesaid $26 million on 8 aircraft.

111. On March 17, 2008, Boeing wrote AAI in regard to the 2008 Bridge Contract work and provided in writing such "revised pricing for FY08 Bridge inducted aircraft," of $26 million for 8 aircraft, and required that AAI accept this pricing by the following day. On the next day, March 18, 2008, AAI wrote back to Boeing and accepted the $26 million pricing. In that letter, AAI made it crystal clear that it was doing so in reliance on Boeing's representations: "We accept the revised pricing, as it has been represented to us that it is being requested by the customer (*i.e.*, USAF) to provide for flexibility in moving forward with the contract within government funding/budgetary constraints."

66

112.   Boeing had its discussions on the 2008 Bridge Contract, and such funding matters, with the USAF to the exclusion of AAI, which did not participate therein.   AAI did not know, or have reason to know, of pricing facts and "funding/budgetary constraints" any differently than as were represented by Boeing.   Nor did Boeing share with AAI what Boeing would do, and was planning to do, and did do, about its own pricing to the USAF on the 2008 Bridge Contract.

113.   Eventually, the number of aircraft the USAF allocated to Boeing increased, and, therefore, the number of aircraft that AAI received also increased, but AAI performed the PDM work on all such aircraft at approximately $3.5 million per aircraft, consistent with the March 2008 correspondence.   AAI ultimately received and has performed PDM work on 14 aircraft under such terms.

114.   On December 18, 2008, the USAF modified its contract with Boeing, number FA8105-05-D-0004, through Defendant BAOI, in the form of a bridge contract (the "2008 Bridge Contract"), modification P00024, exercising Option III for six months from October 1, 2008 through March 31, 2009 and Option IV for six months from April 1, 2009 through September 30, 2009.   Such modification covers the time period of the work done, and the aircraft serviced for PDM, by AAI.   This action had the effect under the LTRC above, of extending or applying to the LTRC between Defendants and Pemco.   The total contract value to Boeing of such 2008 Bridge Contract was eventually found to be $154.9 million.

115.   AAI subsequently, by accident, obtained a copy of the 2008 Bridge Contract and thereby learned that Boeing was charging the USAF $4,769,460 per KC-135 aircraft (in total quantities above 16 aircraft) and would have been charging the USAF $5,350,695 per aircraft if there had been 16 aircraft, *i.e.*, 8 done by AAI and 8 done by Defendants.   Even allowing for approximately $750,000 in parts per aircraft supplied by Boeing, the effect of such pricing to USAF by Boeing was to allow Boeing to pocket at least $750,000 to $769,000 per aircraft that AAI was delivering from PDM work, which facts were concealed from AAI and which represents money that AAI should have been paid by Boeing, but for Boeing's misrepresentations and suppressions of material fact.

116.   In addition to Boeing's inequitable, unfair and improper conduct with respect to its pricing treatment with AAI in the 2008 Bridge Contract and its previous bridge contracts, Boeing systematically caused parts and materials to be sent late to AAI, which delayed deliveries of completed KC-135 aircraft, causing AAI to lose valuable performance based fees (or "delivery fee awards") under these contracts.

117.   Pursuant to the 2008 Bridge Contract and the previous bridge contracts, the USAF provides delivery fee awards to AAI for KC-135 PDM for aircraft delivered on or before the target delivery date.   Prior to the sixth airplane induction of FY08 (on July 24, 2008), AAI had received an early delivery award

fee on every KC-135 PDM delivery for the previous two years, which typically came from deliveries in less than 205 days.

118.   On information and belief, following the USAF's March 3, 2008 decision selecting Boeing for the FY08 Recompete KC-135 PDM, Boeing deliberately and systematically caused multiple instances of Customer Furnished Materials Type 2 ("CFM2") deliveries to be later to AAI. CFM2 include parts fabricated and/or supplied by Boeing to AAI used in KC-135 PDM work.

119.   The instances of delays of CFM2 parts following March 3, 2008 to the present are drastically greater than prior to this date. The late delivery of CMF2 parts affected and continues to affect AAI's critical path schedule. The net effect of Boeing's tardy delivery numerous CFM2 parts materially delayed AAI from completing PDM work in a timely fashion, thereby causing multiple late deliveries of KC-135 aircraft and preventing AAI from obtaining performance based compensation under the bridge contracts.

120.   On information and belief, Boeing favored its own San Antonio, Texas facility in the delivery of CFM2 parts over AAI in an effort to harm AAI and in anticipation of Boeing's facility performing work under the newly awarded FY08 Recompete KC-135 PDM, which had the effect of preventing AAI from receiving performance bonuses based upon completed delivery dates of aircraft.

121.  In addition to causing CFM2 parts to be delayed, Boeing's conduct has attributed and continues to attribute the timely delivery of serviceable Government Furnished Material ("GFM").  Prior to FY09, AAI ordered GFM directly through the G009 asset management program, whereby AAI had access to G009 and communicated material needs directly to the government, and in turn, the government communicated with AAI.  Beginning in FY09, the USAF required GFM to be ordered through the CAV AF system, whereby AAI must communicate and manage material needs through Boeing.  In other words, AAI now has to provide Boeing its GFM orders, who then convey such orders to the government. Because AAI is denied access to CAV AF, AAI has no control over the efficiency and effectiveness of GFM deliveries through CAV AF.

122.  Boeing has and continues to inadequately manage the ordering through CAV AF.   Boeing has caused material delays in communication of material needs and errors in information shared among AAI, Boeing and the government.  Boeing's delays, errors and logistical problems in operating the CAV AF has caused delays of GFM parts, and ultimately, delays of aircraft deliveries following PDM.

