FILED

2013 Mar-20  PM 12:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA AIRCRAFT INDUSTRIES, INC., et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | **Case No.: 2:11-CV-3577-RDP** |
| | } | |
| **THE BOEING COMPANY, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 39). The Motion has been fully briefed (Docs. # 40, 46, 49, 52, 53, 54).

**I.      Facts**[1]

Plaintiff Alabama Aircraft, Inc. ("AAI" or "Pemco")[2] has been performing Programmed Depot Maintenance ("PDM") in Jefferson County, Alabama for the United States Air Force's ("USAF" or "Air Force") KC-135 Stratotanker fleet since approximately 1969 and has processed well over 2,400 such aircraft, more than Boeing or any other provider of these services. (Doc. # 34 at ¶ 8).

---

[1] For purposes of this Motion, the facts are as alleged in Plaintiff's Second Amended Complaint. These may not be the actual facts of this case; however, they are the well-pleaded facts contained in the Second Amended Complaint.

[2] The claims of the named Plaintiffs in this action, Alabama Aircraft Industries, Inc., Alabama Aircraft Industries, Inc. – Birmingham, and Pemco Aircraft Engineering Services, Inc., are being prosecuted by and through Joseph Ryan as the trustee of the Litigation Trust established in relation to the Chapter 11 Bankruptcy case of the named Plaintiffs. Thus, the term "Plaintiff" will be used in the singular herein.

In or about August 1994, after a competitive bidding process, the Air Force awarded Pemco (as AAI was known at that time)[3] the 1994 PDM Contract to perform maintenance on its KC-135 aerial refueling tanker aircraft.  AAI completed work on the final aircraft inducted for PDM under this contract during 2003.  (Doc. # 34 at ¶ 9).

In February or March 2004, Boeing[4] and AAI began conversations about teaming up to bid jointly on the government KC-135 PDM work.  (Doc. # 34 at ¶ 29).  On or about May 20, 2005, the Air Force released its draft for the FY08 Recompete KC-135 PDM Contract, with a Request for Proposal number of FA8105-05-R-0014 (hereafter, the "RFP") for the FY08 KC-135 PDM work.  (Doc. # 34 at ¶ 33).  The original RFP contemplated a Best Estimated Quantity ("BEQ") of 44 KC-135 aircraft per year.  (Doc. # 34 at ¶34).

On June 3, 2005,  Pemco and Boeing entered into a Memorandum of Agreement ("6/2005 Recompete MOA") to submit a joint proposal for the KC-135 PDM Contract under a "teaming" arrangement in which Boeing would be the prime contractor and Pemco would be the principal subcontractor.   (Doc. # 34 at ¶35).  Under the 6/2005 Recompete MOA, Pemco provided to Boeing proprietary "technical and cost proposal information" including its lower cost structure and bidding methodology.   (Doc. # 34 at ¶¶ 36, 40, 41).   The 6/2005 Recompete MOA contained a Non-Disclosure Agreement, under which the proprietary business and financial information provided by Pemco to Boeing was to be used solely "for the purpose of negotiating a Memorandum of Agreement leading to a long-term subcontracting relationship relating to the [KC-135 PDM] program."  (Doc. # 34 at ¶ 38).  The 6/2005 Recompete MOA also contained a Work Share

---

[3] The terms "Plaintiff," "Pemco" or "AAI" will be used interchangeably to refer to Plaintiff.

[4] For ease or reference, Defendants will be referred to as "Boeing."

Agreement that recognized the possibility that the BEQ of 44 aircraft was only an estimate and that the actual number of planes involved in the Program was subject to change.  (Doc. # 34 at ¶ 39).

Effective on September 6, 2005, the 6/2005 Recompete MOA was re-issued by Boeing and Pemco, and amended by the addition of another company (the "9/2005 Recompete MOA").  (Doc. # 34 at ¶ 44).  Under the Work Share Agreement relating to the 9/2005 Recompete MOA, Boeing agreed that "[u]pon successful award of a contract for the Program, it is agreed that Pemco will receive 50% of all KC-135 inductions awarded on said contract." (Doc. # 34 at ¶ 47).  The Work Share Agreement continued: "In the event that the number of aircraft drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties that the touch labor would be performed entirely at Pemco with the engineering and procurement remaining at BASC." (Doc. # 34 at ¶ 47).

