## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ALABAMA AIRCRAFT INDUSTRIES,  )
INC., ALABAMA AIRCRAFT        )
INDUSTRIES, INC. – BIRMINGHAM, AND  )
PEMCO AIRCRAFT ENGINEERING    )
SERVICES, INC.,               )
                              )
      **Plaintiffs,**        )
                              )
v.                            )        **Case No. 2:11-cv-03577-RDP**
                              )
THE BOEING COMPANY,           )
BOEING AEROSPACE OPERATIONS,  )
INC. AND BOEING AEROSPACE     )
SUPPORT CENTER,               )
                              )
      **Defendants.**        )

## MEMORANDUM OPINION

Over the past four decades, singer-songwriter Joni Mitchell has won Grammys in the traditional folk and pop music categories, as well as a lifetime achievement award.  Many of her songs are hits and have been covered by such diverse musicians as Prince, Amy Grant, the Counting Crows, and Crosby, Stills, Nash and Young.  One of those songs, Big Yellow Taxi, reminds us of this: "Don't it always seem to go, That you don't know what you've got til its gone."[1] But in this case, Alabama Aircraft Industries, Inc. ("AAI") contends that employees of the Boeing Company have destroyed documents, and that presents a somewhat different problem: AAI doesn't know what Boeing had *because* it's gone.

---

[1] http://jonimitchell.com/music/song.cfm?id=307. Mitchell recorded this song in 1970.  It was remade by Amy Grant in 1994, and again by the Counting Crows in 2002.

AAI has filed a Motion for Sanctions (Doc. # 227), which has been fully briefed (Docs. # 244, 245, 262, 263, 281, 290, and 296), and the court has heard argument on the Motion. The Motion alleges two different spoliations: (1) an August 2006 ESI[2] Spoliation ("2006 Spoliation"), and (2) a Spring 2007 ESI Spoliation ("2007 Spoliation").

Although the court assumes general familiarity with the facts of this case, a brief summary is appropriate here. Since approximately 1969, Plaintiff AAI (or "Pemco") had been performing Programmed Depot Maintenance ("PDM") in Jefferson County, Alabama for the United States Air Force's KC-135 Stratotanker fleet. (Doc. # 34 at ¶ 8). In February or March 2004, Boeing and AAI began conversations about teaming up to bid jointly on future KC-135 PDM work. (Doc. # 34 at ¶ 29). The Air Force's original Request for Proposal ("RFP") contemplated a Best Estimated Quantity ("BEQ") of 44 KC-135 aircraft per year. (Doc. # 34 at ¶34).

On June 3, 2005, Pemco and Boeing entered into a Memorandum of Agreement ("MOA") to submit a joint proposal for the KC-135 PDM Contract under a "teaming" arrangement in which Boeing would be the prime contractor and Pemco would be the principal subcontractor. (Doc. # 34 at ¶35). On or about May 31, 2006, the Air Force released an amendment to the KC-135 PDM Contract reducing the annual BEQ from 44 to 24 aircraft. (Doc. # 34 at ¶ 68). On June 6, 2006, Boeing terminated the MOA with Pemco citing the reduced BEQ as the reason and stating that the "requested quantities is so unfavorable to Boeing that further participation in the Program pursuant to the MOA is no longer practical or financially viable." (Doc. # 34 at ¶ 69).

---

[2] As used in this opinion, "ESI" references Electronically Stored Information.

Originally, the Air Force refused to accept submissions by new bidders. Pemco filed a protest, and thereafter the Air Force re-opened the bidding process. (Doc. # 34 at ¶ 74). Pemco and Boeing each submitted their own bids (Doc. # 34 at ¶ 85), and on September 7, 2007, the Air Force accepted Boeing's revised bid. (Doc. # 34 at ¶ 77). In 2011, after unsuccessfully protesting the award of the contract to Boeing, Pemco initiated this lawsuit. In its Complaint, Pemco alleges, among other things, that Boeing impermissibly used Pemco's proprietary information about costs, pricing, bidding methodology in preparing its successful bid. (Doc. # 34 at ¶ 82).

The 2006 Spoliation issue involves the ESI of Steve Blake, the Chief Financial Officer of Boeing's Support Systems Division. On August 4, 2006, after terminating the MOA, Boeing instituted a Firewall Plan which called for preservation and delivery of Pemco-related ESI to Boeing's Law Department. Blake enlisted the assistance of Patrick Holden and Kyle Smith to extract from his computer of all Pemco-related emails (including all attachments to such emails), ostensibly to comply with the Firewall Plan. Holden and Smith were two key members of the Boeing Recompete Team (which was responsible for Boeing's bids on the KC-135 PDM Contract) and had both removed and preserved the ESI from their own computers in compliance with the Firewall Plan. However, when they assisted Blake with his ESI, rather than removing the information from the computer and delivering it to the legal department as directed by the Firewall Plan, they simply deleted the ESI. Interestingly, Kyle Smith did not work in Blake's Finance unit and did not report to Blake. Rather, Smith ran the Boeing pricing activities on the Recompete project and was involved in Boeing's comparisons of Pemco and Boeing costs and pricing.

The 2007 Spoliation issue involves the ESI of Doug Lundy, a Boeing analyst providing assistance in writing Pemco out of the joint bid volumes in order to convert them into Boeing solo bid documents. Lundy had complied with the Firewall Plan and forwarded all Pemco-related information he had to Boeing's legal department. In May 2007, Mark Rabe, in-house Boeing attorney who worked on setting up the Firewall Plan, and who was the designated recipient and custodian of Pemco-related information to be sequestered under that Plan, removed two CDs of Pemco-related ESI which had been collected from Lundy. Rabe does not recall why he removed the CDs, and claims they were subsequently misplaced.

## I.    Relevant Facts

### A.    Background

Before entering into the Recompete MOA with Pemco in 2005, Boeing was aware that Pemco's KC-135 PDM subcontract work with Boeing represented the vast majority of Pemco's business, and essentially all of its reported profits for the relevant time period. (Doc. # 264-14 at 10; Doc. # 264-15 at 12). Boeing was also aware that the loss of KC-135 PDM work would force Pemco out of business. (Doc. # 228-40 at 6; Doc. # 228-42 at 2, 6).. The Recompete bid was a "bet the farm" bid for Pemco because "eighty percent of the business in Birmingham was KC-135 PDM." (Doc. # 263-2 at 328:16-23).

In October 2005, even before the Air Force actually reduced the number of aircraft subject to the RFP, Boeing was evaluating certain "off ramps with Pemco" (*i.e.,* ways to opt out of the teaming arrangement with Pemco). (Doc. # 263-31). Boeing's own candid assessment at that time was that if it opted out of either the MOA or a separate bridge contract, "we can expect an ugly, lengthy legal battle." (Doc. # 263-31). Perhaps owing to that assessment, Boeing did

not opt out of the Recompete MOA in October 2005. Rather, later that month, Boeing went ahead with a Recompete bid along with AAI as its subcontractor. (Doc. # 290-25).

On November 15, 2005, Pemco announced a third quarter net loss of $3.75 million and a 43.5% decline in revenue. (Doc. # 290-26).

In December 2005, Roger Witte (Boeing's lead MOA negotiator) admonished Boeing Recompete team members not to discuss "contractual interpretation" matters with Pemco because he was spending "90% of [his] time this year… resolving litigation and supplier claims against Boeing." (Doc. # 263-85).

On March 27, 2006, Pemco announced a net loss of $5.8 million for 2005, as well as a 38.5% decline in revenue. (Doc. # 290-27 at 2). In a March 29, 2006, e-mail from Witte, copying in-house counsel Rabe, titled "Pemco Contingency Plan," Witte recognized the possibility of Pemco filing for bankruptcy protection.  (Doc. # 296-5). Witte also reported that "[t]he group feels Pemco's primary course of action is to wait and see what happens with contract award. … Also, if we win, we would probably still see a significant amount of claims from them." (Doc. # 296-5).

In another Boeing document created around the time of the March 2006 contingency planning e-mail, Boeing analyzed "Pemco Options" in response to Boeing terminating the MOA both before and after the Recompete award. (Doc. # 296-7). For each of the "options" listed, Boeing identified that Pemco may "File Claims." (Doc. # 296-7). It estimated the probability of that Pemco may "File Claims" as "Medium" if Boeing terminated the MOA before the Recompete award. (Doc. # 296-7). Under options for if "Boeing Wins" and "Pemco continues to Perform," one identified action is "[e]nsure litigation strategy is ready to implement." (Doc. # 296-7). Boeing also listed certain "Actions [to be taken] regardless of options and to be taken

ASAP." (Doc. # 296-7). Included on that list was "Prepare litigation strategy," which included a subheading "identify outside litigation and bankruptcy counsel." (Doc. # 296-7).

### B.     The Air Force Changes the Contract's BEQ

On April 18, 2006, the Air Force released a Letter of Intent stating that it was considering a dramatic reduction in the Best Estimated Quantity ("BEQ") of planes for the Recompete RFP, potentially reducing the BEQ from 44 to 24 aircraft per year. (Doc. # 245-5 at 3). Before issuing a formal amendment to the RFP, the letter sought bidders' "input" on the "proposed changes." (Doc. # 245-5 at 4). On May 1, 2006, Boeing, with input from AAI, sent a letter to the Air Force urging it to "continue the source selection based on the requirements set forth in the current RFP" of 44 aircraft per year. (Doc. # 245-7).

In April and May 2006, Boeing formed the Truman Project to evaluate and compare options for terminating the Pemco MOA. (Doc. # 263-38; Doc. # 264-5). Boeing sought the legal advice of Jeana McFerron-Berron, in-house litigation counsel, "regarding [Boeing's] contracts/agreements with AAI" between May 26, 2006 and June 2, 2006, the time frame leading up to its decision to terminate the MOA. (Doc. # 263-1). On May 10, 2006, Pemco had a board meeting where it discussed the "Consequences of 24 A/C BEQ Decision." (Doc. # 290-13). Pemco acknowledged it "would have a decision to make relative to teaming," and the options considered were: (1) "Stay the course with Boeing"; (2) "Propose as Prime"; or (3) "Another teaming arrangement." (Doc. # 290-13).

When Boeing's Patrick Finneran told Pemco CEO Ron Aramini that Boeing might terminate the MOA, Aramini responded "Pat, we have a contract. You can't cancel. You know, that would be a clear violation of the contract." (Doc. # 263-4 at 178:5-10). Aramini further told Finneran, "Pat, we have an agreement. Under the MOA, you can't cancel because of quantities or

number of hours. Very clear, and you and I talked about this, that the work comes to us. So we don't believe you have a right to cancel." (Doc. # 263-4 at 177:15-20).

On May 31, 2006, the Air Force issued a formal amendment to the RFP that lowered the BEQ to 24 aircraft per year. (Doc. # 245-6).

### C.       Boeing Terminates its Contract with AAI

On June 6, 2006, Boeing unilaterally terminated the MOA with Pemco. (Doc. # 244-2). Boeing's MOA termination letter invoked §5.0(c) of the MOA as the basis for termination in light of the May 31, 2006 amendment to the RFP. (Doc. 244-2 at 4). Boeing's termination of the Recompete MOA did not affect the parties' Bridge MOA, and Boeing and AAI continued to work together on the Bridge for four more years.

After he received Boeing's MOA termination letter, Pemco's Gil McSheehy told Boeing's Mike Wright, "[y]ou guys have violated the agreement, substance of the agreement. I don't believe it's correct and proper, and we're likely going to do something about it … ." (Doc. 263-7 at 47:12-23). Boeing's Roger Witte memorialized a similar conversation he had with McSheehy in a June 6, 2006 email to his superiors. (Doc. # 228-56). Witte wrote that McSheehy told him that Pemco's "lawyers are going through the [termination] letter with a fine toothed comb" and that "I believe [Pemco] will be seeking consideration for terminating the MOA." (Doc. # 228-56).

When Finneran told Michael Tennenbaum, Chairperson of Pemco's Board of Directors, that Boeing was terminating the MOA, Tennenbaum told Finneran that he "did not believe they were legally able to do so."  (Doc. 263-6 at 293:23-294:1). Finneran told Tennenbaum that Boeing would make it up to Pemco in some fashion. (Doc. 263-6 at 293:23-294:1).[3]

---

[3] On June 6, 2006, Aramini e-mailed Pemco's board and stated, "We plan on taking the following actions to keep Pemco in the KC135 PDM business … We are not going after Boeing, it is our preference to try and work

On June 8, 2006, Patrick Holden (who assisted in deleting Steve Blake's Pemco-related ESI) replied to Witte's June 6 e-mail and laid out his thoughts on why Pemco may believe Boeing is "liable" for "[t]ermination of Recompete MOA" and he set forth potential Boeing defenses to different scenarios. (Doc. # 228-58).

On June 15, 2006, a meeting was held between Boeing and Pemco regarding their relationship after the MOA termination.  Aramini summarized that meeting as follows:

> Very unusual meeting … We agreed that we would be competitors for the KC135 work. This sort of validated our approach to Boeing that the cancellation was not valid if they continued without us.  It is valid if they cancel the RFP and issue a new bid. We will get to our lawyers as Boring [sic] will be filing for loss of work in 06 by the aircraft deleted and costs of filing the bid. They will also file for costs incurred by Pemco.

(Doc. # 244-8).

Boeing had developed a Win Strategy Steering Committee ("WSSC") which evaluated methods of opting out of the teaming arrangement with Pemco.  (Doc. # 283-1 at 133:18-134:12). Four days after Aramini and Finneran's June 15, 2006 conversation, Boeing's WSSC had its first post-MOA termination meeting which was attended by Finneran, Steve Blake, Roger Witte, and other Boeing senior officials. (Doc. # 264-7). At that meeting, the WSSC discussed removing knowledge-contaminated personnel from Boeing's solo bid Recompete team. (Doc. # 264-7).

### D.    Boeing and AAI Move Toward Recompeting as Separate Bidders and the Litigation War Drums Begin to Beat

Because Pemco had not previously submitted a bid as prime contractor for the Recompete, it was at first precluded from bidding as a prime on the amended RFP.  Therefore, AAI filed a protest requesting permission to submit its own bid for the Recompete contract.

---

with the USAF first … ." (Doc. # 245-16) (emphasis added). The court understands this to be an internal Pemco communication to which Boeing would not have been privy during the relevant time frame.

(Doc. # 244-9). On June 19, 2006, Finneran e-mailed his boss, copying in-house counsel Rabe, stating his belief that "Pemco [had been] informed … that their protest would be denied" and therefore Pemco would not be allowed to submit a bid as a prime. (Doc. # 263-71). Finneran further suggested that "a proactive move by Boeing with the USAF would…help us should Pemco file a claim for termination of the MOA." (Doc. # 263-71). Therefore, he suggested that Boeing's general counsel meet with the Air Force's general counsel "to seek to understand the rationale for the USAF actions." (*Id.*).

On June 27, 2006, before any meeting between Boeing and the Air Force occurred, the Air Force issued another amendment to the Recompete RFP that opened the competition to allow Pemco to submit its own bid. (Doc. # 290-8).

On July 11, 2006, Boeing's Tim Coyle e-mailed Roger Witte stating that he had "the impression [AAI's Glenn Hess] sends his finger pointing notes to us in order to provide documentation for a legal battle someday. …  I guess he does not want his email used against him someday in that same court." (Doc. # 262-2).

### E.    Boeing Agrees to Sequester AAI's Proprietary Information

At the end of June 2006, Boeing attorney, Mark Rabe, and Pemco General Counsel, Doris Sewell, reached an agreement regarding each party's proprietary data, and Boeing promised "to retrieve all Pemco-originated proposal-related information, for return to" Sewell. (Doc. # 263-28). Pursuant to the agreement, on August 4, 2006, Boeing circulated a Firewall Plan to Holden, Blake, Smith, and many other Boeing Recompete Team members. (Doc. # 228-39; Doc. # 263-89). Section 6.4(3) of Boeing's Firewall Plan required that Pemco ESI be copied to a disk and delivered to the Boeing Law Department for preservation purposes. (Doc. # 263-36 at 4). Ironically, on August 4, 2016, Holden sent an email to certain persons involved in the

project, including Blake, which enclosed the Firewall Plan. (Doc. # 263-36 at 1). The e-mail included this language:"[t]his is an IMPORTANT DOCUMENT. Please take the necessary time to review and comply with the attached documents." (*Id.*). The e-mail circulating the Firewall Plan also contained the following instruction:

> You are required to take the following action…ensure that all PEMCO Competition Sensitive Information delivered by PEMCO in support of Boeing's proposal in the previous KC-135 PDM competition phase is segregated and delivered to the Law Department for disposal or return to PEMCO.

(Doc. # 290-15 at 2-3, 7).

Also on August 4, 2006, Jerry Dunmire, who replaced Wright as Boeing Recompete Capture Team Leader, sent an e-mail reiterating that Pemco ESI must be copied and sent to the Boeing Law Department for preservation. (Doc. # 263-89 at 2). Boeing attorney Rabe has testified twice that Boeing's Firewall Plan was the "rough[] equivalent" of a litigation hold. (Doc.# 263-12 at 278:4-16; Doc. # 263-13 at 10:22-11:10). Rabe also admitted that, as Boeing employees were gathering and pulling Pemco-related documents and communications from their computers and files, they had an obligation to "deliver that data" to him rather than disposing of or deleting it. (Doc. # 263-12 at 278:4-12; Doc. # 263-13 at 12:21-13:8).

Pemco did not issue a written litigation hold letter at any point between 2006 and 2008 (Doc. # 245-19 at 3-4), but Sewell instituted a verbal litigation hold in June 2006. (Doc. # 245-19). During more than one Monday morning manager meetings, she instructed all managers to make sure that they and all of their direct reports preserved all relevant information. (Doc. # 245-19). Around this same time, Pemco also implemented its firewall plan in accordance with the MOA and the June 2006 agreement between Sewell and Rabe. (Doc. # 244-12; Doc. # 290-17).

**F.      Pemco Data on Blake's Computer is Deleted Rather than Preserved**

Blake was the second-highest ranking Boeing employee on both the Recompete WSSC and the Truman Project and had to approve the pricing on the Recompete. (Doc. # 276 at 56:18-56:25; Doc. # 263-14 at 105:12-106:23). Blake attended WSSC Meeting 11 on August 4, 2006 in which the attendees discussed establishing preliminary firewall rules of engagement, including ensuring that "Pemco Sensitive Information [was] identified and segregated." (Doc. # 273-4 at 10). Blake has admitted that he knew of the August 4, 2006 directive to preserve and deliver Pemco-related materials to the legal department. (Doc. # 228-12 at 440:19-441:1).

Before working with Blake, Holden and Smith fully complied with Boeing's Firewall Plan with respect to information which resided on their own computers. They did so by copying Pemco ESI found on their computers to a disk, and turning that disk over to the Boeing legal department for preservation. (Doc. # 276 at 27:25-28:4; Doc. # 281-4 at 10:16-11:16, 19:19-20:11, 34:9-22; Docs. # 228-4, 228-7, 228-10, 228-14 at 282:1-285:15). But, rather than handling Blake's Pemco ESI as they did their own (in compliance with the Firewall Plan), Smith and Holden (Boeing's Firewall roster administrator), accessed Blake's company computer and, in two stages, permanently deleted Blake's Pemco-related ESI. And, these two steps required intentional actions. First, Smith and Holden moved the Pemco ESI to the Recycle Bin. Second, they then "emptied" the Recycle Bin (read: they deleted the ESI rather than copying it to a disk to deliver to the legal department before deleting it, as required). (Doc. # 276 at 17:16-19:9; Docs. 228-12 at 441:7-446:8, 263-21 at 14:1-20:11; Doc. # 281-5 at 276:13-288:2; Doc. 276 at 20:5-29:23). Shortly after deleting Blake's Pemco-related information, Holden emailed Gaye McGill, a paralegal assisting with documenting Firewall compliance, to inform her that "Steve Blake has

signed off [sic] the firewall memo and deleted all his emails that had anything to do with [AAI]" and "[h]e has no hard copies of anything to send to you." (Doc. # 245-3; Doc. # 244-6 at ¶ 11).

The record evidence also shows that Blake maintained Pemco-related ESI in his e-mail files. These were e-mails that he personally segregated into a Pemco-specific folder on his computer. (Doc. # 263-21 at 14:1-16:7). The record also shows that Blake: (1) participated in comparisons of Pemco pricing to Boeing pricing (Docs. # 264-4, 264-10, and 228-12 at 395:8-399:7); (2) was head of the Truman Project, which evaluated options for terminating Pemco from Recompete and Bridge PDM work and which rewrote the Joint Bid documents to convert them to "independent" Boeing bid volumes (Docs. # 228-57, 228-2, 228-20, and 228-5); (3) reviewed and approved the May 5, 2006 MOA-termination numerical analyses and presentation to Finneran (Docs. # 264-16, 228-48, 228-49, 264-19, 264-13, 228-20 and 264-18); and (4) participated in the key June 19, 2006 WSSC strategy and decision-making meeting (Docs. # 228-18, 263-42, 263-77, 263-43, 228-15 and 228-16). He was a key player.

But while he played a key role, Blake was not involved in the day-to-day administration of the KC-135 program.  Rather, he provided general, high-level input to Boeing's team, focusing on ensuring that the proposal targeted achievable profits. (Doc. # 245-2 at ¶¶ 4-5). In fact, it appears Blake's role in the Recompete bidding process was limited to providing high-level input and signing off on the bid submissions based on financial presentations developed by his team. (Doc. # 245-2 at ¶ 5). Blake had limited interaction with subcontractors on the programs he oversaw, and does not recall ever receiving original documents or data from AAI. (Doc. # 245-2 at ¶¶ 3, 16). He retired from Boeing in March 2013 (Doc. 263-14 at 13:4-15), and any custodial files that he may have had were not retained after his retirement. (Doc. # 227-57). Boeing has indicated Blake's computer no longer exists. (Doc. # 276 at 19:10-20:4).

12

### G. Data Taken from Lundy's Computer and Sent to the Legal Department Goes Missing

In the spring of 2007, Boeing in-house counsel Rabe removed two computer disks of Pemco competition-sensitive ESI from secure storage at the Boeing Law Department. Notably, the disks were removed prior to Boeing's June 2007 submission of its final (and winning) Recompete bid. The disks were never returned. They purportedly contained ESI that Recompete team member Doug Lundy, an analyst providing assistance in writing Pemco out of the joint bid volumes in order to convert them into Boeing solo bid documents, had collected and surrendered to the Boeing law department pursuant to the Firewall Plan. (Doc. 228-21 at 318:5-320:3). Rabe has provided no reason for the removal of the disks; he "ha[s] no idea" what happened to the CDs, and does not even remember removing them. (Doc. # 228-21 at 318:1- 320:3).

Lundy was involved in writing the project management descriptions of the Technical volume (Vol. II) for the 2005 joint Pemco/Boeing bid, as well as in converting the bid volume to be used by Boeing in its "independent bid." In doing so, he removed any references to Pemco. (Doc. # 245-4 at ¶¶ 3-7). Lundy was also involved in the Truman Project which evaluated and compared options for terminating the Pemco MOA. In that role, he had access to the 2006 and 2007 Truman server folders. (Docs. # 263-83, 274-9, and 263-68). AAI did not depose Lundy to attempt to discover what was on the missing CDs.

There is no index or other record of the contents of either the Lundy CDs (or the deleted Blake ESI) that would enable that information to be specifically identified. (Doc. # 227-15 at 108:11-15).

### H.    Other Instances of Boeing's Non-Compliance with the Firewall Plan

Pat Finneran, President of ASD, left Boeing in 2012.  His records were not retained. He testified that he did not turn over his e-mails under the Firewall Plan, and that he does not know what happened to them. (Docs. # 227-57 at 3; 227-27 at 411:6-18; 263-19).

Mike Salerno, Division CFO of the San Antonio facility, testified that he deleted his e-mails regularly, and by the time he learned about this litigation, he had no Recompete or Bridge-related e-mails to provide to counsel because they had already been deleted. (Doc. # 263-18 at 330:3-331:21).

Mike Wright, Boeing's Recompete Capture Team Leader, did not receive a litigation hold letter for this case until September 2011.  There are very few e-mails from his custodial files that involve Blake and that could thus replace the ESI that Blake had. (Docs. # 263-19, 263-15 at ¶¶ 22-25).

Blake received e-mails which contained direct questions he was asked during the critical April through August 2006 time period, but Boeing has not produced any responses from Blake to those direct questions. (Docs. # 273-14, 274-7, 274-3, 263-48, 264-13, 264-19, 263-22, and 262 at 17-18).

### I.    Boeing Wins the Recompete Contract

The Air Force awarded the Recompete contract to Boeing in September 2007. Shortly thereafter, AAI protested the award in the Government Accountability Office, and within days of that protest, Boeing issued a litigation hold with respect to that protest. The GAO denied AAI's protest on June 13, 2008. *Matter of: Pemco Aeroplex, Inc*., 2008 WL 2684841 (June 13, 2008). On June 27, 2008, AAI filed a complaint against the Air Force in the United States Court of Federal Claims. *Alabama Aircraft Industries, Inc. v. USA*, United States Court of Federal Claims

Case No. 1:08-CV-00470-CFL, Doc. # 1). On July 11, 2008, Boeing issued a "Supplemental Freeze Instruction" to dozens of individuals that included a blank Statement of Compliance to be signed by each recipient to certify compliance with the freeze instructions. (Doc. # 290-28 at 2). The Statement of Compliance attached to the July 11, 2008 email mistakenly included a date of "2006" on the face of the form. (Doc. # 290-28 at 8).

This litigation was filed in Alabama state court by the Litigation Trust on September 9, 2011. (Doc. # 1-1). AAI now seeks relief from this court related to its spoliation claims against Boeing.

## II.    Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp*., 310 Fed.App'x. 298, 301 (11th Cir. 2009) (internal quotation marks omitted) (quoting *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999)).); *see also Green Leaf Nursery c. E.I. DuPont de Nemours & Co*., 341 F.3d 1292, 1308 (11th Cir. 2003) (spoliation defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument, without reference to intentionality). A district court has "broad discretion" to impose sanctions as part of its "inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir. 2005). Sanctions for spoliation of evidence are intended to accomplish two objectives: "prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Id*.

Federal law governs the imposition of spoliation sanctions as "spoliation sanctions constitute an evidentiary matter." *Id*. (citations omitted).  Although federal law governs, a court

may look to state law for guidance to the extent is consistent with federal law. *Flury*, 427 F.3d at 944 (examining spoliation factors enumerated in Georgia law inasmuch as the Eleventh Circuit had not set forth specific guidelines and Georgia law on the subject was wholly consistent with federal spoliation principles). The Alabama Supreme Court has applied five factors in analyzing a request for spoliation sanctions: "(1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal." *Story v. RAJ Properties, Inc.*, 909 So.2d 797, 802–803 (Ala. 2005) (citation omitted); *see also Oil Equip. Co. v. Modern Welding Co* 661 Fed.App'x. 646, 652 (11th Cir. 2016) (citing *Story*); *Ray v. Ford Motor Co.*, 792 F.Supp.2d 1274, 1279 (M.D. Ala. 2011) (citing *Story*).

Federal Rule of Civil Procedure 37(e) addresses ESI. Effective December 1, 2015, Rule 37(e) was amended to establish the findings necessary to support certain curative measures for failure to preserve electronically stored information – which is what is at issue here. Amended Rule 37(e) provides:

> **Failure to Preserve Electronically Stored Information**. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  The Advisory Committee's notes to the 2015 amendment explain that the newly amended rule "forecloses reliance on inherent authority or state law to determine when certain measures would be used." Fed.R.Civ.P. 37(e) Advisory Committee's notes to 2015 amendment.

This version of Rule 37(e) applies to civil cases commenced after December 1, 2015, "and, insofar as just and practicable, all proceedings then pending." See 2015 US Order 0017; 28 U.S.C. § 2074(a). Applying the amended version of Rule 37(e) to this case is just and practicable because the amended Rule 37(e) does not create a new duty to preserve evidence. See Fed. R. Civ. P. 37(e), Advisory Committee Note to 2015 Amendment ("Rule 37(e) does not purport to create a duty to preserve. The new rule takes the duty as it is established by case law, which uniformly holds that a duty to preserve information arises when litigation is reasonably anticipated."); *see also Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 696 (N.D. Ga. 2016).

## III.    Analysis

Rule 37(e) applies where, as is the case here, the allegedly spoliated evidence was ESI. Both Blake's information (*e.g.*, e-mails, attachments) and Lundy's CDs were electronically stored.  The court must address three preliminary questions before turning to an analysis of subsections 37(e)(1) or (e)(2).

### A.    Was the allegedly spoliated ESI evidence that should have been preserved?

The Advisory Committee's notes on Rule 37(e) explicitly state that "[t]he rule does not apply when information is lost before a duty to preserve arises." Fed. R. Civ. P. 37(e) Advisory Committee's notes to 2015 amendment.  Rule 37(e) does not set forth a standard for preservation and does not alter existing federal law which controls (1) whether evidence should have been

preserved and (2) when the duty to preserve attaches. In the Eleventh Circuit, the test is whether litigation was "pending or reasonably foreseeable" when the spoliation occurred. *Graff*, 310 Fed.App'x. at 301; *see also Oil Equip. Co. Inc. v. Modern Welding Co. Inc*., 661 Fed.App'x 646, 652 (11th Cir. 2016) (citing *West*, 167 F.3d at 776).

> However, the Advisory Committee notes do explain as follows:

> Due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible.... This rule recognizes that "reasonable steps" to preserve suffice; it does not call for perfection. The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation.

Fed. R. Civ. P. 37(e) Advisory Committee's notes to 2015 amendment.

The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence and is triggered not only when litigation is pending but also when it is reasonably foreseeable to that party. *See Graff*, 310 Fed.App'x. at 301; *West*, 167 F.3d at 779. And even when litigation is reasonably foreseeable, "[a] corporation under a duty to preserve is not required to keep every shred of paper, every e-mail or electronic document, and every backup tape. ... In essence, the duty to preserve evidence extends to those employees likely to have relevant information—the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liability Litigation*, 299 F.R.D. 502, 517–518 (S.D. W.Va. 2014) (internal quotation marks and citation omitted); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-18 (S.D. N.Y. 2003) (noting that, as a general rule, a party need not preserve all backup tapes for e-mail even when it reasonably anticipates litigation.)

Here, Boeing argues that it had no duty to preserve documents in September 2006 or May 2007. (Doc. # 290 at 13). It bases this argument on the premise that it did not reasonably anticipate litigation with Pemco at that time. (*Id.*). The court finds this argument somewhat disingenuous. First, there is quite clearly sufficient evidence that Boeing *should have* reasonably anticipated litigation at that time. Second, shortly after Boeing terminated the MOA, the parties began negotiating the Firewall Plan which required the preservation of Pemco-related ESI and also provided that such ESI be delivered to Boeing's Law Department. The court addresses both of these findings in turn.

In October 2005, before the Air Force actually reduced BEQ, Boeing was already evaluating certain "off ramps with Pemco." (Doc. # 263-31). Boeing's assessment at that time was quite candid: if it opted out of either the MOA or a separate bridge contract, "we can expect an ugly, lengthy legal battle." (Doc. # 263-31). In Boeing's own document, created when it was contemplating how to exit from the teaming arrangement with Pemco, Boeing identified that Pemco may "File Claims." (Doc. # 296-7). It estimated the probability that Pemco would "File Claims" as "Medium" if Boeing terminated the MOA before the Recompete award. (Doc. # 296-7). Under options for if "Boeing Wins" and "Pemco continues to Perform," one identified action is "[e]nsure litigation strategy is ready to implement." (Doc. # 296-7). Boeing also listed certain "Actions [to be taken] *regardless* of options and to be taken ASAP." (Doc. # 296-7)(emphasis added). Included on that list was "Prepare litigation strategy," which included a subheading "identify outside litigation and bankruptcy counsel." (Doc. # 296-7).

Admittedly, Boeing anticipated that Pemco would "wait and see what happens with contract award" but it fully recognized that it if it won the contract, it "would probably still see a significant amount of claims from them." (Doc. # 296-5). Boeing sought the legal advice of

Jeana McFerron-Berron, in-house *litigation* counsel, "regarding [Boeing's] contracts/agreements with AAI" between May 26, 2006 and June 2, 2006, leading up to its decision to terminate the MOA. (Doc. # 263-1).

When Boeing's Patrick Finneran told Pemco CEO Ron Aramini that Boeing might terminate the MOA, Aramini responded "Pat, we have a contract. You can't cancel. You know, that would be a clear violation of the contract." (Doc. # 263-4 at 178:5-10). Aramini further told Finneran, "Pat, we have an agreement. Under the MOA, you can't cancel because of quantities or number of hours. Very clear, and you and I talked about this, that the work comes to us. So we don't believe you have a right to cancel." (Doc. # 263-4 at 177:15-20).

After he received Boeing's MOA termination letter, Pemco's Gil McSheehy told Mike Wright, "[y]ou guys have violated the agreement, substance of the agreement. I don't believe it's correct and proper, and we're likely going to do something about it … ." (Doc. 263-7 at 47:12-23). Boeing's Roger Witte memorialized a similar conversation he had with McSheehy in a June 6, 2006 email to his superiors. (Doc. # 228-56). Witte wrote that McSheehy told him that Pemco's "lawyers are going through the [termination] letter with a fine toothed comb" and that "I believe [Pemco] will be seeking consideration for terminating the MOA." (Doc. # 228-56).

Boeing next argues that if anything should have been anticipated, it was merely a bid protest, not the current litigation.  But there are at least two problems with that argument. First, not all of the statements referenced above (which were made by both AAI and Boeing) fit into such a small cubby hole in the litigation world.  Second, to accept Boeing's assertion that it was only expecting a bid protest would be to ask the court to assume Boeing had its head in the sand. The company was well aware that winning the contract was a "bet the farm" deal for Pemco, and that the loss of the work would likely put it out of business.  Even if no one at Boeing actually

anticipated litigation over the termination of the MOA (a proposition wholly unsupported by the record evidence), there is more than sufficient evidence to establish that Boeing *should* reasonably have anticipated litigation. In other words, the standard is an objective one and application of the objective standard here yields a straight forward result: a reasonable party in Boeing's position would have expected litigation over the termination of the MOA.

But, as noted above, there is even more.  After the termination of the MOA, at the end of June 2006, the parties' respective in-house counsel, Rabe and Sewell, negotiated an agreement regarding each party's proprietary data.  Boeing promised to extract all Pemco-related ESI from its employees for return to Sewell. (Doc. # 263-28). And, in implementation of that agreement, on August 4, 2006, Boeing circulated a Firewall Plan which required certain Boeing employees, including Blake and Lundy, to copy any Pemco-related ESI to a disk and deliver that data to the Boeing Law Department for preservation. (Doc. # 263-36 at 4).

Despite the fact that Boeing (1) should reasonably have anticipated litigation, and, in any event, (2) entered into an agreement to preserve Pemco-related ESI, Holden and Smith, deliberately deleted the Pemco-related ESI from Blake's computer.  And, they did so knowing that they were required to copy it onto disk and send it to the legal department.  Moreover, it was Rabe himself who removed the Lundy CDs from the legal department.  There is no explanation as to why the CDs were removed or what happened to them. Thus, the court has little hesitation in concluding that Boeing had a duty to preserve ESI, and breached that duty.

**B.**     **Was the allegedly spoliated ESI lost because a party failed to take reasonable steps to preserve it?**

The next requirement under Rule 37(e) is a showing that the allegedly spoliated ESI was lost because a party "failed to take reasonable steps to preserve" it. Fed.R.Civ.P. 37(e).  Without question, the Blake ESI was intentionally destroyed in violation of Boeing's agreed Firewall

Plan.  As to the Lundy CDs, the circumstances surrounding their loss are less clear. Their removal from the legal department was deliberate, but we do not know why they were removed.

### C.    Is the allegedly spoliated ESI evidence that cannot be restored or replaced through additional discovery?

The last prerequisite to a spoliation finding is that the information "cannot be restored or replaced through additional discovery." Fed.R.Civ.P. 37(e).  This requirement precludes any sanctions or curative measures if the ESI can be restored or replaced through additional discovery. *Id.* According to the Advisory Committee Notes, "Because electronically store information often exists in multiple locations, loss from one source may be harmless when substitute information can be found elsewhere."  Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee. However, "[i]n spoliation cases, courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence."  *Southeastern Mechanical Services, Inc. v. Brody*, 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009) (citing *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)).

In the instant case, it is not clear (at least to AAI and the court) what potentially relevant ESI was lost and that impacts the ability to determine whether it is replaceable. But we do know that all of it was Pemco-related.  And we do know that the parties had agreed to collect that information and send it to the legal department.  Holden and Smith then accessed Blake's computer and searched specifically for Pemco-related ESI and then deleted it rather than removing it and delivering it to the legal department.  (Doc. # 276 at 17:16-19:9; Docs. 228-12 at 441:7-446:8, 263-21 at 14:1-20:11; Doc. # 281-5 at 276:13-288:2; Doc. 276 at 20:5-29:23).

Boeing has suggested that whatever ESI Blake had on his computer has been otherwise produced through other ESI custodians.  But Boeing did not index the information and cannot

even identify with any specificity what ESI was destroyed.  Moreover, the evidence shows that Boeing did not search and produce documents from key Boeing personnel with whom Blake had dealings. As a result, Blake's relevant communications with these key Boeing financial personnel are essentially lost forever ─ even more lost that Joni Mitchell's paradise.  Moreover, the ESI of other key personnel was not preserved.  Pat Finneran testified that he did not turn over his e-mails under the Firewall Plan, and he does not know what happened to them.  He left Boeing in 2012, and his records were not retained. (Docs. # 227-57 at 3; 227-27 at 411:6-18; 263-19). Mike Salerno, Division CFO of the San Antonio facility, testified that he deleted his emails regularly, and by the time he learned about this litigation, he had no Recompete or Bridge-related emails to provide to counsel because they had already been deleted. (Doc. # 263-18 at 330:3-331:21). Mike Wright, Boeing's Recompete Capture Team Leader, did not receive a litigation hold letter for this case until September 2011. (Docs. # 263-19, 263-15 at ¶¶ 22-25).

Because the information at issue is not even identifiable, and certain other ESI was not preserved, the allegedly spoliated ESI cannot be restored or replaced through additional discovery.

### D.     The answers to the above questions determine the court's next step

If the answers to any of questions 1–3 is "no", then the court may proceed no further under Rule 37(e), and a motion for spoliation sanctions or curative measures must be denied. If the answer to all three of the questions is "yes", however, the court must analyze the facts at hand under subsection (e)(1) if there is a finding of "prejudice" or under subsection (e)(2) if there is a finding of "intent to deprive."

### E.      Is there prejudice under Rule 37(e)(1)?

In the Eleventh Circuit, even before the advent of Rule 37(e), "prejudice" was already a factor in assessing whether spoliation sanctions are appropriate. *See, e.g., McLeod v. Wal–Mart Stores, Inc.*, 515 Fed.App'x 806, 808 (11th Cir. 2013). While the burden of establishing prejudice generally falls on the party seeking sanctions, the court is cognizant that AAI will likely never be able to prove what was contained in the destroyed evidence. In such a situation, only the party that engaged in the destruction knows how much prejudice has been caused (or potentially caused) by the destruction.  *See Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. 2008) ("To require a party to show, before obtaining sanctions, that unproduced evidence contains damaging information would simply turn 'spoliation law' on its head."). The Advisory Committee Notes address the  parties' respective prejudice burdens:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee.

Where there is evidence of bad faith in the destruction of evidence, it may be inferred that missing evidence was unfavorable and that there was prejudice. *See Southeastern Mechanical Services, Inc.*, 657 F. Supp. 2d at 1300, citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (court "will not infer that the missing speed tape contained evidence unfavorable to appellees unless circumstances surrounding the tape's absence indicate bad faith, e.g., that appellees tampered with the evidence); *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833,

at *9 (D. Del. July 12, 2016) (upon finding that the alleged spoliator acted in bad faith, the court shifted the burden that party to show a *lack* of prejudice); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 110 (S.D. Fla. 1987) ("While it is now impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced Plaintiff's ability to prove the claims set forth in its Complaint, we find [the alleged spoliator's] contention that no significant prejudice has resulted from this pattern of destruction to be wholly unconvincing.").

The context of the spoliation is relevant. Pemco and Boeing entered into a MOA to submit a joint proposal for the KC-135 PDM Contract under a "teaming" arrangement with Boeing. (Doc. # 34 at ¶35). The MOA required Pemco to provide to Boeing proprietary "technical and cost proposal information" including its lower cost structure and bidding methodology. (Doc. # 34 at ¶¶ 36, 40, 41). After the Airforce reduced the BEQ of aircraft, Boeing terminated the MOA and proceeded to submit its own bid.  (Doc. # 34 at ¶¶ 69, 76). Pemco submitted a competing bid. (Doc. # 34 at ¶ 78). Both companies also submitted revised bids. (Doc. # 34 at ¶ 85). The Air Force accepted Boeing's revised bid, which had a lower total evaluated price difference of $15 million, even though Boeing failed to submit any technical justifications or explanations for the reduction in its labor hour assumptions. (Doc. # 34 at ¶ 77). AAI alleges that Boeing used Pemco's proprietary information about costs, pricing, bidding methodology in making this change. (Doc. # 34 at ¶ 82). This is information which Boeing would have obtained only under the MOA and which should have been removed from the reach of Boeing's bid team by operation of the Firewall Plan.

Blake was the second-highest ranking Boeing employee on both the Recompete WSSC and the Truman Project which evaluated options for exiting the teaming arrangement with

Pemco, and he had to approve Boeing's pricing on the Recompete. (Doc. # 276 at 56:18-56:25; Doc. # 263-14 at 105:12-106:23). Blake also attended WSSC Meeting at which the attendees discussed establishing preliminary firewall rules of engagement, including ensuring that "Pemco Sensitive Information [was] identified and segregated." (Doc. # 273-4 at 10). Did Blake's ESI show that Pemco's proprietary data, which was obtained under the MOA, was used by Boeing to aid in preparing its own, ultimately-successful bid? We simply don't know.

Because the court has little trouble finding that Boeing acted in bad faith with regard to Blake's ESI, the burden shifts to Boeing to show a lack of prejudice to Pemco resulting from the deletion (rather than the segregation) of Blake's Pemco-related ESI. *See Micron Technology, Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 319 (D. Del. 2013) ("If the spoliation was not done in bad faith, then the burden lies with the non-spoliating party to show prejudice. On the other hand, if the spoliation was done in bad faith, the burden shifts to the spoliating party to show lack of prejudice."). "A bad faith spoliator carries a heavy burden to show lack of prejudice because [a] party who is guilty of intentionally [destroying] documents ... should not easily be able to excuse the misconduct by claiming that the vanished documents were of minimal import." *Micron Technology*, 917 F. Supp. 2d at 319 (internal quotation marks omitted). The court concludes that Boeing has not satisfied its burden of showing a lack of prejudice to AAI with regard to the destruction of Blake's ESI.

The court does not reach the same conclusion as to the lost Lundy CDs. Although their loss is inexplicable, there is insufficient evidence for the court to conclude that there was any nefarious intent involved in their loss. Admittedly, Lundy was involved in the joint Pemco/Boeing bid, as well as in converting that bid (a multi-volume set of materials) to a solo bid by Boeing by removing references to Pemco. (Doc. # 245-4 at ¶¶ 3-7). But he was not

involved in work on the pricing or cost volume. (Doc. # 276 at p.61). Rather, his work involved revising the technical volume to remove references to Pemco. (*Id.*). AAI did not depose Lundy to even attempt to discover what was on the missing CDs. And, it readily admits that it lacks sufficient information to show that the 2007 Rabe incident was carried out with any intent to deprive a party or this court of any material. (Doc. # 231 at p. 22). Therefore, the court cannot say that AAI was prejudiced by the loss of these CDs.

F.     **Was there an "intent to deprive" under Rule 37(e)(2)?**

Under Rule 37(e)(2), more severe spoliation sanctions are permitted if there is evidence of "intent to deprive."   The notes pertaining to the 2015 amendments to (e)(2) provide as follows:

> Subdivision (e)(2). This subdivision authorizes courts to use specified and very severe measures to address or deter failures to preserve electronically stored information, *but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation*. It is designed to provide a uniform standard in federal court for use of these serious measures when addressing failure to preserve electronically stored information. It rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence.
>
> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have. The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to cure prejudice caused by its loss, but to limit the most severe measures to instances of intentional loss or destruction.
>
>  Similar reasons apply to limiting the court's authority to presume or infer that the lost information was unfavorable to the party who lost it when ruling on a pretrial motion or presiding at a bench trial. Subdivision (e)(2) limits the ability of courts to draw adverse inferences based on the loss of information in these

27

circumstances, permitting them only when a court finds that the information was lost with the intent to prevent its use in litigation.

Subdivision (e)(2) applies to jury instructions that permit or require the jury to presume or infer that lost information was unfavorable to the party that lost it. Thus, it covers any instruction that directs or permits the jury to infer from the loss of information that it was in fact unfavorable to the party that lost it. The subdivision does not apply to jury instructions that do not involve such an inference. For example, subdivision (e)(2) would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision. These measures, which would not involve instructing a jury it may draw an adverse inference from loss of information, would be available under subdivision (e)(1) if no greater than necessary to cure prejudice. In addition, subdivision (e)(2) does not limit the discretion of courts to give traditional missing evidence instructions based on a party's failure to present evidence it has in its possession at the time of trial.

*Subdivision (e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in the litigation.* This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial. If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation. If the jury does not make this finding, it may not infer from the loss that the information was unfavorable to the party that lost it.

Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because *the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position.* Subdivision (e)(2) does not require any further finding of prejudice.

Courts should exercise caution, however, in using the measures specified in (e)(2). *Finding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2).* The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.

Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee (emphasis added).

At least one court has suggested that "the "intent to deprive" standard in Rule 37(e)(2) may very well be harmonious with the "bad faith" standard previously established by the Eleventh Circuit." *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd*., 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016) (citing *Managed Care Solutions, Inc. v. Essent Healthcare, Inc*., 736 F. Supp. 2d 1317, 1323 (S.D. Fla. 2010)). In *Managed Care Solutions*, the court held that following constitutes circumstantial evidence of bad faith:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

736 F. Supp. 2d at 1323 (citing *Walter v. Carnival Corp*., 2010 WL 2927962 at *2 (S.D. Fla. July 23, 2010)).

Here, there is no direct evidence of an intent to deprive Pemco of Blake's ESI in this litigation. But there certainly is sufficient circumstantial evidence for the court to conclude that Boeing's agents acted with an intent to delete (or destroy) ESI on Blake's computer in order to hide from Pemco what Blake possessed at a time when Boeing should have anticipated litigation related to the terminated MOA and/or for a jury to infer that Boeing wished to conceal what information was on Blake's computer. As discussed above, Boeing anticipated (or, at a minimum should have anticipated) litigation with Pemco, and the parties had agreed to a manner of handling Pemco-related ESI. In furtherance of that agreement, Boeing instituted a Firewall Plan calling for Pemco-related ESI to be removed from Boeing employees' computers *and sent to the legal department.* Blake's Pemco-related ESI was intentionally destroyed by an affirmative act

which has not been credibly explained. Smith and Holden knew how to comply with the Firewall Plan (and they did so with their own information), but failed to do so with Blake's. No credible explanation has been given as to why they departed from the Firewall Plan's protocols and intentionally deleted Blake's information.

This type of unexplained, blatantly irresponsible behavior leads the court to conclude that Boeing acted with the intent to deprive Pemco of the use of this information in connection with its claims against Boeing. And, because the information is irretrievably lost, AAI (not to mention this court) is left to speculate as to why the data was destroyed.

For all of these reasons, the court believes firm measures, such as those discussed in subdivision (e)(2), are appropriate to remedy the wrong that has occurred in this case. Specifically, the giving of an adverse inference jury instruction, such as the one outlined in Rule 37(e)(2)(B), is a proper sanction. If this case goes to trial, the court will instruct the jury that it *may* presume that the lost information contained in Blake's Pemco-related ESI was unfavorable to Boeing. The court also finds it appropriate for Boeing (not Boeing's counsel)[4] to pay AAI's reasonable attorney's fees and costs in prosecuting this motion.

## IV.    CONCLUSION

For the foregoing reasons, Alabama Aircraft Industries, Inc.'s Motion for Sanctions is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this March 9, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[4] To be clear, no assertion has been made that counsel appearing in this case were in any way involved in the spoliation issues which are the subject of AAI's Motion and this opinion, and the court finds that they were not.