FILED
2017 Oct-06 PM 06:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| **ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC. – BIRMINGHAM, and PEMCO AIRCRAFT ENGINEERING SERVICES, INC.,** | |
| **Plaintiffs,** | **Case No. 2:11-cv-03577-RDP** |
| **vs.** | |
| **THE BOEING COMPANY, BOEING AEROSPACE OPERATIONS, INC. and BOEING AEROSPACE SUPPORT CENTER,** | |
| **Defendants.** | |

**BOEING'S MOTION TO EXCLUDE**
**SECTIONS OF THE REPORT AND TESTIMONY**
**OF PATRICK F. GANNON**

Craig S. Primis, P.C. (*pro hac vice*)
Erin C. Johnston (*pro hac vice*)
Tia Trout-Perez (*pro hac vice)*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

R. Thomas Warburton, Esq.
J. Thomas Richie, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................. 5

I. A Damages Expert Must Analyze Rather Than Simply Assume The Causal Link Between The Alleged Misconduct And The Amount Of Damages................................... 5

II. Mr. Gannon's Opinion Is Unreliable Because He Fails To Analyze How Much Market Value AAI Lost As A Result Of Boeing's Termination Of The MOA, As Opposed To Other Factors. ....................................................................................... 9

A. Mr. Gannon's Opinion Is Based On The Nonsensical Assumption that Boeing's Misconduct Caused Past Damages. ........................................................ 9

B. Mr. Gannon Fails To Account For Significant Factors Other Than Boeing's Conduct That Caused AAI's Business Decline. .................................................. 11

1. Mr. Gannon Fails To Account For AAI's Pre-Existing Financial Troubles. ........................................................................................ 12

2. Mr. Gannon Fails To Account For The Air Force's Decision Before The Parties' MOA To Move Toward Doing The PDM Work Itself. ....... 13

3. Mr. Gannon Also Fails To Account For Independent Events Subsequent To The MOA That Impacted The Value of AAI's Business, Such As The 2008 Financial Crisis.......................................... 14

C. Mr. Gannon's Defenses Of His Unsupported Causation Assumption Do Not Make His Opinion Reliable.................................................................... 16

CONCLUSION ............................................................................................................ 18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Blue Dane Simmental Corp. v. American Simmental Ass'n*,
178 F.3d 1035 (8th Cir. 1999)....................6

*Brandeis Univ. v. Keebler Co.*,
2013 WL 5911233 (N.D. Ill. Jan. 18, 2013)....................14

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1080 (10th Cir. 2006)....................15

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998)....................17

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................16

*Fashion Boutique of Short Hills, Inc. v. Fendi USA*,
75 F. Supp. 2d 235 (S.D.N.Y. 1999)....................7, 10

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
117 F. Supp. 2d 1078 (D. Kan. 2000)....................7

*Gastaldi v. Sunvest Resort Communities, LC*,
709 F. Supp. 2d 1299 (S.D. Fla. 2010)....................7, 11, 14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................5, 15

*Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*,
2017 WL 2062955 (S.D. Ala. May 12, 2017)....................17

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
305 F.3d 368 (5th Cir. 2002)....................14

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005)....................6, 11, 12

*Morehouse v. Behlmann Pontiac-GMC Truck Serv., Inc.*,
31 S.W.3d 55 (Mo. App. 2000)....................7

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................17

*Rink v. Cheminova, Inc.*,
400 F.3d 1286 (11th Cir. 2005)....................................................................................4, 5

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
969 F.2d 410 (7th Cir. 1992)....................................................................................6, 11

*Snac Lite v. Nuts 'N More*,
2016 WL 6778268 (N.D. Ala. Nov. 16, 2016) ........................................................5, 6, 11, 13

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)....................................................................................................5

## INTRODUCTION

Boeing brings this motion to exclude a portion of the expert testimony of Plaintiffs' damages expert, Patrick F. Gannon. Specifically, in his expert report Mr. Gannon improperly uses the entire business value of AAI as of the date the parties entered the KC-135 PDM Recompete Memorandum of Agreement ("MOA"), as a measure of damages for Boeing's alleged wrongful termination of the MOA. It is well settled that an expert opining on damages must employ a reliable methodology to analyze the causal link between the alleged misconduct and the resulting harm claimed as damages. Here, Mr. Gannon conducted ***no*** analysis, let alone one utilizing an accepted methodology, to assess whether or how Boeing's alleged breach could have caused AAI to lose its ***entire*** market value. Nor did he account for other market factors that contributed to AAI's business decline, as required of a reliable expert. Indeed, Mr. Gannon admitted at deposition that his methodology would enable AAI to recover its lost market value from Boeing even if that loss is "***zero percent because of Boeing***." (Ex. 1, 8/17/17 Gannon Dep. Tr. at 164:17-25.) This is sufficient to render his methodology unreliable, as the law is clear that a damages opinion is unreliable where the expert attempts to attribute all business losses following the alleged misconduct to defendant, without accounting for significant alternative factors that contributed to that loss. That is precisely what Mr. Gannon has done here, and therefore the opinions offered in Section B.I of Mr. Gannon's expert report should be excluded.[1]

---

[1] It is important to note that all of the damages Mr. Gannon calculates are consequential damages or are tied to lost profits AAI hoped to earn on the KC-135 Recompete Contract and therefore are barred by the limitation of liability provision in Section 11 of the MOA. Boeing has filed a separate motion to enforce that provision. *See* October 6, 2017 Boeing's Motion for Summary Judgment on Counts II and IV of AAI's Third Amended Complaint and Boeing's First Affirmative Defense. This motion is filed in the alternative to the extent Mr. Gannon's testimony is still relevant in light of how the Court rules on Boeing's motion to enforce the limitation of liability provision.

**FACTUAL BACKGROUND**

AAI was a troubled business well before the parties entered the MOA on June 3, 2005 and Boeing terminated the MOA on June 6, 2006. AAI's pension fund began underperforming in 2001, and by 2005, AAI faced a $26.3 million pension shortfall (Ex. 2, 3/24/06 Pemco Aviation Group, Inc. (2005) 10-K at 19.) Further, AAI's pretax net income fell by nearly 90% between 2003 and 2004, and it reported a loss in every subsequent year. (*See* Ex. 3, McLeod Report ¶¶ 47-48.) As a result of its poor performance, AAI was unable to secure financing, as evidenced by the February 2006 disclosure that it borrowed $5 million at the distressed rate of 15%. (*See* Ex. 4, 2/15/06 Pemco 8-K Form at 2.)

AAI's business continued to decline as the result of competition, its own management decisions, and unforeseen market events—such as the 2008 financial crisis that exacerbated AAI's preexisting financial problems. Furthermore, by January 2005 the Air Force had decided to move toward doing the KC-135 PDM work in-house on its own PDM line, rather than outsourcing to private companies such as AAI or Boeing—a decision that ultimately would doom AAI given that PDM work comprised the majority of AAI's business. (*See* Ex. 5, DX 173, at 5.) On February 15, 2011, AAI filed for Chapter 11 bankruptcy. Its bankruptcy filings identify the pension shortfall as "the primary driving force behind [AAI's] Chapter 11 filings," and also highlight AAI's inability to "obtain additional financing or a refinancing of [the high-interest] debt" it took on in February 2006 as a significant factor. (Ex. 6, Decl. of Randall C. Shealy in Support of Chapter 11 Petition and First Day Motions ¶¶ 38, 51 ("Shealy Decl.").)

It is thus apparent that a multitude of factors contributed to AAI's 2011 bankruptcy. Against this backdrop, Mr. Gannon's expert report nonetheless attempts—with no expert analysis whatsoever—to hold Boeing responsible for AAI's entire loss in value. Specifically, Section B.I of Mr. Gannon's report estimates damages for Boeing's alleged improper termination of the MOA

as the amount of the total fair market value of AAI prior to the start of any alleged Boeing misconduct. (*See* Ex. 7, Gannon Report at 40.) Mr. Gannon's primary opinion in this regard calculates $99.6 million in damages—his estimate of AAI's fair market value on June 3, 2005, the date the MOA was signed—as damages for Boeing's alleged improper termination of the MOA approximately one year later on June 6, 2006. (*See id.*) Mr. Gannon also offers an alternative figure of $76 million—his estimate of AAI's fair market value on June 5, 2006—in the event that the jury does not find Boeing to have engaged in misconduct prior to terminating the MOA. (*See Id.* at 40 n. 77.)

But Mr. Gannon conducts no analysis to assess what portion of AAI's loss of fair market value between 2005 and 2011 may have been attributable to factors other than Boeing's MOA termination. Instead, Mr. Gannon relies on the ***assumption*** that Boeing caused all of the loss in value of AAI's business after the date on which the parties entered into their MOA, and then puts forth the entire value of AAI's business on that date as the damages claim for Boeing's allegedly improper termination of the MOA one year later.

Mr. Gannon's purported damages analysis is in fact not an analysis of damages at all, because it is not an assessment of what AAI's market value would have been absent Boeing's alleged misconduct. Rather, it is nothing more than a valuation of AAI's business on a given date, disconnected from Boeing's actions. Indeed, under this methodology, AAI's eventual entire loss of its June 2005 market value purportedly would still be a valid measure of damages even if a substantial portion of that loss could not be attributed to Boeing. For instance, the substantial decline in AAI's market value in the year ***before*** Boeing's June 2006 termination of the MOA could not have been caused by that termination; but that decline would still count towards damages under Mr. Gannon's methodology. Mr. Gannon made this point clear at his deposition:

> Q. If you accept my rough math, Pemco's share price, according to your exhibits, dropped approximately 30 percent between June 3, 2005, and June 5, 2006; is that correct?
>
> A. I accept your math.
>
> …
>
> Q. So even if this decline in the stock price … is not attributable to Boeing's misconduct, you would still stand by your June 2005 damages claim?
>
> A. Yes. If the difference in value was wholly because of Boeing ***or zero percent because of Boeing,*** I still stand by both valuations and both models.

(Ex. 1, 8/17/17 Gannon Dep. Tr. at 161:14-18, 164:17-25) (emphasis added).) In light of this testimony and the lack of any accepted methodology for assessing alternative causes for AAI's total loss in business value, Boeing brings this motion to exclude Mr. Gannon's damages opinions based on the entire value of AAI's business.

**LEGAL STANDARD**

The proponent of expert testimony bears the burden of demonstrating its admissibility under Rule 702 by establishing that:

> "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Mr. Gannon's methodology using AAI's market values as damages for the alleged improper termination of the MOA fails to meet the second and third requirements for admissibility and therefore should be excluded. In particular, the focus of the reliability inquiry is the expert's methodology, but the Supreme Court also has explained that "conclusions and methodology are not entirely distinct from one another," and "[a]

court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" where the opinion "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In this case, both the methodology and the tenuous conclusions of Mr. Gannon's testimony using AAI's market value as the measure of damages for Boeing's alleged improper termination of the MOA fail to meet the "exacting" requirements for admissibility of expert testimony under Rule 702. *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000); *see also Rink*, 400 F.3d at 1291.

**ARGUMENT**

The law is clear that a damages expert must analyze rather than assume the causal link between the alleged misconduct and the amount of loss he computes. But Mr. Gannon fails to analyze whether any of the damages he computes in Section B.I of his report are causally connected to Boeing's alleged misconduct. Instead, he assumes all of AAI's business losses since June 2005 were caused by Boeing. (Ex. 7, Gannon Report at 26-27.) This assumption is untenable because the record contains ample documentation of numerous unrelated factors that contributed to AAI's losses, and Mr. Gannon simply ignores these factors. Mr. Gannon's opinion is therefore not a reliable assessment of compensatory damages for Boeing's allegedly improper termination of the MOA and must be excluded.

**I. A Damages Expert Must Analyze Rather Than Simply Assume The Causal Link Between The Alleged Misconduct And The Amount Of Damages.**

Mr. Gannon's methodology in calculating damages as a loss of business value is unreliable under a consistent body of law in this Court and courts around the country. As this Court recently held, "an expert must present some evidence that Defendant's alleged [misconduct] caused Plaintiff to lose" the claimed damages amount. *Snac Lite v. Nuts 'N More*, Case No. 2:14-cv-01695-RDP, 2016 WL 6778268, at *7 (N.D. Ala. Nov. 16, 2016) (Proctor, J.) (excluding both of

plaintiff's damages experts for failure to analyze the causal link). In *Snac Lite*, this Court excluded the first expert's testimony as unreliable because he did not analyze "the impact, if any, Defendant's alleged false advertising had on Plaintiff's sales," and simply made the "assumption that all of Plaintiff's sales losses since 2012 [when the false advertising began] are attributable to Defendant's alleged false advertising." *Id.* at *7-8. Similarly, this Court found that the second expert's "methodology simply involved calculating all of Plaintiff's sales declines following 2012" and impermissibly "assumed that a causal connection existed between Defendant's alleged false statements and Plaintiff's damages." *Id.* at *9-10. The Court also held that "in order to provide reliable testimony an expert must take into account most relevant factors as to causation," and found that neither expert had accounted for the obvious factors that contributed to plaintiff's post-2012 business losses, such as "Plaintiff's independent financial troubles" and "contamination in [plaintiff's] manufactur[ing] plant." *Id.* at *8. Here, Mr. Gannon's damages opinions based on the entire value of AAI's business suffer from these same fatal flaws and likewise should be excluded.

Federal courts across the country agree that an expert must analyze rather than assume a causal connection between the amount of damages computed and defendant's alleged misconduct. *See e g., MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1354 (Fed. Cir. 2005) (excluding expert who "attributed all of the company's post 2000 losses solely to the alleged tortious conduct … [and] did not link a single misconduct to a specific injury"); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (affirming exclusion of "before-and-after" damages model because "statements regarding causation [require] considering all independent variables that could affect the conclusion"); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992) ("The expert should have tried to separate the damages

that resulted from [other factors] from the damages that resulted from particular forms of misconduct allegedly committed."); *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (excluding expert whose "entire analysis is based upon the assumption that the Defendant's [misconduct] caused [the asserted] loss for the Plaintiff"); *Fashion Boutique of Short Hills, Inc. v. Fendi USA*, 75 F. Supp. 2d 235, 239 (S.D.N.Y. 1999) (excluding damages expert who relied on "irrational assumption" that alleged misconduct destroyed plaintiff's entire business).

The need for experts to analyze rather than assume causation is particularly acute in breach of contract actions because mistakenly attributing business loss caused by other factors to the alleged breach "would give the Plaintiffs a 'windfall,' which is forbidden by law." *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1299, 1302 (S.D. Fla. 2010) (excluding expert who attributed without explanation entire drop in property value to breach of renovation contract); *see also Morehouse v. Behlmann Pontiac-GMC Truck Serv., Inc.*, 31 S.W.3d 55, 62 (Mo. App. 2000) ("In the breach of contract setting, damages are the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented.").

Mr. Gannon has taken the position in another case—contrary to his position here—that a damages expert must analyze the causal connection between the alleged misconduct and the amount of damages he computes. Just last year, Mr. Gannon submitted an expert report in *VHT, Inc. v. Zillow Group, Inc.*, 15-cv-1096 (W.D. Wa.), a copyright infringement suit arising from Zillow's alleged unlicensed display of plaintiff's photographs on its website. (Ex. 8, 9/30/16 Gannon *VHT v. Zillow* Report at 36-40.) In that report, Mr. Gannon criticized the plaintiff's damages expert, for "endeavor[ing] to quantify Zillow revenues from listings that happen to include VHT sourced images, along with a significant amount of other property specific

information" with "no analysis or stated basis for the causation leap suggesting that … photographs themselves caused, or even contributed to these higher revenues." (*Id.* at 36.) He went on to explain that "[t]o suggest that VHT's photographs … somehow caused Zillow to receive higher revenue per listing … without any … cause and effect analyses is contrary to an expert's duty to at least consider causation." (*Id.*) Mr. Gannon has thus previously advocated the well-established principle that a reliable expert must conduct "cause and effect analysis" in computing damages. Yet, Section B.I of his report lacks any such analysis. (*See* Ex. 1, 8/17/17 Gannon Dep. Tr. at 90:20-23 ("I don't have an expert opinion that's going to say that this particular thing Boeing did, in fact, caused the damages.").)

Even the treatise that Mr. Gannon relies on throughout his expert report in this case explains that the role of a damages expert is to "compute … the plaintiff's damages claim for loss ***resulting from*** the defendant's alleged legal wrong." (Ex. 9, Roman Weil, Daniel Lentz, and David Hoffman, "Litigation Services Handbook: the Role of the Financial Expert" at 36 (6th ed. 2017) ("Weil Treatise") (emphasis added); *see* Ex. 7, Gannon Report at 23, 27, 42, 47, 57, 59 (citing Weil Treatise).) The Weil Treatise also emphasizes the need to analyze causation:

> The failure to properly consider causation jeopardizes the admissibility of expert testimony on damages. In evaluating the admissibility of expert testimony under Rule 702, a trial court must consider whether the "expert testimony … is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Damages experts who fail to consider causation risk a ruling that their testimony lacks this essential tie to the facts of the case.

(Ex. 9, Weil Treatise at 163-64 (footnote omitted).) The Weil Treatise goes on to explain that "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the causal link and measure the negative impact on profits." (*Id.* at 148.) These tools include regression analysis and other models and simulations that can isolate the effect of different factors and thereby link the alleged wrongful act to the

amount of damages. (*Id.* at 143-48.) At bottom, Mr. Gannon's failure to analyze causation by considering whether factors other than Boeing's alleged misconduct contributed to the decline in the value of AAI's business renders his valuation damages claims inadmissible under settled law.[2]

## II. Mr. Gannon's Opinion Is Unreliable Because He Fails To Analyze How Much Market Value AAI Lost As A Result Of Boeing's Termination Of The MOA, As Opposed To Other Factors.

There is no dispute that Mr. Gannon did not analyze the impact of Boeing's alleged breach of the MOA on AAI's loss of fair market value from 2005 to 2011. Nor did he attempt to account for other factors that could have contributed to that loss. Rather, Mr. Gannon admits that he simply assumed that all decline in AAI's business value since June 2005 was caused solely by Boeing. (*See* Ex. 7, Gannon Report at 26.) As an initial matter, this assumption is nonsensical because Boeing's June 2006 termination could not have caused damages in June 2005. Moreover, Mr. Gannon's failure to analyze whether any of the damages he computes actually resulted from Boeing's alleged misconduct, as opposed to other obvious factors that impacted AAI's market value, renders his opinion unreliable.

### A. Mr. Gannon's Opinion Is Based On The Nonsensical Assumption that Boeing's Misconduct Caused Past Damages.

The most glaring deficiency in the causation assumption underlying Mr. Gannon's damages opinion is that it holds Boeing responsible for the approximately 30% drop in AAI's

[2] In direct conflict with the Weil Treatise he cites and the position he took in *VHT v. Zillow*, Mr. Gannon attempts to defend his failure to analyze the causal link in this case by relying on the AICPA Practice Aid – Attaining Reasonable Certainty in Economic Damages, to assert that "in certain situations, it is appropriate for the plaintiff's damages expert to rely on the fact that the plaintiff will be able to establish the existence of a causal link." (Ex. 10, Gannon Rebuttal at 82.) But the Practice Aid Mr. Gannon cites actually refutes the validity of his assumption of the causal link. The Practice Aid explains that an expert may assume causation "when the issue of liability ***does not*** involve accounting, financial, or economic issues," but discourages experts from doing so "when it may be argued that the damages are attributable to factors having nothing to do with the purported bad acts." (Ex. 11, AICPA Practice Aid at 34 (emphasis added).) It also expressly warns against "the *post hoc ergo propter hoc* fallacy" and states that "[i]f ... unaccounted-for factors influenced the amount of the loss, the credibility of the plaintiff's expert's damages analysis may be jeopardized." (*Id.* at 55.)

market value during the year ***before*** Boeing terminated the MOA, *i.e.*, between June 5, 2005 and June 3, 2006. (*See* Ex. 1, 8/17/17 Gannon Dep. Tr. at 161:14–164:25; Ex. 7, Gannon Report at 26, 40.)

An identical assumption was found to be "irrational" in the Southern District of New York's decision in *Fashion Boutique*, 75 F. Supp. 2d 239. In that case, the damages expert assumed that defendant's disparaging statements from December 1990 to June 1991 destroyed Fashion Boutique's entire business and computed the lost value of that business as the measure of damages. *Id.* at 237-38. The court observed that "[i]n order for evidence of the lost value of Fashion Boutique's entire business to be [admissible], Fashion Boutique must show that [defendant's] isolated defamatory statements caused it to lose its entire business." *Id.* at 238. But no such showing was possible because the sharp decline that destroyed plaintiff's business began in December 1989, a full year before the alleged disparagement. *Id.* The expert's opinion therefore was excluded because it was based on the "irrational assumption" that disparagement somehow caused ***past*** business losses. *Id.* at 239. Mr. Gannon's opinion is likewise based on the irrational assumption that Boeing's June 6, 2006 termination of the MOA somehow caused past losses going back to June 2005, and should be excluded for the same reason.

The past losses here are substantial and, by Mr. Gannon's own calculation, total over $23 million—the difference between his June 2005 and June 2006 valuations. (Ex. 7, Gannon Report at 40 n. 77.) Mr. Gannon does not explain how Boeing's termination of the MOA could possibly have caused past losses and instead confirmed that his methodology would hold Boeing responsible for such loses even if they were "zero percent because of Boeing." (Ex. 1, 8/17/17 Gannon Dep. Tr. at 164:22-25.) Thus, by his own account, Mr. Gannon acknowledges that his methodology permits AAI to recover from Boeing losses that have nothing to do with Boeing's

alleged misconduct, thereby impermissibly overcompensating AAI with a substantial windfall. *See Gastaldi, LC*, 709 F. Supp. 2d at 1302 (excluding damages opinion that would lead to a windfall recovery in breach of contract action).[3]

**B. Mr. Gannon Fails To Account For Significant Factors Other Than Boeing's Conduct That Caused AAI's Business Decline.**

Mr. Gannon's methodology is unreliable not only in attributing past AAI losses to Boeing's termination but also because it includes AAI's post-June 2006 losses attributable to numerous market factors unrelated to the alleged misconduct. The law is clear that an expert must "separate the damages that resulted from [these factors] from the damages that resulted from particular forms of misconduct allegedly committed." *Schiller & Schmidt*, 969 F.2d at 415-16. Indeed, as noted above, this Court recently excluded damages experts who, like Mr. Gannon, "analyzed only the parties' financial records, and did not consider any of a number of potential outside sources that may have affected Plaintiff's [business losses]." *Snac Lite*, 2016 WL 6778268, at *8-9. In particular, the unreliable *Snac Lite* experts failed to consider whether any of the losses they assumed were caused by the defendant's misconduct actually had resulted from the plaintiff's "independent financial troubles." *Id*. Here, Mr. Gannon likewise ignores, among other factors, the effect of AAI's innumerable independent financial troubles—both before and after Boeing's termination of the MOA—on its eventual bankruptcy.

[3] Recognizing this fatal flaw in his opinion, Mr. Gannon's report proposes in a footnote an alternative estimate for the loss of AAI's market value based on a valuation date of June 5, 2006 (MOA termination date). (Ex. 7, Gannon Report at 40 n. 77.) Mr. Gannon maintains, however, that his June 3, 2005 valuation is his "primary analysis" that "would be the most appropriate [destruction of business damages] for the trier of fact to consider" and minimizes the significance of the June 5, 2006 valuation calculations as "simply alternative calculations that I made in the interest of being highly transparent." (Ex. 1, 8/17/17 Gannon Dep. Tr. at 190-91.) In any event, all of Mr. Gannon's valuation damages claims are invalidated by the same failure to exclude the impact of any of the factors other than Boeing's alleged misconduct that contributed to the loss of AAI's market value. *See, e.g.*, *MicroStrategy*, 429 F.3d at 1354.

**1. Mr. Gannon Fails To Account For AAI's Pre-Existing Financial Troubles.**

AAI was a business in decline well before Boeing terminated the MOA in June 2006. AAI's pretax income dropped from $23.7 million in 2003 to only $2.5 million in 2004, and it incurred a loss in every subsequent year. (*See* Ex. 3, McLeod Report ¶¶ 47-48.) At the same time that its income was falling, AAI's pension fund underperformed, leading to a pension shortfall of $26 million by the end of 2005. (Ex. 2, 3/24/06 Pemco Aviation Group, Inc. (2005) 10-K at 19.) As a result of these problems, AAI could not obtain affordable financing and was required to take out high-interest loans to stay afloat. (*See* Ex. 4, 2/15/06 Pemco 8-K Form at 2 (disclosing $5 million loan at 15% interest rate).)

There is no basis for Mr. Gannon to assume that AAI's pre-existing business setbacks did not contribute to AAI's decline in value in 2006 and thereafter. The Federal Circuit's decision in *MicroStrategy* is instructive on this point. 429 F.3d 1344. In that case, MicroStrategy's expert "attributed all of the company's post 2000 losses solely to the alleged tortious conduct" even though MicroStrategy had "suffer[ed] severe financial problems," including "downward readjustment of its 1997, 1998, and 1999 earning reports." *Id.* at 1354. MicroStrategy argued that the expert "accounted for these grave market set-backs by selecting the year 2000 as his baseline," but the Federal Circuit held the methodology was speculative and unreliable because there was "no basis for assuming that *all* of MicroStrategy's financial struggles … had no lingering effects beyond 1999" and "no indication that these economic set-backs had no effect in 2000 and thereafter." *Id.* Here, AAI's own bankruptcy filings reference similar long-running financial troubles with such "lingering effects," pointing to the pension shortfall that began in 2001 as the "primary driving force" behind AAI's eventual collapse. (Ex. 6, Shealy Decl. ¶¶ 38, 51.) Those filings also identify AAI's inability to obtain financing and difficulty servicing the 15% interest

rate loan that it assumed in February 2006—before Boeing terminated the MOA—as significant factors that led to bankruptcy. (*Id.* ¶ 51.) Thus, it is apparent that AAI's business setbacks prior to Boeing's termination of the MOA played a substantial role in the eventual complete loss of AAI's business value, and Mr. Gannon's failure to take these factors into account renders his damages opinion unreliable. *See Snac Lite*, 2016 WL 6778268, at *8-9 (excluding damages experts who failed to analyze effect of "independent financial troubles" on plaintiff's business loss).

**2. Mr. Gannon Fails To Account For The Air Force's Decision Before The Parties' MOA To Move Toward Doing The PDM Work Itself.**

Mr. Gannon also fails to take into account the fact that, by at least January 2005—several months before the parties' had even entered the MOA—the Air Force had made its own decision to move toward handling the PDM work itself, rather than outsourcing it to private companies such as AAI or Boeing. Specifically, as of January 2005, for the approximately 80 KC-135 aircraft that undergo PDM work each year, the Air Force's own internal PDM line was "reducing flow days to accommodate up to 60 (committed to 48) aircraft per year and 70 aircraft by 2008." (Ex. 5, DX 173, at 5.) The Air Force gradually reduced the number of aircraft outsourced each year until it ceased outsourcing KC-135 PDM work entirely in 2012. (*See, e.g.*, Ex. 12, Air Force Sustainment Center, Art of the Possible at 89 ("At the end of FY12 the decision was made to make [Tinker Base] the sole provider of KC-135 PDM work.").)

As Mr. Gannon recognizes, "the KC-135 program was a critical part of Pemco's business," and he asserts that "the loss of the KC-135 program did in fact cause Pemco to fail." (Ex. 10, Gannon Rebuttal at 83, 86.) It is thus undeniable that this decision—by the Air Force, not Boeing—to reduce (and eventually eliminate) the PDM line of work that comprised a large percentage of the work AAI performed would impact AAI's business value, and yet Mr. Gannon

fails to account for this factor. Courts routinely exclude damages experts who inadequately analyze market demand, such as the Air Force's reduced demand for KC-135 PDM work in this case. *See, e.g., IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 376 (5th Cir. 2002) (affirming exclusion of experts where "[n]either expert conducted reliable survey or market research"); *Brandeis Univ. v. Keebler Co.*, No. 1:12-CV-01508, 2013 WL 5911233, at *7 (N.D. Ill. Jan. 18, 2013) (excluding economist due to her "failure to discuss … consumer demand."). Thus, Mr. Gannon's damages opinions are unreliable as a matter of law, because he fails to take into account the falling demand for AAI's main line of work.

#### 3. Mr. Gannon Also Fails To Account For Independent Events Subsequent To The MOA That Impacted The Value of AAI's Business, Such As The 2008 Financial Crisis.

A number of market events subsequent to Boeing's termination of the MOA also played a role in AAI's business failure. These include, for instance, the 2008 financial crisis that the unreliable damages expert in *Gastaldi* also failed to consider. 709 F. Supp. 2d at 1302. There, the damages expert attributed the entire decline in condominiums' market value from 2007 to 2009 to defendant's breach of a renovation contract. *Id.* at 1308-09. The court excluded the expert because he provided no reasoning to support his assumption that, absent the breach, the units' 2009 market value would have equaled their 2007 purchase price. *Id.* Having failed to account for other factors that "may have affected the market value of the units," notably the 2008 financial crisis, the court found that the expert's resulting damages would overcompensate the plaintiff for market value lost due to factors other than Defendants' alleged misconduct. *See id.* at 1302, 1305. Here too, the most severe financial crisis in modern history undoubtedly exacerbated AAI's problems with its underperforming pension fund and inability to access credit—factors that AAI admits caused the destruction of its business. (*See* Ex. 6, Shealy Decl. ¶¶ 38, 51 ¶¶ 38, 51.) But Mr. Gannon completely ignores these impacts. To blame Boeing for these losses would generate a windfall for

AAI, through which AAI would potentially obtain compensation from Boeing for lost business value that was "zero percent because of Boeing." The same is true for the many other subsequent events that even Mr. Gannon admits contributed to AAI's business collapse. (Ex. 1, 8/17/17 Gannon Dep. Tr. at 81:14-18 ("Q. So there were events that you are assuming occurred after the valuation date that contributed to the destruction of Pemco's business? A. Yes.").) For instance, Mr. Gannon identifies banks calling in loans, loss of other business opportunities, and AAI's decision to sell off other profitable subsidiaries as subsequent events that caused AAI's eventual bankruptcy. Yet his methodology does nothing to analyze the impact of those factors; he simply assigns 100% of the lost business value to Boeing's conduct. (*Id.* at 68:14–70:23.)[4]

* * * * *

By ignoring the multitude of factors that caused AAI to lose business value, and instead attributing—by way of an unsupported assumption—all of AAI's losses to Boeing, Mr. Gannon has not offered an admissible expert opinion as to the proper compensatory damages for Boeing's allegedly wrongful termination of the MOA. Rather, his opinion is an impermissible attempt to recover from Boeing all business losses regardless of their cause. Mr. Gannon fails to disclose any reliable analysis that supports such overcompensation, and therefore, his opinion should be excluded.

---

[4] Mr. Gannon blames these factors as somehow arising from Boeing's alleged breach of the MOA, but he provides no basis for this assumption. Given that AAI's preexisting financial problems undoubtedly played a significant role in these subsequent events (*see* Ex. 6, Shealy Decl. ¶¶ 38, 51), blaming Boeing for these events is implausible. Furthermore, Mr. Gannon simply relies on AAI for these assertions; he conducted no analysis to reach this conclusion and offers no expert opinion on the matter, even though it is beyond dispute that "[n]o reasonable economist would simply accept the self-serving statement of an interested party as fact." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1080 n.4 (10th Cir. 2006) (affirming exclusion of expert who based his testimony solely on facts provided by plaintiff); *see also Joiner*, 522 U.S. at 146; (Ex. 1, 8/17/17 Gannon Dep. Tr. at 112:18-113:15).

### C. Mr. Gannon's Defenses Of His Unsupported Causation Assumption Do Not Make His Opinion Reliable.

Perhaps because he recognizes that a damages expert must analyze rather than assume causation (*see* Ex. 8, 9/30/16 Gannon *VHT v. Zillow* Report at 36-40), Mr. Gannon makes some attempt to defend the causation assumption underlying his damages estimate. Specifically, in his opening Report he asserted that he "considered the claims and the facts and the circumstances" and believes that "[t]he fact pattern, as [he] understand[s] it, appears to be supportive rather than contrary to the causation assumption." (Ex. 7, Gannon Report at 25.) But Mr. Gannon discloses no analysis supporting this belief. To the contrary, he directly acknowledged that: "I don't have an expert opinion that's going to say that this particular thing Boeing did, in fact, caused the damages." (Ex. 1, 8/17/17 Gannon Dep. Tr. at 90:20-23.) Thus, Mr. Gannon's defense of his causation assumption is merely inadmissible personal belief and is not proper expert opinion. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("subjective belief or unsupported speculation" is inadmissible).

Indeed, none of the grounds Mr. Gannon cites as supporting the causation assumption undergirding his damages opinion qualifies as expert analysis. ***First***, Mr. Gannon interprets this Court's March 9, 2017 Opinion as "making it obvious that the loss of [AAI's KC-135 work] would force Pemco out of business." (Ex. 10, Gannon Rebuttal at 83.) But that Opinion concerned the unrelated issue of whether litigation was reasonably anticipated. The Court did not conduct or rely on any economic analysis as to what portion, if any, of the decline in AAI's business after the parties entered the MOA on June 3, 2005 was attributable to Boeing's termination of the MOA. And, in any event, Mr. Gannon is not qualified to interpret this Court's legal opinions. *See, e.g.*, *Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*, Civ. A. 16-0231-WS-C, 2017 WL

2062955, at *2 (S.D. Ala. May 12, 2017) ("expert opinions are inadmissible to the extent that they contain legal conclusions regarding the expert's interpretation of … legal documents.").

***Second,*** Mr. Gannon reviews and characterizes Boeing's business records as indicating that Boeing "believed that the loss of the KC-135 PDM program by Pemco could put Pemco out of business" and similar statements made by AAI. (Ex. 10, Gannon Rebuttal at 84-86.) Reviewing and characterizing documents, however, is not sound expert methodology. *See City of Tuscaloosa*, 158 F.3d at 565 (excluding expert's "characterizations of documentary evidence"). Nor may Mr. Gannon opine about what Boeing "believed." *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("states of mind of corporations … have no basis in any relevant body of knowledge or expertise"). And as a factual matter, even AAI does not assert that it lost the KC-135 PDM work the moment the parties entered into the MOA on June 3, 2005. Yet, Mr. Gannon assumes that causative factor and computes AAI's losses from that date and earlier. Likewise, none of the documents Mr. Gannon cites addresses whether Boeing's termination of the MOA, by itself, caused the loss of AAI's KC-135 program. Yet, Mr. Gannon has identified that factor as the condition that supports his confidence in the causation assumption. (Ex. 10, Gannon Rebuttal at 83 ("the causation assumption is reasonable" only "if Boeing is found to have caused Pemco to lose [its KC-135 PDM] line of work.").)

Thus, not only is Mr. Gannon's confidence in the causation assumption not grounded in expert analysis, but Mr. Gannon fails even to disclose viable grounds to support his subjective belief in the reasonableness of that assumption. Accordingly, Mr. Gannon's half-hearted defense of the unsupported assumption that Boeing's termination of the MOA destroyed AAI's entire business cannot save his opinion from being unreliable and inadmissible.

## CONCLUSION

For the foregoing reasons, the opinions found in Sections B.I of Mr. Gannon's expert report based on the value of AAI's business should be excluded from Mr. Gannon's testimony and report.

Respectfully submitted this 6th day of October, 2017.

*/s/ R. Thomas Warburton*
One of the Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to the following recipients:

J. Michael Rediker, Esq.
Meredith J. Lees
Peter J. Tepley
R. Scott Williams
Rebecca A. Beers
RUMBERGER, KIRK & CALDWELL, P.C.
Renasant Place, Suite 1300
2001 Park Place North
Birmingham, AL 35203

Joshua D. Lerner
RUMBERGER, KIRK & CALDWELL, P.C.
Brickell Bayview Centre, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037
(305) 995-5416

*/s/ R. Thomas Warburton*
R. Thomas Warburton