FILED
2017 Oct-06 PM 06:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 9

# PREFACE

*A real patriot is the fellow who gets a parking ticket and rejoices that the system works.*

—Bill Vaughan (columnist and author, 1946–1977)

In the world of American business, few may feel the patriotic spirit in the face of a litigation and enforcement environment that increasingly saps the financial and human resources of the unfortunates that find themselves embroiled in the process. The debate over whether the system really works, and for whom, would likely be a long one, colored by the individual experience of the debaters. Corporations in America find themselves constantly participating in the process.

The litigation services practice remains a growth business for financial experts as the complexity and the global nature of business disputes continue to expand. The *Litigation Services Handbook* has for more than 25 years, through five previous editions and more than 20 annual supplements, offered a comprehensive guide for economists, accountants, and litigators involved with the analytic and damages issues in commercial litigation. It has enjoyed critical success as its revised editions have served to guide readers and practitioners in the litigation services industry.

We note several milestones wrapped into the sixth edition: Elizabeth A. Evans of FTI Consulting has joined our editorial team; her academic training and many years of experience have contributed to the quality of earlier editions as author and to this edition, as well, as editor. This is the final edition for editor Daniel G. Lentz, who has coauthored or shepherded many chapters through the last two editions. We extend special thanks to his firm, Ernst & Young, LLP, for underwriting the costs involved to bring the handbook from submitted drafts to published volume (a long and winding road). Last, we extend a (possible) fond farewell and our gratitude to Roman L. Weil, who plans to retire from the helm of lead editor for the *Litigation Services Handbook.* He joined Peter Frank and Michael Wagner, who conceived of this book, more than 25 years ago. Throughout every edition, he has driven the authors and his fellow editors to ensure clarity, accuracy, completeness, and avoidance of his pet peeves: passive verbs, the word “may,” and certain qualifying “-ly” adverbs.

This edition includes new chapters that reflect the changing business environment and related litigation, incorporates a fresh look at existing content to this edition, and retains the highest-quality work from predecessor authors and editions to ensure inclusion of the most current and relevant information on each topic. Each of the 44 chapters in the sixth edition has authors—accountants, economists, academics, and litigators—expert in their fields. Together, these chapters explain the financial theory behind the demonstrated practical application and clarify the relevant case law, regulation, and statutes.

-------------- Page 27 --------------

**Organization and Writing.** This edition comprises seven sections, each addressing a different practice area or set of functional tools.

*Part I, The Litigation Environment* (3 chapters), discusses the civil court system, principles and techniques of alternative dispute resolution, and how CPAs and economists function in the litigation environment, including a discussion on *Daubert* challenges and the art of testifying.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

*Part II, Developing a Damages Analysis* (11 chapters), addresses the components of damages calculations: damages theories and modeling, estimating the cost of capital, business valuation, business interruption claims, lost earnings of individuals, and class certification issues.

*Part III, Litigation Tools and Techniques* (1 chapter), explains data management in regulatory and litigation environments in an entirely revised chapter incorporating the latest information from a rapidly changing subject area.

*Part IV, Ancillary Issues in Damages Matters* (3 chapters), discusses prejudgment interest, punitive damages, and tax treatment of damages—all issues that are ancillary to the underlying damages claims and litigation.

*Part V, Civil Litigation* (21 chapters), addresses specific types of commercial cases, categorized into five subsections:

1. *Intellectual Property* (5 chapters) discusses the complexities of this vexing area of litigation, and describes the process of conducting royalty audits.
2. *Ownership and Business Failure* (3 chapters) guides practitioners in how financial experts contribute to matters involving growth and decline or failure of businesses.
3. *Regulatory Litigation* (6 chapters) deals with a variety of matters related to securities, monitorships, antitrust, and federal contracts.
4. *Construction and Real Property Disputes* (2 chapters) provides insights on litigation dealing with property issues.
5. *Other Civil Litigation* (5 chapters) addresses accountant liability, executive compensation, non-compete covenants, employment litigation, and fair lending litigation.

*Part VI, Criminal Matters and Investigations* (4 chapters), helps practitioners understand the unique issues and skill sets required to serve as an expert in the investigations environment.

*Part VII, Family Law* (1 chapter), gives readers broad-based insight into this common area of litigation.

**Note on Writing Style.** Many chapters contain a variety of statements of the

--------------- Page 28 ---------------

form, “The expert will measure cash flows and discount them to present value.” Often, the authors originally wrote, and meant, “The expert will usually measure cash flows and then, typically, discount them to present value.”

Rather than qualify every positive or absolute statement with “typically” or “usually” or “generally,” we have omitted those qualifiers. The reader should understand that unless the statement says something like “always do X,” the writer intended to qualify the statement with “typically” or “generally” or the like, not to assert a prescriptive formula. As a result of this style simplification, we think the reader will comprehend the message more easily.

**Relation between Authors and Editors.** We acknowledge the cooperation and patience that our contributing authors have shown. We do not agree with everything they say and sometimes so indicate in the notes. We prefer to have experts give their own opinions, even when controversial, rather than less specific guidance—like bland committee reports—on which we can all agree. Note to litigators cross-examining us: just because the author of the chapter said it doesn’t mean we agree with it.

**Acknowledgments.** We thank Debbie Asakawa for her work in managing, editing, and adding consistency and clarity to the manuscript, and for her assistance in encouraging authors, in addition to the other tasks that helped bring the book to fruition. We acknowledge the diligent work of our liaisons at John Wiley & Sons: Sheck Cho, Judy Howarth, Kimberly Monroe-Hill, and Vincent Nordhaus.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

We invite readers and practitioners to submit proposals for chapters to include in the *Litigation Services Handbook*'s annual cumulative supplements. Contact Elizabeth Evans at Elizabeth.Evans@fticonsulting.com for more information.

Roman L. Weil

Daniel G. Lentz

Elizabeth A. Evans

---

Copyright © 2017 John Wiley & Sons, Inc., Hoboken, New Jersey.

# Chapter 1 A Dispute Resolution Primer *

-------------- Page 31 --------------

## 1.1 INTRODUCTION

-------------- Page 32 --------------

### (A) Rationale For The Book

Anyone who considers undertaking the role of an expert will find this book valuable. It will help novice and experienced practitioners stay abreast of current methods and case law and will guide them in other areas in which they can apply their experience.

This book is a current reference for certified public accountants (CPAs) and other experts involved in typical litigation cases and includes technical approaches and case-specific tools in use today. Although not exhaustive on any topic, it addresses the roles that experts play in litigation in commonly encountered cases. We incorporate advice from practitioners with extensive experience in litigation services.

### (B) Expert Opinions And Admissibility: The Rules Of The Road

Over time, the role of experts has expanded in the American legal system. Originally, courts allowed expert testimony only when the facts became too complex for an average juror to understand, and no expert could express an opinion on the ultimate issue. The Federal Rules of Evidence have liberalized this and other rules applying to experts, thereby increasing their roles. Rule 702, Testimony by Experts, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [1]

Rules 703 through 705 of the Federal Rules of Evidence also relate to expert testimony. Rule 703 allows experts in reaching their opinion to rely on otherwise inadmissible facts or data if they are “of a type reasonably relied upon by experts in the particular field in forming

Bloomberg Law®
© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

opinions or inferences upon the subject.” Experts can, for example, rely on hearsay evidence, posing the risk that their testimony will expose jurors to evidence from which the Rules of Evidence aim to insulate them. For this reason, Rule 703 requires judges to guard against the expert acting as a “smuggler of hearsay” to the jury: “Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert’s opinion substantially outweighs their prejudicial effect.”

Rule 704 allows experts to give an opinion on the issue that the trier of fact will ultimately decide. (The only exception relates to an alleged criminal’s mental

--------------- Page 33 ---------------

state.) Thus, an expert can give an opinion on such issues as liability or the amount of damages.

The U.S. Supreme Court guided federal trial court judges as to the admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2796 (1993). The trial judge has broad discretion to act as a gatekeeper to forbid expert testimony based on mere subjective belief or unsupported speculation. Although the Court decided *Daubert* in the context of scientific expert testimony, the decision applies to any expert testimony, including financial, economic, and accounting testimony; the Court provided this clarity in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). For an in-depth discussion of the effects of the *Daubert* case, see Chapter 3.

Although *Daubert* and its progeny provide no exclusive list or set of tests that the expert’s testimony must meet to be admissible—and thus survive the judge’s gatekeeping function—one does well to consider the factors that the decision enumerates:

- Is the theory or technique testable? Has it been tested?
- Has it been subjected to peer review or publication?
- Is the potential rate of error known?
- Is it generally accepted within the relevant community of experts?

These *Daubert*-originated factors, bowing to the scientific method, reflect the scientific nature of the expert evidence at issue in that case. We reiterate that these are only examples; they are neither mandatory tests nor a checklist, and one’s testimony can flunk a given test yet be judged admissible by the court. Similarly, a court will exclude testimony that meets all the factors if it lacks relevance, doesn’t relate to the facts of the case, or otherwise proves unreliable. The Advisory Committee’s Note to Amendment (to Rule 702) effective December 1, 2000, includes some bases for excluding testimony, as well as good standards to apply when evaluating one’s own prospective testimony (Chapter 3 includes an extended discussion of this topic and related court cases):

- Whether testimony is based on research conducted independent of the litigation or was expressly undertaken for the purpose of the testimony;
- Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
- Whether the expert has adequately accounted for obvious alternative explanations;
- Whether the expert applies the same degree of intellectual rigor within the courtroom as without;
- Whether the field of expertise claimed by the expert is known to reach reliable results (for example, astrologers observe some principles generally accepted within their community but not accepted, per the Advisory Committee, within the courtroom).

Diligent, experienced attorneys with adequate time and funding will take the time and care needed to maximize the likelihood of the testimony’s admissibility. Many cases lack such resources, and the experts must then apply care and thoughtfulness to avoid exclusion. In the short term, admissibility will avoid the prejudice to the client (and embarrassment to the expert) of a testimony’s exclusion. Excluded testimony will also have long-run repercussions: The misfortune will become a topic of discussion in future depositions and *voir dire* [2] proceedings. It will also require a “yes” answer to one of the first questions that most attorneys will ask an expert whom they consider retaining: “Has a court ever excluded your testimony?”

Before one can confront the perils of qualifying to testify in the courtroom, the court must allow the expert to enter. Federal Rules of


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Civil Procedure Rule 26(a)(2) provides the requirements for federal cases:

(2) Disclosure of Expert Testimony.

(A) In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

(C) These disclosures shall be made at the times and in the sequence directed by the court … [The expert should consult with the retaining attorney regarding the specific provisions that follow.]

Section 1.3(d) of this chapter discusses the nature and content of expert disclosures, including the report substance. Note that the states' requirements for expert disclosure and discovery have more variation than do the federal standards for admission of expert testimony. Some states have little or no discovery of evidence

--------------- Page 35 ---------------

from the parties, resulting in "trial by ambush."

### (C) Role Of The Financial Expert In Litigation

Lawyers use experts in litigation for the same reasons that businesses retain experts as advisors: Lawyers need quality advice when litigating, and experts offer this service because they give advice in the real world to real companies with real problems. Juries understand and respect this practical experience. Because accounting is the language of business, accountants can often clarify business transactions and explain the records reflecting them to lawyers, judges, and the jury. Because economists help companies apply the principles of market definition, price theory, economic modeling, and market risk, they can help interpret the effects of a firm's behavior on competitors or other related entities. Various experts have the quantitative skills required to undertake and perform the analyses necessary to interpret the technical evidence required in complex commercial cases.

The ideal expert (1) has never testified before and has no relationship with the hiring attorney, firm, or client, so that the jury will be disinclined to regard him as a hired gun, but (2) has substantial experience in litigation analyses, testimony, and response to cross-examination. This prospective expert does not exist. The lawyer must weigh the risks and rewards each case presents in making the selection.

This book focuses on the role of an expert witness (rather than a fact witness) because litigation practitioners most often serve in this comprehensive role. Experts frequently play a behind-the-scenes role as consultant to the legal team or, occasionally, as arbitrator.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

### (D) Tasks Undertaken By Financial Experts

Attorneys most often retain experts to compute or rebut the plaintiff's damages claim for loss resulting from the defendant's alleged legal wrong. They also provide analysis and testimony on liability issues where their expertise suits them to prepare relevant analyses or to discuss compliance with professional standards in malpractice and similar cases. In addition, experts sometimes address the business issues in a case: economists and CPAs with suitable experience often consult or testify on issues that involve marketing, economics, and industry practices.

Experts can organize and synthesize data. Hence, lawyers rely on them to review collections of documents to extract, store, and analyze information relevant to discovery and trial.

## 1.2 THE CIVIL COURT SYSTEM

### (A) General Process

--------------- Page 36 ---------------

With the exception of criminal activities related to fraud (Part VI), this book focuses primarily on civil disputes. Those disputes fall into tort or contract causes of action. A tort is a wrongful act or inaction unrelated to a contract, such as negligence, fraud, or interference with prospective economic relations. Contract causes of action arise from a breach of a contract's essential terms.

Judges and juries resolve disputes. Judges determine the applicable law in all courts; in *bench trials* (i.e., trials heard by judges, without a jury), they also identify the facts when those are in controversy. Parties also have the right to demand a jury to decide disputed facts in trials before most courts of general jurisdiction, but not in trials involving family law, probate and estate, and equitable issues. [3] The litigants in some special courts—including tax courts and the U.S. Court of Federal Claims—have no right to a jury. Appellate courts have no juries because the trials held in them address only legal issues; the trial court from whose decision one of the parties has appealed decides all factual issues. Even when parties can demand a jury trial, many prefer that the judge resolve all matters in dispute.

Parties have a right to appeal a decision at a trial court to the first level of the appellate process in either state or federal courts. After that, they have a right of appeal to the higher court(s) but with a diminished likelihood of that court exercising its discretion to hear the case where hearing the case is not mandatory. For example, the U.S. Supreme Court must hear cases where state or federal courts hold federal statutes unconstitutional, and many state supreme courts must hear appeals involving the death penalty. In most cases, however, the higher court has the discretion to hear or refuse to hear the appeal from the intermediate court's decision.

Courts of appeal can sustain the lower court's decision, reverse it, or partially sustain and partially reverse it. They can remand the case for retrial on whatever issues they consider appropriate and, in certain circumstances, resolve the matter with a trial *de novo*, an unusual proceeding in which the appeals court in effect retries the case itself based on the original trial record.

### (B) Experts' Involvement In A Case

Lawyers for the parties involved in litigation interview and retain experts both for their particular expertise and for their ability to communicate their opinions effectively. The retention usually occurs after the plaintiff files the complaint but before trial. During the pretrial period, lawyers will consult with the expert. The expert can assist in discovery by educating the lawyers as to the types of business records

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## 4.4 DAMAGES THEORY

Parties to a lawsuit employ various theories of damage and related models in the legal remedy of damages, depending on the court and the nature of the case. This section describes damages theories that underlie models used to calculate damages. Exhibit 4-4 defines some categories of damages.

1. Measures related to the extent of damages
   - **Actual (but-for) damages**: caused directly by the defendant's improper actions
   - **Consequential damages**: a natural and foreseeable, but indirect, consequence of the improper actions
2. Damages measures focused on plaintiff
   - **Compensatory damages**: either expectation damages or reliance damages
     - **Expectation damages**: the difference between the amount which the plaintiff reasonably expected to receive and the actual amount received; also known as benefit of the bargain (BOB) damages
     - **Reliance damages** (RD): an amount the plaintiff lost because it relied on false representations from the defendant
3. Damages measure focused on defendant
   - **Restitution (or disgorgement) damages** (RR): the amount that the defendant foreseeably gained at the plaintiff's expense
4. Other damages measures
   - **Punitive damages**: intended to punish or dissuade the objectionable behavior; not directly tied to the plaintiff's loss or defendant's gains

--------------- Page 133 ---------------

**Exhibit 4-4. Damages Categories**

These categorizations are often interrelated. For instance, courts often remedy actual and consequential damages with compensatory or restitution payments from the defendant to the plaintiff. Courts may award punitive damages in addition to compensatory or restitution damages. In addition, statutes and case law often specify the type of damages attached to specific offenses or actions. We discuss these measures in more detail in subsequent sections of this chapter.

### (A) Compensatory (Expectation And Reliance) And Restitution Damages

Compensatory damages involve either expectation damages or reliance damages.

Expectation damages, as the term connotes, compensate an aggrieved party for the loss of the bargain for which it negotiated. [59] Courts sometimes refer to expectation damages as "benefit of the bargain" (BOB) damages. Expectation damages seek to make a plaintiff whole as if the defendant had performed the contract in full. [60]

Reliance damages seek to compensate the plaintiff for losses resulting from its reliance on the contract. [61] Under reliance damages (RD) the plaintiff would receive only the amount it invested plus any out-of-pocket expenses as a damages award, less any benefits received if there was partial performance. Thus, an RD remedy would essentially unwind the transaction, rather than awarding what the nonbreaching party expected to realize had the transaction been completed as planned. As a result, RD are usually less than BOB damages because RD do not include any lost profits from the breached contract. Many courts award RD only when the court cannot measure BOB (expectation) damages. [62]

In contrast, where the nonbreaching party has not only acted in reliance upon the contract, but that action also conferred a benefit on the breaching party, courts sometimes award a remedy of restitution (RR). [63] Accordingly, RR measures damages based on the defendant's

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

ill-gotten gains rather than the plaintiff's loss and seeks to return to the plaintiff the benefit conferred on the defendant by the breach.

For example, assume that the buyer made a down payment on the purchase of widgets and the seller used that down payment to make a profit by depositing the money in the bank and earning interest on the down payment. If the seller then breached the contract, its profits from interest on the buyer's down payment would be the RR. RR requires the offending party to give up the profits it earned through its misdeeds and turn them over to the aggrieved party. Many jurisdictions consider losses suffered as a result of misrepresentations made by the defendant, or on the contract itself, a part of the RR damages measure. Although RR sometimes equals

-------------- Page 134 --------------

BOB or RD, RR will often be smaller because it does not include the plaintiff's lost profits (BOB) and it does not include the plaintiff's expenditures made in reliance on the contract (RD). [64] On the other hand, ill-gotten gains made by the defendant (RR) may exceed profits made by the plaintiff (BOB) if the defendant enjoyed certain manufacture or distribution efficiencies that the plaintiff did not have. Some courts hold that RR damages are not limited by the extent of BOB damages, as are RD damages by many courts. [65]

Using an analysis suggested by Professor Eyal Zamir, [66] we summarize these concepts in the following table.

| | **Damages Measured by Effect on Injured Party** | **Damages Measured by Effect on Party in Breach** | **Undoes the Effect of the** |
|---|---|---|---|
| Backward Looking | Reliance | Restitution | Contract |
| Forward Looking | BOB (Expectation) | Disgorgement | Breach |

We compare damages measurements from these concepts later in this chapter. While damages can derive from a wide range of actions under statutory, tort, and contract law, the remainder of this chapter will focus on damages related to contract law.

We next describe some subsets of the compensatory and restitution damages remedies.

*(i) Out-of-Pocket Damages* Expectation, reliance, and restitution damages can over- lap with each other to the extent that the damaged party incurred costs in connection with a breached contract. For example, if the nonbreaching party contracts with another to purchase a product and pays advance or tooling costs, or incurs marketing and promotional costs, or undertakes other efforts requiring monetary or nonmonetary outlay, the court can award the buyer compensatory or restitution damages for these various costs.

In addition, the remedy of rescission can also involve out-of-pocket damages claims and recoveries. In all instances, the courts will see that the defendant makes whole the plaintiff for costs incurred as a direct result of the breached contract.

*(ii) Repair Costs* To return a defective product or do without the product or services due under the contract is not always feasible or practical, even where the deliverable provided represented a breach. Accordingly, the buyer that elects to repair or mitigate the deficiencies will incur costs associated with this effort. Costs incurred to remedy the breach can be the subject of a compensatory damages claim. These claims can include legal, technical, and financial cost elements. Repair cost

-------------- Page 135 --------------

Bloomberg Law® © 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

damages affirm the underlying transaction but compensate the aggrieved party for the cost of setting things right owing to the defendant's (or nonperforming party's) failures.

*(iii) Operating Losses and Expenses* A breach of contract can have serious deleterious effects on the nonbreaching party, including reduced operating performance, higher expenses, and loss of revenue. Even where a company has a history of operating losses, the breach can cause higher expenses or result in unabsorbed fixed expenses. The practitioner, however, must recognize that operating losses that would have been incurred regardless of the defendant's actions should be offset against potential lost profit damages in other periods. For example, if the plaintiff would have an operating profit in year 3, but operating losses in years 1 and 2, the plaintiff should add all three years together, assuming that the plaintiff would not have profits in year 3 without operating the business in years 1 and 2 also. Similarly, future expenses that the plaintiff avoids because of the breach represent cost savings that the analysis should discount to present values as an offset to potential damages. Careful analysis of expense patterns can identify inefficiencies that result from a breach, causing the plaintiff to experience higher levels of expense than normal; a compensatory damages claim should include these excess expenses.

*(iv) Lost Profits* Definitions for the various types of damages measures run for more than three full pages in *Black's Law Dictionary*, tenth edition, and many of them fall within the realm of compensatory damages (e.g., reliance, benefit of the bargain [BOB] damages, continuing damages, discretionary damages, expectation damages, hedonic damages, and liquidated damages). In breach of contract cases, however, the most commonly sought damages measure relates to lost profits. Lost profits represent the difference between the plaintiff's actual profits and the profits that the plaintiff would have realized but for the defendant's actions. A thorough discussion of this type of damages follows in Section 4.5 of this chapter.

*(v) Consequential Damages* In addition to the direct damages owed to the plaintiff, consequential (or special) damages can also occur. As connoted by the name, courts award consequential damages to compensate a plaintiff in a civil action for a harm that is not a direct result of an illegal act, but instead a consequence to that act. In a breach of contract case, the parties can reasonably foresee or contemplate consequential damages at the time they entered into the contract. [67]

- **Example 1.** Consider a builder of a hotel that completed construction on time but turned over the property with plumbing issues that the owner had to correct before opening. Direct damages equal repair costs to rectify the plumbing issues, while consequential damages equal the lost revenue less saved costs related to the delay in opening the hotel.
- **Example 2.** Suppose a buyer breaches a contract to purchase Product A, which is jointly produced with Product B, and the breach thereby causes the plaintiff to alter its production of both products. In this case, the breach could also cause consequential damages related to Product B.
- **Example 3.** Consequential damages can also arise when a breach affecting the sales of a complicated machine also affects the subsequent sales of replacement parts or maintenance service for the machine.

If damages awards purport to restore the plaintiff to the position it would have been in but for the defendant's actions, the damages claim must encompass every phase of the plaintiff's business affected by the defendant's actions. To ascertain whether consequential damages have occurred when the plaintiff has an integrated facility may require that the practitioner or other consultant conduct a market definition and market structure analysis not only for any primary product, but also for the joint products or co-products. The presence of joint products or co-products in the analysis will also have implications for mitigation. Minimizing the losses for one product and minimizing a division's losses can result in two different sets of actions.

*(vi) Liquidated Damages* In certain types of contracts, particularly in the construction industry, the parties sometimes agree to liquidated damages as a term of the contract. In these cases, the parties agree to the amount of compensatory damages associated with particular types of breaches (such as delays in performance) and make them a part of the contract itself. To be enforceable, however, the actual damages must be difficult or impracticable to measure and the liquidated damages amount must be reasonable. If the liquidated damages claim does not meet these standards, it is considered a penalty and is unenforceable.

*(vii) Return of Price* Sometimes restitution awards can include the return of the price (consideration) paid by the buyer. Some contracts, particularly in specialized manufacturing or research and development, require significant advance payments by the buyer in order for the seller to begin work under the contract. Assume that the seller fails to perform on the contract owing to the emergence of a more immediate and profitable opportunity with another customer. As a result, the buyer must procure the required goods or services through an alternative provider at a higher cost. This breach could result in a restitution damages award that would cover the return of the advance


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

payments made, as well as compensatory claims for the additional cost of the alternative contract. The restitution damages relate to the payments made under the contract for which the buyer received no value. The price could include costs of delivery, handling, freight, warehousing, fees, taxes, insurances, and any other costs associated with the purchase of the product.

*(viii) Disgorgement* Disgorgement requires the surrender of profits earned by the breaching party through illegal or unethical means. Courts can order wrongdoers to turn over such profits to the aggrieved party, with interest, to prevent unjust

--------------- Page 137 ---------------

enrichment. Disgorgement is analogous to the equitable remedies of specific performance and injunctive relief. [68] Courts can award disgorgement in addition to compensatory and other damages, but only to the extent that the disgorgement does not duplicate other damages measures. Disgorgement damages depend on the facts of the case, as well as the jurisdiction. For example, disgorgement is a frequent remedy in intellectual property cases because of the nature of the harm caused. Courts have recently awarded disgorgement in areas such as antitrust, where the defendant remitted disgorged profits to the U.S. Treasury. [69] Damages in copyright, trademark, and trade secret cases permit disgorgement of the infringer's profit to the extent that the lost profits calculation does not include this amount. (See Chapter 19.)

### (B) Comparing Benefit Of The Bargain (Expectation), Reliance, And Restitution Approaches

This section presents a hypothetical fact situation and the damages computations associated with the benefit of the bargain (BOB), reliance (RD), and remedy of restitution (RR) damages measures.

**Hypothetical facts:**

- Buyer purchased ePad Co. for $800 million and expected to earn a 12.5 percent annual return.
- Buyer expected to sell ePad Co. after five years for $1.5 billion.
- ePad's weighted average cost of capital (WACC) is 20 percent. As a result, the first year's cash flow will have a present value factor (PVF) of 0.83 (1/1.20). [70]
- Seller fraudulently induced buyer to enter into a deal by representing that no one else had ePad technology even though the seller secretly helped a friend introduce a competing product in year 2.
- Buyer achieved expected cash flows of $100 million in its first year of ownership.
- The new competing project came onto the market in the beginning of year 2. Buyer closed ePad Co. at the end of year 2 to mitigate ongoing losses, suffering $100 million of losses and costs of shutdown during year 2; the company was deemed worthless at that time.

Exhibit 4-5 represents the relevant cash flows from the ePad example.

--------------- Page 138 ---------------

| Year | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| | | | | | | |
|---|---|---|---|---|---|---|
| But-for Cash Flows (a) | $(800M) | + $100M | + $100M | + $100M | + $100M | $100 M + $1.5 B |
| PVF (b) | 1 | 0.83 | 0.69 | 0.58 | 0.48 | 0.4 |
| But-for NPV Cash Flows (a x b) = c | $(800M) | +$ 83M | +$ 69M | +$ 58M | +$ 48M | +$ 640M |
| Total But-for Cash Flow NPV (years 0 to 5) (d) | +$98M | | | | | |
| Actual Cash Flows (e) | $(800M) | + $100M | ($100M) | 0 | 0 | 0 |
| PVF (f) | 1 | 0.83 | 0.69 | 0.58 | 0.48 | 0.4 |
| NPV of Actual Cash Flows (e) x (f) = g | $(800M) | +$ 83M | ($ 69M) | 0 | 0 | 0 |
| Total Actual Cash Flow NPV (years 0 to 5) (h) | ($786M) | | | | | |
| Difference in Cash Flows (a – e) = (i) | 0 | 0 | +$200M | +$100M | +$100M | $100 M + $1.5 B |
| PVF (j) | | | 0.69 | 0.58 | 0.48 | 0.4 |
| NPV of Difference in Cash Flows (i) × (j) = (k) | | 0 | +$ 138M | +$ 58M | +$ 48M | +$ 640M |
| Total NPV of Damages (d) – (h) or sum of (k) | $884M | | | | | |
| PVF = Present value factor | | | | | | |
| NPV = Net present value | | | | | | |

Exhibit 4-5. Cash Flows

Calculations of damages:

- **Benefit-of-the-bargain damages (BOB or expectation damages):** Based on the assumptions and cash flows enumerated, BOB damages would provide the plaintiff with the return it expected from the deal had the seller's representations been true. Thus, the difference between but-for versus actual cash flows from the time of purchase (*t* = 0) to the time of expected sale (*t* = 5) provides the appropriate measure of BOB damages. As calculated in Exhibit 4-5, discounting future cash flows to *t* = 0 at the weighted average cost of capital of 20 percent equals BOB damages of $884 million.
- **Reliance damages (RD):** RD-based undiscounted damages, which compensate the plaintiff for losses from reliance on the contract, would consist of the $800 million initial investment, less the $100 million return in year 1, plus the $100 million loss in year 2. Applying the appropriate present value factors (PVFs) to adjust for the time value of the cash flows, RD-based damages would equal $786 million (= $800 - $83 + $69).
- **Remedy of restitution damages (RR):** For restitution damages, the practitioner must look at this situation from the viewpoint of the defendant and calculate its ill-gotten gains. Assuming the seller joined the competing company that benefited by this breach and they were codefendants, the damages would include the profits earned by the defendant using the competing technology.

  In calculating RR damages, due consideration of the buyer's plans to sell the company in year 5 may affect RR calculations. For example, if the buyer continued to operate the business beyond the fifth year, it may have difficulty establishing harm beyond the year that it planned to sell the business in any event and an appropriate terminal value would be required. In this case, RR damages would normally be substantially less than either RD or BOB damages, unless the defendant enjoyed various efficiencies in manufacture or distribution that the plaintiff did not possess.

When courts allow more than one method of computing damages, practitioners have many considerations that affect the choice among BOB, RD, and RR. One can decide based on case-specific, jurisdictional, and governing law factors. Other factors that lead to a particular choice relate to the difficulty of measurement, including the following situations:

- Negative NPV venture
- Complex estimations:
  - New business with no operating history
  - Business in volatile industry
  - Few guideline companies
  - Complex business model
- Potential changes in market conditions, such as Porter's Five Forces: [71]
  - 1. Increased bargaining power of buyers
  - 2. Increased bargaining power of suppliers
  - 3. Reduced barriers to entry
  - 4. Increased competition
  - 5. Increased threat of substitutes

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

As noted previously, practitioners should obtain from counsel the form(s) of damages that the law prescribes. They should then evaluate and build their analysis with an eye to which available measure best fits the facts of the case and captures all of the damages consistent with applicable law.

### (C) Punitive Damages

*Punitive* damages (also called *exemplary*, *vindictive*, *presumptive*, and *added* damages) are special damages awarded in addition to actual damages. They function to penalize the wrongdoer or deter others from engaging in similar wrongful acts. Courts often award them when the defendant exhibited malicious, deceitful, or particularly reckless or reprehensible conduct. Courts do not award punitive damages in breach of contract matters. [72]

The court decides on the amount of punitive damages pursuant to Supreme Court guidance. (Chapter 17 discusses the reasons for awarding punitive damages and the reasonableness of amounts awarded.) In some litigation, including willful patent

--------------- Page 140 ---------------

infringement or antitrust violations, the court can award treble damages under statute as a particular type of punitive damages. Judge Richard Posner suggests that one should consider the difficulty of concealment when awarding punitive damages. For example, if the probability of discovery of a tort equals 10 percent and the optimal damages award equals $60, the amount of punitive damages should equal $600 (= $60/0.10). [73] Where liquidated damages provided in a contract exceed the actual damages likely to be caused by a breach, the court has discretion to treat some of the damages as punitive damages.

### (D) Rescission Or Rectification (Or Reformation)

Certain equitable remedies under the law give rise to damages claims. *Rescission* of a contract means that the contract should be undone, the agreement unwound, and the parties returned to their pre-contract position. [74] *Rectification* (or *reformation*) of a contract involves modifying its terms to reflect what the parties intended to say or "should have said" to avoid an egregious inequity in the outcome. [75] Neither rescission nor rectification are themselves damages theories, but both commonly set the stage for damages claims. See "reformation" of the contract in Section 37A.3(d) of Chapter 37, Covenant Not to Compete.

Reasons for undoing or reforming the terms of a contract include (1) poorly drafted contracts and (2) fraud. First, sometimes the complexity of a transaction results in a poorly or inadequately written contract. That is, the drafted contract fails to reflect the bargain contemplated by the parties. Second, when one of the parties to a contract alleges fraud, that party often seeks rescission. For example, suppose false information in an insurance policy application induces an insurer to write a policy that it would not have issued under its underwriting standards had the policyholder provided all of the accurate facts. Thus, the policyholder induced the insurer to contract with the policyholder under false pretenses. When the insurer establishes this fact situation, the court often awards rescission of the insurance contract, relieving the insurer from any obligations under the contract. Parties to the case retain forensic accountants to help establish the facts or veracity of information in the contracting process, or to show financial harm to a party that relied on the fraudulent information used to induce agreement to the contract. This in turn can form the basis for a damages claim in addition to the equitable remedy of rescission.

### (E) Other Considerations

*(i) Anticipatory Breach* Anticipatory breach occurs when either the buyer or seller to a contract informs the other party that it will not perform its duties under the contract. Either the breaching party informs the nonbreaching party or the nonbreaching party assumes that a breach has occurred because of the behavior of


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

--------------- Page 141 ---------------

the breaching party. The nonbreaching party can sue when the anticipatory breach occurs; it does not need to wait until the time when the breaching party would have performed its duties under the contract. [76]

An anticipatory breach can result in an efficient result. Assume that Seller A and Buyer B have contracted for 1,000 widgets at 10 cents per widget (or $100). Seller A expects a profit of 2 cents per widget (or $20). Buyer B finds Seller C, who will sell it the widgets for 6 cents (or $60). Buyer B is better off with an anticipatory breach with Seller A and completing the contract with Seller C. Instead of paying Seller A $100, Buyer B pays Seller A its lost profits of $20 and pays Seller C $60 for the performance of the contract, for a total of $80. Buyer B is $20 better off because of its anticipatory breach. In our example we knew Seller A's lost profits beforehand. Because Seller A's lost profits must meet the reasonable certainty standard, complications can ensue where the contract in question is long-term and the market for the product in question is thin. [77]

*(ii) Effects of Competitive Markets* The competitiveness of the market involved in the litigation determines whether actual sales during the period of breach represented additional sales that would have occurred anyway or replaced the lost sales attributable to the breach. For example, with a perfectly competitive market for the plaintiff, the expert should assume that the plaintiff sells at the level justified by cost considerations and capacity. (Even plaintiffs who could sell more would not unless they were willing to use higher cost capacity or to invest in extra capacity, a consideration we ignore for now.) In other words, the seller can find all the customers it wants. Now a customer breaches the contract. In a perfectly competitive market, the expert should assume that the seller could find another customer to take the breaching buyer's amount. The only compensation owed the plaintiff would equal the difference in the two buyers' prices, if any such difference existed. [78]

On the other hand, assume that the market has long-term contracts and few buyers and the seller has extra capacity. Now one of the plaintiff's buyers breaches, and subsequently the plaintiff makes sales to a new buyer (or additional sales to a present buyer). Here one can argue that the new sales do not replace the breached amount and that the court should consider the full amount of the breached contract as lost sales. [79] Thus, experts who do not first analyze the plaintiff's market and capacity can find their conclusions vulnerable to attack on examination.

Suppose a buyer breaches the contract before, or shortly after, the seller has begun performance. Should the seller receive its expected lost profits (expectation damages, or BOB) or only the costs it incurred in reliance on the buyer's performance (reliance damages)? The answer depends on the situation. A contract formed in a competitive market with symmetrical information between the buyer and seller can call for expectation damages. Otherwise one may find that, although

--------------- Page 142 ---------------

expectation damages present a solution to the problem of inefficient breach (i.e., when the costs related to the breach exceed its benefits), reliance damages present a solution to inefficient purchase (i.e., when high-cost customers buy more than the efficient quantity and low-cost customers buy less than the efficient quantity). [80]

*(iii) Ex Ante versus* Ex Post As noted earlier, a damages award should restore the plaintiff to the position it would have been in but for the defendant's actions. But complications can occur when one considers the goal of deterrence and the passage of time. What if the plaintiff's economic damages are less than the defendant's ill-gotten gains? For example, suppose the defendant steals a $1 lottery ticket that has the possibility of paying out $20 million. One week later the holder of that lottery ticket wins and receives $20 million. Are the damages of the theft $1 (the value of the lottery ticket at the time of the theft) or $20 million (the value of the lottery ticket later in time)?

Bloomberg Law® © 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

*Ex ante* damages describe the compensation that the plaintiff should receive to place it in the position it would have been in before the defendant's actions. *Ex ante* damages use only information known or knowable before the date of the action in question and ignore what happens afterward. One computes damages as of the date of the act in question. *Ex ante* damages would equal $1 in the case of the lottery ticket. *Ex post* damages instead would use all available information and would measure damages as of the time of the analysis. *Ex post* damages would equal $20 million for the stolen lottery ticket. Chapter 5 discusses these issues in greater detail.

*(iv) Newly Established Business* An expert can experience difficulty in measuring the lost sales or revenues for a newly established or never-established business. [81] Courts now hold that such businesses can recover damages, provided they have been proved with "reasonable certainty." [82] As a result, the expert needs to ascertain the plaintiff's market structure. If the plaintiff's market contained many small firms or a few large ones, an expert should know where a firm of the plaintiff's expected size would fit along this spectrum. If the plaintiff would have been a small competitor in a market composed chiefly of large competitors, the plaintiff's expert has to prove that the plaintiff still could have competed in such a market. Experts also need to consider ease of entry and the stability of existing firms in the industry. If the plaintiff asserts that its firm would have had an advantage over other competitors because of a patent or other new process but for the defendant's actions, the expert must make some reasonable assumption regarding how long the benefits conferred by the patent or new process would last. [83] Regardless of the method used to estimate the plaintiff's lost sales, the expert should have some economic underpinning for the assumptions.

*(v) Damages for Fraud* The prevailing approaches for damages in fraud claims are BOB (expectation) and out-of-pocket damages. In these matters, the plaintiff can,

--------------- Page 143 ---------------

but need not, ask the court to proceed as though the plaintiff wishes to carry out the contract. That is, the plaintiff can ask the court to remedy the damage done by the fraudulent activities or, in the alternative, unwind the transaction and rescind the contract. If the court calculates damages based on the assumption that the plaintiff would carry out the contract, BOB damages provide the usual remedy; reliance damages apply in the rescission scenario. A minority of jurisdictions recognize other possible techniques for evaluating damages; practitioners should confirm the allowable techniques with counsel.

## 4.5 MODELING CONSIDERATIONS

This section identifies various modeling techniques used for damages claims. Many of the specific methods of calculating damages use these techniques. This section will note those that have limited application to certain types of cases; others have broadly accepted application across case types, jurisdictions, and court systems.

### (A) Use Of Averages And Indexes

The use of an average (or the mean) is a basic, but sometimes necessary, technique used in damages claims. Practitioners employ averages when they cannot obtain sufficient evidential matter that provides a more accurate or reliable mechanism for estimating a value. For example, average revenue growth over a historical period could offer the only reasonable means of estimating revenues during a but-for period where the resources needed to provide insight into market trends and the likely impacts of the adverse event are unavailable. Similarly, if useful data regarding cost trends are unavailable, practitioners can analyze averages across time, across an industry, or across operating units.

In some instances, such as litigation of insurance claims, convention employs the use of averages because experts who develop and adjust insurance claims often use unsophisticated or expedient estimation techniques in developing the underlying covered loss claim. Consequently, counsel and clients often do not want to develop another, more sophisticated damages model for use in litigation, absent

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

other driving factors. This mindset reflects cost consciousness on one hand: the likely difference that could result from more sophisticated techniques often does not justify the added cost and complexity of using them. On the other hand, this mindset could result in loss of a damages award when the opposing party can demonstrate a disconnect between the use of an average and the circumstances of the plaintiff claiming damages. Practitioners also use averages when analyzing stable, mature businesses with predictable growth patterns in revenue and cost.

The use of averages can often mislead the analysis (as further discussed in Section 4.5(g)), [84] especially when used as a benchmark in but-for comparisons. For example, suppose a practitioner draws a trendline average based on a large number

-------------- Page 144 --------------

of disparate data points and then attributes damages to a breach because sales fell below the trendline average. The opposing practitioner could easily refute this claim if most data points fell below the trendline but were offset by a few skewed data points that fell well above the trendline (see the Monte Carlo simulation discussion in Section 4.5(g)). [85] In such instances, the use of averages will present significant risk to validity of the practitioner's analysis.

Some analysts seek to mitigate this risk by using indexes and other broader-based averaging techniques that can provide further corroboration for the use of a company-specific average figure. For example, some practitioners compare a company's financial performance and share price to a stock market index, such as the Standard & Poor's (S&P) 500, to establish the relative effect of broader market variables for all market participants versus the subject company's results. But the practitioner needs to justify the use of these indices as an appropriate mechanism of comparison or they will be no more defensible than basic averages in proving damages.

### (B) Use Of Ranges

Some courts allow or prefer the presentation of damages as a range of results. Because damages claims often use but-for scenarios based on analysis of events that might have occurred but for an alleged wrong, they are inherently uncertain. Some courts find the presentation of a single damages figure objectionable when a certainty of knowledge of what would have occurred is usually impossible. In these cases, practitioners often modify key assumptions to generate a range of likely outcomes based on the probabilities of various assumptions coming to pass. This also allows practitioners some flexibility in explaining how they developed their damages conclusions. They should discuss with counsel the court's conventions and preferences when deciding whether to use ranges versus specific damages figures.

### (C) Lost Profits Versus Lost Business Value

Commercial disputes involve claims of lost income or lost business value, [86] or both. Sometimes the claims include loss of future earnings or lost goodwill. How do practitioners differentiate among these damages elements, and when should each be used? The courts have not provided consistency in distinguishing among these remedies. Some courts have ruled that they are redundant or overlapping; others have allowed claims and awarded damages under more than one of these theories. Federal and state laws provide different remedies depending on the substantive issues in the case and the types of claims brought by plaintiffs. This section will clarify the proper theoretical application of these measures, but practitioners should confirm with counsel the local court history and perspective on damages before deciding which method to use.

-------------- Page 145 --------------

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

As previously described, we define lost profits as the difference in profits between (1) what the plaintiff would have earned but for the defendant's actions and (2) the actual profits made by the plaintiff. In this context, lost profits usually refer to lost cash flows but the practitioner must match the measure to the damage suffered. Lost business value addresses the negative impact of the impaired earnings (cash flows) on the overall

-------------- Page 146 --------------

value of the business. The period over which the practitioner measures the lost profits, as well as the portion of the plaintiff's business affected by the defendant's actions, can result in different computations for lost profits and lost business value. However, if the defendant's actions caused the plaintiff to lose 100 percent of its cash flows, then the damages from the lost profits analysis, the lost cash flow analysis, and the lost business value should equal each other, *ceteris paribus* (all else being equal).

Practitioners usually derive revenues for a lost profits analysis using one of four approaches:

1. **Before-and-after approach.** Comparing the performance of the company before and after the alleged harmful acts.
2. **Forecast approach.** Using sales forecasts of expected performance for the business or industry to evaluate the probable effect of the harmful acts.
3. **Yardstick approach.** Comparing the harmed business to comparable but unharmed businesses or locations to assess but-for results.
4. **Market share approach.** Comparing the plaintiff's market share during the period prior to the harm to that of the firm afterward.

From these revenues, the practitioner subtracts the appropriate amount of costs. Several of the remaining sections of this chapter as well as Chapters 8 and 9 of this handbook discuss cost estimation.

Similarly, practitioners usually measure business value by comparing the before-and-after values of the business using one of three approaches:

1. **Discounted cash flow approach**—measures the present value of future earnings that the owners of the business would receive.
2. **Market approach**—evaluates what informed capital market investors would pay for shares in the company (generally, the market capitalization for publicly traded companies).
3. **Comparable company transaction approach**—refers to transactions involving the purchase or sale of comparable companies within a reasonably recent period of time.

The terms *loss of future earnings* and *lost goodwill* refer to the same measure of damages as loss of business value because the various valuation approaches account for the effect of the defendant's actions on the cash flows and thus the value of the business. A loss of goodwill will lead to reduced cash flows, which factor into the valuation.

*Lost profits* and *lost business value* can be redundant terms because the business value equals the discounted value of the stream of anticipated future earnings. However, the practitioner must ensure that a damages analysis does not inadvertently make duplicate claims: the law does not allow for double recovery of damages. For example, lost profits and lost business value should not cover the same time periods.

Lost business value measures of damages are the appropriate measure when the defendant's injurious acts have destroyed a business. Lost profits measures are appropriate when the defendant's actions have negatively affected, but not destroyed, a business or when damages occur over a finite period. For example, the breach of a five-year supply contract after the first year would define the damages period for lost profits analysis as the ensuing four years. This may in turn result in subsequent consequential damages, but they are not a

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

part of the contractual lost profits analysis. Some cases involve a period of impairment followed by a complete cessation of the business. Damages analysis for these cases can include both lost profits and lost business value elements, with the date of business demise serving as the dividing line. Note that claims for so-called diminution of the value of a business are lost profit claims—lost business value claims apply only to the destruction of a business. The practitioner must avoid overlap of these periods in the calculations to avoid duplicate claims.

### (D) Time Considerations

Time is a critical component of damages calculations: inception and duration of the damages influence both underlying data and risk factors that affect cash flows and discount rates. Damages have no universally accepted valuation date. Accountants and economists often disagree whether to measure damages at the date of violation, the date the violation ceased, the date of trial, the date of recovery, or some other date. [87] We show the effects of these differences next.

Assume that the date of contract breach is January 2, 2010, the date of trial is May 15, 2012, and the date of the final judgment is April 20, 2013. Also assume that the damages measurement involves five years of cash flows (2010-2014).

- **Damages calculations as of the date of violation.** The practitioner should discount the five years of net cash flows (2010-2014) to January 2, 2010. Then the practitioner should bring the damages amount forward using a prejudgment interest rate to the time of trial (May 15, 2012). [88]
- **Damages calculations as of the time of trial.** Lost profits calculations performed as of the date of trial will not require prejudgment interest. The practitioner should bring the cash flows for periods prior to trial (January 2, 2010, through May 15, 2012) forward to the time of trial and the cash flows for period post-trial (May 16, 2012, through 2014) backward to the time of trial.
- **Damages calculations as of the final judgment or recovery.** Where a great deal of time passes between trial and the issuance of the final verdict, some courts permit the parties to recalculate the final judgment as of the date that the court rendered that judgment—that is, the amount calculated at trial increased to reflect that the plaintiff did not have use of the recovery between the time of trial and the time the court rendered its final judgment.

The risk factors relevant to different measurement dates will also bear on the valuation of both lost profits and lost business value measures. The practitioner can account for differing risk factors (such as market changes and economic conditions) either through adjustments to the anticipated cash flow streams or through adjustments to the discount rate, but not both. [89] The practitioner should avoid adjustments to both cash flows and discount rates to prevent redundant consideration (double counting) of a risk factor.

### (E) Causation

Courts often find that damages analyses do not adequately address the issue of causation. Many times, counsel instructs the practitioner to rely on the analysis and opinions of others. This instruction can put the practitioner, and the case at large, on thin ice. A damages analysis that does not clarify the proximate cause link between the defendant's acts and the plaintiff's damages will fail court scrutiny. The court will often label the damages estimates as speculative, and in such cases would likely bar the damages measurement from evidence. The damages claim must consider all other material factors that could have affected the plaintiff's financial results, and must develop sufficient evidential support for the nexus between the claimed damages and the defendant's wrongdoings.

Practitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the causal link and measure the negative impact on profits. Sections 4.5(f) through (j) discuss important analyses used in developing damages claims that appropriately consider these factors.

### (F) Regression Analysis With Confidence Interval

Regression analysis applies a statistical technique to develop an equation depicting the relation among variables and then uses that equation for prediction. [90] For example, an expert who needs to predict the sales that a firm would have made but for the defendant's actions could use a regression analysis that models the relation between the firm's sales and other relevant factors (e.g., total industry sales) over a


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

--------------- Page 148 ---------------

control period preceding the defendant's actions to predict but-for sales in the absence of those actions. Similarly, an expert who needs to estimate how a share would have performed but for some event can predict this by performing a regression analysis. This regression analysis might relate an investment in the firm's shares to an investment of the same size in a portfolio of shares in the same industry or in the market.

The regression analysis also provides other relevant information such as the statistical significance of the relation among the variables, the degree of explanation afforded by the equation, and the ability to construct confidence intervals around the estimate. Hence, the technique not only provides predictions but also explicitly describes the strength or stability of the predictions.

Assume that an expert has constructed an equation that models the sales of Firm A as a function of total industry sales. Now the expert would like to know whether the sales of Firm A relate to the total industry sales—that is, whether this variable helps explain the movement of the firm's sales. The *t*-statistic generated by the regression analysis will help the expert assess whether the variable has significant explanatory power. The expert can also check the coefficient of determination (often called the *R*-squared) to measure the amount of the change in the firm's sales explained by the total industry sales.

Although regression analysis produces an unbiased estimate, certain data relations can occur that obscure or overemphasize the estimates. See Chapters 8 and 9 for more discussion on regression analysis.

### (G) Monte Carlo Simulation

Assume that the two parties in litigation need to value a mine. Both sides agree that the mining operation can recover one million tons of the mineral and that the incremental cost of mining the material equals $10 per ton. Both sides also agree that the mineral has an uncertain future price, ranging between $4 and $20 per ton, with an average of $12 (that is, the mean of the two extremes). The defense argues that the court should base the value of the mine on the average price of $12, leading to a valuation of $2 million [= 1,000,000 × ($12 - $10)]. However, the average value of the property exceeds this because if the mineral price drops below $10, the mine has the option to shut down, limiting costs when the low price precludes extraction. In other words, if the price drops to $8, the mine would not operate at a loss (-$2 = $8 - $10), but would cease operating until the price rose above $10. On the other hand, if the price rises, no such limitation exists on the upside. At any price above $10, the mine would operate. This example illustrates the principle that evaluating formulas using average values of uncertain inputs does not result in the average value of the formula. Mathematicians refer to this result as Jensen's inequality; Sam Savage also pioneered much of the work in this

--------------- Page 149 ---------------

field. [91]

Monte Carlo simulation is a well-accepted valuation technique that avoids this *flaw of averages* (a term coined by Sam Savage). The mathematician Stanislaw Ulam developed the Monte Carlo approach while working on the Manhattan Project. As the name implies, the approach resembles testing a gambling strategy by repeating thousands of rolls of dice and recording the results. Suppose that a damages calculation depends on several uncertain variables—an interest rate that ranges between 2 percent and 28 percent, a price that ranges between $10 and $40, and a cost that ranges between $1 and $12—but each uncertain variable has its own pattern of probabilities. That is, certain interest rates will more likely occur than others, and the pattern of probabilities for interest rates differs from the patterns for

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

prices and costs. A Monte Carlo simulation can easily calculate multiple scenarios of a model by repeatedly sampling values from the probability distributions for each of the uncertain variables. The simulations can consist of as many trials (or scenarios) as the expert wants—hundreds, or even millions. During a single trial, the model randomly selects a value from the defined possibilities (the range and shape of the distribution) for each uncertain variable and then recalculates the value. The average of these outcomes would equal expected damages. The method offers, as a side benefit, measures of dispersion of the average estimate. [92]

### (H) Discounting

Many empirical studies on discounting require consideration of capital market risk. [93] For example, in a present value analysis, the practitioner discounts cash flows to a specific date, and the discount factor the practitioner uses should reflect in some cases the market and industry effects of each period. Experts can estimate the appropriate discount rate.

Practitioners often use the capital asset pricing model (CAPM) to estimate the appropriate discount rate (see Chapter 10). CAPM defines the return of a firm as the risk-free rate of return (usually measured by the return on short-term U.S. Treasury bills) plus the difference between the return on the market and the risk-free rate of return (otherwise known as the risk premium) times the firm's beta (the measure of the firm's market risk). [94] A practitioner using the CAPM could develop a discount factor for the present value analysis that would incorporate not only the effects of cash flows occurring in different time periods but also the return that the market and the specific firm experienced. Hence, an expert could more precisely measure what an expected cash flow occurring in Period 6 would equal in Period 0.

Practitioners must also deal with the effect of leverage (or debt). The presence of debt that a company must pay before the shareholders receive any return makes the shareholders' investment riskier. The discount factor for a firm's assets will

-------------- Page 150 --------------

therefore differ from the discount factor for the firm's equity by the amount of risk represented by debt. [95] If the practitioner measures lost cash flows after deducting interest, the practitioner should use the firm's equity beta in developing the correct discount rate. In contrast, if the practitioner measures lost cash flows before deducting interest, the practitioner should use the firm's asset beta in developing the correct discount rate (or use the firm's weighted average cost of capital).

### (I) Prejudgment Interest

A practitioner who has used a discounted cash flow analysis to evaluate the plaintiff's lost profits will need an interest rate to bring those cash flows forward to the time of the trial from the base point of the analysis—and if enough time passes between the trial and recovery, to the time of the final judgment. (This assumes that the jurisdiction or particular cause of action permits prejudgment interest—see Chapter 16.) At the very least, this interest rate should reflect the value that the plaintiff's funds have lost owing to inflation. This measure, however, will not compensate the plaintiff for the opportunity costs of the use of its funds. [96]

Some experts suggest using the defendant's debt rate [97] while others invoking a similar theory prefer the risk-free rate [98] to measure prejudgment interest. Others suggest using the plaintiff's cost of capital—that is, a measure of the opportunity cost to the plaintiff (of course, at this point the defendant can argue that by doing so the plaintiff seeks consequential damages). The defendant's borrowing rate offers another measure because it regards the plaintiff's claim as an investment (albeit an involuntary one) in the defendant. [99]

Because confusion still abounds in the courts as to the meaning and proper application of lost profits, lost business value, appropriate valuation dates, discount rates, and risk factors, practitioners should address these issues early in the process through discussion with counsel to ensure proper consideration of jurisdictional nuances and accepted approaches for the type of matter at issue.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

### (J) Damages For Different Types Of Cases

Certain types of cases have developed a body of case law and have established precedents for methods of calculating damages that nearly all practitioners use and nearly all courts recognize as the most appropriate means of measuring damages. Examples include royalty rate calculations in patent matters, market share analyses in antitrust matters, trendline analysis in business interruption insurance cases, and event studies in securities cases. The courts broadly (or even universally) apply some of these precedents; other precedents are jurisdictional or even specific to a judge. We advise discussion with counsel to discern or confirm these differences.

We also note that while some damages methods have academic support (for

-------------- Page 151 --------------

example, see Chapter 27 for a discussion of the use of event studies in securities cases), other damages measurement methods do not. Damages measurement methods lacking an economic basis or support within the academic community carry additional risk. In *Uniloc USA Inc. v. Microsoft*, [100] the Federal Circuit unanimously struck down the use of the 25 percent rule in patent damages cases (see discussion in Section 20.6(m) of Chapter 20). Although the court noted that this measurement method had general acceptance, the court also stated that this measure of damages was unrelated to the facts in the case and was inadmissible under the *Daubert* guidelines.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## 4.6 DEVELOPING AN EFFECTIVE DAMAGES CLAIM

Experts have no prescribed or universally accepted model for developing a damages claim, but those with experience employ methods that will improve the efficiency and effectiveness of the process and the results.

### (A) Learn The Background

Experts should first understand the facts of the case and the liability issues related to causation of the alleged damages. They should review the relevant pleadings in the case that address damages (including the complaint and answer) and discovery-related documents such as interrogatories, depositions, and requests for admissions. Counsel often amends complaints and answers, so experts should review the most current pleadings. In addition, they should discuss the case background and liability assumptions with counsel to confirm the basis giving rise to the claim. For some matters, the expert will find media coverage in either mainstream or industry-specific sources. A search of the Internet can also yield useful background information for some matters.

With the participation of counsel, the expert can obtain relevant background factual information from representatives of the company for whom the expert performs the analysis. However, one should scrutinize with professional skepticism any information obtained from a party to the litigation to avoid accepting potential bias in that information. Industry research and company-specific research often yield a wealth of information that provides insight into the substantive issues of the case; this can also prove useful when the expert develops assumptions for the damages analysis. The benefits of learning the case background extend beyond the obvious need to understand the firm’s operations and the effect thereon of the events in question; they also help the expert identify other potential factors that affected the operations and incorporate them in the analysis.

### (B) Understand Causation And Its Effect

The harmful acts identified in the complaint will likely provide a framework to

--------------- Page 152 ---------------

begin understanding causation and effects of the harm. However, most complaints and pleadings lack substantive proofs of cause and effect; these are the requirements of trial and often the province of the expert to prove. The expert should use the knowledge gained in learning the background of the case to begin associating the

--------------- Page 153 ---------------

defendant’s injurious acts with the plaintiff’s damages. Other experts in the case (economists, industry experts, engineering and other technical experts, and medical professionals) often establish causation. Nevertheless, the expert should not blindly accept the conclusions of others without exercising due professional skepticism in applying these conclusions to the facts of the case and observed effects on the business. This becomes less complex when experts can establish causation through their own work, but is nearly always a necessary step. Triers of fact will look for a nexus between the actions of the defendant and the damages to the plaintiff and will expect experts to

 © 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

establish that connection based on their own work or through that of other experts. Practitioners can accomplish this through a combination of applying logic to the facts, using targeted analytics, and rebutting other possible explanations. Knowledge of company practices, industry conventions, technical methods, competitive behavior, accounting requirements, and economic principles are all important in analyzing potential effects and building the foundation for causation arguments.

### (C) Identify The Damages Theory

As discussed throughout the chapter, many facets of damages analysis depend on the applicable law of specific jurisdictions or the circumstances of each case. Accordingly, we iterate that experts should work with counsel to ensure that the damages categories in the model comport with those pled and with the law from both a liability and a quantum perspective. For example, the expert should discuss and understand whether the plaintiff is seeking rescission of the contract, or affirmation of the contract with correction of the breach, or recovery of costs, or some other remedy. Ascertaining the objectives of the legal action will shed light on the available remedies and in turn the damages theories that can underpin a damages claim. Sometimes the plaintiff seeks a combination of equitable remedies and other legal remedies, such as damages. The plaintiff could have suffered losses for which it seeks compensation or could have lost opportunities for which it seeks restitution. Some cases have claims for both, which may be recovered so long as there is no duplication of the losses. Understanding the damages theory will allow the expert to identify appropriate models for an informed discussion with counsel.

### (D) Select The Damages Model

Several factors affect the selection of an appropriate damages model:

- An understanding of the background of the case;
- Knowledge of the causation of damages and the effect on the company of the defendant's injurious actions;
- Verification of acceptable damages theories for the jurisdiction and matter at hand;
- Practices accepted by professional peers and academics;
- Consistency with the damages suffered; and
- Avoidance of redundancy (if using multiple models).

For example, a royalty rate model is both commonly accepted and well suited to assessing patent infringement damages because it applies an appropriate valuation of the patented technology to the effect of lost sales usurped by the infringing party. Once experts identify the appropriate model and confirm its use with counsel, they should begin to build the damages claim.

### (E) Build The Damages Model—Lost Profits Scenario

A discussion of all the various methods of preparing damages claims could fill an entire book. Other chapters in this book provide guidance on particular types of litigation and the claims that naturally ensue in those matters. Thus, we limit this discussion to the development of a lost profits claim, although most of the steps identified (if not the specific procedures described) pertain to most damages analyses. Our scenario presents the steps from the viewpoint of the plaintiff, but the same activities occur regardless of which side of the litigation the expert represents. One develops knowledge about important factors and considerations—for example, background facts, contract terms, causation, damages theory (including recovery objectives), and ramifications of the breach—before building the damages model, which concerns the quantum of loss claimed.

*(i) Identify the Damage Period* While the attorneys will likely have already identified the key dates relevant to the damage period, the length of this period has important implications for revenue and cost measurements; the expert should critically review the attorney's assumptions. For example, over a long-enough period, almost all costs vary, and over a short-enough period, almost all costs remain fixed. With a shorter period, experts will subtract fewer indirect cost items from the lost sales revenues to estimate lost profits. In any event, experts who ignore this issue can arrive at the wrong answer even though they have correctly made all the other assumptions in the analysis. At a minimum, the expert must ascertain whether the lost profits apply only to the period of the contract term or have ramifications beyond the contract that the expert will express as an ongoing detrimental impact to the business. Identifying this period will define one of the most important parameters of the damages claim.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

*(ii) Identify Assumptions and Estimates Needed for the Particular Case* Experts who calculate lost profits damages must understand how to create a but-for world

--------------- Page 154 ---------------

because such claims require assessing what would have happened to a business had the defendant's injurious acts not occurred. When experts need to make conjectures, they develop and rely on supportable assumptions and estimates that must hold up under the counterparty's scrutiny. Thus, experts should identify the elements of a damages analysis as:

- Undisputed facts, or
- Estimates (and the estimation process), or
- Assumptions (and the support for those assumptions).

An overabundance of estimates and assumptions can lead to a damages claim that experts will find difficult to defend.

Experts frequently ground undisputed facts in lost profits claims in either the contract terms or certain verifiable key metrics (for example, actual sales volumes, revenues, and fixed-cost items). They obtain this information through data that are readily available or subject to independent confirmation. Experts sometimes need to make estimates concerning many key financial components of the model (for example, levels of sales returns, bad debts, purchase volumes and discounts available, and ramp-up rates on new product introductions). They base these on analyses of historical results achieved, regression analysis of relevant variables, or other analytical procedures. Assumptions usually involve broader parameters of the but-for world (e.g., inflation rates, price and demand elasticity, relevant market size and share, and interest rate trends). Some experts do not recognize any practical distinction between estimates and assumptions and use the term *assumptions* in referring to all subjective factors in the analysis.

*(iii) Build the Foundation for the Damages Claim* The process of building the foundation for the damages claim is partly defensive and partly practical, but is always necessary. Without sufficient foundation, the expert cannot establish the defendant's injurious acts as the proximate cause of the claimed losses; this omission can render the damages claim speculative and inadmissible. Even assuming another expert established causation, an inadequately researched, documented, and supported claim can fail to meet professional standards, survive a *Daubert* challenge, [101] or prevail against the counterparty's arguments. A proper foundation will include supporting documentation, corroborative evidence, use of methods accepted by professional peers, and conformance to the law and precedent in the jurisdiction.

Experts must address many considerations in a lost profits analysis. Some of them are conducive to analysis using sophisticated modeling, including regression analysis and game theory. [102] However, adequate or reliable data are not always available for these models. Nevertheless, experts would be remiss in not adequately considering the factors described next, even if they cannot employ preferred

--------------- Page 155 ---------------

modeling techniques.

- **Company knowledge.** Experts gather significant information for the lost profits model during earlier activities in the process of evaluating the damages claim. In this step, they synthesize this diversity of knowledge and organize it to help develop and support the lost profits analysis. The expert should understand the company's operations, markets, and management practices; these factors help explain the negative impact on the company's profits. They also help the expert account for other factors that could play a role in the company's financial performance and explain the nature and duration of any negative effects caused by factors other than the breach. Hence, the expert gathers this body of knowledge for application to the damages claim model.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

- **Pre-breach budgets and forecasts.** Experts can review pre-breach budgets and forecasts to help them understand the company's expectations before the defendant's injurious acts occurred. These documents can provide a wealth of corroborative information about management's expectations concerning the operations of the business, its revenue plans, cost structure, and investment plans. Most lost profits models will employ more sophisticated analyses to establish lost revenues and cost ramifications of a breach. (Section 4.5(f) and Chapters 8 and 9 include discussions on regression analysis that we will not repeat here.)

  Certain matters involve loss models that derive from the underlying contract, such as business interruption insurance claims. In these cases, experts may use pre-breach budgets or forecasts as a basis for estimating but-for revenues and costs. To test and gain comfort on the forecasting accuracy previously achieved, an analyst could use a pre-loss budget as the basis for cost estimates by performing regression analysis of historical budgeted costs and actual results for the corresponding period. Aside from these relatively limited applications, budgets and forecasts are largely beneficial only as corroborating evidence; the expert will need to explain where they differ significantly from modeled lost profits.

- **Analysis of historical performance.** Most experts consider the historical financial performance of the subject company in validating estimates of but-for performance, regardless of the method used to develop that but-for estimate. Failure to do so will expose experts to criticism if their pro forma estimates materially diverge from actual past performance unless, of course, the parties intended the breached contract to have a material beneficial impact on that performance and the damages estimate reflects this gap. For example, suppose that the plaintiff sold 26,000 widgets per year for the two years preceding the damages period but the but-for analysis assumes that the plaintiff sells 25 percent more. The plaintiff's expert should explain why a 25 percent increase in sales was a reasonable assumption in the but-for world. The analysis of historical performance should include a comparison to other comparable market participants and to the industry at large. Trends in historical performance can also be corroborative or identify other factors that the expert must address in showing causal links. In short, an expert will find it perilous to prepare a damages claim in a vacuum, isolating the claimed losses from what the company accomplished in the past.
- **Industry research/guideline company analysis.** Another foundation of a damages claim is an analysis of the relative performance of guideline companies or industry averages. This approach is particularly useful for new entities lacking historical track records, but experts broadly use this approach to establish corroborating evidence, to challenge assumptions and estimates, or to establish the reasonableness of loss estimates for the subject company. While no specific requirements exist for guideline company selection, valuation literature contains widely accepted practices. [103] Such guidance helps to ensure that the analysis includes appropriate companies and excludes inappropriate companies. For example, if the subject company's labor costs as a percentage of revenue were 10 percent higher than its competitors for each of the past five years and the company reasonably expected this relationship to continue, then the expert could estimate costs for the subject company by using the guideline company's actual results plus 10 percent. Such an approach could remove the macroeconomic factors affecting performance (assuming these factors would affect the guideline companies in a similar manner) by isolating relative performance of the subject company.
- **General economic conditions.** Any approach used to estimate but-for profits should account for the general market and economic conditions that could affect future results in the absence of other intervening factors. Such conditions are as diverse as changes in the core economic indicators (e.g., housing starts for a real estate company damages claim), financial health of suppliers and buyers, substitute or complementary product introductions, pricing trends, inflation, legal and regulatory issues, and globalization of markets. In addition, the expert should consider ongoing or anticipated trends in these conditions or factors that will alter the prospects of the subject company or business.
- **Changes in competitive landscape.** Other effects fall closer to home than broad economic indicators. For example, in markets with high barriers to entry for new competition, a breach of contract may eliminate a competitive advantage and allow new entrants to enter an otherwise exclusive or restricted market, permanently impairing the profits of the victim of the breach. Outside influences can also alter the competitive landscape. Consider the effect of a hurricane on a broad geographic area. A breach of a supply contract suffered by a roofing contractor, absent the hurricane, could have a seriously detrimental effect on that contractor's profits. Assume the intervening hurricane damaged the property of the contractor and all local competitors, enabling out-of-state contractors to enter the market and win market share. Given these circumstances, a lost profits claim that relates all of the detrimental impact on this contractor to the contract breach is likely fatally flawed.
- **Potential company-specific factors.** Additional company-specific factors can affect the performance of the company, and the expert should consider them in developing the lost profits analysis and, in some cases, establishing proximate cause of the plaintiff's damages. These factors that are often specific to the individual subject company include the following:
  - **Impairment of goodwill.** Plaintiffs sometimes assert lost profits claims based on impairment of goodwill. These claims usually stem from actions that damage the reputation of the business (for example, the effects of counterfeit goods). This damage to reputation can result in reduced revenues and profits. Establishing that the damage to the reputation (1) was caused by the counterfeit goods, (2) resulted in lost sales and profits, and (3) was the only cause of the lost sales and profits can present a number of challenges to the expert. The expert must avoid separate claims in this regard—for example, claiming both lost profits and lost value of the intangible (goodwill) asset—as this reputation damage should manifest in lost profits and be recovered on that basis. In any event, supporting these claims can be challenging and will require ample documentation and a well-constructed analysis to prevail.
  - **Management changes.** Experts should also consider the possible effects of normal changes in management as well as those that may have resulted from the acts of others. The expert should have gathered enough information about the company to


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

establish critical management positions, personnel, and responsibilities that affect operating performance. For example, if the chief scientist on a key new product in development left the company, damages claims are appropriate if he was improperly recruited away by a competitor developing a similar product, but would not usually be expected if he went to teach in academia.

- **Other market issues.** A number of other market factors will bear on the performance of a specific company. These include the following:
  - Changes related to buyers and suppliers;
  - Changes in business lines and the market conditions that affect them;
  - The introduction of new products by the subject company and its competitors; and
  - The legal and regulatory environment in which the company operates.

Accounting for all other factors that can reduce profits for a company would be overwhelming. Few cases require such rigor. Experts can simplify the process by looking for the factors that *materially* affect business performance and focusing on those material factors where changes occurred or are anticipated. An expert who fails to explore key factors affecting company performance will be ill-equipped to assure the court that the defendant's actions have caused the damages suffered, thus weakening the causation argument and the damages case.

We next present a detailed analysis of constructing the revenues the plaintiff should have received but for the actions of the defendant, and the costs that an expert should apply to those revenues.

*(iv) Revenue Analysis* In a lost profits study, the expert must first compute the amount of lost revenues or sales units that the defendant's actions have caused. Experts use four common approaches to measure this amount:

1. **Before and after.** This approach compares the plaintiff's sales level before the defendant's wrongdoing with the plaintiff's sales level after the defendant's wrongdoing; the difference between the two levels represents the lost sales. This approach assumes that only the defendant's wrongdoing affected the plaintiff's business volume. It can underestimate lost sales for a plaintiff whose sales were increasing prior to the defendant's actions and overestimate lost sales if a plaintiff's business was in decline prior to the defendant's actions. To use such an approach effectively, experts often include a market analysis in the lost profits study. For example, if the target company's market is mature and stable during the period under question, the plaintiff's sales level probably would have remained unchanged but for the defendant's actions.
2. **Statistical forecast.** The expert forecasts but-for sales by using a variety of tools such as regression (or other statistical) analysis and then subtracting the actual sales to estimate the lost sales. With this approach, the expert's model (or equation) must adequately predict the sales and use a control period (over which the equation is estimated) that does not contain events that would bias the results; also, the regression equation must not contain biases such as heteroscedasticity, autocorrelation, or other similar factors (see Chapters 8 and 9). The model should also consider all important industry factors that affect the sales of the plaintiff's products. For example, the price of oil can affect the sale of products used in the construction of oil rigs. The omission of a significant factor can invalidate the expert's results or make these results seem less credible to a judge and jury. The expert should ensure that the damages study considers all relevant factors and that the model includes the significant ones. [104]
3. **Yardstick.** The expert identifies an index of firms similar to the plaintiff's firm and compares the plaintiff's performance with the index's performance. This approach assumes that, but for the defendant's actions, the plaintiff would have performed the same, relative to the index, as it had in the past. Underlying biases in the data, however, can invalidate this index approach. A plaintiff firm that is smaller or larger relative to the index firms can lead to inaccurate results. For example, if a large plaintiff firm lost market share because of the defendant's wrongful conduct, small firms that acquired those shares could appear to be growing even if the market size remained constant.
4. **Market share.** Experts consider the plaintiff's market share during the period prior to the defendant's wrongdoing. In addition to defining the relevant market, the expert must also ensure that the market remained somewhat stable during the relevant time period. Numerous entrances or exits of competitors could undermine the use of this measure. Also, the analysis should examine the trend of the plaintiff's market share, because if the plaintiff's market share varied greatly over the period before the defendant's actions, this measure can yield unreliable results.

*(v) Cost Analysis* After estimating the amount of lost sales, the expert must subtract the costs the firm would have incurred to achieve these revenues. Such an analysis will consider many different cost measures, depending on the nature of the harm: [105]

- *Marginal cost* is the cost of producing one additional unit.
- *Incremental cost* refers to the cost of an unspecified number of additional units or of a new product line.
- *Average cost* equals the total cost divided by the number of units produced.
- *Variable costs* change as the activity (or production) level changes.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

- *Direct costs* are the costs of the direct material and direct labor incurred in producing a product.

The expert must decide which cost measure pertains to the particular case. For example, a variable cost estimate will apply only over a certain range of production (called the relevant range). If the estimated lost sales units would increase the production level outside the relevant range, then the use of the variable cost estimate can be incorrect.

The relevant cost measure can vary, of course, depending on whether the business is expanding or contracting. If the business is expanding and the amount of lost sales units would take production beyond the plaintiff firm's present capacity, the expert should consider including the capital costs of investment in new capacity or new equipment as a cost in the lost profits analysis. The expert using incremental costs should include such costs and should also make reasonable assumptions concerning the timing of the investments.

-------------- Page 160 --------------

An expert estimating costs for a firm that would have sold more units but for the defendant's actions should consider the possibility of economies (or diseconomies) of scale. [106] If the model projects a large number of lost units, the plaintiff could achieve large cost savings at that production level. A study using only current costs could underestimate the plaintiff's damages. Similarly, learning curve effects would lead to a higher cost structure in a start-up firm than in a firm in business for some time. Finally, although average variable cost analysis can be appropriate for a firm already in the market, it can be inappropriate for a new entrant that will have to engage in promotional pricing to gain customer loyalty, a capital asset that a longtime competitor already possesses.

Even when the expert has decided on the relevant cost measure, important aspects of the analysis remain. For example, if claims relate to a single division (or product) of a multidivision (multiproduct) firm, the expert needs to consider joint costs. [107] The time frame over which the expert analyzes the firm's costs as fixed or variable becomes important: the shorter the period, the fewer the variable costs. The expert should consider whether to analyze costs that vary as production rises and falls within some output range or whether to measure costs that vary as production falls to zero (going-concern versus shutdown analysis). For a firm that has large costs associated with producing one unit that do not increase with the production level (zero-one costs), the level over which one measures costs as variable could determine the outcome of the case. [108]

*(vi) Subtract Actual Results from the But-For Amount to Ascertain Lost Profits Damages* This step is basic arithmetic and does not require much discussion. Exhibit 4-5 illustrates the basic format for calculating the amount of damages from the but-for and actual balances. The expert only needs to match up but-for and actual cash flows so the expert can properly adjust for the time value of money.

*(vii) Adjustment for Time Value of Money* As noted in Section 4.5(d), courts differ on the dates for evaluating a lost profits analysis. Regardless of whether a court decides that the appropriate date is the date of the breach, the date of the trial, or some other date, the expert must value the lost profits occurring in multiple periods to a single period. That is, the expert must adjust lost profits for the time value of money.

Experts use a variety of discount rates (see Section 4.5(h)), but they use these discount rates to express the lost profits occurring in multiple years as if they occurred in a single year. For example, proper discounting allows the expert to appropriately offset the negative cash flows required in some years with positive cash flows that result in others because of those investments. Recall that lost profits are usually expressed as lost cash flows in this analysis. Sometimes the facts warrant an expert using profit measures instead of cash flows. Regardless of what measure the expert uses, the discount rate must correspond to the cash flow being

-------------- Page 161 --------------



© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

discounted.

Although the cash flows at issue can occur during the course of a year, most experts do not conduct a monthly or daily discounted lost profits analysis. Instead they present an annual amount and discount that amount based on a midyear convention. With a midyear convention, the expert assumes that the annual cash flow occurs on June 30. Assume that the expert wants to discount all cash flows to December 31, 2008. Using the midyear convention, the January 15, 2009, cash flow would be discounted too much whereas the December 15, 2009, cash flow would be discounted too little. On average, the cash flows would be discounted the proper amount. The expert, however, should check to ensure that no factors exist that would cause the midyear convention to bias the results.

If experts discount the lost profits to a date that is not the trial date, they should adjust the net discounted lost profits result to the date of the trial using prejudgment interest. Many states have statutes governing the rate to use for prejudgment interest. Chapter 16 examines the principles and mechanics of prejudgment interest.

*(viii) Tax Considerations* In many litigation analyses, the expert must consider the effects of income taxes. This includes the average tax rate, the marginal tax rate, the effective tax rate, or even the marginal effective tax rate. [109] For example, a firm's weighted average cost of capital calculation includes the marginal corporate tax rate, whereas a firm's adjusted present value uses the effective tax rate. [110]

In addition, when experts complete their lost profits calculations, they should decide whether to calculate the damages on a pretax or after-tax basis. Because the government taxes a lost profits award, some experts prefer to calculate the award on a pretax basis. This advice, however, can lead to an over- or underestimation of damages by its failure to recognize changes in tax rates. Alternatively, one could calculate the award on an after-tax basis and then gross up the damages amount by the current tax rate (i.e., divide the after-tax damages by one minus the current tax rate). For example, suppose the plaintiff would have made $100 on a pretax basis during year one and, had it generated those funds in year one, it would have paid $46 in federal income taxes. (This example ignores present value and state tax issues.) Thus, the plaintiff would have had $54 more but for the defendant's wrongdoing. The plaintiff's case goes to trial in year seven, after the marginal corporate federal income tax rate has dropped to 34 percent. On one hand, if the court awards the plaintiff the pretax $100 in year seven, it will pay only $34 in federal taxes and on an after-tax basis will have $66, $12 more than the amount needed to make it whole. On the other hand, had the court awarded the grossed-up amount of the plaintiff's lost profits on an after-tax basis, the plaintiff would have received $82 [= $54/(1 - 0.34)], paid $28 in taxes, and have $54 left. In this example, the plaintiff would have benefited had the damages award been paid on a

--------------- Page 162 ---------------

pretax basis. The results go in the opposite direction if the tax rate increased. (Chapter 18 discusses the tax treatment of damages awards.)

## 4.7 PRACTICAL ASPECTS OF EXPERT TESTIMONY ON DAMAGE CAUSATION

Lawyers sometimes ask liability experts to evaluate whether the defendant has engaged in wrongful conduct without regard to whatever harm has flowed from the conduct. Likewise, they frequently instruct damages experts to assume causation.

These practices, when pursued without proper consideration, can lead to mismatches between the expert evidence and the facts of the case. For example, expert testimony quantifying the amount of damages lacks relevance unless one can show that the damages resulted from the defendant's wrongful acts. Similarly, proof that an audit conducted pursuant to generally accepted auditing standards (GAAS) would have detected a misstatement in a company's financial statements is irrelevant unless the misstatement caused the plaintiff's injury.

Bloomberg Law® © 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

As these examples illustrate, cases involving financial matters often require expert testimony to resolve whether the defendant's wrongful conduct caused the plaintiff's damages. Such expert testimony is frequently challenged on the following grounds:

- Causation is a fact question that depends on the testimony of fact witnesses rather than experts.
- Causation is a legal issue, on which experts should not offer an opinion.

The following discussion addresses these issues. Each case it reviews arises under Federal Rule of Evidence 702, which provides that a court can admit expert testimony relating to scientific, technical, or other specialized knowledge to assist the trier of fact in understanding the evidence or determining a fact in issue so long as it complies with the following requirements:

- The testimony is based on sufficient facts or data.
- The testimony is the product of reliable principles and methods.
- The witness has applied the principles and methods reliably to the facts of the case.

These requirements ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." [111] They apply to all witnesses offered as experts. [112]

### (A) Admissibility Of Expert Testimony

The failure to properly consider causation jeopardizes the admissibility of expert

-------------- Page 163 --------------

testimony on damages. In evaluating the admissibility of expert testimony under Rule 702, a trial court must consider whether the "expert testimony … is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." [113] Damages experts who fail to consider causation risk a ruling that their testimony lacks this essential tie to the facts of the case.

For example, in *Concord Boat Corp. v. Brunswick Corp.*, [114] the U.S. Court of Appeals for the Eighth Circuit overturned a $133 million antitrust judgment based in part on the conclusion that the trial court should have excluded the damages-related testimony of the plaintiff's financial expert. The court found that the expert's damages model "was not grounded in the economic reality of the … [relevant] market, for it ignored inconvenient evidence." [115] Among other things, the damages model "failed to account for market events that both sides agreed were not related to any anticompetitive conduct." [116] Based on this and other "deficiencies in the foundation of the opinion," the court held that the expert's conclusions were speculative and unhelpful to the trier of fact. [117]

*Concord Boat* teaches that an expert cannot ignore whether the plaintiff's calculated damages flow from the defendant's conduct or other events. Indeed, even if the court had not excluded the expert's testimony there, the damages calculation would still have been vulnerable to attack as the expert would presumably have been hard-pressed to calculate on the witness stand the extent to which his damages calculation would have changed in response to changes in the facts.

### (B) Expert Testimony Versus Fact Testimony

Expert testimony on causation can prove more reliable than fact testimony in financial cases. A breach of contract case in the U.S. Court of Appeals for the Federal Circuit illustrates this situation.

*California Federal Bank v. United States* [118] is one of a series of so-called *Winstar* cases in which banks that purchased failing thrifts during the savings and loan crisis of the late 1980s and early 1990s sought to recover for damages caused by the passage of the Financial

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Institutions Reform, Recovery, and Enforcement Act (FIRREA) in 1989. This act effectively negated beneficial financial statement and regulatory capital provisions of banks' earlier contracts with the federal government to acquire failing thrifts. In *California Federal*, the plaintiff bank, CalFed, alleged that the enactment of FIRREA forced it to sell certain assets, including a large number of adjustable-rate mortgages (ARMs), to meet the act's new regulatory capital requirements. [119]

The court held that the government breached its contract with the bank, thus establishing liability. CalFed sought lost profits as damages for this breach, arguing that, but for FIRREA's enactment, it would have retained more ARMs, which would

-------------- Page 164 --------------

have yielded substantial profits. The government countered that FIRREA did not cause the sale of ARMs, which shrunk the size of the bank, and that other factors existed that would have caused the sale irrespective of the changes in regulatory capital requirements effected by the act.

The government sought to debunk the plaintiff's lost profits claim through a financial expert who testified about the economics of the relevant market and presented an analysis of the operations and financial performance of CalFed. Among other considerations, the expert explained a principle familiar to most financial experts: one would expect the sale of the ARMs to have produced the same amount of profit as retaining them because, in a liquid market, the fair value of the ARMs at the time of their sale would have included the present value of the future cash flow if CalFed had retained them.

The trial court relied on the government's expert in finding that "it was the recession in the California real estate market in the early 1990s that 'caused CalFed to shrink the bank,' not the changes in regulatory requirements that resulted from the enactment of FIRREA." [120] On appeal, CalFed argued that "it was improper for the [trial] court to rely on the testimony of the government's experts rather than the testimony of CalFed's fact witnesses, who testified about their own intentions [i.e., but for FIRREA, they would have retained the ARMs]." [121] The Federal Circuit rejected this argument, explaining that

> the court, sitting as finder of fact, was entitled to weigh the credibility of CalFed's fact witnesses, taking into account their interest in the outcome of the litigation. At the same time, the court was entitled to consider the government's expert testimony to the extent that it shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment.
>
> The expert testimony on which the court relied in this case provided an explanation of why a bank such as CalFed might well have chosen to dispose of the ARMs, even in the absence of a breach …, and why the sale of the ARMs did not necessarily result in a loss to CalFed. The expert testimony thus satisfied the requirement of Rule 702 of the Federal Rules of Evidence, which permits expert testimony to be admitted "to assist the trier of fact to understand the evidence or to determine a fact in issue." [122]

Accordingly, the court held that "the inability to prove by a preponderance of the evidence that profits would have been made but for the breach" barred the bank from recovering lost profits. [123]

*CalFed* demonstrates not only how a financial expert can properly present evidence to support or undercut a causation theory but also that such evidence can prove even more useful and credible than fact testimony that appears self-serving to the

-------------- Page 165 --------------


© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

finder of fact under the circumstances.

### (C) Expert Sensitivity To Alternative Outcomes

In cases in which but-for causation becomes an issue, the expert must prepare to address alternative outcomes. For example, suppose a former client brings a claim against a law firm for improper representation in a bankruptcy proceeding. The plaintiff/debtor contends that, but for the defendant law firm's bad advice, the bankruptcy judge would have confirmed a different plan that provided a superior outcome to either historical equity interests or creditors. The plaintiff's contention hinges on proving that the alternative plan would have:

- Been approved for a creditor vote;
- Won approval of the impaired creditors in number and dollar amount;
- Prevailed over any competing topping bids that would have been made at a confirmation hearing; and
- Been held by the bankruptcy court to be in the best interests of creditors, feasible, and not likely to be followed by liquidation of the entity.

To carry this burden, the plaintiff would need to show that the required number and amount of creditor interests would have confirmed the alternative plan. Such a showing would necessarily rest on evidence in the bankruptcy regarding (1) the relative value of the alternative plan compared with the confirmed plan, (2) the positions of important interested parties regarding the alternative plan, and (3) whether the alternative plan would serve the highest and best interests of the creditors compared with any other proposed or alternative plans. Given the many financial and bankruptcy issues involved in making this showing, the plaintiff would almost certainly need an expert witness to explain such evidence and its relevance.

This example illustrates why the trier of fact often finds expert testimony helpful and necessary to understand whether the defendant's wrongful conduct has caused the damages claimed by the plaintiff. Even if damages experts do not provide testimony regarding causation, they must nevertheless understand the plaintiff's theory of causation, connect their opinions on causation to facts of the case, and be ready to opine on both alternative outcomes and alternative causes.

## 4.8 CONCLUSION

Damages claims present some of the most interesting challenges and complex issues addressed by experts. An expert's effectiveness requires an understanding of the law, familiarity with various damages models and their appropriate usage, attention to detail and thoroughness in analysis, and close coordination with legal counsel to assure the appropriateness of the models and methods used. Courts vary

--------------- Page 166 ---------------

widely in their level of sophistication in assessing damages, and in many cases the expert will fulfill the traditional role of providing specialized knowledge to the triers of fact to help them understand these complex issues.

Damages presentations are often the culminating events in a trial. They incorporate many of the key factual and expert presentations that establish the basis for damages and claims, and represent the means of righting the wrongs established during trial. Consequently, experts often play a defining role in the success of litigation.

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

NOTES

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service