# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC. – BIRMINGHAM, AND PEMCO AIRCRAFT ENGINEERING SERVICES, INC.,** | ) ) ) ) ) ) |  |
| **Plaintiffs,** | ) ) ) |  |
| **v.** | ) ) | **Case No. 2:11-cv-03577-RDP** |
| **THE BOEING COMPANY, BOEING AEROSPACE OPERATIONS, INC. AND BOEING AEROSPACE SUPPORT CENTER,** | ) ) ) ) ) ) |  |
| **Defendants.** | ) |  |

## MEMORANDUM OPINION

This case relates to an award of Programmed Depot Maintenance ("PDM") work for the United States Air Force's KC-135 Stratotanker fleet. (Doc. # 97 at ¶ 8). Since approximately 1969, Alabama Aircraft, Inc. ("AAI" or "Pemco")[1] had performed some of this work in Jefferson County, Alabama. In February or March 2004, Boeing[2] and AAI began conversations about teaming together to bid jointly on future KC-135 PDM work. (Doc. # 97 at ¶¶ 8, 29). After a long and circuitous series of events, the work was awarded to Boeing. (Doc. # 97). This case relates to the events surrounding that award.

---

[1] The claims of the named Plaintiffs in this action, Alabama Aircraft Industries, Inc., Alabama Aircraft Industries, Inc. – Birmingham, and Pemco Aircraft Engineering Services, Inc., are being prosecuted by and through Joseph Ryan as the trustee of the Litigation Trust established in relation to the Chapter 11 Bankruptcy case of the named Plaintiffs. The term "Plaintiff" or "AAI" will be used in the singular herein to refer to these entities.

[2] Defendants in this case are The Boeing Company, Inc., Boeing Aerospace Operations, Inc., and Boeing Aerospace Support Center. For ease or reference, they will be referred to in the singular as "Boeing."

After a number of pleadings and motions, AAI filed its Third Amended Complaint. The claims presently before the court are as follows:

> 1.     Count One is a Breach of Contract claim alleging that Boeing improperly terminated the Memorandum of Agreement executed on September 6, 2005 ("MOA") and failed to award it 50% of the planes under the 2005 Work Share Agreement ("WSA");
>
> 2.     Count Two is a Declaratory Judgment claim regarding the application of the Limitation of Liability clause in the MOA to Count One;
>
> 3.     Count Three is a Breach of Contract claim alleging that Boeing breached the Non-Disclosure Agreement executed on June 3, 2005 ("NDA");
>
> 4.     Count Four is a Declaratory Judgment claim regarding the application of the Limitation of Liability clause in the MOA to Count Three; and
>
> 5.     Count Seven is a Suppression of Fact claim regarding Boeing's Bridge Contract for KC-135 PDM work.

(Doc. # 97).

This case is currently before the court on the parties' respective motions for summary judgment. (Docs. # 340, 343). The Motions have been fully briefed. (Docs. # 341, 342, 344-347, 392-396, 405-409).[3] For the reasons discussed below, both Motions are due to be granted in part and denied in part.

---

[3] Appendix II to the court's Initial Order, "Summary Judgment Requirements" states that "Counsel must state facts in clear, unambiguous, simple, declarative sentences." (Doc. # 3 at 15). AAI appears to have had trouble drafting its statement of facts in compliance with this requirement, causing Boeing to respond to many of its facts with "disputed as stated" and "Boeing disputes any implication … ." (*See, e.g*. Doc. # 341 at 44, ¶ 152). Plaintiff's proposed undisputed fact 152 clearly contains attorney argument. ("Such undisputed facts demonstrate Boeing's Truman Project rewriting work occurred by early May 2006 … ."), ¶ 163 ("Discovery in this case does not contain any, and Boeing will be unable in its opposition to adduce any, communication from Boeing to Pemco (or vice versa) prior to signing the MOAs, or indeed up through June 6, 2006 or after, which discloses or discusses any ground for termination of the MOA as being founded upon anticipated impacts on Boeing's KC-10, C-130 AMP, C-17, or KC-135 GATM programs (i.e., four other programs in which Pemco did not participate) at San Antonio."). This has made the court's task in sifting through the parties' submissions to determine whether there are undisputed facts much more time consuming and tedious than it should have been. Moreover, in their argument sections, in providing record citations to "evidence" supporting a statement, both parties frequently cited back to their purported statements of undisputed facts, rather than directly to the record evidence on the court docket. This, too, made the court's examination of the facts of the case doubly time-consuming inasmuch as the court was then required to

## I.      Facts

The facts set out in this opinion are gleaned from the parties' respective statements of undisputed facts, their responses thereto, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Boeing is an aerospace and defense company with locations across the country. (Doc. # 97 ¶ 2). AAI provided aircraft maintenance, repair, and modification services for government and military customers. (Doc. # 97 ¶ 1).[4] Because this case involves department of defense contracting, the parties' briefing and this court's opinion are replete with abbreviations and acronyms. The court apologizes in advance.

### A.      Background

AAI has a long history of involvement with refurbishing work on KC-135s. AAI and its predecessors began performing PDM services on KC-135 aircraft in 1968. (Doc. # 349-1). AAI was a prime contractor under a contract with the United States Air Force ("USAF") for KC-135 PDM services from 1994 through 2001. *Alabama Aircraft Indus. Inc. – Birmingham v. United States*, 83 Fed. Cl. 666, 670 n.6 (Ct. Cl. 2008). In 1998, the USAF awarded Boeing a prime

---

reference the asserted fact to find the record cite to then evaluate the record evidence. *See, e.g.,* Docs. 342 at 22, 396 at 57). The court instructs the parties as follows: in the future don't do that!

[4] Michael Tennenbaum, co-founder and former Senior Managing Partner of Tennenbaum Capital Partners, LLC, was AAI chairman of the board from 1999 through 2009. (Doc. # 364-2).

contract to perform PDM services on KC-135 aerial refueling aircraft. (Doc. # 364-5 at 2). Although AAI had performed and was performing KC-135 PDM work, it did not perform other services that the USAF bundled into the 1998 RFP. (Doc. # 349-1).

Historically, Boeing has "experienced performance difficulties associated with the speed and the quality of its work" on the KC-135 aircraft. (Doc. # 349-3 at 12). In 2000, "the USAF 'encouraged' Boeing to take on [AAI] as a major supplier at the end of FY2001." (Doc. # 364-6 at 4). On October 27, 2000, Boeing and AAI entered into a Memorandum of Agreement ("MOA") pursuant to which AAI was made a subcontractor to Boeing for the 1998 KC-135 PDM contract for Fiscal Years ("FY") 2002 through 2007. (Docs. # 364-7, 349-6).[5] The 2000 MOA included various grounds for termination, including "[f]ailure of the Customer to award an FY02 KC-135 PDM contract to [Boeing] at the quantity anticipated in Attachment A." (Doc. # 349-6).

Boeing and AAI entered into a formal Long Term Requirements Contract ("LTRC"), titled "Repair Agreement 01-003," with Boeing designated a prime contractor and AAI a subcontractor in relation to PDM work. (Doc. # 349-10). Boeing and AAI amended the terms of the LTRC numerous times. (Docs. # 349-10, 349-11, 349-12).

In 2004, the USAF elected not to exercise the final option years of the 1998 KC-135 PDM contract (Doc. # 364-8), and decided to "recompete" the KC-135 PDM contract (the "Recompete Contract") and open bidding on the new contract to all bidders. (Doc. # 365-1).

---

[5] The 2000 MOA had a "Limited Obligation" provision at Section 11.0 which provided, in relevant part, that "[n]either Party will be liable to the other for costs expenses risks liabilities or special indirect or consequential damages arising out of this MOA." (Doc. # 364-7 at 6).

On April 1, 2005, Boeing and AAI entered into a Memorandum of Agreement (the "Bridge MOA") for KC-135 PDM work for the Bridge Contract for FY06 and FY07. (Doc. # 365-9). On October 1, 2005, the USAF awarded Boeing the Bridge Contract to perform KC-135 PDM work for FY2006 and FY2007, pending the award of the Recompete Contract. (Docs. # 365-10, 365-11, 349-23).

On October 17, 2005, Boeing and AAI entered into a Long Term Requirements Contract (the "LTRC") whereby AAI would be a subcontractor to Boeing for the Bridge Contract, sharing the aircraft "on a fifty-fifty split." (Doc. # 365-12). The LTRC provided for a "basic period effective 1 Oct 05 through 30 Sep 07 [FY06-07] and two six-month option periods effective October 1, 2007 through September 30, 2008 [FY08]." (Docs. # 365-12, 365-10 at 9-19).  For each year of the Bridge Contract, the parties negotiated the prices Boeing would pay AAI. (Docs. # 365-13 through 365-17).

### B.    Competition for the KC-135 Recompete Contract

After the USAF decided to recompete the KC-135 PDM, Boeing and AAI each expected a Request for Proposal ("Recompete RFP") for the Recompete Contract to be issued. (Docs. # 365-19 at 6, 365-20 at 4).   In January 2005, Boeing and AAI separately evaluated various options to compete for the KC-135 Recompete Contract, including whether to bid independently, team with each other, or team with other companies. (Docs. # 365-19, 365-20, 365-22 at 23, 349-20).

In a January 18, 2005 e-mail among Boeing employees, an "exit strategy with [AAI]" was mentioned. (Doc. # 350-2 at 2). In a January 21, 2005 KC-135 PDM Re-compete "Campaign Review" presentation, Boeing's "Proposed Win Strategy" included "[b]ecom[ing]

5

single source of repair/overhaul on KC-135 for recompete," but its evaluation of AAI recognized that AAI "[c]ould provide a benefit to any competitor that competes against Boeing." (Doc. # 350-3 at 9, 12).

### 1.    The MOA Negotiations

In April and May 2005, AAI and Boeing were negotiating language for a new MOA, Work Share Agreement ("WSA"), and Non-Disclosure Agreement ("NDA"), where it was contemplated that Boeing would act as the prime contractor, and AAI as a subcontractor. (Docs. # 365-23, 395 at 11, 296-19, 350-12). A separate Proprietary Information Agreement was AAI's idea. (Doc. # 350-12 at 2).

On April 28, 2005, Boeing internally circulated a first draft of the Recompete MOA which included a limitation of liability clause at Section 11.0. (Doc. # 367-4). On May 3, 2005, AAI sent its first draft of the Recompete MOA to Boeing, which contained the following provision: "IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES." (Docs. # 367-5 at 10; 377-17 at 5). On May 6, 2005, Boeing sent AAI a revised draft Recompete MOA, which included a different limitation of liability clause at Section 11.0. (Doc. # 367-6 at 2, 11). On May 11, 2005, AAI sent Boeing a revised draft of the Recompete MOA that accepted Boeing's May 6 the limitation of liability language. (Doc. # 367-7 at 2, 11). The clause provided that the parties disclaimed any incidental damages, punitive and exemplary damages and any consequential damages, including but not limited to any profits that the

Non-breaching Parties expected to earn. (Doc. # 367-7 at 11). After May 11, 2005, no further changes were made to the limitation of liability clause. (Docs. # 367-7 at 11, 367-8 at 9-10).

AAI and Boeing both had some concern about the number of aircraft (Best Estimated Quantity or "BEQ") which would be subject to the Recompete MOA, and whether two sources of repair would be feasible. (Docs. # 341 at 16, 349-5 at 34-35, 350-9, 350-10). In May 2005, the parties exchanged various drafts of the Recompete MOA. (Docs. # 367-9, 367-10, 367-11). Early drafts of MOA § 5.0(c) allowed for termination by either party if the USAF failed to award a KC-135 PDM contract to Boeing at a quantity that would support two contractor sources of repair, but in the final MOA language Boeing accepted AAI's proposed revision to § 5.0(c) which allowed either party to terminate the MOA at the time of "any RFP or amendments thereto" rather than at the time of "award." (Docs. # 341 at 15, 395 at 13). AAI wanted "to make sure that if the quantities dropped below a level that they could support work for both of us, that [the planes] would come to [AAI]." (Doc. # 349-5 at 35).

After several months of negotiations, and after multiple drafts of the MOA had been exchanged, Boeing sent AAI "Boeing's final offer for the Re-compete MOA for KC-135 PDM." (Doc. # 350-28). The final MOA was signed on June 3, 2005. (Doc. # 365-18). Exhibit A to the MOA was the WSA, and Exhibit B was the NDA. (Docs. # 341 at 18, 395 at 15, 365-18).

### 2.     Boeing and AAI Begin Work Together

In June 2005, the Recompete MOA was signed and Boeing and AAI began working on their October 2005 joint proposal. (Doc. # 367-18). On July 20, 2005, Boeing and AAI executives held a joint executive review during which they discussed the strategy for the October 2005 bid submission. (Doc. # 367-18).

Boeing regularly employs a Blue Team Process in which people who are not members of the bid proposal team analyze publicly-available information about a competitor to simulate the role of a competitor and develop a bid as that competitor. (Doc. # 367-20). The purpose is to "assess[] the competitive environment; determin[e a] competitor's likely proposal strategies; and communicate mock competitors' strategies to Boeing Capture Team leaders responsible for generating Boeing's proposal for specific competitive procurements." (Doc. # 362-22). The Process manual provides that "[a]ll Blue Teams will be performed in compliance with Boeing ethical standards" and be derived from an "analysis of publicly available information." (Doc. # 362-22 at 2, 5). Although it considers this analysis proprietary, Boeing shared its Blue Team's Recompete analysis with AAI during the July 20, 2005 joint executive review. (Doc. # 367-18 at 15-19).

The USAF issued the Recompete RFP on August 19, 2005. (Doc. # 367-16). The Recompete was for five base years plus five option years. There was a proposed BEQ of 28 aircraft for base year three and a BEQ of 44 aircraft per year for base years four and five, and for all five option years. (Doc. # 351-13).

Although AAI developed its own pricing for the joint Recompete bid, Boeing provided AAI with certain price targets to meet. (Docs. # 368-5, 368-11).

Joint bid work included estimating the intermittent tasks ("ITs") for the Recompete proposal. (Docs. # 368-8 at 50, 381 at 10, 393 at 6). ITs "are a list of PDM tasks that don't appear on … every PDM. And the government wanted us to price all those tasks, should they occur … ." (Doc. # 368-6 at 50). AAI developed its IT hours estimates and provided them to Boeing in October 2005. (Docs. # 368-10, 381 at 10, 393 at 6). AAI completed a pricing

template and provided it to Boeing. (Doc. # 368-5). AAI did not provide Boeing access to substantiation of its costs. (Docs. # 368-13 at 42, 368-18 at 2). Rather, the price substantiation was given to Boeing in a sealed envelope to provide to the USAF. (Doc. # 368-23, 368-24 at 2, 381 at 11, 393 at 8).

### 3.    The Amendments to the Recompete MOA

On September 6, 2005, the Recompete MOA was amended to add L-3 Communications Integrated Systems L.P., another subcontractor, and to list AAI as "Principal Subcontractor." (Doc. # 367-8). The September 6, 2005 Recompete MOA included four attachments: Exhibit A was a WSA between AI and Boeing; Exhibit B was the "L3 Work Share Agreement"; Exhibit C was the June 2005 NDA executed by Boeing and AAI; and Exhibit D was a "Proprietary Information Agreement," executed by Boeing and L3. (Doc. # 376-8).

The September 2005 Recompete MOA contains the following relevant clauses:

**WHEREAS**, the United States Government ("Government" or "Customer"), or its designated agencies, anticipates issuing a Solicitation(s)/Request(s) for the Proposal ("RFP") in the near future for the Program Depot Maintenance for the KC-135 Aircraft (the "Program"), currently referred to as the FY08 Recompete; and
. . . .
**1.0    RELATIONSHIP OF THE PARTIES**
1.1    The relationship established by this document shall be exclusive for each party with the others and the Parties agree that they will not enter into any teaming agreement with any other offeror under or for the Program defined herein. Should any party violate the terms of this paragraph, this Agreement shall terminate immediately and the injured party shall have recourse to all available remedies, at law or in equity, to compensate for any direct damages suffered as a result of breach of this paragraph.
. . . .
**1.4**    Each party shall act as an independent contractor and not as agent for, partner of, or joint venturer with the other party unless such agency, partnership or joint venture is established and agreed to, under separate document, between the parties. ...  No other relationship outside of that contemplated by the terms of this Agreement shall be created hereby. . . .

. . . .

**3.0    PROPOSAL ACTIVITY**
. . . .
3.5    The Parties recognize that changes in the proposed Statement of Work and Work Share may be necessary to respond to changes requested by the Customer to the RFP or to enhance the likelihood of prime contract award. Under such circumstances, and at BASC's request, [AAI] will negotiate in good faith to revise the proposed Subcontract Work consistent with terms of this Agreement. Under no conditions shall the Prime Contractor unilaterally change the Subcontract Statement of Work or workshare.

. . . .
**4.0    SUBCONTRACT AWARD**
**4.1**    Subject to the conditions in this MOA, if BASC is awarded a contract in connection with the Program, BASC will award subcontracts to [AAI] and L3/IS for the stated work shares to the extent that the government awards PDMs.
. . . .
**5.0    TERM AND EFFECTIVITY**
    This MOA … shall terminate upon the first occurrence of any of the following"
. . . .
**c.**    After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.
. . . .
f.    The execution of a contract between the Parties which incorporates key provisions of this MOA.
. . . .
**7.0    INTELLECTUAL PROPERTY**
    Proprietary Information will be treated according to the Non-Disclosure Agreement executed separately by the Parties, incorporated by reference as Exhibit "C" and "D".
. . . .
**11.0    LIMITED OBLIGATION**
**11.1**    The Parties recognize that one Party ... may fail to perform its obligations under this Agreement ... and thereby cause damage to the other Parties ... . The Parties, having full consideration to the nature of this transaction, agree that the following categories of damages are disclaimed by each Party, and the Non-breaching Parties neither expect[], nor will seek, to

recover from the Breaching Party any incidental damages, punitive and exemplary damages and any consequential damages, including but not limited to the following: (a) any profits that the Non-breaching Parties expected to earn on the Prime Contract or any other contract related to the Program; ...

. . . .

**11.2**   . . . Nothing in this MOA shall constitute, create, give effect to or imply a joint venture, partnership, or formal business organization. Each Party is an independent contractor and not an agent for the other Party. ...  No such relationship is intended by any reference herein to a "team" or "team members."

. . . .

**15.0   APPLICABLE LAW**
This MOA shall be governed by the laws of the state of Missouri, without resort to conflict of laws provisions.

. . . .

**17.0   ENTIRE AGREEMENT**
This MOA together with its Exhibits and Attachments contains the entire agreement between the Parties concerning the subject matter thereof and supersedes any previous understanding, commitments or agreements, oral or written.

. . . .

(Doc. # 40-6 at 4, 6, 8-9, 10).

Exhibit A to the September 2005 MOA, the WSA, contains the following relevant language: "Upon successful award of a contract for the Program, it is agreed that [AAI] will receive 50% of all KC-135 PDM inductions awarded on said contract." (Doc. # 367-8 at 13).

Exhibit C to the September 2005 MOA, the NDA executed on June 3, 2005, recites its Purpose as follows:

The Purpose of this Agreement is to set forth the rights and obligations of the parties with respect to the use, handling, protection, and safeguarding of Proprietary Information which is disclosed by and between the parties hereto relating to the KC-135 Program Depot Maintenance (PDM) for the purpose of negotiating a Memorandum of Agreement leading to a long-term subcontracting relationship relating to the aforementioned program.

(Doc. # 367-8 at 17). The NDA contains the following additional provisions:

4(e). This Agreement shall not restrict disclosure or use or use of Proprietary Information that:

. . . .

(3) becomes known to the receiving party from a source other than the disclosing party without breach of this agreement by the recipient.
. . . .
12. In the event the contractual relationship between the parties (for the KC-135 PDM program that is embodied in the associated Memorandum of Agreement or in a subsequent long-term subcontracting relationship) terminates pursuant to the terms of such MOA or subcontract, either party may pursue an independent contract to perform work for the United States Government on the PDM program, either alone or in conjunction with other parties. Nonetheless, in compliance with this Agreement, each party shall safeguard the Proprietary Information exchanged up to the date the relationship ends, and ensure that such data is not used against the disclosing party's interests. This restriction will not preclude a party's employees who have had access to the other party's Proprietary Information from participating in the subsequent independent contract, so long as appropriate safeguards are in place to prevent inappropriate use of the other party's Proprietary Information.

13. Entire Understanding. This Agreement contains the entire understanding between the parties concerning the subject matter hereof, superseding all prior or contemporaneous communications, agreements, and understandings between the parties with respect to the disclosure and protection of Proprietary Information relating to the purpose of this Agreement. The rights and obligations of the parties shall be limited to those expressly set forth herein.

(Doc. # 367-8 at 18-20).

### 4. Behind the Scenes at Boeing

Boeing was aware that AAI's KC-135 PDM subcontract work with Boeing represented the vast majority of AAI's business, and essentially all of its reported profits for the relevant time period. (Doc. # 264-14 at 10; Doc. # 264-15 at 12). Boeing was also aware that the loss of KC-135 PDM work would force AAI out of business. (Doc. # 228-40 at 6; Doc. # 228-42 at 2, 6). In making the Recompete bid, AAI essentially "bet the farm" because "eighty percent of [its] business in Birmingham was [derived from] KC-135 PDM." (Doc. # 263-2 at 328:16-23).

### 5. Submission of the Bid and Boeing Looks at Contingency Plans

Despite this knowledge of the ramifications for AAI of losing the KC-135 PDM work, during the period of time when AAI and Boeing were preparing the joint Recompete bid, Boeing was also exploring contingency "off ramps" with AAI (*i.e.,* ways to opt out of the teaming

arrangement with AAI). (Docs. # 352-27, 368-1 at 90-92, 352-27). Boeing's Patrick Finneran testified that contingency planning was standard practice due to perceived issues with AAI at that time. (Doc. # 368 at 90). However, he further testified that "the issues were resolved to my satisfaction because we continued on." (Doc. # 368 at 91). Boeing's candid assessment at that time was that, if it opted out of either the MOA or a separate bridge contract, "we can expect an ugly, lengthy legal battle." (Doc. # 263-31).

On October 24, 2005, Boeing submitted AAI's price substantiation to the USAF in a sealed envelope. (Docs. 368-23, 368-24, 351-21). On October 31, 2005, Boeing submitted its joint bid to the USAF with AAI and L-3 as subcontractors. (Docs. # 368-20, 368-21, 368-22).

On November 15, 2005, AAI announced a third quarter net loss of $3.75 million and a 43.5% decline in revenue. (Doc. # 290-26).

In February 2006, the USAF conducted a meeting with Boeing and AAI regarding its Joint Bid Evaluation. (Docs. # 370-3 at 45, 370-1, 349-19 at 138-139). The Joint Bid Evaluation is the government's debrief of the proposal. (Doc. # 349-19 at 138-139). Although it was "appropriate for [AAI personnel] to be there for the technical debrief," it was not typical for AAI personnel to attend the cost/price debrief. (Doc. # 349-19 at 138-139). One of the documents used at the USAF's cost/price debrief was a chart that included Boeing's actual "Cost/Price" that Boeing submitted to the USAF. (Doc. # 370-1 at 76-80).

On March 27, 2006, AAI announced a net loss of $5.8 million for 2005, as well as a 38.5% decline in revenue. (Doc. # 290-27 at 2).

In March and early April 2006, Boeing was evaluating "contingency plans" in case the USAF reduced the BEQ to an extent that only one repair site was feasible. (Docs. # 352-32, 352-33). In a March 29, 2006 e-mail titled "[AAI] Contingency Plan," Boeing also considered the

possibility of AAI filing for bankruptcy protection. (Doc. # 296-5). In a different March 29, 2005 e-mail, Boeing's Michael Wright stated that certain events might:

> force Boeing to move all of the workload to one site. Our MOA with [AAI] is clear who that would be, but the financial risk of [AAI] coupled with the risk to San Antonio and future competitions like the KC-10 would indicate that following the MOA might not be wise.

(Doc. # 352-32). An April 4, 2006 Boeing internal memorandum regarding a potential BEQ reduction stated:

> The intent of this white paper is to summarize my conversation with the PCO and highlight the fact that the Government already has mechanics in place to execute any change in quantity that may occur. In addition, information was also provided concerning the MOA and the exit criteria available to both Boeing and [AAI]. This information is preliminary. A decision has not been made and no direction has been given to the Source Selection team to modify the RFP at this time. Upon receipt of formal direction from the Government, we must be prepared to address [our] relationship with [AAI] in a timely manner.

(Doc. # 352-33). Boeing anticipated that, "[c]onsidering their current financial position, [AAI] will make a case that all the aircraft should go to [AAI], should this become a reality." (Doc. # 352-33 at 3-4).

### 6. The Air Force Changes the BEQ

On April 18, 2006, the USAF released a Letter of Intent ("LOI") regarding a potential BEQ change from 44 aircraft per year to 24 aircraft per year. (Docs. # 369-3, 352-35). The LOI sought input and information regarding how the proposed BEQ changes might affect the parties' Recompete bids. (Doc. # 369-3).

Boeing then began comparing different pricing scenarios for a joint bid with the reduced BEQ, including comparing both Boeing and AAI as the single repair site. (Docs. # 352-36, 352-37, 369-14 at 38-39). Boeing executives evaluated the financial impact on Boeing and its San Antonio site of a potential BEQ reduction. (Docs. # 369-13, 369-14 at 38-39). Boeing estimated that losing the PDM program to an AAI single site would result in losses of over $12 million.

(Doc. # 369-13). Boeing considered three options: (1) splitting the aircraft 50/50, (2) splitting the FY06 aircraft and then moving all FY07 aircraft to San Antonio, and (3) moving all aircraft to San Antonio after June 2006. (Docs. # 369-15, 369-14 at 47-48).

In an April 22, 2006 e-mail, although Boeing's Vietor noted that "[c]urrently we have Boeing as the single source for quantities below 26," he requested "one more" comparison and stated that "the next step would be to calculate the true Boeing Management Cost Burden." (Doc. # 352-36). During this time, Boeing continued to engage in various pricing comparisons. (Docs. # 352-37. 352-39, 352-40, 352-41). In an April 27, 2006 version of the comparisons, the AAI versus Boeing price comparison slides are re-captioned "Apples to Apples Comparison Single Site w/o Mgmt. Burden" and "[AAI] vs. Boeing Single Site Comparison w/Mgmt Burden." (Doc. # 352-41 at 16-17).

On May 1, 2006, Boeing sent the USAF a letter in response to the LOI in which it expressed "several concerns regarding this LOI," asked the USAF to "continue the source selection based on the requirements set forth in the current RFP," and stated that "[t]he Boeing/[AAI] team's commitment to the ongoing success of the KC-135 PDM program has never been stronger." (Doc. 369-6).

In April and May 2006, Boeing also formed the "Truman Project" to evaluate and compare options for terminating the MOA. (Doc. # 263-38; Doc. # 264-5). Boeing again estimated that a "Single Site [AAI]" scenario would cause losses at Boeing. (Doc. # 352-47).

On May 3, 2006, Boeing asked AAI to provide its best pricing for a joint bid on the reduced BEQ. (Docs. # 369-10 at 5, 369-20). Boeing noted that "[AAI] should provide an updated pricing matrix that reflects single site scenario." (Doc. # 369-10 at 5). In response, AAI "developed 'best shot' pricing," but did not submit it to Boeing. (Doc. # 369-12).

In May 2006, AAI understood that Boeing was considering its options in light of the reduced BEQ, including "going [it] alone." (Doc. # 369-18). In a May 10, 2006 AAI board meeting presentation, AAI acknowledged that it had a "decision to make relative to teaming"—including "stay[ing] the course with Boeing," "proposing as prime," or finding "another teaming arrangement." (Doc. # 369-21 at 1, 38).

On May 16, 2006, Boeing was advised that an RFP amendment incorporating the LOI should be expected on May 31, 2006, with a June 30 proposal deadline and a contract award in August or September. (Doc. # 353-10). On May 25, 2006, Michael Tennenbaum, the chairman of AAI's Board of Directors, sent an email to the AAI Board stating that "[Boeing] is considering worst case scenarios which include giving all planes to [AAI] and giving no planes to [AAI]. They do not think two sites can be competitive with the present quantity." (Doc. # 369-19).

On May 31, 2006, the USAF formally issued an amendment to the RFP that lowered the BEQ to 24 aircraft per year. (Doc. # 369-22).

On June 1, 2006, Boeing again asked for AAI's pricing. (Doc. # 370-4 at 2-3). AAI completed the pricing package on Saturday, June 3, 2006, and was prepared to give it to Boeing on the morning of June 5, 2006. (Doc. # 398-1). However, AAI never submitted its "best shot" pricing to Boeing. (Doc. # 369-12).

In early June 2006, after the BEQ change, AAI tried to see if it could estimate Boeing's pricing. (Docs. # 365-21 at 64, 370-4). Boeing had never provided AAI with information about the Joint Bid pricing. (Doc. # 365-21 at 63-64). From information received at the USAF's Joint Bid Evaluation meeting and some other data, AAI tried to estimate Boeing's bid price. (Docs. # 365-21 at 63-64, 370-3 at 42-43). Specifically, AAI "looked to see if [it] could make some kind of an estimate of what Boeing was charging the government." (Doc. # 365-21 at 63-64). AAI

wanted to "find out[] what our competition would be if they cut us loose." (Doc. # 365-21 at 64). Ultimately, AAI was not able to do so. (Docs. # 365-21 at 63-64, 370-3 at 42-43). Nonetheless, AAI used the government's analysis of the Joint Bid in analyzing Boeing's pricing and coming up with its own strategy for the KC-1 35 FY08 Re-Compete Program. (*See, e.g.,* Docs. # 370-6, 370-8, 370-12, 370-13, 370-15, 370-16, 372-8). AAI was not aware at the time that the numbers from the USAF presentation were Boeing's actual bid price numbers. (Doc. # 365-21 at 64).

Boeing again engaged its "Blue Team Process." Boeing performed a Blue Team analysis of L-3 Integrated Systems and Lockheed and thereafter decided to team with L-3. (Docs. # 362-23, 362-24). No Blue Team analysis was performed of AAI. (Doc. # 349-4 at 38).

### 7.     Boeing Terminates the MOA

On June 6, 2006, Boeing faxed a letter to AAI titled "Notice of Termination of September 6, 2005 Memorandum of Agreement Between Boeing … [AAI] and L3IS Integrated Systems re: KC-135 PDM Competition." (Doc. # 369-24). The letter explained that "[t]he reduction in requested quantities is so unfavorable to Boeing that further participation in the Program pursuant to the MOA is no longer practical or financially viable." (Doc. # 244-2). The letter further cited Section 5.0(c) of the MOA and the basis for the termination. (Doc. # 369-24). The letter then quotes Section 5.0(c):

> After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.

(Docs. # 369-24, 367-8 at 7). Boeing's termination of the Recompete MOA did not affect the parties' Bridge MOA, and Boeing and AAI continued to work together on the Bridge for four more years. (Doc. # 310 at 7).

Also on June 6, 2006, Boeing sent a separate and different MOA termination letter to L-3. (Doc. # 354-18). In the letter to L-3, Boeing stated that it "would like to continue efforts directly with L-3 one-on-one to maintain the same type working relationship as the MOA dated 6 September 2005 identified. Should L-3 be receptive to a continued relationship with Boeing, please advise the undersigned at your earliest convenience so that we may establish a new MOA between Boeing and L-3 only." (Doc. # 354-18). On June 13, 2006, Boeing and L-3 executed an MOA to submit a joint bid for the Recompete. (Doc. # 354-20).

AAI takes the position that, in the event a party terminated the MOA under section 5(c), that section "would then prevent the party who terminated pursuant to it from pursuing the re-compete independently." (Doc. # 365-22 at 35-36). AAI specifically negotiated the language of section 5(c) with that goal in mind. (Doc. # 365-22 at 35-36). AAI did not want to agree to any provision where Boeing could get out of the MOA if the BEQ was reduced. (Doc. # 365-22 at 35-36). That is, AAI believed it had "taken out the language that would allow [Boeing] to go [it] on their own." (Doc. # 365-22 at 35-36). AAI's in-house counsel, Doris Sewell, explained that AAI's position was that "[w]hen they invoke 5(c), they're saying that pursuing the program is no longer practical or financially viable to them, period. So if they invoke it and then decide to go after it, that's fraud." (Doc. # 365-22 at 36). AAI did not express this position to Boeing at the time the MOA was adopted, but after the termination, AAI informed Boeing that AAI considered Boeing to have violated the agreement and that AAI was likely to do something about the breach. (Doc. # 370-3 at 13).

During a telephone call on June 12, 2006, AAI notified the USAF that it intended to submit a protest letter regarding the change from a 44 BEQ to 24. (Doc. # 370-24). AAI also asked the USAF if it would be allowed to submit an independent bid on the KC-135 Re-compete

Program. (Doc. # 370-24). The USAF responded that AAI would not be allowed to submit a bid because it was a subcontractor on the joint bid with Boeing. (Doc. # 370-24). The USAF indicated it saw no need to allow more participants because it did not consider the BEQ changes to be significant. (Doc. # 370-24). AAI explained to the USAF that Boeing had terminated the MOA with AAI as a result of the change in BEQ. (Doc. # 370-24).

On June 13, 2006, AAI filed a protest with the USAF requesting that the competition be reopened so that it could submit its own proposal. (Doc. # 349-25 at 50).

In a June 19, 2006 presentation regarding the anticipated bid without AAI, Boeing noted that "Mike Wright, Don Vietor, Kyle Smith, Pat Holden, and Roger Witte have handled [AAI's] prices." (Doc. # 354-21 at 8). Despite this acknowledgement, Vietor and Smith continued to work on Boeing's bid with L-3 and the revisions to it. (Docs. # 273-5, 352-48 at 102, 351-19 at 67, 357-10, 357-11).

On June 27, 2006, contrary to its initial pronouncement, the USAF issued another amendment to the Recompete RFP that re-opened the Recompete Contract competition and allowed AAI to submit an independent bid by September 11, 2006. (Doc. # 370-25 at 6).

### C.    Segregation of Proprietary Information

At the end of June 2006, Boeing attorney, Mark Rabe, and AAI General Counsel, Doris Sewell, discussed the handling of each party's proprietary data, and Boeing promised "to retrieve all [AAI]-originated proposal-related information, for return to" Sewell, and to "establish firewalls to screen BRIDGE administration from influencing our proposal." (Doc. # 263-28). Rabe noted, however, that Sewell informed him that AAI did not have enough employees to "screen anybody from working on [AAI's] independent proposal." (Doc. # 263-28).

On June 28, 2006, Boeing sent an e-mail to various employees involved in the Joint Bid on the KC-135 Re-compete Program titled "Protection of [AAI] Data." (Doc. # 371-2). The e-mail instructed recipients to "immediately … identify and locate all data they have received that relates to [AAI] for the KC-135 Recompete Program," including "Cost, Technical, Or Other data; whether on [his/her] hard-drive, CD ROMS, paper copies, etc." and that all such information "need[ed] to be identified, segregated, and protected … to insure Boeing honor[ed] the signed Proprietary Information Agreement." (Doc. # 371-2). On June 30, 2006, Boeing circulated the June 28, 2006 "Protection of [AAI] Data" e-mail to additional personnel. (Doc. # 371-4). On July 3, 2006, Boeing circulated an e-mail titled "KC-135 Firewall," which contained additional information related to the "Protection of Proprietary Data" including an attachment that "describe[d] the firewall procedures in place at Boeing to protect [AAI's] cost, technical, and/or performance data to prevent any unauthorized disclosure." (Doc. # 371-5).

On June 30, 2006, AAI circulated an e-mail titled "Proposal Firewall" discussing what AAI employees were to do with "Boeing proprietary information." (Doc. # 371-3). AAI's "Proposal Firewall" e-mail states: "Upon receipt of your information we will log it and have you sign a certification that you have turned over any and all information to which you held custody." (Doc. # 371-3). The e-mail noted that the firewall does not apply to "working documents required to do business on a daily basis" under the ongoing Bridge Contract. (Doc. # 371-3).

On July 10, 2006, Sewell sent another "Firewall" e-mail stating "Recently I sent you a note that asked that all Boeing proprietary materials you may have with regard to [your work with Boeing on] the original RFP for the FY08 KC-135 Re-Compete effort be sent to me in

compliance with the firewall being developed for purposes of our new bid. It is imperative that those materials…be sent immediately." (Doc. # 372-3).

On August 4, 2006, Boeing issued its "KC-135 PDM Recompete Program FIREWALL PLAN." (Docs. # 228-39, 263-89, 371-6). Section 6.4(3) of Boeing's Firewall Plan required that AAI ESI be copied to a disk and delivered to the Boeing Law Department for preservation purposes. (Docs. # 263-36 at 4, 371-6). Boeing's Firewall Plan included an acknowledgement form stating that the signatory "read and underst[oo]d the KC-135 PDM Program Firewall Plan" and that he/she "confirm[ed] [his/her] commitment to comply with the requirements of that plan." (Docs. # 370-10, 371-7, 371-8, 371-9). Boeing's Firewall Plan was the 'rough[]' equivalent' of a litigation hold. (Docs. # 263-12 at 278:4-16, 263-13 at 10:22-11:10).

Steve Blake, the Chief Financial Officer of Boeing's Support Systems Division, was the second-highest ranking Boeing employee on both the Recompete WSSC and the Truman Project, and Blake had to approve the pricing on the Recompete. (Doc. # 276 at 56:18-56:25; Doc. # 263-14 at 105:12-106:23). Blake maintained AAI-related ESI in his e-mail files. These were e-mails that he personally segregated into an AAI-specific folder on his computer. (Doc. # 263-21 at 14:1-16:7). Blake was aware of the August 4, 2006 directive to preserve and deliver AAI-related materials to the legal department. (Doc. # 228-12 at 440:19-441:1).

Smith and Holden (Boeing's Firewall roster administrator), both of whom had handled AAI's pricing data, assisted Blake in an effort to comply with the firewall. (Docs. # 310 at 11, 354-21 at 8). Before working on Blake's AAI-related ESI, Holden and Smith fully complied with Boeing's Firewall Plan with respect to AAI information which resided on their own computers. They did so by copying AAI ESI found on their computers to a disk, and turning that disk over to the Boeing legal department for preservation. (Doc. # 276 at 27:25-28:4; Doc. # 281-4 at 10:16-

11:16, 19:19-20:11, 34:9-22; Docs. # 228-4, 228-7, 228-10, 228-14 at 282:1-285:15). But, rather than handling Blake's AAI's ESI as they did their own (and in compliance with the Firewall Plan), Smith and Holden accessed Blake's company computer and, in two methodical stages, permanently deleted Blake's AAI-related ESI. First, they moved his AAI ESI to the Recycle Bin, and then they "emptied" the Recycle Bin (that is, they deleted the ESI rather than copying it to a disk to deliver to the legal department before deleting it, as required). (Doc. # 276 at 17:16-19:9; Docs. 228-12 at 441:7-446:8, 263-21 at 14:1-20:11; Doc. # 281-5 at 276:13-288:2; Doc. 276 at 20:5-29:23).

On August 22, 2006, Sewell sent a letter to Boeing's Rabe enclosing AAI's log of documents it had sequestered from AAI personnel. (Doc. # 290-17). AAI confirmed that the documents collected were secured. (Doc. # 290-17).

On August 29, 2007, AAI had its outside counsel, Latham and Watkins, write to Boeing requesting written confirmation regarding Boeing's firewall obligations. (Doc. # 263-37 at 2-3). In an August 31, 2007 letter (which was revised on September 4, 2007), Rabe provided AAI with a copy of Boeing's firewall plan and log of sequestered documents. (Doc. # 263-37 at 5-6).

Relevant to Rabe's own compliance with the Firewall Plan, Doug Lundy was a Boeing analyst providing assistance in writing AAI out of the joint bid volumes in order to convert them into Boeing solo bid documents. Lundy complied with the Firewall Plan and forwarded all AAI-related information he had to Boeing's legal department. In May 2007, Rabe, an in-house Boeing attorney who worked on setting up the Firewall Plan, and who was the designated recipient and custodian of AAI-related information to be sequestered under that Plan, retrieved two CDs of AAI-related ESI which had been collected from Lundy. Rabe does not recall why he removed

the CDs, but acknowledges they were subsequently misplaced and not returned. (Doc. # 310 at 13).

### D. The Parties Submit Independent Bids

In September 2006, AAI and Boeing submitted their independent KC-135 PDM bids. (Docs. # 377-1, 387-2). AAI and Boeing both had employees who worked on the October 2005 Recompete joint bid also work on their respective independent Recompete bids. (Docs. # 372-1 at 29, 368-8 at 14-15).

Thereafter, the USAF issued amendments 9 and 10 to the Recompete RFP. (Docs. # 374-10, 374-13). On February 23, 2007, AAI and Boeing submitted their First Final Proposal Revisions ("FPR1"). (Doc. # 387-70). The USAF then issued Amendment 11 to the Recompete RFP, which further reduced aircraft quantities. (Docs. # 381 at 29, 393 at 34). On June 18, 2007, AAI and Boeing submitted their Second Final Proposal Revisions ("FPR2"). (Docs. # 387-81, 378-191). Both AAI's and Boeing's FPR2 submissions were lower in price than the FPR1 submissions due to the reduced aircraft quantities in Amendment 11. (Docs. # 381 at 29, 393 at 34). No major changes were made from AAI's and Boeing's FPR1 submissions to their FPR2 submissions, beyond the adjustment for Amendment 11. (Docs. # 381 at 29, 393 at 34).

On September 7, 2007, the USAF awarded the Recompete Contract to Boeing. (Doc. # 387-270). The USAF determined that Boeing's proposal "provide[ed] the best overall value to meet the United States Air Force's stated requirements." (Doc. # 384-2 at 2).

On September 19, 2007, AAI submitted a bid protest to the United States Government Accountability Office ("GAO") protesting the award of the Recompete Contract to Boeing. (Doc. # 387-272). On October 19, 2007, in connection with the GAO protest, the USAF Contracting Officer, Jim Stephens, issued a Statement of Facts regarding the decision to award

the Recompete Contract to Boeing. (Docs. # 381 at 31, 393 at 34). The Contracting Officer's Statement of Facts stated: "Ultimately, there was nothing in either Boeing's or [AAI's] proposals to indicate any Procurement Integrity Act violations in their relationship." (Docs. # 381 at 31, 393 at 34).

On December 27, 2007, the GAO sustained AAI's protest "with regard to the agency's evaluation of cost/price" but "den[ied] all of [AAI's] other protest grounds, including those concerning the agency's evaluation of past performance and mission capability, alleged OCIs, and the alleged procurement integrity violation." (Doc. # 387-277 at 23). The GAO further stated: "Our review of the record does not support [AAI's] assertion regarding 'the remarkable similarity' of the two proposals. Indeed, other than the total prices proposed, the two proposals differ markedly." (Doc. # 387-277 at 22).

On March 3, 2008, the USAF again awarded the contract to Boeing. (Doc. # 378-278).

On March 11, 2008, AAI again submitted a bid protest to the GAO protesting the award of the Recompete Contract to Boeing. (Doc. # 387-275). On June 13, 2008, the GAO denied AAI's bid protest in full. (Doc. # 378-280). On June 27, 2008, AAI filed a bid protest in the Court of Federal Claims. *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 679 (Fed. Cl. 2008). On September 30, 2008, the Court of Federal Claims issued an opinion denying all of AAI's claims except for AAI's claim that the USAF did not properly consider the pricing of the proposals. *Id*. at 666. In February 2009, Boeing, the USAF, and AAI cross-appealed to the Federal Circuit. (*Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1374 (Fed. Cir. 2009). On November 17, 2009, the Federal Circuit reversed the judgment of the Court of Claims and vacated the "injunction against proceeding with the contract award to Boeing." *AAI*, 586 F.3d at 1376.

On March 31, 2010, the USAF reinitiated the Recompete Contract with Boeing. (Doc. # 377-19).

E.    **Ongoing Joint Work Under the Bridge Contract**

During the time the KC-135 PDM Recompete issues were playing out, AAI and Boeing continued to work together on the Bridge Contract because the USAF exercised its option to extend the contract during the period 2007 through 2009. (Docs. # 375-13, 375-14, 375-15, 375-16). Each time the USAF extended the Bridge Contract with Boeing, Boeing extended its LTRC with AAI and the parties continued to split the Bridge aircraft. (Docs. # 365-12, 365-15, 375-17).

In early 2008, the USAF planned to reduce the number of aircraft to be serviced under the Bridge Contract and there was some concern at AAI that the USAF might seek to re-negotiate prices under the Bridge Contract.  (Docs. # 375-19, 375-20). On February 19, 2008, the USAF sent a letter to Boeing requesting a reduction in Boeing's FY08 Bridge pricing. (Doc. # 375-21).

On March 17, 2008, the parties held a telephone conference to discuss the pricing cut under the Bridge Contract. (Docs. # # 375-18, 375-22). Boeing told AAI that, although it had received two jets for $12 million so far, the next six jets would be priced at $14 million, which constituted a sum total of $26 million for the eight jets (or $3.25 million per jet). (Docs. # 375-18 at 30-32, 375-22). Boeing presented this as a "take it or leave it" proposal. (Doc. # 375-18 at 30-32). AAI asked "repeatedly (3-4 times)" to know the prime contract numbers, but Boeing "refused to share" them. (Doc. # 375-22). AAI did not know the prime contract number when it entered into the LTRC for 2006, 2007, or 2008. (Doc. # 375-18 at 22).

On March 18, 2008, AAI accepted a reduced FY08 Bridge price of $3.25 million per aircraft, stating: "We accept the revised pricing, as it has been represented to us that it is being

requested by the customer to provide for flexibility in moving forward with the contract within government funding/budgetary constraints." (Docs. # 375-18 at 31-32, 365-16).

On March 19, 2008, Boeing agreed with the USAF to reduced FY08 Bridge pricing at the prime level. (Doc. # 375-24). Under the revised Bridge pricing for FY08, Boeing would receive $3.935 million per aircraft. (Doc. # 375-24).[6]

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). The substantive

---

[6] AAI's 30(b)(6) corporate representative testified as follows: "Q. [W]hat facts did Boeing suppress that [AAI] would have liked to have known in connection with this FY2008 pricing negotiations? A. I don't know that we -- that we were -- that we asked them or they suppressed facts." (Doc. # 375-28 at 23-24). Also, when asked if AAI had asked Boeing what prime contractor price it was getting from the USAF, AAI's representative testified "not to my knowledge. It was something that I personally would not have asked for." (Doc. # 375-18 at 22).

law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## III.    Analysis

AAI argues that it is entitled to a partial summary judgment on counts One through Four. It asserts that (a) Boeing is liable under Count One alleging breach of the MOA; (b) Boeing is liable under Count Three alleging breach of the NDA; and (c) it is entitled to a declaration that the limitation of liability provision in Section 11.1 of the MOA does not limit the damages that AAI can seek under Counts Two and Four for breach of the MOA or the NDA. (Doc. # 340).

Boeing opposes AAI's motion and further contends that it is entitled to summary judgment in this case. It claims that (a) under Counts Two and Four, the limitation of liability clause in the MOA is enforceable and applies to AAI's contract claims; (b) under Counts One and Three, AAI failed to perform under the MOA, Boeing did not breach the MOA, and, in any event, AAI cannot show a causal link between any alleged breach and the damages it claims; and (c) as to Count VII, regarding the Bridge Contract, Boeing did not fraudulently suppress any material information that it was under a duty to provide to AAI. (Doc. # 343).

The parties agree that Missouri law governs the contract claims in counts One through Four because the MOA contains a Missouri choice of law provision. (Docs. # 263-27 at 10, § 15; 342 at 8 n.1; 345 at 5). Alabama law governs the fraud claim in Count Seven.

The court addresses the parties' respective motions by analyzing their arguments related to each count of the operative Complaint, but in a slightly different order.

## A.    Count I - Breach of Contract

In Count I, AAI asserts that Boeing's June 2006 termination of the MOA based on the Amendment to the RFP that reduced the BEQ was a breach of the MOA and the associated WSA. (Doc. # 97).

### 1.    Breach of the MOA

In its letter terminating the MOA, Boeing explained that "[t]he reduction in requested quantities is so unfavorable to Boeing that further participation in the Program *pursuant to the MOA* is no longer practical or financially viable." (Doc. # 244-2) (emphasis added). Boeing cited Section 5.0(c) of the MOA as the basis for the termination. That section provides:

> After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.

(Docs. # 369-24, 367-8 at 7).

AAI argues that the MOA "did not allow Boeing to terminate the MOA for a reduction in the BEQ." (Doc. # 342 at 9). In support of its argument, AAI recounts the negotiations regarding section 5.0(c) leading up to the final version and its repeated insistence that any language which would have allowed for termination upon a reduction of the BEQ be removed. (*Id.*). It further notes that Boeing altered the language of section 5.0(c) in the termination letter to imply that the termination was in compliance with that section. (Doc. # 342 at 14).

In its response, and in its own Motion for Summary Judgment, Boeing focuses its Count I arguments primarily on the alleged breach of the WSA, rather than of the MOA itself. (Docs. # 346, 396). Boeing argues that the MOA unambiguously allowed for termination following an

amendment to the RFP. (Doc. # 396 at 37). In support of this argument, Boeing asserts that the WSA and the NDA are not separate agreements, but rather are all part of the MOA. (Docs. # 346 at 10-11, 396 at 25). If one reads the MOA, the WSA, and the NDA together, Boeing contends, that removes any ambiguity regarding Boeing's ability to terminate the MOA and continue to bid on the Recompete. Specifically, it points out, Paragraph 12 of the NDA provides that, if the relationship between the parties is terminated "pursuant to the terms of such MOA or subcontract, either party may pursue an independent contract either alone or in conjunction with other parties … ." (Doc. # 367-8 at 20).

Under Missouri law, "[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Military Acad*., 304 S.W.3d 98, 104 (Mo. 2010) (citing *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 650 (Mo. Ct. App. 1997)).

It is undisputed that the MOA constituted a contract between the parties. The writing contains the terms agreed to by the parties. As to the MOA, Boeing does not argue that AAI failed to perform. The pertinent question with regard to whether Boeing breached the MOA involves the meaning of language "participation in the Program" used in the section 5.0(c) of the MOA.

"Ambiguities in written instruments may be of two kinds: (1) patent, arising upon the face of the documents, and (2) latent." *Royal Banks*, 819 S.W.2d at 362 (citing *Busch & Latta Painting Corp. v. State Highway Comm'n*, 597 S.W.2d 189, 197 (Mo. Ct. App. 1980)). "A 'latent ambiguity' arises where a writing on its face appears clear and unambiguous, but some collateral matter makes the meaning uncertain." *Id*. (citing *Boswell v. Steel Haulers, Inc*., 670

S.W.2d 906, 912 (Mo. Ct. App. 1984)). "Where a contract is ambiguous, recourse must be had to evidence of external matters, bearing in mind the cardinal principle that the object is to determine the true intent of the parties." *Boswell*, 670 S.W.2d at 913. "Appropriate for consideration are the relationship of the parties, the circumstances surrounding execution of the contracts, the subject matter of the contracts, the acts of the parties in relation to the contract and any other external circumstances which would cast light on the intent of the parties." *Id.* (citing *N.B. Harty Gen. Contractors, Inc. v. W. Plains Bridge and Grading Co., Inc.*, 598 S.W.2d 194, 197 (Mo. Ct. App. 1980)).

Although this language may appear straightforward, after careful review the court concludes that, in context, the language is latently ambiguous. "'An ambiguity exists when there is more than one reasonable interpretation which can be gleaned from the contract language.'" *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 367 (Mo. Ct. App. 2008) (quoting *Harris v. Union Elec. Co.*, 622 S.W.2d 239, 247 (Mo. Ct. App. 1981)). "Whether an ambiguity exists depends on the context of the agreement." *Sherman v. Deihl*, 193 S.W.3d 863, 866 (Mo. Ct. App. 2006 (citing *Yerington v. La–Z–Boy, Inc*., 124 S.W.3d 517, 520 (Mo. Ct. App. 2004)). "A determination as to whether a [contract] is ambiguous is a question of law to be decided by the court." *Alack v. Vic Tanny Int'l. of Mo., Inc*., 923 S.W.2d 330, 337 (Mo. 1996) (citing *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 361 (Mo. 1991)).

Section 5.0(c) of the MOA clearly allows for termination upon the issuance of an amended RFP under certain circumstances. (Doc. # 367-8 at 7). One of those defined circumstances was "[a]fter the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the Prime or a Principal Subcontractor that participation in the Program is no longer practical or financially viable … ." (Doc. # 367-8 at 7). The "Program" is defined as

30

"the Program Depot Maintenance for the KC-135 Aircraft." (*Id.*). Therefore, Boeing had a right to terminate the MOA pursuant to its terms if the BEQ amendment made participation in the KC-135 PDM "Program" no longer practical or financially viable. Pursuant to section 12 of the NDA, if the MOA terminated pursuant to its terms, either party was free to pursue an independent contract to perform the KC-135 PDM work. (Doc. # 367-8 at 20).

During the negotiation of the MOA, AAI and Boeing both had concerns about the eventual BEQ and whether two sources of repair would end up being feasible. (Docs. # 341 at 16, 349-5 at 34-35, 350-9, 350-10). Early drafts of MOA § 5.0(c) allowed for termination by either party if the BEQ would not support two sources of repair. Boeing's early draft of MOA § 4.1 did not require Boeing to subcontract with AAI at an award of the Recompete contract if the number of aircraft fell below "the anticipated quantity." (Docs. # 341 at 15, 395 at 12, 350-26). AAI on the other hand wanted "to make sure that if the quantities dropped below a level that they could support work for both of us, that [the planes] would come to [AAI]." (Doc. # 349-5 at 35). Those negotiations resulted in MOA terms that are open to more than one reasonable interpretation. Could Boeing terminate the MOA under § 5.0(c) because the Amendment to the RFP made participation in the KC-135 PDM Program no longer practical or financially viable for it to proceed with AAI as a principle subcontractor? Or, alternatively, could Boeing only terminate the MOA under § 5.0(c) if the Amendment to the RFP made participation in the KC-135 PDM Program no longer practical or financially viable under any circumstances?

Because the contact is ambiguous, the object of the court's current inquiry is to determine the "true intent of the parties." *Boswell*, 670 S.W.2d at 913. The record evidence shows that the parties had competing interests and competing intents. Thus, a question of fact is raised as to whether there was actually a meeting of the minds on the termination issue. Therefore, the court

finds that genuine issues of material fact remain to be resolved by a jury on the claim that Boeing's termination of the MOA pursuant to § 5.0(c) was in breach of the MOA.

### 2.     Breach of the WSA and Section 1.1 of the MOA

Also under Count I, AAI argues that, in addition to breaching the MOA, Boeing also breached the WSA and the exclusive teaming arrangement found in § 1.1 of the MOA. The relevant clause of the WSA provides that, "[u]pon successful award of a contract for the program, it is agreed that [AAI] will receive 50% of all KC-135 PDM inductions." (Doc. # 367-8 at 13). Section 1.1 provides that "[t]he relationship established by this document shall be exclusive for each party with the others and the Parties agree that they will not enter into any teaming agreement with any other offeror under or for the Program defined herein." (Doc. # 367-8 at 4). Boeing argues that, under Missouri law, the WSA was an unenforceable "agreement to agree," and that the MOA terminated before the WSA was triggered. (Doc. # 346 at 37-39). It also complains that the claim regarding § 1.1 was raised for the first time at summary judgment. (Doc. # 396 at 48). Boeing also asserts that AAI has failed to present substantial evidence in support of the essential causation element of its breach of contract claim, *i.e.,* that its breach caused AAI's damages. (Doc. # 356 at 41).

As to § 1.1, Boeing did not enter into any teaming agreement with any other offeror. It continued to work with L-3, which was a party to the MOA - no one else. Moreover, the court is not persuaded that the parties' obligations under the WSA and § 1.1 survived the termination of the MOA. *See Katz v. Anheuser-Busch, Inc*., 347 S.W.3d 533, 541 (Mo. Ct. App. 2011) ("even though an arbitration provision in a contract may be presumed to survive the agreement's expiration, this presumption is overcome when, as here, the parties specifically expressed an intent to negate that presumption."); *see also Regions Bank v. Chattanooga-Hamilton Cty. Hosp.*

*Auth.*, 2014 WL 12621478, at *17 (N.D. Ga. 2014) ("In evaluating what clauses of a contract survive its termination, courts first look at enumerated items identified as intended to survive in the termination clause." (*citing Jackson Nat'l Life Ins. Co. v. Workman Secs. Corp.*, 803 F. Supp. 2d 1006, 1015 (D. Minn. Mar. 17, 2011)).[7]

In the MOA, the parties expressly agreed that "[t]ermination of the MOA shall not abrogate any Party's obligations regarding Proprietary Information disclosed prior to the effective date of termination." (Doc. # 367-8 at 8). That is, both sides expressly agreed that the obligations under the NDA would survive termination of the MOA. Thus, it is clear that the parties knew how to contractually provide for certain obligations to survive termination of the agreement. They did not include similar language in connection with the WSA. Nor did they do so for the exclusive teaming arrangement in § 1.1 of the MOA. Therefore, the court concludes that those obligations did not survive the termination of the MOA. Boeing is entitled to summary judgment AAI's claim that it breached the WSA and/or the exclusive teaming arrangement in § 1.1 of the MOA.

### 3.    Damages

Boeing further argues that is it entitled to summary judgment on AAI's breach of contract claims because AAI cannot establish that Boeing's alleged breach caused its alleged harm. (Doc. # 346 at 41). It argues that, "to prevail on Count I, AAI must establish that Boeing's termination of the MOA is what caused the Air Force not to award the Boeing/AAI team the Recompete Contract." (Doc. # 346 at 41-42). Boeing asserts that "[t]here is no evidence that the joint bid

---

[7] While contractual obligations may expire upon the termination of a contract, provisions that are structural (*e.g.*, relating to remedies and the resolution of disputes) may survive that termination. *Goshawk Dedicated v. Portsmouth Settlement Co.*, 466 F.Supp.2d 1293, 1300 (N.D. Ga. 2006).

would have won the Recompete Contract even if the MOA had remained intact." (Doc. # 346 at 42).

AAI responds that it "does not have to prove that the Boeing/[AAI] Joint Bid would have won the Recompete because it is indisputable that Boeing's breach of the MOA prevented any possibility of a successful Joint Bid." (Doc. # 392 at 31). It further argues that Boeing should not be able to profit from its breach of the MOA by now claiming that AAI cannot prove causation because of Boeing's unilateral actions. (Doc. # 392 at 34).

According to the Missouri Supreme Court,

The general rule as to the recovery of anticipated profits of a commercial business is that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. They may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable.

*Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968). However, where one party hinders performance by the other party, the hindering party may not avail itself of the nonperformance which it induced or occasioned. *In re President Casinos, Inc*., 419 B.R. 381, 389 (E.D. Mo. 2009) (citing 17A C.J.S. Contracts s 468, p. 645). That is, "where the breach alleged consists of prevention of performance, the party not in default *may* generally recover the profits which would have resulted to him from performance." *Harvey,* 37 S.W.3d at 819 (emphasis added). Thus, when a plaintiff sues for damages arising directly out of a breach of contract, he or she need not prove past profits or expenses. *BMK Corp. v. Clayton Corp*., 226 S.W.3d 179, 195 (Mo. Ct. App. 2007); *Harvey v. Timber Resources, Inc*., 37 S.W.3d 814, 818 (Mo. Ct. App. 2001).

After careful review, under the circumstances of this case, and for the reasons stated above, Boeing's argument that is it entitled to summary judgment due to AAI's failure to prove damages caused by its breach is without merit.

34

**B.      Count III – Breach of the NDA**

Count Three of the Third Amended Complaint alleges that Boeing breached the Non-Disclosure Agreement, executed on June 3, 2005, by using AAI's proprietary information in preparing its own successful bid for the KC-135 PDM recompete after terminating the MOA with AAI. (Doc. # 97).

**1.      Boeing's Motion and the Spoliation Issue**

With regard to evidence related to AAI's claim that Boeing breached the NDA, the court has already found there is evidence that Boeing employees intentionally destroyed potentially relevant Electronically Stored Information ("ESI") which it was under an obligation to preserve - not only under the NDA, but also under Federal Rule of Civil Procedure 37(e). (Doc. # 310) ("[T]here [] is sufficient circumstantial evidence for the court to conclude that Boeing's agents acted with an intent to delete (or destroy) ESI on Blake's computer in order to hide from [AAI] what Blake possessed at a time when Boeing should have anticipated litigation related to the terminated MOA and/or for a jury to infer that Boeing wished to conceal what information was on Blake's computer."). Accordingly, the jury must separately decide whether Boeing engaged in spoliation of relevant evidence.

The spoliation doctrine permits a trier of fact to draw an inference that, if evidence was destroyed in bad faith, the evidence would have been unfavorable to the party responsible for its destruction. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985). The court has already held that Boeing's "unexplained, blatantly irresponsible" destruction of Blake's ESI was done "with the intent to deprive AAI of the use of this information in connection with its claims against Boeing." (Doc. # 310 at 30).

Based on the court's spoliation finding, the court must assume that the deleted ESI was adverse to Boeing.

"At the summary judgment stage, the spoliation doctrine provides a basis for denying a motion for summary judgment where there is sufficient probative evidence for a jury to find an act of spoliation and to draw the inference derived from such an act." *Watson v. Edelen*, 76 F. Supp. 3d 1332, 1343 (N.D. Fla. 2015); *see also Stanton v. Nat'l R.R. Passenger Corp.*, 849 F. Supp. 1524, 1528 (M.D. Ala. Apr. 19, 1994) (giving prejudiced party adverse inference on summary judgment upon determining a question of fact existed as to whether opposing party committed sanctionable spoliation). Therefore, the court's prior ruling on the spoliation issue is a sufficient basis to deny Boeing's Motion for Summary Judgment on the breach of the NDA. To be clear, however, the court held only that, at trial, it would give the jury a permissive, rather than mandatory, adverse inference jury instruction. (Doc. # 310 at 30). Thus, AAI is not entitled to summary judgment on this basis.

### 2.  AAI's Motion for Summary Judgment on Count III

AAI argues that it has established as a matter of law that Boeing breached the NDA by using its proprietary pricing information to conduct an "apples to apples" comparison of AAI as a prime contractor and allowing personnel with knowledge of AAI's pricing to work on Boeing's solo bid. (Doc. # 342 at 19).

In response, Boeing argues that AAI's own failure to perform under the NDA renders it unable to recover on its breach of contract claim, and that the information it possessed regarding AAI's pricing as a subcontractor, rather than a prime, was irrelevant. (Doc. # 396 at 51, 56). Boeing asserts that there is evidence in the record that even AAI concluded that the information it provided to Boeing was "useless even to AAI." (Doc. # 396 at 57).

The court concludes that while AAI has presented evidence that Boeing breached the NDA, there is also evidence submitted by Boeing which creates a genuine issue of material fact as to whether Boeing used AAI's proprietary information in violation of the NDA. At a minimum, the following substantial evidence creates such a material issue of fact. First, record evidence shows that Boeing received AAI's price substantiation in a sealed envelope which was then provided to the USAF in the unopened, sealed envelope. (Doc. # 368-23, 368-24 at 2, 381 at 11, 393 at 8). Second, after the amendment to the RFP lowering the BEQ, Boeing asked for AAI's "best shot" pricing, but AAI never submitted it to Boeing. (Docs. # 369-12, 370-4 at 2-3). Third, Jeff Smith, AAI's then-VP of Finance and a developer of AAI's independent bid pricing model, testified that he did not "review any of [AAI's] information that [AAI] had prepared in connection with the joint bid" during the course of his work on the independent bid. (Doc. # 373-15 at 37-38, 49). Finally, there is Rule 56 evidence that even AAI did not find its alleged proprietary pricing information relevant to preparing its independent bid. (Docs. # 372-1 at 6, 367-24 at 66). Indeed, Smith confirmed that none "of the [AAI] pricing information that [AAI] prepared and submitted to the government in connection with the joint bid phase ha[d] any impact on [his] development of the independent bid cost model for [AAI]." (Doc. # 373-15 at 37-38, 49). This record evidence is sufficient to create a genuine issue of fact as to whether Boeing used AAI's proprietary information in violation of the NDA.

### C.      Counts II and IV - The Effect of the Limitation on Liability Clause

Counts II and IV of AAI's Third Amended Complaint seek a declaratory judgment that a separate clause of the MOA dealing with the Limitation of Liability, § 11.1, does not apply to either Count One, alleging a breach of the MOA, or Count Three, alleging a reach of the NDA.

The Limitation of Liability clause purports to bar recovery of consequential damages based on claims for breach of contract. Specifically, § 11.1 provides as follows:

> the following categories of damages are disclaimed by each Party, and the Non-breaching Parties neither expect[], nor will seek, to recover from the Breaching Party any incidental damages, punitive and exemplary damages and any consequential damages, including but not limited to the following: (a) any profits that the Non-breaching Parties expected to earn on the Prime Contract or any other contract related to the Program; ... .

(Doc. # 367-8 at 9).

The Missouri Court of Appeals has defined consequential damages as "those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement." *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 779 (Mo. Ct. App. 2008) (citation omitted). Black's Law Dictionary defines consequential damages as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." *Damages, Black's Law Dictionary* 17c (10th ed. 2014).

Boeing argues that it is entitled to summary judgment on these claims because the clause is enforceable under Missouri law and it expressly applies to Plaintiff's contract claims. (Doc. # 345). Boeing further argues that AAI's first draft of the MOA, sent to Boeing on May 3, 2005, included a similar limitation of liability provision. (Doc. # 345 at 16). In fact, AAI's first draft of the Recompete MOA contained the following provision (and the provision is in all caps): "IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES." (Docs. # 367-5 at 10; 377-17 at 5).

AAI argues that the clause does not apply to its claim that Boeing breached § 1.1 of the MOA or its claim that Boeing breached the NDA. (Doc. # 342). Specifically, AAI argues that § 1.1 of the MOA has its own damages provision which applies to breaches of that section. (Doc. # 342 at 26). It further argues that the Limitation of Liability clause does not apply to the NDA because it is a stand-alone contract. (Doc. # 342 at 29). Finally, AAI argues that the Limitation of Liability clause is not enforceable because Boeing acted intentionally in breaching the MOA and the NDA. (Doc. # 342 at 34).

"Sophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights." *Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc*., 59 S.W.3d 505, 508 (Mo. 2001). "This freedom includes the right to contractually limit future remedies for consequential damages." *Union Elec. Co. v. Chicago Bridge & Iron Co*., 2015 WL 1262941, at *3 (E.D. Mo. Mar. 19, 2015), *order clarified*, 2015 WL 2193809 (E.D. Mo. May 11, 2015). Here, the parties agreed to limit damages recoverable for a breach of contract. Boeing argues the limitation is enforceable as "[c]lear, unambiguous, unmistakable, and conspicuous limitations of negligence liability do not violate public policy." *Purcell Tire*, 59 S.W.3d at 508.

"Where both parties are sophisticated businesses and damages are economic, courts rarely find that liability limitations are unconscionable." *Purcell Tire*, 59 S.W.3d at 510 (citing *Roy A. Elam Masonry, Inc. v. Fru–Con Constr. Corp.*, 922 S.W.2d 783, 790 (Mo.App.1996) 790; *Liberty Fin. Mgmt. Corp. v. Beneficial Data Processing Corp.,* 670 S.W.2d 40, 49-50 (Mo.App.1984)). "Missouri courts 'have afforded little sympathy to a party who did not understand the consequences of an act.'" *Silgan Containers Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 2*, 820 F.3d 366, 370 (8th Cir. 2016) (quoting *Parks v. MBNA Am. Bank*, 204 S.W.3d 305, 314 (Mo. Ct. App. 2006) (internal quotations omitted)).

First, whether the Limitation of Liability clause applies to a breach of § 1.1 of the MOA is of no concern. The court has already held that Boeing is entitled to summary judgment on any claim that it breached § 1.1 because the terms of that provision did not survive the termination on the MOA. But even if this issue remained a concern, § 1.1 by its terms applies to direct damages. (Doc. # 367-8 at 4). Section 11.1 applies to "any incidental damages, punitive and exemplary damages and any consequential damages … ." (Doc. # 367-8 at 4). Therefore, the clauses are not necessarily in conflict.

As to whether the Limitation of Liability is enforceable with regard to intentional breaches, the Supreme Court of Missouri has "held limitations or shifts of liability in contracts are enforceable if the exculpatory or indemnity clause contains clear, unambiguous, unmistakable, and conspicuous language." *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 47 (Mo. 2017) (citing *Alack v. Vic Tanny Intern. of Mo., Inc*., 923 S.W.3d 330, 337-38 (Mo. banc 1996)). Here, without question, the clause was clear and unambiguous. Moreover, a similar clause was actually proposed by AAI in its initial MOA draft proposal. AAI's "argument that the clause does not apply because the breach was in bad faith asks this Court to adopt a reading [] that has never been adopted in … Missouri." *Foam Supplies, Inc. v. Dow Chem. Co*., 2008 WL 3159598, at *4 (E.D. Mo. Aug. 4, 2008). Indeed, "[t]his argument, if accepted, would render almost all limitations clauses invalid, as most contract breaches are intentional." *Foam Supplies,* 2008 WL 3159598 at *4. A party's "subjective intent when it breached the contract has *no bearing* on whether the limitation on liability clause is valid." (*Id.*) (emphasis added).

AAI also contends that the clause is unenforceable because Boeing entered into the MOA in bad faith. However, the fact remains that AAI and Boeing were both sophisticated businesses and the Limitation of Liability clause was clear and unambiguous. Furthermore, AAI's draft of

the MOA contained a similar clause, as did an MOA between the parties from 2000. (Doc. # 364-7 at 6). And, this argument ignores the undisputed fact that AAI also proposed a similar limitation on liability. Many breaches of contract are intentional in nature. Under these circumstances, where the liability limitation applies only to contract claims, and not tort claims, it is not unconscionable. *See Sports Capital Holdings (St. Louis), LLC v. Schindler Elevator Corp. & Kone*, 2014 WL 1400159, at *4 (E.D. Mo. Apr. 10, 2014). Therefore, AAI's argument that the clause does not apply to an intentional or bad faith breach of the MOA is without merit. Boeing's Motion seeking a declaration that the clause is applicable to the breach of the MOA is due to be granted.

Finally, as to whether the Limitation of Liability clause applies to a breach of the NDA, AAI argues that it does not because the NDA is a separate, stand-alone contract. (Doc. # 342 at 29). Boeing counters by saying that the plain language of both the MOA and the NDA makes clear that they are *one* contract. (Doc. # 396 at 26). Boeing also notes that AAI's current argument conflicts with AAI's previous positions in this litigation. (*Id.*).

Paragraph 6.0 of the MOA expressly incorporates the NDA into the MOA: "PROPRIETARY INFORMATION … Proprietary Information will be treated according to the Non-Disclosure Agreement executed separately by the Parties, incorporated herein by reference as Exhibits 'C' and 'D'." (Doc. # 367-8 at 8). Paragraph 17 of the MOA is a merger clause titled "ENTIRE AGREEMENT" that states "[t]his MOA together with its Exhibits and Attachments contains the entire agreement between the Parties concerning the subject matter hereof[.]" (Doc. # 367-8 at 11). The NDA contains its own merger clause titled "Entire Agreement" which provides "This Agreement contains the entire understanding between the parties concerning the subject matter hereof, superseding all prior or contemporaneous communication, agreements,

and understandings between the parties with respect to the disclosure and protection of Proprietary Information relating to the purpose of this Agreement. The rights and obligations of the parties shall be limited to those expressly set forth herein." (Doc. # 367-8 at 20). The NDA was executed on June 3, 2005. The MOA was executed at the end of August and the beginning of September 2005. Thus, the parties deliberately incorporated the pre-existing NDA into the revised MOA, which contains the Limitation of Liability clause.

"Matters incorporated into contract by reference are as much a part of the contract as if they had been set out in the contract in *haec verba*." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. Ct. App. 2006) (citing *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 839 (Mo. Ct. App. 2004), *as modified* (Apr. 27, 2004)). "So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement … ." *Intertel*, 204 S.W.3d at 196. "Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument." *Intertel*, 204 S.W.3d at 196 (citing Richard A. Lord, *Williston on Contracts* Section 30.25 at 234–35 (4th ed.1990).

"Contract interpretation is a question of law." *Lacey*, 131 S.W.3d at 838. Here, two sophisticated businesses agreed to incorporate a preexisting agreement (the NDA) into a new one (the MOA). The MOA had a clear, conspicuous Limitation of Liability clause. Under these circumstances, the court concludes, as a matter of law, that the MOA's Limitation of Liability

clause applies not only to a breach of the MOA, but also it applies to a to a breach of the incorporated NDA.

### C. Fraudulent Suppression

In Count Seven of its Third Amended Complaint, AAI alleges that Boeing suppressed certain material facts in connection with the Bridge Contract. (Doc. # 97). In response to Boeing's Motion on this claim, AAI has conceded its fraudulent suppression claims based on pricing of the FY2009 and FY2010 planes. (Doc. # 392 at 53, n.47). AAI's remaining fraudulent suppression claim is based on Boeing's refusal to disclose its 2008 prime pricing for KC-135 PDM work. (Doc. # 97). In light of AAI's concession, the court addresses that claim, and only that claim.

AAI specifically requested Boeing's 2008 prime pricing. But Boeing argues that it is entitled to summary judgment because it truthfully and unambiguously told AAI that it would not make that disclosure. Boeing contends that, under Alabama law (which applies to this claim only), such a straightforward refusal to disclose the requested information is not fraudulent suppression. (Doc. # 347 at 5).

AAI asserts that there is a question of material fact as to whether Boeing fraudulently suppressed (1) information indicative of the amount of USAF funding available for the 2008 planes and (2) Boeing's prime pricing for those planes. (Doc. # 392 at 53). To be clear, Count Seven advances only a suppression claim, *not* a misrepresentation claim. AAI had previously asserted a misrepresentation claim in Count Six of its Second Amended Complaint. (Doc. # 34 ¶ 245 ("That the USAF only had $26 million of funding available to pay for PDM work on 8 aircraft (i.e., $3.25 million per aircraft), and a correspondingly low $3.25 million for each additional aircraft that could be sent to Plaintiff, i.e., that the only way the work could be

obtained was by Plaintiff agreeing to do the PDM work for $3.25 million per aircraft.").

However, the court dismissed Count Six because:

> The Second Amended Complaint does not allege that the [] false representation concerned a *material existing fact*. Rather, it assumes based on hindsight that the representations must have been false when made. Plaintiff's failure to allege that the statements were false when made negates Plaintiff's misrepresentation claim, particularly on a third attempt at drafting the claim. *Allen v. Baker*, 99 So.3d 324, 331 (Ala.Civ.App. 2012) (where the alleged misrepresentation is a truthful statement, an essential element of a misrepresentation claim is negated); *see GE Capital Aviation Services, Inc. v. Pemco World Air Services, Inc.*, 92 So.3d 749 (Ala. 2012) (where there is no evidence8 that the representation at issue was false, a fraud claim fails as a matter of law).

(Doc. # 55 at 17). AAI's argument regarding the amount of USAF funding available for the 2008 planes, made in response to Boeing's Motion regarding Count Seven, seeks to revive a misrepresentation claim which the court previously dismissed. It is not entitled to do so.

The remaining suppression claim under Count Seven relates only to AAI's direct inquiry to Boeing for its prime pricing. (Doc. # 55 at 19-20). "The elements of a cause of action for fraudulent suppression are: (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Lambert v. Mail Handlers Benefit Plan*, 682 So.2d 61, 63 (Ala.1996) "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Lawson v. Harris Culinary Enterprises, LLC*, 83 So.3d 483, 492 (Ala. 2011). The court evaluates this remaining claim below.

## A.     Boeing Undertook No Duty to Speak

As the court has already concluded, the parties did not have a confidential relationship which would give rise to a duty to speak. (Doc. # 55 at 19-20). The September 2005 MOA

defined the parties' relationship as follows: "Nothing in this MOA shall constitute, create, give effect to or imply a joint venture, partnership, or formal business organization. Each Party is an independent contractor and not an agent for the other Party. ... No such relationship is intended by any reference herein to a 'team' or 'team members.'" (Doc. # 40-6). Although AAI and Boeing agreed to attempt to work together for their mutual benefit, they were both sophisticated businesses, experienced in their work, and generally operated as competitors. (Doc. # 55 at 19-20).

Despite the ruling on the parties' relationship, the court allowed discovery to proceed on this claim to determine whether there was evidence that AAI posed direct inquiries to Boeing which may have given rise to a duty to speak. "[I]n a commercial transaction involving arm's length negotiations, the parties have no general obligation to disclose any specific information to the other, but each has an affirmative duty to respond truthfully and accurately to direct questions from the other." *CNH Am., LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1201 (Ala. 2013) (citing *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So.2d 883, 892 (Ala. 2005)). "'A disclosing party cannot be punished for fraudulent suppression unless the questioning party articulates with reasonable clarity the particular information it desires.'" *Freightliner,* 932 So.2d at 893 (quoting *Shutter Shop, Inc. v. Amersham Corp.*, 114 F.Supp.2d 1218, 1226 (M.D. Ala. 2000)).

Boeing is entitled to summary judgment on this claim unless AAI can present evidence that it made a direct inquiry on the subject to Boeing, and that Boeing voluntarily undertook to speak in a way that required full disclosure. *See Spearman v. Wyndham Vacation Resorts, Inc.*, 69 F. Supp. 3d 1273, 1286 (N.D. Ala. 2014). The evidence shows that, during a March 17, 2008 telephone call, AAI directly asked Boeing what its prime contract pricing to the USAF was for

the FY08 planes. But Boeing explicitly refused to answer. (Doc. # 375-22 at 2). Fully aware that it did not have the information it requested, AAI accepted the revised pricing under the Bridge Contract. (Doc. # 365-16).

AAI argues that because it asked, Boeing had a duty to answer. (Doc. # 392 at 53). Boeing argues that AAI's suppression claim fails because it explicitly refused to answer. (Doc. # 408 at 46-47).

"Silence is not actionable fraud absent a confidential relationship or some special circumstances imposing a duty to disclose." *Cato v. Lowder Realty Co*., 630 So. 2d 378, 383 (Ala. 1993) (citing *Wilson v. Brown*, 496 So.2d 756, 759 (Ala. 1986); *Cooper & Co. v. Bryant*, 440 So.2d 1016 (Ala. 1983)). In Alabama, "even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure." *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C*., 932 So. 2d 883, 895 (Ala. 2005) (citing *Ellis v. Zuck*, 409 F.Supp. 1158 (N.D. Ala. 1976) (in turn citing *Jackson Co. v. Faulkner*, 55 Ala.App. 354, 315 So.2d 591 (1975))). "'[W]here one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth.'" *Cato*, 630 So. 2d at 383 (quoting *Boswell v. Coker*, 519 So.2d 493 (Ala. 1987)).

Here, the undisputed Rule 56 evidence makes clear that Boeing explicitly refused to provide the requested information. In light of such a candid and clear refusal to disclose, Boeing clearly did not voluntarily undertake to speak in a way that required full disclosure. To the

contrary, Boeing plainly made it clear that it chose not to speak on the subject. The theory behind a suppression claim like this one is that one believes it has been provided all relevant information when in fact it has not. Here, Boeing explicitly refused to respond to the inquiry. Therefore, AAI could not have been under the impression it had all relevant information or that Boeing was "suppressing" any such information. AAI knew that rather than suppressing the relevant information, Boeing flatly refused to provide the information requested. And, when AAI decided to act, it knew fully that it did not have the information it requested. On these facts, AAI has not presented evidence sufficient to create a genuine issue of material fact as to its suppression claim.

## IV.     CONCLUSION

For all of the foregoing reasons, AAI's and Boeing's Motions for Summary Judgment are due to be granted in part and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this August 15, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE