

FILED
2019 Apr-15  AM 08:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **ALABAMA AIRCRAFT INDUSTRIES, INC.,** | ) | |
| **ALABAMA AIRCRAFT INDUSTRIES, INC. –** | ) | |
| **BIRMINGHAM, and PEMCO AIRCRAFT** | ) | |
| **ENGINEERING SERVICES, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 2:11-cv-03577-RDP** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE BOEING COMPANY, BOEING** | ) | |
| **AEROSPACE OPERATIONS, INC., and** | ) | |
| **BOEING AEROSPACE SUPPORT CENTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AAI'S RESUBMITTED REPLY BRIEF IN SUPPORT OF AAI'S MOTION TO
EXCLUDE PORTIONS OF
<u>THE REPORT AND TESTIMONY OF AVRAM TUCKER</u>**

**(Resubmitted to Replace Doc. 476, Which AAI Withdraws)**

## <u>TABLE OF CONTENTS</u>

I.    Tucker Learning Curve Opinions Fail To Comply With *Kumho* And 11th Circuit Law ..... 1

II.   Tucker's Legal Contract Interpretations, Framed As "Industry Experience" Opinions, Fail To Show Relevant Experience Reliably Leading To His Conclusions. ........................... 4

III.  Boeing Does Not Refute that Tucker's Repeated Opinions on the Purpose of the Apples-to-Apples Comparisons Constitute Impermissible State of Mind Opinions...................... 6

IV.   Tucker Not Only Fails To Comply With 11th Circuit *Frazier* Requirements For Relying On "Experience" To Support Expert Opinions, Tucker's Report Is Also Devoid Of Any Showing Of Relevant "Experience" And His Deposition Exposes His Total Lack Of Any Comparable, Relevant Experience, Particularly On MOA § 5.0c. .................................. 8

CONCLUSION.................................................................................................................... 10

CITED EXCERPTS OF AVRAM TUCKER DEPOSITION .......................................EXHIBIT 1

## <u>TABLE OF AUTHORITIES</u>

Cases

*Ala. Aircraft Indus., Inc. v. United States*, 83 Fed. Cl. 666, 673 (2008)..................................... 2, 3

*Bivins v. Stein*, No. 17-14978, 2018 WL 6720628, at *3 (11th Cir. Dec. 20, 2018) ..................... 9

*Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1231-32 (N.D. Ala. 2011) ................................................................................................................................................ 9

*Hughes v. KIA Motors Corp.*, 766 F.3d 1317, 1327, 1330 and n.10 (11th Cir. 2014) .................. 4

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)............................ 7

*United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) ................................... 1

*Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245, 1248-49 (11th Cir. 2018) .................. 4

## I.  Tucker Learning Curve Opinions Fail To Comply With *Kumho* And 11th Circuit Law

Boeing claims that Avram Tucker's opinions, particularly his learning curve and MOA termination opinions, are based on his "experience," as a "non-scientific" expert.[1] Tucker's opinions, *see, e.g.* Doc. 467-2 at 23 ¶ 44,  are written as though they were established, undisputed fact, without even including any preface such as, "It is my opinion, based on my experience which I've applied as follows." The referenced *ex cathedra* opinion (repeated or reflected in other portions of Tucker's report which AAI moves to exclude[2]), merely parrots what *Boeing considered* (*i.e.*, not Tucker's own relevant experience or independent analysis) in abruptly switching from a "flattened" learning curve to a "continuous" learning curve to underbid Pemco/AAI. It cites no specific, relevant continuous learning expert experience or analysis of Tucker himself **and provides no explanation** of (1) *how* his learning curve experience is relevant and "leads to" the underlined opinion,  (2) *why* his experience "is a sufficient basis for the opinion" expressed in the underlined portion, or (2) "*how* that experience is *reliably applied* to the facts." *See United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) (underlined emphasis added).[3]

Tucker is merely telling the jury, "this is what Boeing considered and what the Air Force did, and as an expert, I'm telling you to believe such Boeing and USAF conduct was 'reasonable' for Boeing's economics and financials." Such statements, unsupported by *Frazier*-required demonstrations of *applying* actual, reliable, relevant experience, are inadmissible.

---

[1] *See* Doc. 474 at 5, 7, 8, 16, 17.

[2] *See* Doc 467-2 at 53-4 ¶ 118, and at 115 ¶ 234; also *id.* at 15-16 ¶¶ 20-24; 38-9 ¶¶ 86-88; 40 ¶¶ 90-91; 49 ¶ 109; 53-58 ¶¶ 117-126; 71 ¶ 150; 75 ¶ 160; 87-8 ¶¶ 177-78; 115 ¶ 231; 116 ¶ 235; 121 ¶ 245; 123 ¶ 248; 135 ¶ 269.

[3] Boeing blames AAI for not asking Tucker during his deposition to recite instances of learning curve experience. Doc. 474 at 7.  Boeing's argument puts the cart before the horse. It was incumbent upon Tucker, who provided a total of **22 pages** listing "experience" and qualifications (Doc. 467-2 at 9-14 ¶¶ 4-19 and at 168-183), to have included in his report at least a single word about "learning curve" or "continuous improvement" experience, if (as was the case) his report was premised on "experience." Those 22 pages do not include a single word or mention of any prior Tucker experience in evaluating, studying, researching, writing about, or opining on learning curve theory or continuous improvement versus finite-ending improvement (whether in the PDM field or any other field of work).

1

Boeing's abrupt February 2007 switch of learning curve assumptions was <u>the key data manipulation by which Boeing won the contract award.</u> Yet, both Boeing and Tucker avoid any analysis of trial findings of the Court of Federal Claims (COFC), relying, instead, on snippets of USAF and GAO proceedings nowhere near as explorative as was the subsequent COFC hearing. As the learned Judge Charles Lettow found, "[e]ssential to the ultimate decision of the Air Force to award the contract to Boeing was the manner in which the competitors constructed and used their 'learning curves.'" *Ala. Aircraft Indus., Inc. v. United States*, 83 Fed. Cl. 666, 673 (2008), and "Boeing's decision to embrace a [continuous] learning curve in its final proposals accounted for its lower price." *Id.* at 701. Judge Lettow's findings contradict virtually all the major assumptions used by Tucker.[4] Relying on early GAO stages (with little fact record) of protest proceedings and utterly ignoring merits judicial review (with an extensive fact record) of the learning curve issue, thus not dealing with inconsistencies and contradictions, represents a total abandonment by Tucker of any valid forensic or expert methodology.[5]

AAI's motion initially teed up the methodological and reliability deficiencies in Tucker's opinions, including the *Kumho*/*Frazier* issue of what constitutes proper expert reliance on "experience" (*see* Doc. 467 at 7-9),  thus giving Boeing the opportunity to provide specific rebuttals (if it could) to AAI's assertion that Tucker's report violates the *Frazier* "how/why/how" requirements for admission of an expert opinion relying on experience. But, Boeing's opposition (Doc. 474) fails to provide references to either the Tucker report or Tucker deposition) sufficient to answer AAI's showing that Tucker:

---

[4] From a methodological viewpoint, regardless whether the USAF, the GAO or the COFC was correct about learning, Tucker chose to ignore any inconvenient facts and court findings that would undermine his slavish adoption of the Boeing narrative. Our Circuit rejects as unreliable an expert's opinion which does not consider inconvenient facts.

[5] The Court of Federal Appeals' 2009 reversal of the COFC injunction decision on purely administrative law doctrine grounds did not undertake to address or rule on the merits of the learning curve analysis and certainly does not undercut the issue presented here, of Tucker's utter failure to use proper forensic CPA methodology and his alleged reliance on non-existent *relevant* experience instead of forensic analysis.

- cited no prior instance of his having experience specifically with any learning curve theory, much less any prior instance of study of "continuous" learning in performance of PDM maintenance on 50+ year-old planes inducted on irregular schedules.
- Failed to show **how** any of his *experience* leads to his "economic/financial reasonableness" opinion on switching to continuous learning.
- Failed to show **why** any of his *experience* is a sufficient basis for his "economic/financial reasonableness" opinion on switching to continuous learning.
- Failed to show **how** such *experience* is reliably applied to the facts of Boeing's conduct in this case (e.g., (i) its longtime use of non-continuous learning based on valid and sufficient reasons it provided the USAF contradicting Tucker's current opinion, (ii) its abruptly switching assumptions less than 3 months later, *when Boeing's covert win pricing comparisons indicated Boeing still could not otherwise safely underbid Pemco* and (iii) its failure to explain its abrupt reversal its final bid submissions).[6]

Boeing's assertion that "Check, did not rely on any studies or peer reviews of the type AAI insists Mr. Tucker should have cited" (Doc. 474 at 18) totally misses the point, as – unlike Tucker – Check does not attempt to rely on "experience" as the basis for his learning curve conclusions. Instead, Check relies on detailed, forensic deconstruction of Boeing pricing modeling of learning curve impacts on its bid prices as compared to Boeing's actual PDM performance data and Boeing's bubble chart tracking of PDM hours per plane, among other stated analyses. It is highly **unlikely** that any independent scientific studies of "continuous learning" **in KC-135 PDM operations** existed (the record here cites none from any source). With no **relevant** studies for Tucker to rely upon (and he cites no such studies), and Tucker not having performed a prior forensic, analytical study of continuous learning in PDM operations before accepting a rebuttal role here 10 years after the events, then, beyond doubt, Tucker has no basis upon which to rely on "experience" (his own or any other expert's) in continuous learning in this PDM field.[7] Absent

---

[6] Tucker's method involved ignoring judicial findings in review of USAF conduct Tucker relies upon. Judge Lettow found "Boeing's final proposal did not address why it implemented a [continuous learning curve] in light of the concerns the company expressed in response to the Air Force's inquiry" in 2006. *Ala. Aircraft*, 83 Fed. Cl. at 698.

[7] Indeed, Tucker admitted he did not know the content of any systematic *Boeing* study (if any exists, as Tucker said he did not see one and no such study was ever produced by Boeing during document production) about what would have to cover achievability of continuous learning/improvement year after year for 10 years in KC-135 PDM work. *See* Doc. 352-52 at 91 (361:6-362:11).

such personal experience and absent published, peer-reviewed studies of continuous learning about PDMs on aged aircraft, it was incumbent for Tucker to employ accepted CPA methodologies of analysis of objective performance data that (i) applied "professional skepticism" as to any client (Boeing)-supplied explanations, (ii) tested his resulting conclusions against (and to exclude) alternative scenarios contrary to his conclusion, *see Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245, 1248-49 (11th Cir. 2018), and (iii) used the "falsify-one's-conclusions" testing method used as a yardstick by the trial court and sustained in *Hughes v. KIA Motors Corp.*, 766 F.3d 1317, 1327, 1330 and n.10 (11th Cir. 2014) (upholding exclusion of opinions).  As laid out in Check's report and admitted by Tucker's own deposition testimony,[8] Tucker did not use or follow the methods and standards of the forensic accounting profession in his opinions challenged here. In short, Tucker was reduced to merely listing what *Boeing* "considered" (in the space of a single day in early February 2007) and then attaching a mere "economic/financial reasonable" label to the three factors that *Boeing* allegedly considered.

By reciting and blindly accepting *Boeing's* post-hoc excuses for its switch to continuous learning as the basis of his own opinion, Tucker brings no expertise of his own to the table. If he relied on any Boeing data, then professional standards require that he consider *all* of Boeing's bubble chart tracking and other data, which he admits he did not do (*see* note 8).

## II.     Tucker's Legal Contract Interpretations, Framed As "Industry Experience" Opinions, Fail To Show Relevant Experience Reliably Leading To His Conclusions.

In his deposition, Tucker admits his MOA opinion is based on the assumption that § 5.0c

---

[8] Tucker admitted in his deposition that: (i) he made no analysis of most of the relevant and "available" Boeing data, *see* Doc. 352-52 at 90 (358:23, 359:17-19, and 360:1-6), including admissions he did not study the internal Boeing touch labor hour "bubble" charts that, for example, AAI expert Check had analyzed (*see* Doc. 416 at 23 n.18 and 27); (ii) he knew of no Boeing studies or other documents from 2006-2007 evaluating continuous learning (see Doc. 352-52 at 91 (361:6-369:7)); and (iii) he ceased his own analytical activity once he was provided with the USAF 2008 report (Doc. 352-52 at 91 (362:13-18)), itself a product of Boeing's concealment of updated performance data from the USAF as demonstrated in AAI's initial brief here (*see* Doc. 467 at 26-31).

calls for non-KC135 programs at San Antonio to become part of financial feasibility calculations, and further admits he uses assumptions based on his writing the words "with Pemco" into § 5.0c (i.e., that Boeing can dissolve the teaming with Pemco but still compete for the "Program," defined as solely the KC135 PDM program). He thus admits his opinions are colored by and based on his view (interpretation) that § 5.0c "covers" the circumstance that Boeing could terminate Pemco as a teaming partner and still participate in the "Program." See, Doc 352-52 at 27-28 (108:15-109:7).[9] By phrasing all his MOA-related opinions as declarative statements, and inserting words that do not exist in § 5.0c to flip its meaning 180 degrees, Tucker cleverly instructs the jury what the contract legally means, and presents his interpretation of § 5.0c as the proper interpretation.

Thus, Tucker Report ¶ 22 (Doc. 467-2 at 15) in two sentences states two opinions in absolute declarative terms (e.g., "X is Y"), repeated numerous times in later paragraphs in Tucker's report (Group II opinions as listed in Doc. 466 at 6), each of which seeks to cleverly communicate a legal contract interpretation to the jury. His first sentence essentially communicates a legal contract interpretation which says to a jury: "After the Air Force reduced the BEQs, MOA § 5.0c entitled Boeing unilaterally to determine to 'continue' pursuit of the "Program" as a Recompete bidder without Pemco." His second sentence effectively communicates this further unqualified legal interpretation to the jury: "Section 5.0c entitled Boeing to use 'impact on other Boeing work at the San Antonio location' as a principal decision determinant." Methodologically, Tucker fails to test the validity of his opinion under other alternative ways the contract can be interpreted.

Tucker executes and communicates his first legal interpretation using two subtle

---

[9] See also following Tucker testimony, relating to his opinions that MOA infeasibility determinations included impacts on non-KC-135 San Antonio programs: Doc 352-52 at 22-23 (88:7-89:14) and 95 (378:17-380:19); see also, *id*. at 37-38 (148:20-149:8); and 63-64 (252:10-253:9). Tucker admits he based his MOA § 5.0c conclusions on additions of **non-MOA wording** such as "with Pemco," *id*. at 20-28 (77:22-109:7) or "pursuant to the MOA," *see id*. at 27-28 (108:15-109:7) and 95 (377:13-378:15).

5

techniques: (1) <u>slipping two additional words – *with Pemco* – into § 5.0c which do not exist in the MOA contract</u>, parroting the Boeing "interpretation" of the MOA contract,[10] and (2) <u>reading the contract as if none of the other numerous BEQ-dependent provisions exist, which bear on the "practical or financially viable" issue</u>, e.g., those which take into account anticipated BEQ reductions to provide for Pemco's performing a "minimum" of 50% of reduced BEQs (*e.g.*, MOA (Doc. 263-27) §§ 1.5, 4.1 and its Exhibit A, Work Share Agreement).

Tucker executes and communicates his second legal interpretation of the contract by using the sly technique of treating the phrase containing a defined term, "participation in the *Program*," as being unrelated to the ensuing words, "practical or financially viable" and therefore surplusage that is unworthy of mention in his opinion which he then uses to open the door to his taking cognizance of impact on *non-"Program"* work at San Antonio.

Beyond providing legal contract interpretations as accomplished fact, Tucker purports to rely on his "experience" to support his MOA conclusions, when it is now certain that (1) Tucker has no *relevant* experience with the fact circumstances presented in this case, *see* Section IV *infra*, and (2) whatever experience Tucker claims is not described in any detail nor reliably applied to the facts, to explain *why* and *how* such experience leads to his stated conclusions.

### III.    Boeing Does Not Refute that Tucker's Repeated Opinions on the Purpose of the Apples-to-Apples Comparisons Constitute Impermissible State of Mind Opinions.

Boeing's reply brief never grapples with Tucker's *opinion*, stated at least four times in his Report,[11] attributing a benign <u>purpose, intent, and motive of Vietor, Smith and their cohorts in</u>

---

[10] Tucker repeatedly uses this technique and admits to exclusively using Boeing's <u>interpretation</u> as if it were his as well. *See* Doc. 352-52 at 24 (93:1-17) ("[M]y understanding of **the interpretation**, or **Boeing's interpretation** of these . . . Boeing does **interpret the contract** that way, yes.") and at 27 (106:18-19) ("I'm doing an analysis **based on Boeing's interpretation**.") (emphasis added to the foregoing); *see also id.* at 28 (109:1-7) where Tucker, when asked if his opinion was "from the perspective of Boeing's interpretation," answered, "It's based on my understanding of Boeing's participation and also because this is an MOA with Pemco."

[11] *See* Doc. 467-2 at 22 ¶ 41; 101 ¶ 207; 103 ¶ 209; and 112 ¶ 225.

performing the Apples-to-Apples and related "win price" pricing comparisons, instead of the illegal objective to compare Pemco pricing as a would-be competitor. Tucker opines that Boeing was only motivated by preparing for a joint Pemco/Boeing FPR bid.[12] Tucker's "conclusions" about Boeing's *purpose* in conducting its several Pemco/Boeing pricing comparisons remain "state of mind" opinions of the very type Boeing accuses AAI expert Check of preparing to give. A leading case, cited by Boeing in its motion regarding Check, has ruled, "To the extent Merck's motion seeks to preclude Dr. Parisian from testifying as to the knowledge, motivations, intent, state of mind, **or purposes** of Merck, its employees, the FDA, or FDA officials, it is GRANTED." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (emphasis added).

Despite Boeing denials, Tucker's "conclusions" clearly opine on the purposes and intentions of Vietor and Smith running price comparisons. *See, e.g.*, Doc. 467-2 at 103 ¶ 209. Tucker cites as his authority for that statement of purpose not the content of the pricing comparisons (which *content*, by Check's demonstrations, shows Vietor and Smith were, indeed, undertaking analyses of Pemco pricing as a would-be competitor) but, instead, undocumented "discussions" Tucker held with Wright, Vietor and Smith to understand and regurgitate the storyline that they informed him was Boeing's purpose, intent and objective. *See* Doc. 467-2 at 103 **nn. 286, 287**. Such basis for his opinion (the undocumented Wright/Vietor/Smith "discussions" he purports to have held) do not cite any contemporaneous 2006 Boeing document whose wording and content *tells* the reader that the Apples to Apples and related win pricing modeling of Pemco as a Prime Contractor was (as Tucker now opines) merely for purposes of

---

[12] Such Tucker *opinion* includes his related conclusion that Boeing's persistence in maintaining the $3.5 million "win price," an objective Boeing tested in such Pemco pricing comparisons, long after Blue Team analysis of Lockheed showed Lockheed was not a threat to underbid Boeing, was nevertheless still purposed toward a joint 2006 FPR bid with Pemco. *See* Doc. 467-2 at 103 ¶ 209 and nn. 286-87.

preparing Boeing's joint June 30, 2006 FPR bid with Pemco as a subcontractor teammate.[13]

Similarly, Tucker opined: "Boeing's records demonstrate that Boeing's 'Apples to Apples' analysis was <u>not prepared to determine</u> an independent Pemco proposal price; <u>rather</u> it was <u>prepared in anticipation of</u> Boeing's June 2006 FPR (which would have been a proposal including Pemco)." Doc. 467-2 at 22 ¶ 41 (emphasis added). Telling the jury "why" the preparation of the Apples to Apples comparison was  really conducted is no more than a cleverly-packaged statement of motive, intent and purpose just the same as if he had explicitly written, "Boeing's Apples to Apples analysis was not prepared *for the purpose or intent of determining* an independent Pemco proposal price; rather, it was only prepared *for the purpose* of making a joint FPR bid."  His opinion conveys the same improper state of mind opinions to the jury (*i.e.*, that Boeing's purpose was not to make pricing comparisons on Pemco as a prime competitor, illegally aided by use of Pemco's data; "rather," Boeing's purpose was only to prepare a joint bid with Pemco). AAI's motion to exclude on such bases is well-founded and remains unrebutted by Boeing's opposition.

**IV.   Tucker Not Only Fails To Comply With 11th Circuit *Frazier* Requirements For Relying On "Experience" To Support Expert Opinions, Tucker's Report Is Also Devoid Of Any Showing Of Relevant "Experience" And His Deposition Exposes His Total Lack Of Any Comparable, Relevant Experience, Particularly On MOA § 5.0c.**

In terms of being able to demonstrate any truly comparable prior experience studying and evaluating either (i) terminations of government contractor teaming MOAs under provisions similar to § 5.0c and the Recompete circumstances involved here, or (ii) PDM continuous learning outcomes applied to aged aircraft that are not cookie-cutter assembly line operations, Avram Tucker is truly parading in the Emperor's New Clothes, wearing an illusion of experience-based support for his opinions. Any *comparable, relevant* prior experience turns out to be invisible, when

---

[13] That opinion highlights the soundness of AAI's motion to exclude based on undocumented Wright/Vietor/Smith "discussions," on the grounds of unreliability and unsound methodology (not to mention plain prejudice).

one examines Tucker's report, his deposition testimony, and Boeing's opposition brief (i.e., its final chance to make a showing of requisite experience).

Expert experience-based opinions must display experience *relevant* to the specific activity, i.e., involving comparable prior experiences. *See Bivins v. Stein*, No. 17-14978, 2018 WL 6720628, at *3 (11th Cir. Dec. 20, 2018) (exclusion of expert experience-based testimony which "lack[ed] the **relevant experience** for the issues involved in this case." (Emphasis added).[14]

Tucker's 22 pages of resume and exposition of experience in his report do not set forth any engagements, published papers or studies, cases or details of any other experience specifically in learning curves.  In fact, the words, "learning curves," do not appear in his resume and experience summaries.[15] With no explanation of relevant, comparable experience within the 302 pages of Tucker's report, one also finds that Boeing's brief (Doc. 474) fails to adduce a single instance of relevant Tucker experience in any comparable government RFP/bid teaming contract provisions and competition-with-former-partner scenarios as occurred in this case. Absent showings of **relevant** experience provided either by Tucker's report or by Doc. 474, one finally turns to Tucker's deposition testimony, where extensive efforts were made by AAI counsel (see Doc. 352-52 at 37-42) to have Tucker reveal any actual prior experience in a teaming contract, and its termination and ensuing competitive bidding of former teammates against each other for the work covered by

---

[14] Similarly, this Court has excluded experience-based expert testimony which was not shown to be **relevant** to the actual issues being litigated. *See Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1231-32 (N.D. Ala. 2011), *aff'd* 721 F.3d 1281 (11th Cir. 2013) (excluding experience-based opinions of expert Correnti under the first prong of Rule 702/*Daubert*, affirming the Special Master finding that "neither individual has any **relevant training or experience** in antitrust economics") (emphasis added). *See* special master's report at *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, No. 02-2600, 2010 WL 11561917, at *3-4 (N.D. Ala. Sept. 2, 2010) (concluding: "Here, Correnti does not possess **the relevant experience** or training to serve as an expert on antitrust economic issues. Thus his testimony as proffered should be excluded.") (emphasis added).

[15] On the issue of any *relevant experience* germane to Tucker's MOA § 5.0c opinions, while Tucker's report claims prior experience in a government agency's contract "terminations for default and for convenience", see Doc. 467-2 at 10 ¶ 9, and for "Dealer Distributor Terminations," *id*. at 169, those are specialized types of events quite different from, and not remotely similar to, the circumstances of this case.

such contract. Tucker had repeated opportunities to "put his money where his mouth was," yet Tucker ducked and weaved, gave no direct and responsive answers, and provided not a single example of prior comparable and relevant experience. *See, e.g.,* Doc. 352-52 at 40 (157:21-158:7, "I don't recall the exact ones . . . but that's not something that was only done in this case in my career. I've seen that before."). In the nine pages of examination following the referenced colloquy, Tucker was pushed for specific relevant experience, asked to cite any case or engagement where he served as an expert, or names of any contracting companies, where similar § 5.0c language and a teaming termination were involved, and any similar identifiers of comparable experience. *See id.* at 40-42 (158:8 to 166:17). Despite being pressed repeatedly for specifics or even a single identifiable example, he was unable to provide a single comparable engagement from his purported vast experience. Finally, Tucker conceded that at least he <u>cannot recall any prior experience involving similar circumstances</u>, *Id.* at 41 (163:17 to 164:15, "I don't recall one") and at 42 (167:1-6. "I don't have one in mind, no.").  Tucker's cloak of purported relevant experience is just as invisible as the Emperor's new clothes, and Boeing is no more than the Emperor's courtier, professing to see what does not exist. Indeed, he did have the requisite relevant experience, presumably he would have cited such specific experiences in making the *Frazier* showings. His failure to even attempt the required *Frazier* demonstration is best explained by his not having the requisite comparable, relevant experience.

## <u>CONCLUSION</u>

AAI's motion is due to be granted on the grounds raised in support of its motion.

Respectfully re-submitted this the 15th day of April 2019 in place of the April 12, 2019 submission.

*/s/ J. Michael Rediker*
One of the Attorneys for Plaintiffs

**OF COUNSEL**
J. Michael Rediker (mrediker@rumberger.com)
Joshua Lerner (jlerner@rumberger.com) (admitted *pro hac vice*)
R. Scott Williams (swilliams@rumberger.com)
Peter J. Tepley (ptepley@rumberger.com)
Meredith J. Lees (mlees@rumberger.com)
Rebecca A. Beers (rbeers@rumberger.com)
RUMBERGER KIRK & CALDWELL, P.C.
2001 Park Place North, Suite 1300
Birmingham, Alabama 35203
**Counsel for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, after withdrawing the April 12, 2019 fifteen-page brief, I have, on this the 15th day of April 2019, served a true and correct copy of the foregoing replacement ten-page resubmitted brief on the following via the Court's CM/ECF electronic filing system:

R. Thomas Warburton, Esq.
J. Thomas Richie, Esq.
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Craig S. Primis
John C. O'Quinn
Erin C. Johnston
Tia T. Trout-Perez
Alexia R. Brancato
KIRKLAND & ELLIS, LLP
655 Fifteenth Street NW
Washington, D.C. 20005

_/s/ J. Michael Rediker_
OF COUNSEL

Case 2:11-cv-03577-RDP   Document 352-52   Filed 10/10/17   Page 1 of 130

**FREEDOM COURT REPORTING**

FILED
2017 Oct-10  PM 12:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Page 1**

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE NORTHERN DISTRICT OF ALABAMA
3
4
5 CASE NO.: 2:11-cv-03577-RDP
6
7 ALABAMA AIRCRAFT INDUSTRIES, INC.,
8 ALABAMA AIRCRAFT INDUSTRIES, INC. -
9 BIRMINGHAM, and PEMCO AIRCRAFT
10 ENGINEERING SERVICES, INC.,
11        Plaintiffs,
12
13 v.
14
15 THE BOEING COMPANY, BOEING AEROSPACE
16 OPERATIONS, INC., and BOEING AEROSPACE
17 SUPPORT CENTER,
18        Defendants.
19
20
21 VIDEOTAPED DEPOSITION TESTIMONY OF:
22        AVRAM TUCKER
23        August 29, 2017

**Page 2**

1      A P P E A R A N C E S
2
3
4 FOR THE PLAINTIFFS:
5
6 Michael Rediker, Esq.
7 RUMBERGER, KIRK & CALDWELL
8 2001 Park Place North
9 1300 Park Place Tower
10 Birmingham, Alabama  35203
11 mrediker@rumberger.com
12
13 Joshua D. Lerner, Esq.
14 RUMBERGER, KIRK & CALDWELL
15 80 Southwest Eighth Street, Suite 3000
16 Miami, Florida  33130
17 jlerner@rumberger.com
18
19
20
21
22
23

**Page 3**

1 FOR THE DEFENDANTS:
2
3 Craig Primis, Esq.
4 Alexia Brancato, Esq.
5 KIRKLAND & ELLIS
6 655 Fifteenth Street NW
7 Washington, D.C.  20005
8 craig.primis@kirkland.com
9 alexia.brancato@kirkland.com
10
11 R. Thomas Warburton, Esq.
12 BRADLEY ARANT BOULT CUMMINGS
13 1819 Fifth Avenue North
14 Birmingham, Alabama  35203
15 twarburton@bradley.com
16
17
18 ALSO PRESENT:
19 Bill Gladden
20 Jason Aqui, videographer
21
22
23

**Page 4**

1      I N D E X
2
3 EXAMINATION BY:              PAGE NO.
4 Mr. Rediker             10
5 Mr. Primis              396
6
7      E X H I B I T S
8
9 FOR THE PLAINTIFFS:
10 1994  Deposition notice           42
11 1995  Expert report, Tucker       43
12 1997  Expert report, Check        354
13 1999  Letter, 6/5/17              48
14 2000  Letter, 6/9/17              49
15 2004  Court decision, McDonnell   332
16       Douglas v. Air Force
17 2005  Court decision, Boeing v. Air  333
18       Force
19 2006  Complaint                   324
20 2019  Court decision, Boeing v. U.S.  31
21
22 PREVIOUSLY MARKED EXHIBITS ATTACHED:
23 Plaintiff's Exhibit 7

1 (Pages 1 to 4)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

EXHIBIT
1

## FREEDOM COURT REPORTING

77

1  middle of a line of questioning," which I
2  would have gladly let you finish.  You
3  said, "No."
4        MR. REDIKER:  All right.
5        MR. PRIMIS:  "We will take a
6  break when I ask for it or the witness
7  says he needs it."
8        And I've never been in a
9  deposition where I was treated that way,
10  so then I terminated it.
11        MR. REDIKER:  Well, I haven't
12  been in a deposition where the defendant
13  counsel treated me that way, so.
14        MR. PRIMIS:  All I did was --
15        MR. REDIKER:  It's a two-way
16  street.
17        MR. PRIMIS:  All I did was ask
18  for a break when you had a chance.
19        Q.  (By Mr. Rediker) We're going to
20  start over here.
21        A.  Okay.  Okay.
22        Q.  And I've lost time.  Looking on
23  page 9 of Exhibit 1995, paragraph 20 --

78

1        A.  I'm sorry.  1995?  Oh, okay.
2  I'm sorry.  Back to my report.  Yes.
3        Q.  Third line, second sentence
4  starts, "Boeing's termination of the MOA
5  was based on its determination that the
6  Air Force's May 31, 2006 reduction of
7  yearly aircraft quantities under the
8  Recompete from 44 to 24 made Boeing's
9  continued participation with" -- "with
10  Pemco no longer practical or financially
11  viable."
12        Right?
13        A.  Yes.
14        Q.  You added in that sentence or
15  included in that sentence the words "with
16  Pemco."
17        (Witness reviews document.)
18        A.  Yes.  This was an MOA with
19  Pemco.
20        Q.  So you're not saying that it
21  would have been impractical or
22  financially unviable if it was doing it
23  without Pemco?

79

1        A.  I'm not really sure what you're
2  talking --
3        Q.  You added the words "with Pemco"
4  to the sentence in saying if you have
5  Pemco in the deal, then it's not
6  practical; right?
7        MR. PRIMIS:  Objection to form.
8        A.  Yes.  I was studying the
9  termination of the MOA, which was with
10  Pemco.
11        Q.  And this sentence means, am I
12  correct, that participation in the
13  program, if they don't have Pemco, is
14  practical and financially viable;
15  correct?
16        MR. PRIMIS:  Objection to form.
17        Q.  Did you make that analysis?
18        A.  Not at that time, because the
19  MOA was with Pemco.  I didn't make it at
20  that time.
21        Q.  Did you, before today, ever make
22  an analysis that yes, if they do it
23  without Pemco, it's practical and

80

1  financially viable for Boeing?
2        A.  Yes.  That was part of Boeing's
3  determination, and I reviewed it from an
4  economic, accounting, and operational
5  standpoint.
6        Q.  So in order to make this
7  statement, you have to add the words
8  "with Pemco."  In other words, they can't
9  partner with Pemco and, in your view, be
10  practical for Boeing?
11        MR. PRIMIS:  Objection.
12  Objection to form.
13        A.  I'm not sure what you're asking.
14  But what I'm saying is this was an MOA
15  with Pemco, and I studied Boeing's
16  determination of whether it was
17  financially viable and practical to
18  operate under the MOA and go forward
19  pursuant to the MOA.
20        Q.  And is it your understanding in
21  giving this -- this is an opinion in this
22  sentence; correct?
23        A.  I would say this leads into my

20 (Pages 77 to 80)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

---

81

1  opinion. This is actually more of a
2  statement of what Boeing did. But it
3  does lead in to a similar opinion that I
4  give later in both the summary of
5  opinions and in the detail.
6      Q.  So this is -- is or is not
7  partaking of an opinion?
8          MR. PRIMIS:  Objection.
9      Q.  This sentence?
10         MR. PRIMIS:  Object to form.
11     A.  It's related to my ultimate
12  opinion, yes.
13     Q.  And your ultimate opinion is,
14  what, in paragraph 22?
15     A.  Well, I would say all of these
16  are opinions or conclusions based on my
17  analysis. If you're just talking about
18  the summary and not the detail, I would
19  say that 23 is really my ultimate
20  opinion, at least for the purposes of the
21  summary.
22     Q.  Well, let's ask about 22 before
23  we get to that. "Boeing's analysis of

---

82

1  whether continuing with Pemco" -- with
2  Pemco, there's the word again -- "was
3  practical or financially viable after the
4  Air Force reduced the number of aircrafts
5  was reasonable from an accounting,
6  economic, and operational standpoint."
7          Are those words "reasonable from
8  an accounting, economic, and operational
9  standpoint" an opinion?
10     A.  Okay. I'm sorry. You said the
11  next paragraph. Did you go to paragraph
12  23 in that? Were you reading that from
13  the paragraph 23?
14     Q.  Go ahead.
15     A.  I'm sorry. I'm just clarifying,
16  were you reading from paragraph 23 or a
17  different paragraph?
18     Q.  I'm reading verbatim from 22. I
19  --
20     A.  Twenty-two.
21     Q.  -- said --
22     A.  Let me just -- let -- let me
23  just get there, if you don't mind, and

---

83

1  then I'll -- I'll be able to answer your
2  question.
3      Q.  Bottom paragraph on page 9 of
4  Exhibit 1995.
5          (Witness reviews document.)
6      A.  Yes.
7      Q.  That's an opinion, is it not,
8  where you say it was reasonable from an
9  accounting, economic, and operational
10  standpoint?
11     A.  That is an opinion.
12     Q.  And then the sentence continues,
13  "and it was consistent with industry
14  practices." That's an opinion, isn't it?
15     A.  It is.
16     Q.  And then the next sentence says,
17  in paragraph 22, "Boeing reasonably
18  considered the likelihood of contract
19  award," and other factors.
20         Is that an opinion?
21     A.  It's a sub-opinion to the first
22  sentence in 22, yes.
23     Q.  Do you opine that Boeing making

---

84

1  this analysis of practical and
2  financially viable and continuing in the
3  program as a bidder without Pemco was
4  proper under the teaming agreement?
5          MR. PRIMIS:  Objection to form.
6      A.  If you mean from a legal or
7  contractual standpoint, I'm giving no
8  opinions on those issues or interpreting
9  the contract. My analysis is based from
10  an accounting, economic, and operational
11  standpoint and industry practices.
12     Q.  So you do not opine that Boeing
13  properly terminated the MOA. Is that
14  correct?
15         MR. PRIMIS:  Objection to form.
16     A.  Not if you mean from a legal
17  standpoint.
18     Q.  Or a contractual standpoint?
19     A.  Right. I'm not giving an
20  opinion on the interpretation of the
21  contract or on the legal interpretation
22  of this MOA. I'm doing analyses which
23  are clearly related to that ultimate

---

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

85

1   determination, but that wouldn't be my
2   determination, to make a legal
3   conclusion.
4       Q.   Or an interpretation of a
5   contract.  That's not your job, either,
6   is it?
7       A.   That's correct.  I would expect
8   the Court to make that determination.
9       Q.   Well, it's a jury.
10       A.   Okay.  Either the Court -- the
11   trier of fact, either the Court or the
12   jury.
13       Q.   The trier of fact.  You recall
14   the trier of fact.  Court on motion for
15   summary judgment or a jury in a trial;
16   right?
17           MR. PRIMIS:  Object to the form.
18       A.   I don't want to get into legal
19   issues.  Sometimes Courts construe the
20   interpretation of --
21       Q.   Well, I'm not asking about a
22   legal issue.  I'm talking about a
23   process.  You're not invading -- you do

86

1   not intend to invade the province of a
2   judge deciding it on a motion for summary
3   judgment or the province of a jury
4   deciding it in reaching a verdict at
5   trial.  Is that correct?
6       A.   I'm not going to give any legal
7   or contractual interpretations for the
8   Court or the jury.  I'm going to provide
9   analysis and opinions which they might
10   use in making their determination.
11       Q.   So, would it be fair, based on
12   what you just explained, that what's in
13   paragraph 22 and paragraph 23 are
14   assuming the propriety of Boeing's
15   termination of the teaming agreement?
16           MR. PRIMIS:  Object to form.
17           THE WITNESS:  Could I hear that
18   back?
19           (Requested portion read.)
20       A.   No.
21       Q.   Well, what are they -- what are
22   the assumptions underlying your statement
23   in the first sentence of paragraph 22?

87

1       A.   My sentence has to do with my
2   analysis from an accounting, economic,
3   and operational standpoint and industry
4   practices about Boeing's actions with
5   regard to terminating the MOA.  And it
6   does not assume, as you suggested, the
7   propriety of their termination.
8       Q.   Well, that was what I was
9   asking.  In other words, if Boeing --
10   we -- we don't disagree, do we, that
11   Boeing terminated the teaming agreement
12   with Pemco?
13       A.   We don't disagree.  We do not
14   disagree about that.
15       Q.   They did that.  And that's
16   undisputed, as far as you and I
17   understand it; right?
18       A.   Yes.
19       Q.   That happened.  Do you opine
20   that it properly happened?
21           MR. PRIMIS:  Object to form.
22       A.   As I said before, if you mean
23   from a legal or a contractual standpoint,

88

1   no, I'm not giving that opinion.  I'm
2   giving an analysis based on accounting,
3   economic, operational, and industry
4   practices perspective about whether or
5   not it was financially viable or
6   practical.
7       Q.   And the -- would you agree that
8   everything in your report is derived from
9   the proposition that what made it
10   principally impractical and not
11   financially viable if they continued the
12   MOA with Pemco was simply the impact on
13   San Antonio, other programs?
14       A.   No.  I --
15           MR. PRIMIS:  Object to the form.
16       A.   I do not agree with that.
17       Q.   That's what you focus on over
18   and over in your report, do you not?
19       A.   I do focus on it, but not
20   over -- well, when you say "over and
21   over," not to the exclusion of other
22   financial viability issues.
23       Q.   Well, it wasn't going to make

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

89

1    Boeing, as a entity headquartered in
2    Chicago, go out of business --
3        MR. PRIMIS:  Objection.
4    Q.  -- was it, to continue in the
5    MOA with Pemco?
6        MR. PRIMIS:  Object to form.
7    A.  I didn't study that, but I doubt
8    it would do that.
9    Q.  I mean, do you know how many
10   dozens of times you refer to San Antonio,
11   an impact on San Antonio, in your report?
12   A.  That was -- it's in my report
13   wherever it's relevant.  And yes, it's in
14   there more than once.
15   Q.  So, did you read section --
16   where -- where do the words "practical"
17   and "financially viable" show up in the
18   teaming agreement, the MOA?
19   A.  I would go to Exhibit 48.
20   Q.  I'm there.  Bates number 227311,
21   the last five digits.
22       (Witness reviews document.)
23   A.  It's in Section 5.

90

1    Q.  Right.  See -- see, I refer to
2    the Bates number.
3    A.  I'm sorry?
4    Q.  27311?
5    A.  Correct.
6    Q.  Okay.  And subparagraph (c)
7    under 5.0, "term and effectivity"?
8    A.  Yes.
9    Q.  "After the release of any RFP or
10   amendments thereto, if the contents
11   thereof are so unfavorable to the Prime
12   or a Principal Subcontractor" -- could be
13   either one of those companies; right?
14   A.  Correct.
15   Q.  -- "that participation" --
16   A.  And by the way, when I say
17   "Correct," I'm just reading the
18   agreement.  I'm not trying to give any --
19   Q.  Well, that's --
20   A.  -- contractual interpretation.
21   Q.  -- your understanding, isn't it?
22   A.  Yes.
23   Q.  -- "participation in the Program

91

1    is no longer practical or financially
2    viable."
3        So that's where you got the
4    words; right?  That you then give an
5    opinion on.
6    A.  That I give a accounting,
7    economic, operational, and industry
8    practices opinion, yes.
9    Q.  It doesn't say the participation
10   in the program "with Pemco," does it?
11   The words "with Pemco," those two words,
12   do not follow the word "Program" in this
13   contract, do they?
14       MR. PRIMIS:  Object to form.
15   A.  Those words are not in 5.0(c)
16   but the whole MOA is with Pemco.
17   Q.  They are not in 5.0(c), the
18   termination provision upon which you
19   understand Boeing relied.  Is that
20   correct?
21   A.  I can't answer that question.  I
22   can say that the specific words you asked
23   me are not in there, but I can't just

92

1    talk generally about a legal
2    interpretation about whether they're in
3    there or not.
4    Q.  As a matter of visual
5    observation, the two words are not on the
6    page in that paragraph, is that correct,
7    following the word "Program"?
8    A.  The -- the words "with Pemco" do
9    not appear in the words in 5.0(c).
10   Q.  But in the paragraph 20 of your
11   summary opinions, the last line says,
12   "continued participation with Pemco."
13   You added the words "with Pemco" there,
14   did you not?
15       MR. PRIMIS:  Object to form.
16   A.  I did add "with Pemco," but I'm
17   not saying I added them to anything.
18   That's my understanding of what this MOA
19   constitutes, is an agreement between
20   Boeing and a principal subcontractor,
21   Pemco.
22   Q.  Where did you get that
23   understanding?

23  (Pages 89 to 92)

**FREEDOM COURT REPORTING**

93

1    A.   Well, one, it's -- it -- I can
2  read it in the document that it's between
3  the two parties.  But my understanding of
4  the interpretation, or Boeing's
5  interpretation of these would be based on
6  reviewing Boeing's documents,
7  information, and conduct.
8    Q.   It's Boeing's assertion in this
9  case, in other words; correct?
10    MR. PRIMIS:  Object to form.
11    Q.   You're -- when you put in the
12  sentence "made Boeing's continued
13  participation with Pemco no longer
14  practical," you're using Boeing's
15  assertion, are you not?
16    A.   Boeing does interpret the
17  contract that way, yes.
18    Q.   Okay.  In the first line of
19  paragraph 21 of your summary opinions,
20  you state, "Boeing's determination that
21  continuing with Pemco was no longer
22  practical or financially viable was based
23  on a detailed analysis," et cetera.

94

1    Again you used the words "with
2  Pemco" following the word "continuing."
3  Is that correct?
4    MR. PRIMIS:  Object to form and
5  following other words.
6    Q.   You have to answer.
7    A.   I will.  I -- I didn't hear the
8  end of the objection.  I'd like to hear
9  that again.
10    MR. PRIMIS:  Object to form.
11    Q.   Well, he -- he's -- he's trying
12  to interrupt my flow, and I'm not going
13  to be deterred.  Keep going.
14    MR. PRIMIS:  I object to that
15  statement.
16    MR. REDIKER:  Well, it's true.
17    MR. PRIMIS:  You can -- you can
18  answer.
19    A.   If you mean did I add -- did I
20  include the words "with Pemco" in
21  paragraph 21, I did in the first line.
22    Q.   And then in paragraph 22 you
23  say, "Boeing's analysis of whether

95

1  continuing with Pemco was practical or
2  financially viable," you put in the words
3  "with Pemco."  Is that correct?
4    A.   Yes.
5    Q.   And in paragraph 23, the first
6  sentence is an opinion.  Is that correct?
7    A.   It is.
8    Q.   The second sentence is an
9  opinion.  Is that correct?
10    A.   It is the result of my analysis,
11  and it's an opinion, yes.
12    Q.   And the third and final sentence
13  is also an opinion; correct?
14    A.   Yes.
15    Q.   In the first sentence of
16  paragraph 23, again you say, "Boeing's
17  continuation with Pemco."  You included
18  the phrase, "with Pemco"; correct?
19    A.   I did.
20    Q.   And in the third sentence, "When
21  the impact" -- you say, "When the impact
22  on other Boeing programs is considered,
23  Boeing's continuation with Pemco would

96

1  have resulted in a significant financial
2  loss to Boeing."  You again included the
3  word "with Pemco."  Is that correct?
4    A.   Yes.
5    Q.   I'm not going to try to find all
6  the places, but those aren't the only
7  places that you said "with Pemco," is it?
8    A.   I'm sure that in the -- this is
9  just -- you're just reading to me from
10  the summary.  I'm sure it would also be
11  included in the section of my report that
12  provides the detailed analysis and
13  opinions.
14    Q.   All right.  Well, let's look at
15  page 39 of your report, Exhibit 1995.
16  Paragraph -- are you there?
17    A.   Yes.  I'm sorry.  Which
18  paragraph?
19    Q.   Ninety-nine.
20    A.   Yes.
21    Q.   In the first line you included
22  the words "with Pemco as its
23  subcontractor"; correct?

24  (Pages 93 to 96)

## FREEDOM COURT REPORTING

97

1    A.  First and second line, yes.
2    Q.  And in the second line of
3  paragraph 100, you say, "In my opinion,"
4  in the first line.  So it's an opinion;
5  correct?
6    A.  Yes.
7    Q.  You add the words in that
8  sentence "with Pemco as the
9  subcontractor."
10    A.  Yes.
11    Q.  So that's an opinion, and it's
12  based on, as are -- as are these other
13  expressions, the scenario where Pemco
14  would be a subcontractor.  Then, if that
15  is true, your opinion is it would be not
16  financially viable; correct?
17    MR. PRIMIS:  Object to form.
18    A.  I have more opinions than that,
19  but it is true that I was studying the
20  financial viability under the MOA between
21  Boeing and Pemco.
22    Q.  And then in paragraph 101, you
23  use the phrase "without Pemco."  Is that

99

1  your conclusions here in the paragraphs
2  we've referenced, for instance, 20
3  through 23, 99 to 101, would be affected,
4  if at all, if the trier of fact
5  determined that Boeing did not have the
6  right to terminate its teaming agreement
7  with Pemco and then thereafter continue
8  to bid as a bidder on the recompete?
9    MR. PRIMIS:  Object to form.
10    A.  First of all, I think the -- the
11  analysis you're describing is backwards
12  from what I did.  This is analysis and
13  opinions that might be considered by the
14  Court in determining whether or not it
15  was appropriate to terminate the MOA and
16  then continue forward.
17    Q.  I didn't ask that question.
18  I -- I -- I hear you making that point.
19  I and the Court may disagree with your
20  point.
21    A.  Okay.
22    Q.  But that isn't my question.
23    A.  All right.  Maybe I didn't

98

1  right?
2    A.  Yes.
3    Q.  In the second sentence of
4  paragraph 101, you say, "Boeing's
5  decision was also consistent of my" --
6  "my understanding of the agreement
7  between Boeing and Pemco embodied in the
8  Recompete MOA," et cetera.
9    Where did you get that
10  understanding?
11    A.  That was based on my review of
12  Boeing documents, information, and
13  possibly testimony.
14    Q.  Boeing documents.  Including
15  their answer --
16    A.  I'm sorry.  Boeing documents,
17  conduct, and possibly testimony.
18    Q.  What documents of Boeing?
19    A.  Well, I think that the fact that
20  Boeing's documents referenced that they
21  went forward after the MOA was
22  terminated.
23    Q.  Okay.  Have you considered how

100

1  understand your question.
2    Q.  My question is very simple.
3  What analysis, if any, did you perform on
4  what Boeing -- what your opinions would
5  be about the impact on Boeing if it were
6  found that Boeing only had the right to
7  terminate the MOA if it could not
8  thereafter participate in the KC-135
9  PDMs?
10    A.  I don't understand your
11  question.  It seems backwards to me.  I
12  recognize --
13    Q.  I don't care whether it seems
14  backwards.  Did you make an analysis of
15  what the impact would be on Boeing if
16  Boeing took itself out of doing PDM work
17  on these planes?
18    A.  I see.
19    MR. PRIMIS:  Object.  I object
20  to form.  That's a slightly different
21    A.  That's a slightly different
22  question than I thought you answered
23  [sic] before.  I -- I can best describe

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

101

1  it as I did analysis which I think is
2  relevant to the legal determination,
3  which I won't make or contractual, about
4  whether it was appropriate to terminate
5  and whether it was appropriate to
6  continue forward.  I think it would be
7  helpful in that decision, but I didn't do
8  an analysis under an assumption that the
9  termination was improper or that Boeing
10  was not allowed to continue forward,
11  other than to the extent that it's
12  already been included in my report.
13  Q.  Do you have -- do you make an
14  opinion -- do you give an opinion in this
15  case that the MOA is clear and
16  unambiguous in its language with regard
17  to termination?
18  A.  No.  That would be a legal or
19  contractual interpretation which I would
20  not give.
21  Q.  So, do you have any opinion
22  whether the language of Section 5.01(c)
23  is ambiguous or not?

102

1  MR. PRIMIS:  Object to form.
2  A.  Not from a legal or contractual
3  perspective.  I think -- if you're just
4  asking me about my view, I think it's
5  pretty clear what it's asking for when it
6  says financial viability and when the
7  paragraph 12 says that the parties -- if
8  it's terminated will continue forward,
9  but I'm not giving a legal or contractual
10  opinion.
11  Q.  You would agree that there are a
12  number of instances under Section 5.0
13  where the MOA can terminate and the
14  parties can continue forward other than
15  5.0(c)?  Isn't that correct?  Right?
16  MR. PRIMIS:  Object to form.
17  Q.  Look at paragraph 5.0(b).  "The
18  Parties agree in writing to terminate
19  this MOA."
20  A.  Yes.
21  Q.  If the parties agree that they
22  can terminate and each can be independent
23  bidders at that point, that fits the

103

1  language of Section 12, doesn't it?
2  MR. PRIMIS:  Object to form.
3  A.  I'm not going to give a legal or
4  contractual interpretation of 12.  But if
5  you're asking me my understanding, yes.
6  If this agreement, MOA terminates, then
7  both parties could continue forward
8  independently.
9  Q.  It doesn't say under every
10  provision, does it?  It just says -- it
11  says, "terminates pursuant to the terms
12  of such MOA or subcontract."
13  MR. PRIMIS:  Object to form.
14  And where are you reading from, Mike?
15  MR. REDIKER:  Section 12, that
16  he had in mind.
17  Q.  For example -- let me give you
18  another example.  You didn't ask me this.
19  A.  Well, hold on.  Let's --
20  where -- where -- what page is Section
21  12?  Are you looking at the Exhibit 48?
22  Q.  Yeah, if you want to do it in
23  Exhibit 48, it would be at Bates number

104

1  27324.
2  A.  324.
3  (Witness reviews document.)
4  A.  Yes, I'm familiar with this.
5  Q.  It says, "terminates pursuant to
6  the terms of such MOA."
7  Do you understand that that
8  means terminates validly pursuant to the
9  terms of the MOA?
10  MR. PRIMIS:  Object to form.
11  A.  I think that's a legal issue,
12  which I'm not giving an opinion on.
13  Q.  All right.  Well, my question
14  was there a provision, there may be
15  several, but certainly under section (b),
16  the parties can agree to terminate the
17  MOA; right?
18  A.  Yes.
19  MR. PRIMIS:  Section (b) of
20  what?
21  MR. REDIKER:  5.0(b), which we
22  had previously looked at on twenty --
23  Bates number 27311.

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

## FREEDOM COURT REPORTING

105

1   A.   Yes.
2        MR. PRIMIS:  Hang on.
3        Object to form.
4        You can answer now.
5   A.   If you're asking me whether from
6   the words itself in Section 5.0(b) on
7   Bates 27311, it does -- one of the terms
8   that this -- that -- where this MOA can
9   be terminated is if the parties agree in
10  writing to terminate the MOA.
11  Q.   And there, there would be a
12  valid room for Section 12 NDA to apply,
13  because that would be one where they
14  could both participate independently in
15  bidding; right?
16       MR. PRIMIS:  Object to form.
17  A.   Again, I'm not going to give a
18  legal or contractual interpretation, but
19  I think all of these are ways that it can
20  terminate, and then I understand 12 would
21  apply.
22  Q.   Well, that's where -- and you
23  say that is an interpretation of 5.0 C.

106

1   Do you understand that Pemco and AAI
2   disagree with you on reading of 5.0(c)?
3        MR. PRIMIS:  Object to form.
4   Q.   Where it says "in the program"?
5   A.   First of all, with respect to
6   the first half of your question, I am not
7   giving an interpretation.  I said that's
8   my understanding.  And with respect to
9   the second half, yes, I know there's a
10  dispute between Pemco and Boeing.
11  Q.   And you're taking Boeing's side
12  of the version of the way that the
13  contract is interpreted.
14       MR. PRIMIS:  Object.
15  Q.   Correct?
16       MR. PRIMIS:  Object to form.
17  A.   It's not a matter of taking
18  side.  I'm doing an analysis based on
19  Boeing's interpretation.
20  Q.   All right.  Well, that's taking
21  sides, isn't it?
22       MR. PRIMIS:  Object to form.
23  A.   I don't think of it that way.  I

107

1   think of it as gaining an understanding
2   of Boeing's interpretation of the MOA and
3   then performing analyses to present to
4   the jury.
5   Q.   Now, if Boeing went bankrupt, it
6   couldn't participate in the bidding;
7   right?
8        MR. PRIMIS:  Object to form.
9   Q.   Is it your understanding, in
10  government contracting they don't award a
11  contract of this magnitude to a bankrupt
12  bidder?
13  A.   I guess there's some legal
14  issues with regard to that, but I think
15  that there's concern about issuing
16  contracts to bankrupt bidders.
17  Q.   So under Paragraph 5.0(g), "If a
18  business unit of a Party responsible for
19  participation in the Program is suspended
20  or debarred" -- so if -- let's take out
21  bankruptcy.  If Boeing was debarred, then
22  that would be a termination of the MOA.
23  Do you understand that language?

108

1        MR. PRIMIS:  Object to form.
2   A.   If you're asking me for my
3   understanding, I think if either party
4   were debarred, it would -- it could
5   result in a termination of the MOA.
6   Q.   All right.  Do you have an
7   opinion on whether the language of 5.0(c)
8   should be read literally as written on
9   the page or not?
10       MR. PRIMIS:  Object to form.
11  A.   If you're asking me for a legal
12  or contractual opinion, I don't have one.
13  That's not what I do.  I don't give legal
14  or contractual opinions.
15  Q.   Okay.  You would agree that read
16  literally, there are no words such as
17  "with Pemco" or "pursuant to the MOA."
18  Those words do not appear in Section
19  5.0(c); correct?
20       MR. PRIMIS:  Object to form.
21  A.   If you're just asking me whether
22  those words appear, they do not.  That
23  doesn't mean it's not covered by 5.0(c).

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

---

109

1    Q.   And again, that's because you're
2  looking at it from the perspective of
3  Boeing's interpretation.  Is that
4  correct?
5    A.   It's based on my understanding
6  of Boeing's participation and also
7  because this is an MOA with Pemco.
8    Q.   Do you have any understanding
9  what state's contract law applies to the
10  interpretation of the MOA?
11    MR. PRIMIS:  Object to form.
12    Q.   I'm not asking for what the law
13  is.  I'm just asking for your
14  understanding of which law applies.
15    MR. PRIMIS:  Object to form.
16    A.   I -- I don't recall.  I -- if
17  I -- if I knew it, I don't recall.
18    Q.   Okay.  Where did you go to
19  college?
20    A.   I graduated from George
21  Washington University in Washington, D.C.
22    Q.   Okay.  And did you ever take a
23  course in business law?

---

110

1    A.   I did.
2    Q.   Okay.  That's a very fine
3  university.
4    A.   Thank you.
5    Q.   Okay.
6    A.   I'm still associated with it.
7    Q.   Well, they've named a big
8  athletic field after you, haven't they?
9    A.   They did.
10    Q.   Would you agree or disagree that
11  agreements of contracting parties and
12  negotiations of contracting parties made
13  contemporaneous with the execution of a
14  written agreement are admissible to
15  establish the meaning of the contract?
16    MR. PRIMIS:  Object to form on
17  multiple grounds.
18    A.   I'm not sure I fully understood
19  your question, but it sounds like a legal
20  question that I wouldn't respond to,
21  wouldn't be able to respond to.
22    Q.   Did you take into account the
23  surrounding circumstances of the parties

---

111

1  in arriving at your opinions with regard
2  to Boeing's termination of the MOA?
3    MR. PRIMIS:  Object to form.
4    A.   I'm not sure what you're
5  referring to as "the surrounding
6  circumstances."  I did look at and study
7  documents and sort of the history of the
8  parties both before the MOA and during
9  the MOA.
10    Q.   I guess that's what I was
11  talking about.
12    A.   All right.
13    Q.   You put it better than I did.
14  Thank you.
15    A.   Okay.
16    MR. REDIKER:  So I'll now show
17  the witness Exhibit 1209, please.  Wait a
18  minute.  Let's -- let's start with
19  Exhibit 1004.  And can we display this on
20  screen, please?
21    THE COURT REPORTER:  1004.
22    THE VIDEOGRAPHER:  1004.
23    MR. REDIKER:  Actually, I want

---

112

1  to get to 1004-2.  Those are numerical.
2  Way down.
3    THE VIDEOGRAPHER:  Way down.
4    MR. REDIKER:  1004-2.  See 2?
5  That (indicating).
6    THE VIDEOGRAPHER:  Okay.
7    Q.   (By Mr. Rediker) So 1004 has a
8  cover e-mail.  Do you see that?
9    A.   Yes.
10    Q.   And then it's got a -- what they
11  at Boeing call a white paper.  Do you see
12  that?  Actually, the subject of the
13  e-mail says, "Subject:  White Paper."
14    A.   I do see that.  And I'm
15  assuming, because they are stapled
16  together, that it relates to this e-mail.
17    Q.   Other witnesses have tied the
18  two together.
19    A.   Okay.
20    Q.   It's the cover transmittal and
21  the attachment.  And the Bates numbers
22  are consecutive.
23    A.   Thank you.

---

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

---

145

1      MR. REDIKER: Let's just get
2  that up on the screen, please, sir.  458.
3  And it will be -- 458-2 is the native.
4  458-1 is just the slip sheet.  There we
5  go.  Now you've got to go to -- this is
6  the slip sheet.  We need to go --
7      THE VIDEOGRAPHER: Yeah.  This
8  is only like one sheet.
9      MR. REDIKER:  We need to go
10  one -- there you go.  Where it has that
11  little icon.  There you go.
12      Q.  (By Mr. Rediker)  All right.  I'm
13  showing you on screen, and we will show
14  you in a printout, Vietor sends a set of
15  chart -- what he calls charts.  I call it
16  a slide deck -- to -- on May 4th to Tony
17  Robertson and others, Roger Witte, Curt
18  Nothstine.  And then he apologized to
19  Salerno.  And then at 6:00 in the evening
20  he sends the charts.  He says they "will
21  be reviewed with Pat, tomorrow."
22      So this is what I was referring
23  to, the -- mainly the attachment.

---

146

1      A.  I'm sorry.  What did you mean
2  about an apology?  I didn't catch that
3  part.
4      Q.  Well, just read it --
5      A.  "Sorry I left you off the
6  initial distribution."  Yeah.
7      Q.  Yeah.  He's apologizing to
8  Salerno.
9      A.  Okay.
10      Q.  Did you know what Salerno's role
11  was at Boeing?
12      A.  Yeah.  I think he was in finance
13  at -- at San Antonio.
14      Q.  Correct.  So in this executive
15  review slide deck at page -- I guess it's
16  the last page.  I seem to have more than
17  one copy of this.  But there is a chart
18  that says, "Impact to San Antonio Site
19  Wrap Rate."  Do you see that?
20      A.  Okay.  Let's go to that.  Yes.
21  "SA Site Wrap Rates."
22      Q.  And on the right-hand side, it's
23  got a grid, calendar 2008, calendar year

---

147

1  2009 calendar year 2010.  And it lists a
2  number of Air Force plane programs.
3      Do you see those?
4      A.  Yes, different programs.
5      Q.  In issuing your report, was it
6  your understanding that these six -- or
7  let's see -- six programs -- five
8  programs, I'm sorry, were all where work
9  was being done on those aircraft at San
10  Antonio Boeing?
11      A.  Yes.  Perhaps not entirely, but
12  yes, some work on these programs, I
13  understood, was being done in San
14  Antonio.
15      Q.  For the KC-10, was it your
16  understanding Pemco was not involved in
17  doing any of that work?
18      A.  I don't know.
19      Q.  Do you have any knowledge that
20  Pemco was doing any PDMs on KC-10
21  aircraft?
22      A.  Not aware of any.
23      Q.  Do you have any knowledge that

---

148

1  Pemco was involved in the C-130 AMP
2  contract work?
3      A.  I'm not aware of any
4  involvement.
5      Q.  Are you aware of any involvement
6  of Pemco in the C-17 contract work?
7      A.  Not aware of any.
8      Q.  Are you any -- aware of any work
9  on the KC-135 GATM contract work by
10  Pemco?
11      A.  I'm not aware of any.  They may
12  have had some role, but I'm not aware of
13  any.
14      Q.  So of those five programs, the
15  only one you're aware of that Pemco had
16  involvement at this point in time, May of
17  2006, was KC-135 PDM; right?
18      A.  That -- I believe that's
19  correct.
20      Q.  All right.  So when you referred
21  to impact on other Boeing programs or
22  work at San Antonio, you're referring to
23  these programs other than the KC-135 PDM,

---

37 (Pages 145 to 148)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

149

1    is that correct, in your report?
2      A.  Yes.
3      Q.  Just collectively?
4      A.  When I -- when I'm talking about
5    impacts to San Antonio, yes.
6      Q.  Right.  Impacts to San Antonio,
7    these are the programs you're looking at?
8      A.  Yes.
9      Q.  And I just happened to notice
10   that on this page it says at the top of
11   the chart, "Cost Impacts by Program";
12   right?
13     A.  Yes.
14     Q.  And for calendar year '09,
15   they've got zero under KC-135 PDM, but
16   they have numbers that are positive
17   numbers beside the other four programs;
18   right?
19     A.  Yes.
20     Q.  And the total for calendar year
21   '09 is $16 million; right?
22     A.  Yes.
23     Q.  All right.  Picking up kind of

150

1    where you and I finished before the
2    break, you looked at a lot of documents,
3    which we covered some, relating to the
4    course of white papers and then e-mails
5    and drafts of documents going back in the
6    spring of 2005.  Did you, in your
7    preparation of your report, see a single
8    document, whether it's a report, a white
9    paper, an e-mail, a draft, or anything,
10   where someone at Boeing and someone at
11   Pemco discussed that a practicality
12   analysis would in -- take into account
13   the impacts on the KC-10 program at San
14   Antonio?
15     A.  I may have.  You'd have to show
16   me a document if you want me to refer to
17   something.
18     Q.  Sir, it is my position there is
19   no such document that ever existed on
20   the -- in the history and face of the
21   planet.  There is no such document.
22     A.  Okay.
23     Q.  I want to know -- if you have

151

1    one, I'd like to know about it.
2      A.  All right.  How broad -- what do
3    you mean by "practicality"?  Are you just
4    suggesting whether there was a discussion
5    between Pemco and Boeing about impacts on
6    other programs?
7      Q.  Where in the context of arriving
8    at the words that the parties signed on
9    June 3rd, which included the word
10   "practical" and the phrase "financially"
11   -- "financial feasibility," do you know
12   of any communication between the two
13   contracting parties where that word or
14   that concept included a discussion of
15   non-KC-135 programs?
16     A.  I don't --
17        MR. PRIMIS:  Object to form.
18        Go ahead.
19     A.  I don't recall as I sit here.
20   There may have been such communications,
21   but I don't recall any.
22     Q.  And on what basis do you even
23   say there may have been?

152

1      A.  Because I reviewed thousands,
2    maybe a hundred thousand documents on
3    this case.  And so I'm -- I'm not here to
4    tell you that it doesn't exist.  I can
5    only tell you what I recall.  Or if I
6    happen to know for sure something, I'm
7    happy to tell you that.
8      Q.  Well, let's break that down.
9    You -- you have no knowledge for sure
10   that such a document evidencing any such
11   discussion between Boeing and Pemco ever
12   occurred?
13     A.  That's correct.  I don't recall
14   any.
15     Q.  Beyond that, you don't even have
16   a recollection in your brain of any such
17   a communication, do you?
18     A.  I don't recall that topic being
19   discussed between the parties.
20     Q.  And when we say you don't
21   recall, you don't recall if, say, Witte
22   discussed it with Hess and it was in May
23   or April?  You don't have any of that

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

153

1    recollection, do you?
2        A.  Those types of communications
3    would be subsumed within my answer.
4        Q.   Right.  I just want to make sure
5    that I don't get caught at trial by
6    somebody springing a document on me
7    through you.  You don't know -- have any
8    document in mind that you're going to use
9    at trial to point to?
10       A.  I don't recall any document that
11   I'm going to point to for that.
12       Q.   Okay.  Is there any reason that
13   this kind of an analysis of impact on San
14   Antonio programs other than the one
15   KC-135 PDM could not have also been done
16   on June 2nd, 2005, the day before the
17   parties signed the first MOA?
18       MR. PRIMIS:  Object to form.
19       A.   If you're simply asking me if an
20   analysis could be done before or -- or
21   during the MOA, sure.
22       Q.   Yeah.  These programs were all
23   up and running in 2005, as far as you

154

1    know; right?
2        A.   I'm not positive, but I believe
3    so.
4        Q.   And so the issue of, you know,
5    fewer programs carrying a certain amount
6    of overhead wasn't new in May of 2006.
7    It would have also existed in 2005;
8    correct?
9        A.   It's not an issue of whether it
10   was new or not.  It's just a
11   consideration in a financial viability
12   analysis.
13       Q.   I understand.  What I'm saying
14   is, that same accounting or operational
15   issue, whatever you -- economic issue,
16   however you want to call it, existed in
17   May of 2005 as it did in May of 2006;
18   right?
19       A.   When you say "that same issue,"
20   if you're referring to the fact that if
21   you lose a program, there will be impacts
22   on other programs, that existed even
23   before or on the date you said.

155

1        Q.   Right.  And in your evaluation,
2    Boeing certainly knew that in 2005,
3    didn't they?
4        A.   I would assume so.  I don't know
5    what was in their mind, but I would
6    assume they knew that.  That's a standard
7    thing that's considered by contractors,
8    government and commercial contractors in
9    making business decisions in the
10   long-term contracting industry.
11       Q.   Okay.  So, how many MOA teaming
12   agreements have you ever issued an expert
13   opinion on?
14       A.   I didn't keep track of which
15   ones led to expert opinions, but it
16   depends on how broadly you go.  If you
17   include joint venture agreements and
18   prime-sub relations, I'd say 500 or more.
19       Q.   No.  I'm talking about a team
20   agreement of this nature where you have
21   Boeing and Pemco as the so-called
22   principal subcontractor and there's a
23   work share for roughly 50/50 split on all

156

1    other things being -- all other
2    conditions being met.
3        A.   Well, I don't know --
4        MR. PRIMIS:  Object to form.
5        Go ahead.
6        A.   I don't know about those
7    specifics, but I'm going to guess I've
8    looked at 75 or 100 teaming agreements
9    and joint ventures in which the parties
10   would split up their work.  It might be
11   by capital invested, by how much work, by
12   specific scope, by splitting revenues,
13   splitting profits, or independently doing
14   the work and billing.  So I -- I would
15   include joint ventures in "teaming
16   agreements," and I -- there's been many.
17       Q.   And how many of those were
18   involved in litigation over an alleged
19   wrongful termination of the teaming
20   agreement?
21       A.   I don't know.  But I know I've
22   been involved in probably at least close
23   to fifty terminations where there's been

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

---

**157**

1    disputes about the terminations.
2    Sometimes --
3        Q.  I'm not talking about
4    termination by the government.  I'm
5    talking about termination by one partner
6    of another partner.
7        A.  I don't know.  I'd guess fifteen
8    or twenty.  I don't -- I don't know
9    exactly how many, but it's something I've
10   studied many times.
11       Q.  And how many of those involve
12   the language that you see in Section
13   5.0(c), this kind of language?
14       A.  This kind of language is
15   included in many agreements, but not
16   exactly.  And there's other terms.
17   Each -- each contract would have whatever
18   the two parties negotiated, and that's
19   what I would have studied in each of the
20   other cases.
21       Q.  Do you know of a single teaming
22   agreement, termination, engagement you've
23   ever had where this language of 5.0(c)

**158**

1    was involved?
2        A.  Oh, I think financial viability
3    has -- is something that's -- I don't
4    recall the exact ones or the exact
5    amount, but that's not something that was
6    only done in this case in my career.
7    I've seen that before.
8        Q.  So tell me.  I want to -- the
9    jury is going to evaluate your
10   credibility on this.  Give us a name of a
11   contracting party.
12       A.  You know, I didn't memorize it.
13   I can tell you other teaming agreements
14   or joint venture agreements.  I mean, I
15   could recall some of them.  But if you're
16   talking about with this specific words,
17   I'd have to go back and check if I still
18   had the documents.
19       Q.  As you sit here today, you can't
20   give us a single example, like it was a
21   case of Acme Corporation against Jones
22   Corporation?  You can't think of any that
23   you can cite to me today?

**159**

1        A.  I -- I think all the termination
2    provisions that I've seen have financial
3    consequences.  They may not use these
4    exact terms, but they all have financial
5    consequences of what the prime contractor
6    will pay the subcontractor in the event
7    of a termination.
8        Q.  Well, that isn't what's involved
9    here.  This is not a payment amount
10   clause, is it?
11       A.  It's not.
12       Q.  It's a right to terminate
13   clause, isn't it?
14       A.  Many of them have right to
15   terminate -- to terminate.  And each
16   party's -- each group of parties or two
17   parties negotiate under what terms they
18   can terminate.
19       Q.  Well, there was no negotiation
20   in this case, was there?
21       MR. PRIMIS:  Object to form.
22       Q.  It was an ultimatum on June 6,
23   2006.  There was no negotiation over

**160**

1    price or an exit price or anything, was
2    there?
3        MR. PRIMIS:  Object to form.
4        A.  Okay.  So I'm a little confused
5    by your question.  You just took three --
6    me through a number of documents in
7    negotiation, so I don't see how you can
8    say there was no negotiation.
9        Q.  I'm -- I have gone to the
10   termination activity at -- a year after
11   they signed the contract, Boeing
12   terminates it.  They sign in June of '05,
13   and it's terminated in June of '06.
14       A.  You're talking about the MOA?
15       Q.  Yes.
16       A.  Okay.
17       Q.  And you understand that at the
18   moment of termination notice from Boeing,
19   Boeing expected there was going to be an
20   FPR submission at the end of the same
21   month, June 30; right?  2006?
22       A.  I think that was the schedule,
23   yes.

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

161

1 Q. So roughly 24 days before the
2 then-expected final bid was to be
3 submitted, they terminated Pemco. Is
4 that your recollection?
5 A. That sounds about right.
6 Q. All right. How many lawsuit
7 appearances in deposition or testimony
8 have you given about an MOA teaming
9 agreement termination?
10 A. I'd have to go back and look at
11 my testimonies. I couldn't answer that
12 question from memory.
13 Q. Have you given any under oath in
14 a tribunal about a teaming agreement
15 termination?
16 A. Again, if you're talking about
17 terminations, I've testified many times
18 on terminations. Whether it is -- was
19 called a teaming agreement or a joint
20 venture or something else, I couldn't
21 answer that sitting here.
22 Q. Will you provide us with a list
23 of those, please?

162

1 A. I can't commit to any discovery
2 request. That's not my role.
3 Q. I'm just asking you. Since you
4 assert that there were some but you
5 cannot tell me the specifics, I'm asking
6 you to, in effect, in layman's terms, put
7 your money where your mouth is when you
8 leave here and have a chance to look it
9 up.
10 A. I -- I can't commit to any
11 agreement to give you anything. That's
12 not my role in a case. And furthermore,
13 each case is under protective orders, and
14 I don't always have documents to go back
15 and remember exactly what the details of
16 each case were. I can tell you what my
17 experience is that I do recall, and I
18 just can't answer it as specific in the
19 details that you ask it about these exact
20 words or terms.
21 Q. I'm going to ask you to give me
22 the names that would be in the public
23 domain such as plaintiff name, defendant

163

1 name, court that it was held in, your
2 role as expert, which party.
3 MR. PRIMIS: Mr. Warburton and I
4 will take it under advisement and discuss
5 it off the record.
6 MR. REDIKER: Otherwise, we'll
7 move for relief, given what's happened
8 here.
9 Q. Has Boeing ever terminated a
10 teaming agreement with a principal
11 subcontractor before?
12 A. You mean that I've been involved
13 in?
14 Q. That you know of.
15 A. I know that there's been
16 termination of subcontractors, yes.
17 Q. Do you know of any -- have you
18 been in a case where the teaming
19 agreement and have given testimony,
20 either deposition or trial, where a
21 teaming agreement was terminated and then
22 the partner, the prime contractor went
23 forward with a bid on its own?

164

1 A. Involving Boeing? I'm not aware
2 of that.
3 Q. Involving any corporation.
4 A. I can recall this happening many
5 times in the commercial construction
6 industry. I don't know about if I could
7 from memory talk about in the government
8 contract world.
9 Q. That's what I was making
10 reference to, the government contracting
11 world.
12 A. Well, I kind of lumped together
13 long-term contracting. But I don't
14 recall one, but I'm quite sure it's
15 happened in my experience.
16 Q. So in all your prior answers
17 where you were talking about teaming
18 agreements, were you talking about --
19 including construction agreements?
20 A. Both government contract and
21 construction, yes.
22 Q. Okay. Well, I should have -- I
23 didn't realize that. I'm really

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

---

165

1  interested in teaming agreements to bid
2  on a government contract, teaming
3  agreements to bid on a U.S. government
4  fixed-price contract. How many
5  terminations of that kind have you
6  testified about?
7      A.  Most of my termination
8  experience is in the government contract
9  world, although I've worked on many
10 commercial terminations as well.
11     Q.  Okay. And, but you still can't
12 give us any identification; is that
13 right?
14     A.  Of cases that I've terminated?
15 I could.
16     Q.  Well, give us examples of the
17 facts. Are there any facts that you --
18 give us another case, without naming the
19 names, where you can recall these kind of
20 events occurring.
21     A.  Well, it depends on what you
22 mean by "these kind of events." If
23 you're talking about terminations, I can

---

166

1  name you cases where many, many
2  terminations occurred between a prime
3  contractor and a subcontractor in the
4  government contract world.
5      Q.  And in those, the parties later
6  became competitors for the same bid? In
7  other words, the termination occurred
8  before the award and while the bidding
9  period was still open and they became
10 competitors for that bid, that award?
11     A.  I think some of them, the
12 government would end the procurement and
13 start a new one and they would be
14 competitors on the new one. I don't know
15 if there's been one where it's been the
16 exact same program. I'd have to think
17 about that.
18     Q.  Are you aware that the judge in
19 this case has termed this unique because
20 they didn't terminate and start a new
21 procurement? Are you aware of what the
22 judge's remarks were in that regard?
23     A.  No.

---

167

1      Q.  So you yourself can't think of
2  one where the government continued the
3  procurement and the former teaming
4  partners are now bidding against each
5  other on the same RFP?
6      A.  I don't have one in mind, no.
7      Q.  All right. Along the lines
8  of -- let's go back into the question of
9  impact on San Antonio.
10         MR. REDIKER: Could I see
11 Exhibit 604, please, and 909. Start with
12 604. You've got a lot up in memory. Do
13 you want to exit the memory on some of
14 those and give it a break?
15         THE VIDEOGRAPHER: Yeah. Which
16 one would you like?
17         MR. REDIKER: Because it may
18 slow it down.
19         THE VIDEOGRAPHER: Would you
20 like this one?
21         MR. REDIKER: Yeah. 604-2.
22     Q.  (By Mr. Rediker) All right. I'm
23 going to show you a hard copy of

---

168

1  Plaintiff's Exhibit 604. And Mike
2  Salerno, here on the cover transmittal,
3  sends it to Steve Blake and Curt
4  Nothstine. "Attached is a package that
5  we've put together on financial impacts
6  of taking the PDM work out of Pemco and
7  putting it into San Antonio in FY05 (Pat
8  is asking for a comprehensive package on
9  this subject next week)."
10         So notice he uses the same word
11 you do, "impact"; right? You used the
12 word "impact" on San Antonio many times
13 in your report; right?
14     A.  Yeah, I -- I -- I don't recall,
15 but I believe I used that term.
16     Q.  And you actually were looking at
17 financial impacts; right?
18     A.  Yeah.
19     Q.  And so, did you look at this
20 slide deck, July 16, '04?
21     (Witness reviews document.)
22     A.  This looks familiar.
23     Q.  And do you understand that San

---

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

249

1    about San Antonio --
2        Q.  Top of the page, first page,
3    first page, first page.  "Pat wants us to
4    look at three options for single sources
5    for 24 aircraft."  "Single source" means
6    where the work is done; right?
7        A.  Yes.
8        Q.  One of them was all the work is
9    done at San Antonio; right?
10       A.  I believe so.
11       Q.  Second is Pemco; right?
12       A.  Yes.
13       Q.  The third is again San Antonio
14   with a Boeing buyout of Pemco?
15       A.  Yes.
16       Q.  Right?  Did you evaluate a
17   Boeing buyout of Pemco?
18       A.  I did not.  That's not what
19   happened.  I've analyzed what actually
20   did happen.
21       Q.  Okay.  I'll show you Exhibit
22   4 --
23       A.  Next five or ten minutes could

251

1    says, "We are expecting Pat to make a
2    decision between Boeing and Pemco and
3    then we can proceed with our pricing."
4        A.  I see that.
5        Q.  You didn't take that into
6    account in your opinion, did you?
7        A.  I'm not sure.
8        Q.  "And then we can proceed with
9    our pricing."
10       A.  I took into account what
11   actually happened and then analyzed it.
12       Q.  You took the position that there
13   were two projects, in effect, going on at
14   the same time on parallel tracks.  One
15   was deciding where the work would go, and
16   the other was deciding what the price
17   would be at certain bands; right?
18       A.  If you're talking about to be
19   able to respond to your questions, that's
20   absolutely true.  If you're talking about
21   what I did in my report with respect to
22   determination, I studied what actually
23   happened and whether from an accounting,

250

1    we take a break?
2        Q.  Yes.  I'll have a stopping
3    point.
4            THE VIDEOGRAPHER:  The exhibit
5    number, please?
6            MR. REDIKER:  454.
7        Q.  All right.  In the middle of the
8    first page here, Mike Wright, who was
9    then capture team leader -- right?
10       A.  Yes.
11       Q.  -- writes Tony Robertson, Tim
12   Coyle, and copies Don Vietor.  It says,
13   "We discussed a business case to help Pat
14   decide where the aircraft should go."
15           So, do you understand that by
16   May 4th, they're trying to decide where
17   physically the PDM work is going to go?
18       A.  Okay.  I think that's an overly
19   broad statement.  I think many things
20   were happening during this period.  In
21   this particular letter, I think that's
22   what they're referring to.
23       Q.  The last sentence of that e-mail

252

1    economic, and operational standpoint it
2    made sense.
3        Q.  Assuming they had the right to
4    do what they did; right?
5        A.  Again, that's backwards.  I
6    think the analysis is to support, or at
7    least relate it to, whether they had a
8    right to do it or not, not assuming they
9    had a right to do it.
10       Q.  If they could take into account
11   San Antonio programs that were not
12   KC-135, there is not a single mention in
13   the MOA, either of the MOAs, to the KC-10
14   program, is there?
15           MR. PRIMIS:  Object to form.
16       A.  It's not in either MOA, and I
17   wouldn't expect it to be.
18       Q.  And there's not a single mention
19   of the C-17 or C-130 programs either;
20   right?
21       A.  I have the same answer.
22       Q.  And there's no mention in there
23   of impact on San Antonio, is there?

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

253

1    A.  There -- agreed.  There would be
2   no reason to put that in there.
3    Q.  And you would agree with me that
4   on those -- I think you would agree with
5   me that on those programs, Pemco had no
6   participation in the income stream from
7   KC-10, C-17, and C-130 work?
8    A.  It's Boeing projects, not
9   Pemco's.
10   Q.  So, why was it logical for Pemco
11  to enter into an agreement in which
12  Boeing could make a determination based
13  on programs over which Pemco had no
14  control, no participation in the
15  earnings?
16   MR. PRIMIS:  Object to form.
17   Q.  Is that logical?
18   MR. PRIMIS:  Object to form.
19   A.  The agreement, if you're asking
20  from an economics standpoint, not
21  legally, makes sense.  Oftentimes,
22  companies don't want to do things that
23  are not financially viable.  There would

254

1   be no reason for Pemco to tell Boeing
2   about its other work or Boeing to tell
3   Pemco about its other work.  It is well
4   known in this industry that what we refer
5   to as cost contract impacts are virtually
6   always considered in making economic
7   determinations.
8    Q.  Well, that's what Boeing tried
9   to do and was rebuffed and gave up on
10  getting the words in the contract.  Isn't
11  that right?
12   A.  No, that's not correct.  At
13  least as I understand the --
14   Q.  Well, you have nothing to
15  support that.  You have not a single
16  document that you know of, much less have
17  ever seen, that says this was a subject
18  discussed in the negotiations between the
19  parties.
20   MR. PRIMIS:  Object.  Object to
21  form.
22   A.  I'm not taking the position that
23  it was discussed, nor am I taking the

255

1   position that it had to be discussed.
2   I'm taking the position that it's a
3   proper consideration for a government
4   contractor to consider cross-contract
5   impacts.
6    Q.  And it's also a proper
7   consideration for a company who's a sub
8   at the mercy of the prime and over 80
9   percent of whose revenues, military
10  revenues come from this one KC-135
11  program to not want that to be a
12  consideration.  Isn't that right, from
13  Pemco's point of view?
14   MR. PRIMIS:  Object to form.
15   A.  I'm not really sure I can
16  address what was in Pemco's mind.
17  Clearly, in the negotiations, documents
18  you pointed out, they wanted certain
19  changes and they got them.  But one of
20  the things that is included in the MOA
21  was something related to financial
22  viability.  And that's what I studied,
23  not from a legal standpoint, but from an

256

1   accounting, economic, and operations
2   standpoint.
3    Q.  Did you make an analysis --
4   well, actually, you did.  Didn't you
5   conclude that a company could make money
6   doing PDMs if there were only 24 planes
7   in their facility or 21 planes in their
8   facility?
9    MR. PRIMIS:  Object to form.
10   A.  I think the -- I don't recall a
11  separate analysis I made myself, but
12  there are Boeing analyses that show that
13  the company could make money doing 22 or
14  24 planes in their facility.  In fact,
15  when it was a joint proposal, that's
16  exactly what was going to happen.  Each
17  party was going to do about 22.
18   Q.  And Pemco actually said, "We can
19  make money bidding by doing five planes
20  in our facility," didn't they?
21   A.  They may have.  I don't recall
22  that.
23   Q.  Well, that's the band pricing

64 (Pages 253 to 256)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

357

1    A.  Yes.
2    Q.  Did Boeing consider those
3  results of those last four squares, those
4  last four planes that say "Current EACs"?
5    A.  I think you would have to ask
6  them exactly how they considered it, but
7  I do know that at least qualitatively
8  they considered it.
9    Q.  Look at S6 -- you see more dots.
10  You see some triangles.
11    A.  Yes.
12    Q.  -- and you see more squares
13  getting closer to the 80th plane?  Do you
14  see that?
15    A.  Yes.
16    Q.  And they're all above -- they're
17  all high numbers of hours, aren't they?
18  They're not meaning what would be
19  consistent with the continuous learning
20  curve?
21    A.  That's not a fair statement.
22  Many of those planes were high because
23  the government had extraordinarily high

358

1  amounts of over and above, but told the
2  contractors in the proposals to assume
3  only 600 hours.  So when Boeing
4  considered only 600 hours, I don't
5  believe -- I think it would show that
6  those were along -- I didn't do the
7  analysis, but I believe that would be
8  along the lines of what they expected for
9  continuous learning.
10    And the fact that it was higher
11  on these planes, the government was
12  telling Boeing and the other proposers
13  only to consider 600 hours of over and
14  above.
15    Q.  As far as the number of hours it
16  took, look at, for example, S7.  You see
17  all those triangles for FY06 planes?
18    A.  Yes.
19    Q.  You're saying that those all
20  support Boeing's switch from its prior
21  learning curve assumptions to a
22  continuous learning curve assumption?
23    A.  I didn't study these specific.

359

1  I studied a component, a portion of what
2  Mr. Check studied, and then I determined
3  that there were very high O&A hours,
4  which is the qualitative analysis that I
5  believe Boeing considered in determining
6  that the learning curve was still
7  appropriate.
8    Q.  Well, this chart says, "Basic
9  and Unplanned <200 hours."  And those
10  were not the current EACs I was referring
11  to.  I was referring to those triangles.
12  The EACs are in squares.  Do you see
13  that?
14    A.  First of all, I don't
15  necessarily agree about anything you just
16  said was less than 200 hours,
17  particularly O&A in general.  But again,
18  I hadn't studied these specific ones, so
19  I'd have to look at that.
20    And then did you ask me if
21  there's both squares and triangles?
22    Q.  Yes.
23    A.  Yes.

360

1    Q.  So when you say you didn't
2  consider these, are you saying you --
3  your report and your conclusions did not
4  take into account these charts?
5    A.  I would say they didn't -- I
6  didn't study them directly to do it.  I
7  did a analysis of Boeing's models,
8  Boeing's determination, and what the Air
9  Force concluded based on their study as
10  the achievability and attainability and
11  the realism of Boeing's continuous
12  learning estimates.
13    Q.  You said --
14    A.  Then --
15    Q.  Go ahead.
16    A.  Then what I did was, in response
17  to Mr. Check, I identified that he took
18  this position, maybe in part based on
19  this.  And I think he used planes that
20  Boeing didn't consider in making its
21  determination.  And for the ones that he
22  considered, I think there were
23  qualitative reasons why the triangles or

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

361

1  squares would be above the learning curve
2  line, but not necessarily appropriate to
3  consider going forward, based on the
4  government's statement about what O&A
5  should be assumed for the future.
6      Q.  Wow.  Is there a single document
7  that existed contemporaneously back in
8  2007 where anyone at Boeing just gave the
9  analysis that you are now giving ten
10 years later?
11     A.  You can look throughout their
12 documents.  You will see the things I
13 just talked about.  It won't be on any
14 one document.
15     Q.  Well, that's interesting.  I
16 would like you -- because I don't see any
17 cited in your report and I asked Mr.
18 Dunmire to give me documents when I
19 deposed him.  Do you know of a study, an
20 analysis by Boeing of the learning curve
21 change that they made in February of
22 2007?
23     A.  I know they studied it.  I

362

1  didn't study the details of what they
2  studied.  I saw what their conclusion
3  was.  I relied on that as well as other
4  things that I've testified today and in
5  my report that I considered.
6      Q.  If it's not in your report in a
7  footnote, like a Bates number or
8  something, then you didn't consider it;
9  right?
10     A.  At the time of my report, that
11 would be true.  But in response to Mr.
12 Check's rebuttal report, I may have
13 looked at other things because I was -- I
14 thought I had sufficient evidence in my
15 report, particularly once the Air Force
16 concluded the learning curve was
17 reasonable.  So I didn't feel I needed
18 any additional information at that time.
19     Q.  The Air Force didn't really
20 conclude it was reasonable, did they?
21     A.  I think they did.  They
22 concluded that it was attainable,
23 achievable, and in one case I think they

363

1  said it was realistic and in one case
2  they said it was maybe reasonable.
3      Q.  Did you ever read the Court of
4  Federal Claims' decision?  You don't
5  refer to it as -- as if it never even
6  happened.
7      A.  I -- I didn't because the
8  appellate court reversed that and said
9  that the analysis that was done by the
10 Air Force was proper, and I relied on
11 what the Air Force did that the appellate
12 court said was proper.
13     Q.  Well, the appellate court --
14 you -- I think you're mischaracterizing
15 it.  The appellate court said that it
16 simply was not in the Court of Claims
17 judge's purview under the standard of
18 review that he had to apply to make a
19 deconstruction to the extent he did.  He
20 didn't say -- the Court of Claims --
21 Court of Appeals did not analyze the
22 learning curve, did they?
23     A.  Why don't we take -- if you

364

1  want -- I'm not into -- it's not my job
2  to interpret appellate decisions, but
3  let's take a look at it --
4      Q.  Well --
5      A.  -- if you want.  And --
6      Q.  Well, I'm getting to that,
7  but --
8      A.  And basically what was upheld
9  was the Air Force's and the GAO's
10 analysis in which they made the
11 conclusion that I relied on.
12     Q.  What was upheld was -- we'll get
13 to that.
14     A.  Okay.
15     Q.  Are you aware of any Boeing
16 internal white paper discussing the pros
17 and cons of switching from the learning
18 curve that they presented in September of
19 2006 to what they presented in February
20 23 of 2007?
21     A.  I don't recall a white paper.
22 There may be one, but I don't recall one.
23     Q.  Do you know of any memorandum

91 (Pages 361 to 364)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

**FREEDOM COURT REPORTING**

377

1  And I assume they may have worked with
2  Mr. -- Mr. McLeod, but I don't know.
3       Q.  Well, do you know anything about
4  how much time they spent, how many hours
5  they worked?
6       A.  I do not.
7       Q.  What areas they covered?
8       A.  I do not.
9       Q.  Did you review anything that
10  Mr. McLeod did in conjunction with your
11  firm?
12       A.  No.
13       Q.  I'm going to show you Exhibit
14  86.  And I have highlighted on the third
15  page the words "pursuant to the MOA."
16  Have you seen this June 6, 2006,
17  termination letter before?
18       A.  Yes.
19       Q.  Are you aware that there was a
20  draft of this circulated the day before
21  to be sent to Pemco that did not have
22  paragraph 1 in it?
23       A.  I'm not aware of that.

378

1       Q.  And that the previous draft only
2  had what is now numbered here as
3  paragraph 2?
4       A.  I don't think I saw that, I
5  mean, if there is such a document.
6       Q.  You would agree with me that the
7  termination letter in paragraph 1 uses
8  "pursuant to the MOA."  Those four words
9  are not in the quoted language from the
10  MOA itself in paragraph 2; is that right?
11       A.  That's correct.  The quoted
12  language is in the MOA that is being
13  referred to there.
14       Q.  The quoted language in paragraph
15  2 is in the MOA?
16       A.  Yes.
17       Q.  So, as a preliminary, you
18  state -- and I'm just going to
19  summarize -- in paragraph 22, that it was
20  reasonable for Boeing to consider the
21  impact on other Boeing -- Boeing work in
22  San Antonio.  Right?
23       A.  Yes.

379

1       Q.  Paragraph 24, you make the same
2  point.
3       A.  Let me just get there so I can
4  make sure we've got the right paragraphs.
5  Twenty-two and 24?
6       Q.  Yeah.
7       (Witness reviews document.)
8       A.  I don't think in 24 that relates
9  to that issue, that I'm aware of.  It's
10  twenty --
11       Q.  You said, "When the impact on
12  other Boeing programs is considered,
13  Boeing's continuation with Pemco would
14  have resulted in a significant financial
15  loss to Boeing."
16       A.  In paragraph 24?
17       Q.  Did I get that wrong?
18       A.  Oh, you mean 23.
19       Q.  Yeah.
20       A.  In 23?
21       Q.  Yeah, 23.  I'm sorry.
22       A.  I do state that "When the impact
23  on other Boeing programs is

380

1  considered" --
2       Q.  Yeah.
3       A.  -- "Boeing's continuation with
4  Pemco would have resulted in a
5  significant financial loss to Boeing."
6       Q.  Would it be a financial loss or
7  just a reduction in the amount of
8  earnings they made?
9       A.  It would be a financial loss.
10       Q.  In paragraph 94, you make the
11  same point.  And you say, "Boeing also
12  analyzed the financial impact to Boeing
13  of losing the KC-135" --
14       A.  I'm sorry.  Which paragraph?
15       Q.  Nine four, 94.
16       A.  I'm sorry.  I apologize.  I went
17  to page 94.
18       Q.  Numbered paragraphs.
19       A.  Yes, I see that.
20       Q.  "Boeing" -- and you say, "Boeing
21  estimated an impact of $16 million in
22  FY09."
23       Did you yourself recalculate

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**