123.  In an effort to mitigate the harm of delayed aircraft deliveries caused by Boeing's late deliveries of GFM and CMF2 parts, AAI completely overhauled its methods and efficiencies of performing PDM work.  Beginning with the 12th

aircraft induction of FY09 (August 26, 2009), AAI moved from a pulsed-line aircraft flow to a docked aircraft approach to perform PDM work. Under the pulsed-line aircraft flow system, when a KC-135 aircraft arrived at AAI, it would move from three different locations in AAI's hangers as various crews would complete needed PDM work on the planes. When the delinquent deliveries first began to become more than a nuisance, AAI would still move aircraft to their next docking station, even if it needed parts yet to arrive. When the late parts arrived, the work crew from the previous docking station would transfer to the current docket station to perform the delayed work with the tardy parts. This "work-around" solution caused inefficiencies to the pulsed-line and delays to the ultimate delivery of aircraft.

124. Ultimately, and in an effort to mitigate the inefficiencies caused by Boeing's systematic and high number of late parts, AAI moved from a pulsed-line system to a docked aircraft approach whereby the plane remained in one location for the duration of the PDM work while various crews rotated to the aircraft depending on the schedule of work tasks. This was an expensive and disruptive change for AAI. Although the new docking approach may ultimately provide more flexibility to schedule work around parts availability, it has been both an expensive and disruptive change to AAI.

125. Boeing also failed to compensate AAI for rightfully earned non-conforming "over and above" work performed pursuant to the 1998 KC-135 PDM (and extensions, including the FY08 Recompete KC-135 PDM Contract) and/or the 2008 Bridge.

126. At the request of Boeing and/or the USAF, AAI faithfully repaired or replaced fuel pumps on multiple aircrafts to prevent uneven fuel burn. This repair work ensured that fuel was distributed equally among tanks to the aircraft during flight. Such modifications constituted "over and above" work from the contracts' standard maintenance requirements. Boeing did not compensate AAI for all "over above" work performed on multiple aircrafts related to the prevention of uneven fuel burn.

127. Additionally, Boeing failed to compensate AAI for "over and above" non-conforming repairs on multiple aircraft to replace incorrectly-sized fasteners, or rivets, on the aircraft. During the time period of contracts at issue, multiple aircraft arrived at AAI for standard PDM work with incorrectly-sized fasteners. At the request of Boeing and/or the USAF, in order for AAI to return the aircraft to the USAF in technical compliance with the contracts, AAI spent many man hours removing the incorrectly-sized fasteners and replacing them with the correct size. This constituted "over and above" work from the contracts' standard maintenance

requirements. Boeing did not compensate AAI for all "over and above" work performed related to the removal and replacement of incorrectly-sized fasteners.

128.   At the request of Boeing and/or the USAF, AAI also spent more than 200 man hours performing work on several wing planks of aircrafts. This work constituted "over and above" work from the contracts' standard maintenance requirements. Boeing did not compensate AAI for all "over and above" work performed related to repairs on wing planks exceeding 200 man hours.

## V.   CLAIMS

Based upon the foregoing facts, AAI claims against the Defendants, and each of them, separately and severally, for relief on the following several bases:

## COUNT ONE
## BREACH OF CONTRACT – 2005 MOA

129.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

130.   Under the 2005 MOA, Boeing promised, agreed, contracted and committed to making Pemco its 50% or better subcontractor and de facto partner in the FY08 Recompete KC-135 PDM Contract, solicitation number FA8105-05-R-0014, regardless of the number of KC-135 aircraft involved and regardless whether the number of aircraft ultimately involved would support two "touch" work facilities (in which case both Pemco and Boeing would do some of such work) or not (in which case, Pemco would do such work).

73

131.  As stated above in the "Facts" section of this Complaint, Defendants were the drafters of the 2005 MOA.  The principal substantive terms of the 2005 MOA were established in the 6/2005 MOA document, which was not only prepared by Defendants but was then presented by Defendants to Plaintiff on a "take it or leave it" basis, with a 24-hours-to-sign-it ultimatum.  Defendants were vastly larger in size and financial capital than Plaintiff.  Defendants had a long history and almost incestuous relationship with various USAF personnel or representatives as previously alleged.  Defendants were in the driver's seat, and by far the stronger of the parties; the Plaintiff was in a weak and vulnerable position. Under the circumstances, the 2005 MOA was a contract of adhesion, and should be interpreted and construed in accordance with the special rules of construction that apply to contracts of adhesion, in addition to the basic principle of resolving any ambiguities and omissions against the drafter.  Moreover, Plaintiff alleges upon information and belief that at the time Boeing submitted the 2005 MOA language, on a take-it-or-leave-it basis, to Plaintiff to sign, Boeing had the intention, which it deliberately suppressed, to induce Plaintiff to enter into the MOA long enough to provide Boeing with Plaintiff's proprietary information and to eliminate Plaintiff as a meaningful opposing bidder, and then to pull out of the MOA, hence the inclusion of contract language intended for Boeing's benefit (solely, under the circumstances).  In equity and good conscience, and to prevent injustice, Boeing

74

should be estopped to rely upon or avail itself of exculpatory language or limitations of remedies, under the circumstances.

132.   Boeing knowing, willfully and intentionally breached its several agreements and promises with AAI, then known as Pemco.

133.   In accordance with the 2005 MOA, Pemco assisted Boeing in preparing a proposal for the FY08 Recompete KC-135 PDM Contract and complied with its obligations under the contract of the parties and provided Boeing with its confidential and proprietary information in connection with the proposal.

134.   On or about October 31, 2005, Boeing submitted the proposal as a prime contractor, with Pemco acting as its principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

135.   On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract, solicitation number FA8105-05-R-0014, reducing the annual BEQ from 44 to 24 aircraft.

136.   Using the aforesaid amendment as a pretext (which was invalid, given the parties' agreed assumptions entering into the contract), Boeing breached its MOA with Pemco regarding the FY08 Recompete KC-135 PDM Contract.

137.   Boeing improperly terminated the agreement, citing the reduced BEQ as the basis for its actions, despite the fact that the MOA set out a plan for the distribution of work should just such a BEQ reduction occur and despite the fact

that Boeing had long expected (and taken account in its deliberations that) such event may occur.  The contract termination was not effectuated on account of, and Boeing never contended that Pemco was guilty of, any breach by Pemco of its obligations, or any lack of qualifications of Pemco, or any failures of performance by Pemco.

138.   Boeing was aware that Pemco could not at that time effectively make and win its own separate bid on the FY08 Recompete KC-135 PDM Contract and by terminating the agreement Boeing was motivated by considerations of unfairly attempting to remove Pemco as a competitor, after obtaining Pemco's proprietary data.

139.   On information and belief, Boeing also possessed non-public information that the Air Force might not implement the BEQ reduction or that additional services could be required due to the Air Force's inability to complete its planned internal PDM which would have resulted in a sufficient quantity of aircraft available for PDM under the MOA.

140.   As a result of Boeing's breaches of contract, including but not limited to breaches of the 2005 MOA and the 2005 Work Share Agreement, Pemco has suffered massive damages that continue to accrue throughout the time period of the USAF PDM work which was to be shared with Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

**COUNT TWO**
**BREACH OF CONTRACT –**
**2005 MOA NON-DISCLOSURE AGREEMENT**
**REGARDING PEMCO'S PROPRIETARY INFORMATION**

141.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.  This Count is brought alternatively to Count Four below (the claim for conversion of and indirect trespass to Plaintiff's personal property).

142.   As part of the 2005 MOA with Pemco, Boeing executed a separate Non-Disclosure Agreement.  Pursuant to the Non-Disclosure Agreement, Boeing agreed to hold as confidential all propriety information belonging to Pemco.

143.   The Non-Disclosure Agreement defines "Proprietary Information" as "technical data and other information (including but not limited to descriptions, drawings, compositions, business and financial information, and computer software) which is related to" the subject matter of the 2005 MOA.

144.   Under the Non-Disclosure Agreement, Boeing agreed that:

> a.    Proprietary Information shall be used solely for the purpose stated in Article I [of the MOA] and shall not otherwise be used for the benefit of the recipient or others.

77

\*\*\*

    c.     Proprietary Information shall be disclosed only to the employees of the party who have a 'need to know' in connection with the purpose stated in Article I.

145.   The Non-Disclosure Agreement also provides that, upon termination of the MOA, "each party shall safeguard the Proprietary Information exchanged up to the date the relationship ends, and ensure that such data is not used against the disclosing party's interest."

146.   During the period of activities that followed execution of the 2005 MOA, and in the course of fulfilling its requirements and conditions, Pemco disclosed extensive confidential information to Boeing regarding it methods and means of performing work for the United States Government under the MOA, including but not limited to, proprietary business and financial information. Pemco identified this information to Boeing as Proprietary Information as required by the Non-Disclosure Agreement.

147.   Boeing has breached the Non-Disclosure Agreements by, among other things, improperly disclosing Pemco's proprietary information to its Employees and affiliates without a "need to know" and to others for the purpose of using that information to improperly compete with Pemco for the award of the KC-135 Recompete Program and/or by using the information to the detriment of Pemco's business interests. Boeing has further breached the Non-Disclosure Agreements by

78

not following (deliberately or otherwise) firewall procedures, and by using Pemco's proprietary information for Boeing's own benefit.

148. Further, Boeing engaged in activities and a pattern and practice of unfair competition and improper conduct which undermined its promises and agreements with Plaintiff, both before and after its formal issuance of a notice in 2006 of termination of the 2005 MOA.

149. As a result of Boeing's breaches of contract and duty, including but not limited to breaches of the 2005 MOA and the 2005 Work Share Agreement, and the Non-Disclosure Agreement and firewall requirements, Pemco has suffered damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## COUNT THREE
## PROMISSORY AND EQUITABLE ESTOPPEL

150. The preceding allegations are incorporated by reference and re-alleged as if fully set out herein. This Count is asserted in the alternative to Counts One and Two, and in the event a remedy at law is insufficient to avoid injustice and insufficient to provide adequate relief or remedies.

151.   Defendants, after lengthy discussion and due deliberation on their part, by September 2005 made a promise to Plaintiff that, effectively, even if the BEQ of the upcoming FY 2008 PDM fell to as low half of the USAF's original number set out at the time of the 2005 RFP (*see* paragraph 35) and also paragraph 58 *supra*), nevertheless, Pemco would remain a team member and subcontractor and would perform the "touch labor" on the aircraft for the overall Team consisting of Pemco and the Defendants, regardless if that resulted in Pemco doing the labor on all of the aircraft per year.   In the many months following such promise, Defendants reinforced such promise by their conduct (including their suppression of knowledge and intentions), and Plaintiff relied thereon by expending millions of dollars and a large amount of executive and employee time and effort not merely quantified in such dollar costs expended directly.

152.   The aforementioned promise was sufficiently definite as to its terms as to create or sustain a contract.  Further, the promise was made by Defendants under circumstances that they should reasonably expect would induce Pemco's actions or forebearance of a definite and substantial character.  Such promise in fact did induce Pemco's actions and forebearance of a definite and substantial character.

153.   Once the aforementioned promise was made, and in reliance thereon, particularly in light of Defendants' actions which immediately following the

making of the promise reinforced it, Pemco expended considerable moneys (well in excess of $5 million) and substantial effort and officer and employee time, and channeled and allocated resources, over the ensuing many months, toward carrying out its side of the bargain.

154.  Furthermore, the Defendants made their promises while acting deceptively, inequitably and unjustly, concealing their intentions to back out of the teaming arrangements if and when the USAF in fact lowered the BEQ, or even without such an excuse, especially once the Defendants had in hand the proprietary information they obtained from the Plaintiff.  Moreover, Plaintiff alleges upon information and belief that at the time Boeing submitted the teaming arrangement and made its promises, on a take-it-or-leave-it basis, and Plaintiff entered into performance of its side of such bargain and promises, Boeing had the intention, which it deliberately suppressed, to induce Plaintiff to enter into the arrangements long enough to provide Boeing with Plaintiff's proprietary information and to eliminate Plaintiff as a meaningful opposing bidder, and then to pull out of the teaming arrangement, hence the inclusion of language in teaming documents intended for Boeing's benefit (solely, under the circumstances).  In equity and good conscience, and to prevent injustice, Boeing should be estopped to rely upon or avail itself of exculpatory language or limitations of remedies, under the circumstances.

155.   Injustice can be avoided only by enforcement of the promise against the Defendants, who being duly advised, made such promise.  The purpose of promissory estoppel and equitable estoppel, applicable here, is to prevent the Defendants from asserting technical points in support of their breach of promise and breach of contract, when their own conduct has rendered (as it has here) the assertion of such technical rights contrary to equity and good conscience.

156.   Plaintiff offers to do equity.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined at trial, plus costs and such other relief as may be appropriate.

## COUNT FOUR
## CONVERSION OF AND INDIRECT TRESPASS
## TO PLAINTIFF'S PERSONAL PROPERTY

157.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.  This Count is brought alternatively to Count Two above (the claim for breach of contract as to Plaintiff's proprietary information).

158.   Defendants have converted property of Plaintiff, and committed indirect trespass with respect to the personal property of Plaintiff, including, but not limited to, confidential proprietary financial and technical information, and Plaintiff's costs, procedures, bidding techniques and computational and bidding

methodologies pertaining to performance of KC-135 PDM work, all of which was and is of a unique nature, was not public information, and was "personal property" of the Plaintiff within the meaning of Ala. Code § 6-2-34(2) and (3), belonging to Plaintiff, for Defendants' own use and benefit. The period of time during which Defendants converted and committed trespass to such property was between June 6, 2005 and at least the summer of 2007, and has continued subsequent to that time. (Plaintiff, not having present discovery of, nor access to, Defendants' internal records, cannot presently pin down the end date of misuse of Plaintiff's proprietary information more closely than the foregoing.) Moreover, the Defendants continue to the present day to hold such property, in defiance of Plaintiffs' ownership and rights to same.

159.   Defendants have no legal claim or right to such property and certainly did not have any legal claim or right to such property from and after June 6, 2006.

160.   Plaintiff has made a demand upon Defendants for the protection and return of all property belonging to Plaintiff, but Defendants have refused to do so.

161.   Defendants have indirectly trespassed upon, damaged the proprietary nature of, detained, used, and enjoyed the benefits of, Plaintiff's property in defiance of Plaintiff's ownership rights, and with the motive and intention of making a gain and profit for the Defendants therefrom. Without limiting the generality of the foregoing, Defendants' indirect trespass upon Plaintiff's personal

property essentially destroyed its proprietary nature and uniqueness and usefulness to Plaintiff in gaining any advantageous bidding position or any award of the FY08 KC-135 PDM contract.

162.  As a proximate result of Defendants' various and collective actions and omissions, Pemco has lost the use, benefit and value of its property, especially its proprietary nature, which was destroyed by Defendants' conduct.

163.  Defendants' conduct was intentional, willful, and deliberately carried out with the intention to harm Plaintiff through misuse of Plaintiff's own property and for the profit and unjust enrichment of Defendants.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, profits and benefits conferred by the intentional conversion of and indirect trespass to personal property aforesaid, and for amounts by which Defendants have been unjustly enriched, and for other damages, and Plaintiff further is entitled to exemplary and punitive damages of at least three times the compensatory damages of Plaintiff, all in amounts to be determined by a jury, plus costs.  Plaintiff also prays for such other and further relief as may be appropriate, premises considered.

## COUNT FIVE
## QUANTUM MERUIT AND UNJUST ENRICHMENT
## ON BOEING'S 2008 BRIDGE CONTRACT

164.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

165.   Boeing requested AAI to perform PDM work on eight (later, 14) KC-135 Aircraft involved in Boeing's 2008 Bridge Contract (#FA8105-05-D-0004). AAI faithfully performed such PDM work on 14 aircraft.

166.   Boeing and AAI agreed in 2007 that the fair value of AAI's work would be in the neighborhood of $6 million per aircraft aforesaid.

167.   Boeing subsequently misrepresented to AAI material facts as to the available USAF money to pay for such PDM work, telling AAI that only $26 million was available to pay for PDM work on 8 aircraft, and a correspondingly low $3.25 million on additional aircraft, and through such misrepresentations as well as its exercise of superior bargaining position and a position of superior knowledge about material suppressed facts, Boeing forced AAI to perform the PDM work at a below-fair-value price of $3.25 million per aircraft on a total of 14 aircraft.   AAI believed Boeing, and in reliance on Boeing's representations, AAI accepted the below-fair-value pricing on the PDM work and performed at that low price.

168.   Boeing billed the USAF for such aircraft at a materially higher cost to the USAF, and thereby unjustly benefitted, and reaped the profits and benefits of having forced AAI to do the PDM work at a below-fair-value price level.   AAI claims that it should have been paid such difference, amounting in the aggregate to an estimated $750,000 per aircraft on 14 aircraft.

169.   On a quantum meruit basis, the fair value of AAI's PDM work delivered to Boeing on said aircraft in relation to the 2008 Bridge Contract was at least $4 million, yet AAI only received $3.25 million per aircraft in payment from Boeing.   AAI herewith claims the difference, on 14 aircraft that AAI has worked upon between March 2008 and the present under contract.

170.   The aforesaid conduct also constitutes unjust enrichment of Boeing.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this court utilize its equitable powers and award to AAI just compensation for all damages that it has suffered by virtue of Defendants' unjust and unfair actions, including, but not limited to, monies received by Defendants under the 2008 Bridge Contract (#FA8105-05-D-0004) in respect of the 14 aircraft on which AAI performed PDM work (after crediting Boeing for moneys already paid), and consequential damages, attorney's fees, costs, and any other equitable relief to which Plaintiff is or may be entitled.

## COUNT SIX
## QUANTUM MERUIT AND UNJUST ENRICHMENT
## ON BOEING'S 2008 BRIDGE CONTRACT

171.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

172.   Boeing requested AAI to perform PDM work on eight (later, 14) KC-135 Aircraft involved in Boeing's 2008 Bridge Contract (#FA8105-05-D-0004). AAI faithfully performed such PDM work on 14 aircraft.

173.   Under the 2008 Bridge Contract, Boeing has a good faith obligation to provide CFM2 parts to AAI, as well as a good faith obligation to manage AAI's ordering of GFM parts through the CAV AF system.

174.   The 2008 Bridge Contract provides that AAI is to receive an early delivery award fee for KC-135 PDM deliveries in 205 days or less.

175.   Through its own incompetence, or wrongful preference to its San Antonio facility, or a combination of both, Boeing failed to provide timely delivery of CFM2 parts to AAI.   Boeing also caused delays in GFM parts to AAI through its mismanagement and inadequate operation of the CAV AF system.

176.   The delays of CFM2 parts to AAI created critical path delays and caused AAI deliver late of completed KC-135 aircraft under the 2008 Bridge Contract.   The delivery delays prevented AAI from receiving early delivery fee awards.

177.   Furthermore, Boeing's late delivery of CFM2 and GFM parts to AAI caused AAI to expend considerable time and expense moving its operations from a pulsed-line approach to a docked aircraft approach.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## COUNT SEVEN
## UNJUST ENRICHMENT – 2005 MOA AND
## USAF SOLICITATION # FA8105-05-R-0014

178.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

179.   As a result of Defendants' actions, misconduct, deception and suppressions of material fact described herein, with regard to the 2005 MOA, Defendants have been awarded the FY 08 KC-135 PDM solicitation number FA8105-05-R-0014 and have refused to honor their agreements to subcontract a portion of the work contemplated by that contract to Plaintiff.  Defendants have already realized, and stand to continue to realize, a substantial pecuniary gain by virtue of their conduct, and their omissions.  Such unjust enrichment is continuing in nature, and is increasing over time, just as is the work and payments that Defendants are receiving under the PDM arrangements are continuing.

180. Additionally, Defendants utilized Pemco's confidential and proprietary information obtained through improper, fraudulent and acts of bad faith to unfairly compete against Pemco and to deprive it of substantial revenue.

181. Accordingly, Defendants have been unjustly enriched and each day that goes by are continuing to be unjustly enriched by their wrongful actions and to the detriment of Plaintiff, which were accomplished through intentional, reckless and wanton conduct.

182. Defendants are guilty of unclean hands and unfair competition.

183. Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, and with certain representatives of the Air Force (or through taking undue advantage of the latter), in both such suppression and misrepresention of material facts and in the Defendants' scheme to unjustly enrich themselves and as a part of such unjust enrichment, to deprive the Plaintiff of its rightful role in the FY2008 KC-135 PDM Program, solicitation number FA8105-05-R-0014, and of its other rights described herein.

184. Plaintiff offers to do equity.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this court utilize its equitable powers and award to AAI just compensation for all damages that it has suffered by virtue of Defendants' unjust and unfair actions,

including, but not limited to, monies received by Defendants under the FY08 KC-135 PDM solicitation or contract number FA8105-05-R-0014, consequential damages, attorney's fees, costs, and any other equitable relief to which Plaintiff is or may be entitled.

## COUNT EIGHT
## SPECIFIC PERFORMANCE

185.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

186.   In accordance with the 2005 MOA and its several attached agreements and exhibits, Pemco assisted Defendants in preparing a proposal for the FY08 Recompete KC-135 PDM Contract number FA8105-05-R-0014 and provided Defendants with its confidential and proprietary information in connection with the proposal.   On or about October 31, 2005, as prime contractor, Defendants submitted the joint proposal, with Pemco acting as their principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.

187.   On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft.   Such a possibility had been specifically contemplated and contracted for between Plaintiff and the Defendants, and the agreements among them were structured to work, and be capable of performance, in such an eventuality.

90

188. Nevertheless, using this RFP amendment as a pretext, Boeing breached its 2005 agreements (which were already being performed by the parties, including the 2005 MOA and 2005 Work Share Agreement, with Pemco regarding the FY08 Recompete KC-135 PDM Contract number FA8105-05-R-0014. Boeing, itself (not merely BAOI or BASC), improperly terminated the several agreements, citing the reduced BEQ as the basis for its actions, despite the fact that the 2005 MOA and 2005 Work Share Agreement set out a plan for the distribution of work should just such a BEQ reduction occur.

189. Boeing also possessed and used for its own benefit considerable non-public information, and concealed the same from Plaintiff, including material information that the Air Force might not implement the BEQ reduction or that additional services could be required due to the Air Force's inability to complete its planned internal PDM which would have result in sufficient a sufficient quantity of aircraft available for PDM under the MOA.

190. Plaintiff has performed all of its obligations under the 2005 MOA and 2005 Work Share Agreement, and is ready, willing and able to perform all work on the FY08 Recompete KC-135 PDM Contract in accordance with those several agreements.

191. Plaintiff is the owner of Pemco's rights in and under the 2005 MOA and 2005 Work Share Agreement, and related agreements, and offers to do equity.

192.   Defendants are guilty of unclean hands and the other misconduct hereinabove alleged.  Defendants are not, in equity and under the circumstances, entitled to retain and enjoy 100% of the work and benefits of the 2008 FY Recompete KC-135 PDM Contract.  Work under such contract remains unfinished and therefore the MOA and Work Share Agreement, and related agreements, are capable of specific performance.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court exercise its equitable powers and issue a judgment and decree of Specific Performance requiring Boeing and Defendants to fulfill all their obligations to Plaintiff with respect to the 2008 Recompete KC-135 PDM Contract, number FA8105-05-R-0014, and otherwise under the 2005 MOA and the 2005 Work Share Agreement.  Plaintiff prays for such other and further equitable relief as may be appropriate to secure Plaintiff's rights and benefits, including without limitation ordering Defendants to assign or share work on up to 50% of the KC-135 aircraft that Defendants receive for PDM work, and for declaratory relief and injunctive relief.

## COUNT NINE – FRAUD AND FRAUDULENT SUPPRESSION

193.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

194.   Defendants made numerous material representations to Plaintiff in 2007 and 2008 during the course of their joint efforts to obtain additional work in relation to the 2008 Bridge Contract (#FA8105-05-D-0004).  These representations include, but are not limited to:

a.   That the USAF only had $26 million of funding available for aircraft that could be sent to AAI, *i.e.*, that the only way the work could be obtained was by agreeing to do the PDM work for $3.25 million per aircraft.

b.   That Boeing had done its best to get the most advantageous arrangement with USAF.

c.   That Boeing was in the same predicament as AAI in the matter of pricing obtainable.

195.   Defendants made such misrepresentations of material fact, either intentionally, recklessly without regard to their truth or falsity, or innocently or by mistake but with the intention that Pemco rely thereon.

196.   Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, and with representatives of the Air Force, in both such misrepresentation of material facts and in the Defendants' scheme to deprive the Plaintiff of its rightful share of revenues from the 2008 Bridge Contract.

93

197.   AAI reasonably relied on such material misrepresentations to its detriment and, as a proximate result, has suffered damages.

198.   Boeing was under a duty to disclose the full details of its relationship with the Air Force and the knowledge and information it obtained during and by reason of that relationship.

199.   That duty to disclose arose from Boeing's confidential relationship with Plaintiff and/or the other particular circumstances of the parties' dealings. The duty to disclose further arose from direct requests for information from Plaintiff, and because once Boeing made statements to Plaintiff, it had the duty to disclose the full truth.   The duty to disclose further arose from Defendants' position of superior knowledge derived and resulting from Defendants' superior access to and ex parte contacts with Air Force personnel and representatives, where Defendants deliberately kept communications secret from Plaintiff and did not advise Plaintiff of what Defendants were doing and saying with the Air Force.

200.   In addition to such misrepresentations, Boeing intentionally, recklessly or negligently suppressed and failed to disclose material information to Plaintiff, including, but not limited to:

> a. Material information as to the nature and content of Defendants' many communications with Air Force representatives and personnel.

b. Material information received by Defendants relating to pricing of PDM work on aircraft to be delivered under extensions and modifications of Contract #FA8105-05-D-0004.

c. Material information as to the prices that Boeing would charge the USAF for PDM work and aircraft serviced by AAI.

201. Instead, Defendants suppressed the aforesaid information from Plaintiff, and by such suppression were able to jam AAI under pressure of time deadlines promulgated by Defendants, forcing AAI down on the PDM work prices per aircraft that AAI was forced to take, the alternative being having no business at all.

202. At all times here relevant, in and about the foregoing conduct, Defendants and each of them acted willfully, intentionally, and maliciously, with the motivation to harm and disadvantage Plaintiff and its interests, and to advance the Defendants' interests.

203. Further, at all times, the several Defendants and their employees and representatives acted in concert and conspiracy with each other, in both such suppression and misrepresentation of material facts and in the Defendants' scheme to deprive the Plaintiff of its rightful share of revenues from Boeing's Contract #FA8105-05-D-0004.

204.  At all relevant times, Plaintiff relied in its conduct upon not knowing of the material suppressed facts.

205.  As a proximate result of the forgoing actions or failures to act based on Defendants' suppressions of material facts, Plaintiff has suffered damage.

206.  Because of Defendants' active concealment of their activities and of material facts, as well as the fact that the Air Force representatives involved also kept silent about such activities and about communications and dealings between them and the Defendants, and because Plaintiff did not have access to such communications between Defendants and the USAF, the Plaintiff did not know of facts that would provide a sufficient basis to bring the cause of action set forth in this Count, sooner than two years before filing of this claim (taking into account the tolling effect of the bankruptcy case filing, see statement *infra*).

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, profits and benefits conferred by the misrepresentations and suppressions of material fact aforesaid, and for amounts by which Defendants have been unjustly enriched, and for consequential damages, and Plaintiff further is entitled to exemplary and punitive damages of at least three times the compensatory damages of Plaintiff, all in amounts to be determined by a jury, plus costs.  Plaintiff also prays for such other and further relief as may be appropriate, premises considered.

## COUNT TEN
## QUANTUM MERUIT, UNJUST ENRICHMENT
## AND BREACH OF CONTRACT
## FOR "OVER AND ABOVE" WORK

207.   The preceding allegations are incorporated by reference and re-alleged as if fully set out herein.

208.   At the request of Boeing and/or the USAF, AAI performed "over and above" work on multiple aircraft pursuant to the 1998 KC-135 PDM (and extensions, including the FY08 Recompete KC-135 PDM Contract) and/or the 2008 Bridge.

209.   AAI performed this requested "over and above" work related to uneven fuel burn, replacement of incorrectly sized fasteners and 200 plus man hours on wing plank repair.

210.   None of these repairs constituted standard PDM work pursuant to the contracts.   Under these contracts, Boeing has a good faith obligation to provide AAI compensation for all of such "over and above" work.

211.   However, Boeing failed and refused to fairly compensate AAI for all "over and above" work performed on aircrafts pursuant to these contracts.

212.   Such conduct also violated Boeing's contractual obligations to AAI, and, further, unjustly enriched Boeing at the expense of AAI.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory and other damages, in

97

an amount to be determined by a jury, plus costs and such other relief as may be appropriate.

## STATEMENT APPLICABLE TO ALL COUNTS OF COMPLAINT:

213.  Plaintiff does not assert, nor does it attempt or intend to assert, directly or indirectly, explicitly or implicitly, any claim for recovery or relief under any federal statute or federal law or regulatory provision affording any civil remedy or right of recovery.  Plaintiff alleges that the law of the State of Alabama, relied upon in and for each of the Counts of this Complaint, provides all the avenues needed by the Plaintiff for ample and complete relief for the Plaintiff. (Even to the extent Missouri law may eventually be determined to apply to *interpretation* of certain contract documents, which Plaintiff does not concede, nevertheless, such law is also state law, not federal law.)  Without limiting the generality of the foregoing, the Plaintiff does not assert, nor does it attempt or intend to assert, directly or indirectly, explicitly or implicitly, advertently or inadvertently, expressly or impliedly, any claim for recovery or relief under or by reason of any federal law or federal regulation (including any agency regulation) concerning matters such as federal contracting, false claims submitted to the government, racketeering, wire or mail fraud, or any other type of statute or regulation governing or potentially governing the conduct or affairs of any parties hereto or governing the USAF, the GAO or any other agency, nor does this action

seek any interpretation of, or declaration or enforcement of rights under, or relief under, any federal law or federal regulation.  Nor does this action seek any explicit or implicit review or overturning of any federal agency or federal court or USAF decisions. Further, no relief is sought from, and no claims are asserted, against or with respect to, the USAF or any federal employee or federal agency.  Plaintiff requests that this Complaint and all prayers for any relief be construed to effectuate the foregoing statements.

214.   Any and all statutes of limitations with respect to claims and causes of action asserted in this case were tolled by reason of the Plaintiffs' bankruptcy case filing.  Plaintiffs also claim the benefit of statutory and equitable tolling, as well as equitable estoppel (by reason of Boeing's actions) to assert any statutes of limitations or laches, with respect to all to legal and equitable claims set forth herein.

### THESE CLAIMS ARE DEEMED UNSUITED FOR A.D.R.

215.   Plaintiff has evaluated the long history of discussions between it and Defendants, the many efforts the Plaintiff has made, unsuccessfully, to work out disputes concerning the above issues with the Defendants, and the necessity for pursuing in various situations formal administrative protests or remedies. Moreover, resolution of the parties' disputes over many of the events and facts are or will necessarily involve testimony and recollections of witnesses, and deposition

discovery, which is only available or best available through a court forum.  Based upon all of the foregoing, Plaintiff has reasonably determined that this action must be brought in order to resolve the claims set out herein, and that these claims are not suitable for alternative dispute resolution ("ADR").

## JURY DEMAND

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE AS OF RIGHT TO A JURY, AND DEMANDS TRIAL BY ADVISORY JURY OF ALL FACTS RELATING TO ANY EQUITABLE CLAIM.

Dated:  September 22, 2011

/s/ J. Michael Rediker
One of the Attorneys for Plaintiffs

**OF COUNSEL:**
J. Michael Rediker (RED004)
Roger A. Brown (BRO078)
Patricia C. Diak (DIA005)
Meredith J. Lees (JOW002)
R. Scott Williams (WIL167)
Peter J. Tepley (TEP002)
Vincent J. Graffeo (GRA108)
HASKELL SLAUGHTER YOUNG & REDIKER, LLC
2001 Park Place, Suite 1400
Birmingham, Alabama 35303
Phone:  205.251.1000
Facsimile:  205.324.1133
*Attorneys for Alabama Aircraft Industries, Inc.*

**Please Serve Defendants by Hand Delivery and Certified Mail at:**

The Boeing Company
c/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Operations, Inc.
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

Boeing Aerospace Support Center
c/o CSC Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL  36104

4341162_1



Haskell Slaughter Young & Gallion, LLC

Post Office Box 4660

Montgomery, Alabama 36103-4660

The Boeing Company
c/o CSC-Lawyers Incorporating Service, Registered Agent
150 South Perry Street
Montgomery, AL 36104

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |
|---|---|---|

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

THE BOEING CO., C/O CSC-LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of     ALABAMA AIRCRAFT INDUSTRIES,
   pursuant to the Alabama Rules of the Civil Procedure

| 9/22/2011 11:37:43 AM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested     /s JOHN MICHAEL REDIKER

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____                _____

Date                Server's Signature

| State of Alabama<br><br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |
| --- | --- | --- |

### IN THE CIVIL COURT OF JEFFERSON, ALABAMA

### ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

BOEING AEROSPACE OPERATIONS, INC., C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    ALABAMA AIRCRAFT INDUSTRIES,
pursuant to the Alabama Rules of the Civil Procedure

| 9/22/2011 11:37:43 AM | /s ANNE-MARIE ADAMS | |
| --- | --- | --- |
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested    /s JOHN MICHAEL REDIKER

                                    Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____      _____

Date                             Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |
|---|---|---|

## IN THE CIVIL COURT OF JEFFERSON, ALABAMA
## ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

BOEING AEROSPACE SUPPORT CENTER, C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of ALABAMA AIRCRAFT INDUSTRIES,
   pursuant to the Alabama Rules of the Civil Procedure

9/22/2011 11:37:43 AM          /s ANNE-MARIE ADAMS
_____          _____          _____
Date                       Clerk/Register                 By

☑ Certified mail is hereby requested          /s JOHN MICHAEL REDIKER
                                              _____
                                              Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____          _____
Date                       Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |
|---|---|---|

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

THE BOEING CO., C/O CSC-LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____

pursuant to the Alabama Rules of the Civil Procedure

| 9/22/2011 11:41:32 AM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested _____

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____

Date                Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |
|---|---|---|

### IN THE CIVIL COURT OF JEFFERSON, ALABAMA

### ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

BOEING AEROSPACE OPERATIONS, INC., C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER _____

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203 _____

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____
    pursuant to the Alabama Rules of the Civil Procedure

| 9/22/2011 11:41:32 AM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

☐ Certified mail is hereby requested _____
Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____                _____
Date                                                    Server's Signature

| | | |
|---|---|---|
| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2011-903218.00 |

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

BOEING AEROSPACE SUPPORT CENTER, C/O CSC LAWYERS INC. 150 SOUTH PERRY STREET, MONTGOMERY, AL 36104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN MICHAEL REDIKER

WHOSE ADDRESS IS 2001 PARK PLACE NORTH, SUITE 1400, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____
   pursuant to the Alabama Rules of the Civil Procedure

9/22/2011 11:41:32 AM                    /s ANNE-MARIE ADAMS                         _____

Date                                     Clerk/Register                              By

☐ Certified mail is hereby requested     _____

                                         Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____                    _____

Date                                     Server's Signature



*1st Amended Complaint w/orig svc*



# NOTICE TO CLERK

### REQUIREMENTS FOR COMPLETING SERVICE BY CERTIFIED MAIL

**SEP 2 8 2011**

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

**01-CV-2011-903218.00**

To: CLERK BIRMINGHAM
   clerk.birmingham@alacourt.gov

**TOTAL POSTAGE PAID FOR CERTIFIED MAIL: $31.05**

Parties to be served by **Certified Mail - Return Receipt Requested**

THE BOEING CO.
C/O CSC-LAWYERS INC.      D1        Postage: $10.35
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104          7010 2780 0002 8186 7773

BOEING AEROSPACE OPERATIONS, INC.
C/O CSC LAWYERS INC.      D2       Postage: $10.35
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104          7010 2780 0002 8187 0179

BOEING AEROSPACE SUPPORT CENTER
C/O CSC LAWYERS INC.                Postage: $10.35
150 SOUTH PERRY STREET    D3
MONTGOMERY, AL 36104          7010 2780 0002 8186 7780

Parties to be served by **Certified Mail - Restricted Delivery - Return Receipt Requested**

```
10·35 +
10·35 +
20·70 *
20·70 X
3·00 =
62·10 *
```



# NOTICE TO CLERK

### REQUIREMENTS FOR COMPLETING SERVICE BY
### CERTIFIED MAIL

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
ALABAMA AIRCRAFT INDUSTRIES, INC. V. THE BOEING CO. ET AL

**01-CV-2011-903218.00**

To: CLERK BIRMINGHAM
     clerk.birmingham@alacourt.gov

**TOTAL POSTAGE PAID FOR CERTIFIED MAIL: $31.05**

Parties to be served by **Certified Mail - Return Receipt Requested**

THE BOEING CO.
C/O CSC-LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104
                                                Postage: $10.35

BOEING AEROSPACE OPERATIONS, INC.
C/O CSC LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104
                                                Postage: $10.35

BOEING AEROSPACE SUPPORT CENTER
C/O CSC LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104
                                                Postage: $10.35

Parties to be served by **Certified Mail - Restricted Delivery - Return Receipt Requested**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Boeing Aerospace Support Center
C/O CSC Lawyers Inc.
150 South Perry Street
Montgomery, AL 36104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X Roxie Benton     ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Roxie Benton                    SEP 30 2011

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

CV11 903218 1st Amended
03

Proposed SFC

3. Service Type
   ☐ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7010 2780 0002 8186 7780

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

FILED IN OFFICE

OCT 0 3 2011

ANNE-MARIE ADAMS
Clerk

• Sender: Please print your name, address, and ZIP+4 in this box •

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD. NO.
BIRMINGHAM, ALABAMA 35203

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

THE BOEING CO.
C/O CSC-LAWYERS INC.
150 SOUTH PERRY STREET
MONTGOMERY, AL 36104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Roxie Bethea_  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Roxie Bethea    SEP 30 2011

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

CVII 903218 1st Amended
DI
W/bng Sec

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7010 2780 0002 8181 7773

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

30 SEP 2011 PM 2 T

**FILED IN OFFICE**

OCT 0 3 2011

**ANNE-MARIE ADAMS**
Clerk

• Sender: Please print your name, address, and ZIP+4 in this box •

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD. NO.
BIRMINGHAM, ALABAMA 35203

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Boeing Aerospace Operations, Inc
C/O CSC Lawyers Inc.
150 South Perry Street
Montgomery, AL 36104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ___Roxie Bell___  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Roxie Bethea    OCT 3 2011

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

CV11 203218 1 Atlenfeld
DV
Wargast St C

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7010 2780 0002 8187 0179

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

FILED-IN-OFFICE

OCT 04 2011

ANNE-MARIE ADAMS
Clerk

• Sender: Please print your name, address, and ZIP+4 in this box •

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF. CO. COURTHOUSE
716 RICHARD ARRINGTON JR BLVD. NO.
BIRMINGHAM, ALABAMA 35203