The 9/2005 Recompete MOA contains the following relevant clauses:

**1.0    RELATIONSHIP OF THE PARTIES**
. . . .
**1.4**    Each party shall act as an independent contractor and not as agent for, partner of, or joint venturer with the other party unless such agency, partnership or joint venture is established and agreed to, under separate document, between the parties. ...  No other relationship outside of that contemplated by the terms of this Agreement shall be created hereby. . . .
. . . .
**5.0    TERM AND EFFECTIVITY**
. . . .
**c.**    After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.
. . . .
**11.0    LIMITED OBLIGATION**

3

**11.1**   The Parties recognize that one Party ... may fail to perform its obligations under this Agreement ... and thereby cause damage to the other Parties ... . The Parties, having full consideration to the nature of this transaction, agree that the following categories of damages are disclaimed by each Party, and the Non-breaching Parties neither expects, nor will seek, to recover from the Breaching Party any incidental damages, punitive and exemplary damages and any consequential damages, including but not limited to the following: (a) any profits that the Non-breaching Parties expected to earn on the Prime Contract or any other contract related to the Program; ...

**11.2**   . . . Nothing in this MOA shall constitute, create, give effect to or imply a joint venture, partnership, or formal business organization. Each Party is an independent contractor and not an agent for the other Party. ...  No such relationship is intended by any reference herein to a "team" or "team members."

. . . .

**15.0   APPLICABLE LAW**
This MOA shall be governed by the laws of the state of Missouri, without resort to conflict of laws provisions.

. . . .

**17.0   ENTIRE AGREEMENT**
This MOA together with its Exhibits and Attachments contains the entire agreement between the Parties concerning the subject matter thereof and supersedes any previous understanding, commitments or agreements, oral or written.

. . . .

(Doc. # 40-6 at 4, 6, 8-9, 10).

Pursuant to its teaming arrangement with Boeing and the 9/2005 Recompete MOA, Pemco made approximately $5 million in capital expenditures.   (Doc. # 34 at ¶ 50).

On or about August 19, 2005, the Air Force formally released the FY08 Recompete KC-135 PDM Contract RFP, number FA8105-05-R-0014.  Boeing and Pemco jointly worked under the 9/2005 Recompete MOA to bid in response to the RFP.  (Doc. # 34 at ¶ 57).  On or about October 1, 2005, the Air Force awarded a "Bridge Contract" for KC-135 PDM to Boeing, with Pemco serving as Boeing's subcontractor, pending the award of the FY08 Recompete KC-135 PDM Contract. (Doc. # 34 at ¶ 58).

4

Pemco did not plan to submit a separate bid for the FY08 Recompete KC-135 PDM Contract in response to the RFP.  Instead, pursuant to the MOA, Pemco assisted Boeing in preparing a proposal for the FY08 Recompete KC-135 PDM Contract.  (Doc. # 34 at ¶ 59).  On or about October 31, 2005, Boeing submitted the joint bid proposal in response to the RFP as a prime contractor, with Pemco acting as its principal subcontractor and having responsibility for approximately one-half of the KC-135 PDM work.  (Doc. # 34 at ¶ 62).

On May 1, 2006, Boeing wrote to the Air Force concerning a "Letter of Intent" (LOI) dated April 26, 2006, in which the government had proposed changes to the RFP # FA8105-05-R-0014 for the KC-135 PDM work and the proposed reduction of the BEQ to a baseline of 24 aircraft, from the original proposed 44 aircraft per year.  (Doc. # 34 at ¶ 66).  On or about May 31, 2006, the Air Force released an amendment to the FY08 Recompete KC-135 PDM Contract consistent with its April 26, 2006 LOI reducing the annual BEQ from 44 to 24 aircraft.  (Doc. # 34 at ¶ 68).

On June 6, 2006, Boeing terminated the 9/2005 Recompete MOA pursuant to Paragraph 5c citing the reduced BEQ as the reason and stating that the "requested quantities is so unfavorable to Boeing that further participation in the Program pursuant to  the MOA is no longer practical or financially viable."  (Doc. # 34 at ¶ 69).[5]

---

[5] Again, paragraph 5c of the MOA provides:

> After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.

(Doc. # 34 at ¶ 69).

On June 12, 2006, Pemco had filed an agency-level protest asking the Air Force to allow submissions of new proposals. The Air Force contacted Pemco and asked it to withdraw the protest, because it would create paperwork and would slow down the process. (Doc. # 34 at ¶ 75). Because the Air Force promised to re-open the bidding, Pemco withdrew its protest.

On July 19, 2006, the Air Force announced that it was throwing open the RFP FA8105-05-R-0014, for the FY08 KC-135 PDM work, to both new bidders and existing bidders to submit or re-submit a proposal or a changed proposal. (Doc. # 34 at ¶ 74). On September 18, 2006, Boeing submitted its own bid to the USAF in response to the amended RFP, which proposed doing all the FY08 Recompete KC-135 PDM work at Defendants' San Antonio facility. (Doc. # 34 at ¶ 76). Pemco submitted its own bid on September 18, 2006 to serve as prime contractor on the FY08 Recompete KC-135 PDM. (Doc. # 34 at ¶ 78).

On or about February 23, 2007, Pemco and Boeing each submitted separate Final Proposal Revisions ("FPRs") for the FY08 Recompete KC-135 PDM Contract. (Doc. # 34 at ¶ 81). In Boeing's FPR, it substantially dropped its labor hours per aircraft, especially in key years of the contract. This resulted in a substantial price reduction in Boeing's bid, which was more than large enough to account for the $15 million difference in the evaluated prices. (Doc. # 34 at ¶ 82). On or about June 18, 2007, Pemco and Boeing each submitted separate Second FPRs for the FY08 KC-135 PDM Contract. (Doc. # 34 at ¶ 85).

On or about August 31, 2007, Boeing belatedly provided Pemco with information regarding its efforts to comply with its obligations under the 9/2005 Recompete MOA to implement a firewall and take other precautions to protect Pemco's proprietary information that it had received while Boeing and Pemco were working together in connection with making the original joint proposal for

6

the FY08 Recompete KC-135 PDM.  (Doc. # 34 at ¶ 88).  The information provided by Boeing revealed that it had failed to prevent Boeing personnel with specific knowledge of detailed Pemco pricing and proprietary information from continuing to work on Boeing's proposal to the Air Force which was in direct competition with Pemco's proposal. (Doc. # 34 at ¶ 89).  On September 6, 2007, Pemco notified the Air Force of their belief that Boeing personnel with knowledge of Pemco's proprietary information had worked on Boeing's bid.  (Doc. # 34 at ¶ 90).  Pemco withdrew its September 6, 2007 complaint after being advised that the complaint was holding up the award of the contract. (Doc. # 34 at n.10).

On September 7, 2007, the USAF accepted Boeing's revised bid, even though it found that Pemco was as well qualified as Boeing.  (Doc. # 34 at ¶ 77).  The Air Force was impressed by Boeing's lower total evaluated price difference of $15 million.  (Doc. # 34 at ¶ 77).  Boeing failed to submit any technical justifications or explanations for the change in its labor hour assumptions. Plaintiff alleges that Boeing used Pemco's proprietary information about costs, pricing, bidding methodology in making this change.  (Doc. # 34 at ¶ 82).

After Pemco submitted a bid protest that was sustained, on March 3, 2008, the Air Force issued a notice to Pemco of a new award decision which again selected Boeing for award of the FY08 Recompete KC-135 PDM Contract.  (Doc. # 34 at ¶ 96).

On March 11-13, 2008, Pemco attended a Program Management Review ("PMR") set of briefings by the Air Force regarding the KC-135 PDM program which indicated that there was a likelihood that the Air Force would actually increase quantities of KC-135 aircraft to be sent to outside contractors for PDM work. Over the period from mid-March 2008 to late July 2008, Pemco received other indications that this would probably occur.  (Doc. # 34 at ¶ 98).

Before Boeing and Pemco entered into the 6/2005 Recompete MOA to submit their joint bid, on April 1, 2005, they entered into another Memorandum of Agreement (the "Bridge MOA") which provided for the continuation of their contractual relationship for obtaining and sharing KC-135 PDM work for FY06 and FY07 on a PDM contract that had covered Fiscal Years 2002 through 2005. (Doc. # 34 at ¶ 112). On October 18, 2005, pursuant to the Bridge MOA, Boeing and Pemco entered into a contract titled "Repair Agreement No. 06-003," for a "Long Term Requirements Contract" (or "LTRC") under Government Price Contract Proposal number FA8105-05-D-0004 for the performance of PDM on KC-135 aircraft. Pursuant to this LTRC, Pemco was to perform PDM for Boeing on KC-135 aircraft for a base period of October 1, 2005 through September 30, 2007, and two six-month option periods effective October 1, 2007 through September 30, 2008.

The LTRC was subsequently extended to cover later aircraft that Boeing was awarded under its FA8105-05-D-0004 contract with the Air Force. Boeing and AAI were in agreement that the fair value of AAI's PDM work on such a volume of KC-135 aircraft would be approximately $6 million per aircraft, per contract. (Doc. # 34 at ¶ 115). Thereafter, Boeing called AAI and informed AAI that it had learned from the Air Force that it only had a total of $26 million available to fund PDM work on 8 KC-135 aircraft, and that AAI would have to do the PDM work for that lower price, equal to $3.25 million per aircraft. (Doc. # 34 at ¶ 116). On March 18, 2008, in a LTRC of the same date ("the March 18, 2008 LTRC"), AAI accepted Boeing's offer to do the work based on that pricing model. (Doc. # 34 at ¶ 118). In doing so, AAI relied upon Boeing's representation that $26 million was all the funding available from the Air Force. (Doc. # 34 at ¶ 118). Plaintiff alleges that at this time, Boeing knew (and/or reasonably expected) that it would seek and receive additional compensation from the USAF for the PDM work during the performance of the 2008 Bridge

8

Contract.  (Doc. # 34 at ¶ 119).  AAI ultimately received and performed PDM work on 14 aircraft under the terms of the March 18, 2008 LTRC.

Boeing later received a modification (or modifications) of its 2008 Bridge Contract with the Air Force under which it received additional compensation for the work on each aircraft.  (Doc. # 34 at ¶ 120).  AAI learned about these subsequent modifications in approximately February 2009. (Doc. # 34 at ¶ 122).

 Plaintiff alleges that after Boeing received the FY08 Recompete KC-135 PDM Contract in March 2008, Boeing deliberately and systematically caused multiple instances of Customer Furnished Materials Type 2 ("CFM2") deliveries to be delayed to AAI which resulted in it losing early completion bonuses.  (Doc. # 34 at ¶ 125).

Plaintiff also alleges that it was not paid for "over and above" work under the Boeing's 1998 KC-135 PDM (and extensions, including the FY08 Recompete KC-135 PDM Contract) and/or the 2008 Bridge Contract.  Under these respective contracts, in order for AAI to receive payment for "over and above" work, Boeing must approve it as "over and above," and then request the USAF to accept it as "over and above" work.  (Doc. # 34 at ¶ 133).  Plaintiff asserts that Boeing owed a duty to AAI to seek USAF approval for "over and above" work and negotiate proper contract modifications in a timely and consistent fashion such that AAI could issue invoices and receive payment for "over and above" work performed.  AAI alleges that it performed such work, but was not paid for it.[6]  (Doc. # 34 at ¶¶ 133-35).  AAI has an outstanding and unpaid invoice (#27465) to Boeing in the amount of $32,855.23 for "over and above work."  (Doc. # 34 at ¶ 138).  Boeing did

---

[6] Despite this factual assertion, Plaintiff has failed to allege that this breached a contractual obligation on Boeing's part.

not obtain the necessary contract modification with the USAF in order for AAI to be compensated for that work.  (Doc. # 34 at ¶ 139).

## II.    Standard of Review

As a general rule, the Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  However, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  The complaint must include enough facts "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.  To be plausible on its face, the claim must contain enough facts that "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  And to survive Defendants' Motion, the allegations of Plaintiff's Second Amended Complaint must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct."  *Id.*

## III.    Analysis

Plaintiff's Second Amended Complaint was drafted after a lengthy hearing on May 24, 2012, on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  At the May 24, 2012 hearing, the court and the parties engaged in detailed discussions about the pleading deficiencies in

Plaintiff's First Amended Complaint.  After the conclusion of the hearing, the court allowed Plaintiff

a third opportunity to draft a complaint setting forth claims with sufficient detail to satisfy *Twombly*

and *Iqbal*.

Plaintiff's Second Amended Complaint contains the following counts:

1.      Count One:  Breach of Contract - 2005 Recompete MOA;

2.      Count Two:  Declaratory Judgment - Limitation of Liability is Unenforceable;

3.      Count Three:  Breach of Contract - 2005 Recompete MOA Non-Disclosure
        Agreement Regarding Pemco's Proprietary Information;

4.      Count Four:  Declaratory Judgment - Limitation of Liability is Unenforceable With
        Respect to Non-Disclosure Violations

5.      Count Five:  Misappropriation of Proprietary and Trade Secret Information -
        Missouri Trade Secrets;

6.      Count Six:  Misrepresentations - Boeing's Bridge Contract;

7.      Count Seven:  Suppression of Facts - Boeing's Bridge Contract;

8.      Count Eight:  Fraud - Breach of Duty to Correct and Update;

9.      Count Nine:  Breach of Contract - Boeing's 2008 Bridge Contract;

10.     Count Ten:  Declaratory Judgment and Specific Performance for Over and Above
        Work, and Alternately Breach of Contract;

11.     Count Eleven:  Breach of Contract for Over and Above Work

**A.      Counts One and Three**

In their motion, Defendants have not moved to dismiss either of these claims, and the court

does not address them here.

11

**B.      Counts Two and Four**

Counts Two and Four of the Second Amended Complaint seek a declaratory judgment that the Limited Obligation clause of the September 2005 MOA is unenforceable.  The Limited Obligation clause of the September 2005 MOA only comes into play if Plaintiff prevails on its breach of contract claims.  If Plaintiff prevails on the breach of contract claims, the Limited Obligation clause purports to provide Defendants a defense to Plaintiff's recovery of certain damages.  Thus, Counts Two and Four seek declaratory relief on an affirmative defense.

Defendants' Motion to Dismiss argues that such clauses are enforceable under Missouri law. Plaintiff argues that the clause does not apply where a breach is deliberate or in bad faith.  In either case, although the court sees these claims as duplicative of Defendants' affirmative defense to damages, they are matters that will be properly determined in the course of this litigation one way or the other in relation to Counts One and Three, and that is the appropriate time and manner to address them.  Therefore, Defendants' Motion to Dismiss counts Two and Four will be denied.

**C.      Count Five - Misappropriation of Proprietary and Trade Secret Information - Missouri Trade Secrets**

Defendants argue that this claim fails as a matter of law because Alabama's choice of law principles dictate that this court must apply Alabama law to Plaintiff's purported trade secrets act claim.  Plaintiff argues that Missouri law applies because Boeing violated Missouri law in Missouri. Plaintiff further references the parties' Non-Disclosure Agreement as support for the argument that Missouri law applies.

The court notes, however, that Plaintiff does not set forth the "Applicable Law" provision of the Non-Disclosure Agreement in full.  That clause provides,

> 11.  Applicable Law.  The interpretation of this Agreement and the rights and liabilities of the parties to this Agreement shall be governed by the law of the state of Missouri, excluding its conflicts of laws principles.

(Doc. # 40-7).

Plaintiff argues that this language does not limit the application of Missouri law solely to breaches of the Non-Disclosure Agreement.  The court disagrees.  A review of the entire clause reveals that the parties only agreed that Missouri law would apply to the interpretation of the Non-Disclosure Agreement itself.  Moreover, the parties specifically excluded the application of Missouri conflicts of laws principles.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941).  In Alabama, the long established choice of law rule of *lex loci delicti* governs tort causes of action and requires that the substantive law of the place where the tort occurred must be employed, while procedural law of the forum state is to be applied. *Alabama Great So. R.R. v. Carroll*, 97 Ala. 126, 11 So. 803 (1892).  "[A]n Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Fitts v. Minnesota Mining & Manufacturing Co.*, 581 So.2d 819, 820 (Ala. 1991). Where, as here, the injury allegedly suffered by Plaintiff is financial, the location where the injury was felt normally is the determinative consideration.  *Fitts*, 581 So.2d at 820.

Courts in Alabama faced with financial injury claims have consistently held, under the doctrine *of lex loci delicti*, that the law of the state where a plaintiff suffered its alleged financial injury arising from the common law tort claim is the law that governs those claim.  *See San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 2012 WL 4339316, *30 (N.D. Ala. 2012); *San*

*Francisco Residence Club, Inc., et al. v. Park Tower, LLC, et al.*, Case No. 5:08-CV-01423-AKK, Doc. # 294 at 11 (N.D. Ala. Jan. 12, 2012); *Chambers v. Cooney*, 2007 WL 2493682, *11 (S.D. Ala. 2007) *Glass v. Southern Wrecker Sales*, 990 F.Supp. 1344, 1348 (M.D. Ala. 1998).

Plaintiff has its principle place of business in Alabama. (Doc. # 34 at ¶ 1).  Therefore, any financial injury was suffered in Alabama.  Accordingly, this court must apply Alabama law to Plaintiff's trade secrets claim.  Unfortunately for Plaintiff, under Alabama law, the claim in Count Five is time-barred.  The Alabama Trade Secrets Act, Ala.Code 1975 § 8-27-5, provides that "[a]n action for misappropriation must be brought within two years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Plaintiff notified the Air Force of the alleged misappropriation of its proprietary information on September 6, 2007.  (Doc. # 34 at ¶ 90).  Therefore, Plaintiff was aware of the violation, at the latest, by that date.  The original Complaint in this case was not filed until October 7, 2011, over four years later.  Plaintiff's Trade Secrets Act claim is therefore barred by the applicable statute of limitations.[7]

### D.    Plaintiff's Fraud Claims - Counts Six through Eight

To survive a motion to dismiss, a complaint "does not need detailed factual allegations," but it must provide the defendant with fair notice of what the claim is about and the grounds upon which it rests.  *Twombly*, 550 U.S. 544, 545 (2007).  There is an important exception to this general rule where the claim is grounded in fraud: in that instance, the complaint must comply with Federal Rules of Civil Procedure 9(b).  Rule 9(b) provides that in "alleging fraud . . . a party must state with particularity the circumstances constituting fraud."  In order to comply with this requirement, a

---

[7] Moreover, this claim is somewhat duplicative of Count Three, which alleges a breach of the parties' Non-Disclosure Agreement based upon the same or similar facts.

plaintiff must set forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001), quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).  The court will apply these Rule 9(b) requirements to Plaintiff's fraud claims contained in Counts Six, Seven, and Eight in turn.

### 1.    Count Six - Misrepresentations: Boeing's Bridge Contract

Count Six of Plaintiff's Complaint alleges that Boeing made certain misrepresentations of material facts in connection with the October 1, 2005 Bridge Contract.  A plaintiff alleging fraud under a misrepresentation theory in Alabama "must prove four elements: (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." *Billy Barnes Enterprises, Inc. v. Williams*, 982 So.2d 494, 499 (Ala. 2007) (citation omitted); *see also Cook's Pest Control, Inc. v. Rebar*, 28 So.3d 716, 725 (Ala. 2009) ("To establish a prima facie case of fraudulent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff relied on the false representation, and (4) that actual injury resulted from that reliance.") (citations omitted).

Plaintiff alleges that the following misrepresentations were made to it by Boeing:

a.    That the USAF only had $26 million of funding available to pay for PDM work on 8 aircraft (*i.e.*, $3.25 million per aircraft), and a correspondingly low $3.25 million for each additional aircraft that could be sent to Plaintiff, *i.e.*,

that the only way the work could be obtained was by Plaintiff agreeing to do the PDM work for $3.25 million per aircraft.

b.      That Boeing had done its best to get the most advantageous arrangement with USAF, and what Boeing showed the Plaintiff was the best obtainable from such efforts.

c.      That Boeing was going to be paid the same type of revenue per aircraft that Plaintiff was going to receive.

d.      That this was the most advantageous arrangement with the USAF that Boeing would be able to procure.

e.      That Boeing was in the same predicament as Plaintiff in the matter of obtainable pricing.

(Doc. # 34 at ¶ 245).

Plaintiff thereafter makes formulaic allegations that "Boeing knew and/or reasonably anticipated that (1) Boeing would receive more than $3.25 million per aircraft, (2) Boeing could and would seek and receive additional compensation from the USAF for such PDM work during the performance of the contract, and (3) Boeing's other representations were false or stated so as to be misleading in context." However, glaringly absent from Plaintiff's Second Amended Complaint is any factual allegation that the representations were actually false when they were made *and* that Boeing knew they were false. "[A] formulaic recitation of the elements of a cause of action" does not satisfy Rule 8 pleadings standards, much less the the more particularized pleading standards of Rule 9. *Twombly*, 550 U.S. at 555, 557. Pleadings based upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations are due to be dismissed. *Twombly*, 550 U.S. at 555, 557.

At the May 24, 2012, hearing on Defendants' Motion to Dismiss the First Amended Complaint, the court clearly instructed Plaintiff that in re-pleading its fraud claims,

16

> [Y]ou're going to have to be very particular, consistent with 9(b), about what Boeing knew when it made these representations that were inconsistent with the representations and also specific about the fact that Boeing made these representations with the intent to deceive and what facts you have in which to plead to support that allegation.
>
> . . .
>
> and give me the 9(b) particulars, if you have them and you can present them, as to why you can plead with good faith at this point that Boeing, first, knew it was making misrepresentations at the time it made them; . . .

(Doc. # 33 at 82, 84).  Despite being specifically instructed to provide details regarding Boeing's alleged knowledge of the falsity of its representations, Plaintiff's Second Amended Complaint fails to provide these particulars as to falsity.  The Second Amended Complaint does not allege that the a false representation concerned *a material existing fact.*  Rather, it assumes based on hindsight that the representations must have been false when made.  Plaintiff's failure to allege that the statements were false when made negates Plaintiff's misrepresentation claim, particularly on a third attempt at drafting the claim.  *Allen v. Baker*, 99 So.3d 324, 331 (Ala.Civ.App. 2012) (where the alleged misrepresentation is a truthful statement, an essential element of a misrepresentation claim is negated); *see GE Capital Aviation Services, Inc. v. Pemco World Air Services, Inc.*, 92 So.3d 749 (Ala. 2012) (where there is no evidence[8] that the representation at issue was false, a fraud claim fails as a matter of law).  Therefore, Defendant's Motion to Dismiss Plaintiff's misrepresentation claim in Count Six is due to be granted.

---

[8] Although in this case, there is no *assertion* the representation was knowingly false when made, the legal principle nevertheless applies with full force.

17

### 2.    Count Seven - Suppression of Facts - Boeing's Bridge Contract

In Count Seven, Plaintiff alleges that Boeing suppressed certain material facts in connection with the Bridge Contract.  "To make out a prima facie case of fraudulent suppression, [a plaintiff] must show: (1) that [the defendant] had a duty to disclose; (2) that [the defendant] suppressed an existing, material fact; (3) that [the defendant] had actual knowledge of the fact of its materiality; (4) that [plaintiff's] lack of knowledge induced her to act; and (5) that she suffered actual damages as a proximate result." *Hardy v. Blue Cross & Blue Shield of Ala.*, 585 So.2d 29, 32 (Ala. 1991).

Plaintiff's Second Amended Complaint alleges that the following material facts known to Defendants were suppressed:

a.    That Boeing intended to, and would, seek and receive additional compensation from the USAF for such PDM work during the performance of the contract.

b.    That Boeing was being paid a higher per-aircraft amount than it was passing on to Plaintiff (even after allowing for normal differences such as parts supplied by Boeing).

c.    That Boeing was retaining, and would retain, for itself all excess amounts on AAI-inducted aircraft that Boeing was able to obtain from the USAF, without disclosing to AAI that such excess funding was available and the amounts thereof.

d.    That Boeing reasonably anticipated receiving additional compensation from the USAF for such PDM work during the performance of the contract.

e.    Material information as to the nature and content of Defendants' many communications with Air Force representatives and personnel.

f.    Material information received by Defendants relating to pricing of PDM work on aircraft to be delivered under extensions and modifications of Contract #FA8105-05-D-0004.

g.    Material information as to the prices that Boeing would charge the USAF for PDM work and aircraft serviced by Plaintiff.

18

      h.      That Boeing billed the USAF and in fact received additional compensation at a materially higher cost to the USAF, such that Boeing pocketed at least an additional $750,000 to $769,000 per aircraft that Plaintiff was delivering from PDM work.

(Doc. # 34 at ¶ 281).

Defendants argue that Plaintiff's suppression claim fails because there was no duty to disclose.  "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Lawson v. Harris Culinary Enterprises, LLC*, 83 So.3d 483, 492 (Ala. 2011).   Moreover,"[a]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed." *McGarry v. Flournoy*, 624 So.2d 1359, 1362 (Ala. 1993).

Plaintiff first argues that a confidential relationship existed between the parties and gave rise to a duty to speak.  However, the September 2005 MOA defined the parties' relationship as follows: "Nothing in this MOA shall constitute, create, give effect to or imply a joint venture, partnership, or formal business organization. Each Party is an independent contractor and not an agent for the other Party. ...  No such relationship is intended by any reference herein to a 'team' or 'team members.'" (Doc. # 40-6).  Although Plaintiff and Defendant agreed to attempt to work together for their mutual benefit, they were both sophisticated businesses, experienced in their work, who generally operated as competitors. Furthermore, according to Plaintiff's Second Amended Complaint, the parties were already in litigation over the alleged breach of the September 2005 MOA at the time Plaintiff alleges there existed a confidential relationship.  (Doc. # 34 at ¶ 272).  But it is

clear that under these circumstances (and more precisely, these allegations even taken as true), no special or confidential relationship existed which would give rise to a duty to communicate.

Plaintiff also argues that it posed direct inquiries to Defendant which gave rise to duty to speak.   Although at no point does Plaintiff ever set forth the details of any such inquiry in the Second Amended Complaint, Plaintiff has alleged that it made the direct inquiries.  "AAI would periodically request updates from Boeing concerning its government contracting status with the USAF ... ."  (Doc. # 34 at ¶ 270).  "The duty to disclose further arose from direct requests for information from Plaintiff."   (Doc. # 34 at ¶ 285).   "Despite the many requests we made for additional information, ..."  (Doc. # 34 at ¶ 310).   "The duty to disclose further arose from direct requests for information from Plaintiff, ..."  (Doc. # 34 at ¶ 319).

Although the better practice would have been to provide more details about the request for information, particularly given that this was Plaintiff's third attempt to state its claims against Defendants, the court concludes that the allegations are sufficient to permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct," *Iqbal*, 129 S. Ct. at 1949, and that they satisfy Rule 9(b).  Thus, Defendant's Motion to Dismiss Count Seven of Plaintiff's Second Amended Complaint is due to be denied.[9]

### 3.      Count Eight - Fraud: Breach of Duty to Correct and Update

This claim was specifically pled in the alternative to Counts Six and Seven.  (Doc. # 34 at ¶ 292).  Because this claim is duplicative of count Seven, which the court is allowing to proceed, Count Eight is redundant.  Moreover, as argued by Defendants, it is not at all clear that Alabama

---

[9] This is not to say this claim will survive on a more developed factual record unless Plaintiff is able to present evidence regarding the details of the particular requests for information, including but not limited to the dates, substance, and manner of such inquiries.

even recognizes such a claim.  The only Alabama case cited by Plaintiff for the proposition that such a claim exists was actually addressing the elements of an estoppel as to lands claim.  *See Snodgrass v. Snodgrass*, 101 So. 837, 842-43 (Ala. 1924).  For these reasons, Defendants' Motion to Dismiss Plaintiff's breach of duty to correct and update claim is due to be granted.

### E.    Count Nine - Breach of Contract: Boeing's 2008 Bridge Contract

This count involves Defendants' alleged failure to provide parts to Plaintiff in a timely manner.  Plaintiff claims this failure by Defendants is a breach of Boeing's 2008 Bridge Contract.  Defendants argue that Plaintiff's claim fails because Plaintiff is not a party to the 2008 Bridge Contract between Defendants and the Air Force.  In response, Plaintiff argues that this count actually alleges a breach of the Long Term Requirements Contract ("LTRC") between Plaintiff and Defendants.

Interestingly, however, the LTRC is nowhere mentioned in Count Nine.  Despite the fact that this is a breach of contract claim, no contractual term which was allegedly breached is set forth.  Rather, Plaintiff merely alleges that Defendant had a "good faith obligation" to provide the parts.  Plaintiff utterly fails to cite any contractual provision whatsoever that purports to require Defendants to provide the parts at issue in a timely manner (or even within any particular time frame).  Therefore, this count fails to state a claim.  *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1327 (11th Cir. 2005) (finding breach of contract claim failed because plaintiffs could not identify any contractual provision breached by defendant).  As Plaintiff has failed to plead any contractual basis for this alleged duty, Defendants' Motion to Dismiss Count Nine is due to be granted.

**F.    Count Ten - Declaratory Judgment and Specific Performance for Over and Above Work, Alternately Breach of Contract**

In Count Ten, Plaintiff purports to assert claims for declaratory judgment and specific performance (and alternatively breach of contract) in relation to "over and above" work Plaintiffs allegedly performed.  To begin with, the court notes that this count constitutes a classic example of a shotgun pleading, which the Eleventh Circuit has "condemned repeatedly." *Muglata v. Samples*, 256 F.3d 1284 (11th Cir. 2001).  "Shotgun pleading" refers to an unfocused, scattered approach which makes it difficult (often impossible) for the court and the opposing parties to discern the nature of the claims being asserted. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991). This one claim asserts three alternate theories, including one for specific performance, the deficiencies of which were discussed at length at the May 24, 2012 hearing.  "When faced with a shotgun pleading, the trial court, whether or not requested to do so by the party's adversary, ought to require the party to file a repleader." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1354 n. 6 (11th Cir. 2006) (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1133 (11th Cir. 2001)).  However, this is Plaintiff's third attempt to plead its claims.  Therefore, another opportunity to replead is simply not warranted.

Moreover, this count fails to state a breach of contract claim for the same reasons as Count Nine.  Plaintiff has failed to allege that Defendants breached a specific provision in a contract to which Plaintiff was a party.  Again, Plaintiff instead alleges that "Boeing ha[d] a good faith obligation to provide Plaintiff compensation for all such 'over and above' work." (Doc. # 34 at ¶ 340).  Plaintiff does not point to a particular contract provision giving rise to this "good faith duty." The court notes that if there was a specific contractual provision between Plaintiff and Defendants

which had been breached, surely by the third version of its Complaint, it is reasonable to expect that Plaintiff be able to identify it.

Moreover, although it is a potential *remedy* under a contract claim, specific performance is not preferred. But here, the main point is that specific performance is a remedy for a contract breach claim.

> [W]hether to award specific performance is within the discretion of the trial court, and, if a trial court determines that a party has an adequate remedy in an award of money damages, that remedy is preferred. *See General Aviation, Inc. v. Aerial Servs., Inc.*, 700 So.2d 1385, 1387 (Ala.Civ.App. 1997) (affirming the trial court's conclusion that the plaintiff had "an adequate remedy via money damages"); *Alabama Water Co. v. City of Anniston*, 227 Ala. 579, 584, 151 So. 457, 461 (1933) ("'Courts prefer to leave parties the right to break their contracts and to respond in damages; the action for specific performance being a device of equity to enforce contracts of peculiar value and importance.'" (quoting *City of Bremerton v. Bremerton Water & Power Co.*, 88 Wash. 362, 372, 153 P.2d 372, 376 (1915))).

*Goodwyn, Mills & Cawood, Inc. v. Markel Ins. Co.*, 911 So. 2d 1044, 1051 (Ala. 2004). Without a specific contract claim, Plaintiff cannot seek to recover any damages, much less specific performance. Therefore, Defendants' Motion to Dismiss Count Ten is due to be granted.

### G.   Count Eleven - Breach of Contract for Over and Above Work

Count Eleven alleges a breach of contract claim related to "over-and-above" work, but it fails to state a breach of contract claim for the same reasons that Counts Nine and Ten: Plaintiff has not identified any contractual provision breached by defendant. Interestingly, the "over-and-above" work which is the subject of this breach of contract claim was discussed at the May 24, 2012 hearing on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint. There, Plaintiff's counsel stated that with regard to the "over-and-above work," Plaintiff was not alleging a breach of contract,

but rather just that Plaintiff was asked to perform extra work for which it was not paid.  (Doc. # 33 at 14).  Plaintiff has had ample opportunity to identify a particular contractual provision breached by Defendants and plead such a breach, but have failed to do so.  Therefore, Defendants' Motion to Dismiss Count Eleven is due to be granted.

## IV.    Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint  (Doc. # 39) is due to be granted in part and denied in part.  The Motion is due to be granted as to Counts Five, Six, and Eight through Eleven, and denied as to Counts Two, Four and Seven.  A separate order will be entered.

**DONE** and **ORDERED** this _____20th_____ day of March, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE