FILED

2020 Apr-28  PM 05:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |
|---|---|
| ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC. – BIRMINGHAM, and PEMCO AIRCRAFT ENGINEERING SERVICES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> THE BOEING COMPANY, BOEING AEROSPACE OPERATIONS, INC. and BOEING AEROSPACE SUPPORT CENTER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 2:11-cv-03577-RDP |

## BOEING'S REPLY IN SUPPORT OF ITS RULE 50(b) MOTION
## FOR JUDGMENT AS A MATTER OF LAW

Craig S. Primis, P.C. (*pro hac vice*)
Erin C. Johnston (*pro hac vice*)
Tia T. Trout-Perez (*pro hac vice*)
Kasdin Miller Mitchell
Alexia R. Brancato (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

R. Thomas Warburton
J. Thomas Richie
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

**TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................................... 1

**ARGUMENT**............................................................................................................................ 1

**I.      Pemco Failed To Introduce Sufficient Evidence To Satisfy Its Burden Under Count I.** ............................................................................................................................ 1

**II.     Pemco Failed To Introduce Sufficient Evidence To Satisfy Its Burden Under Count III.** ........................................................................................................................ 8

     A.    Pemco Fails To Rebut The Overwhelming Evidence Of Pemco's Actual Misuse Of Boeing's Proprietary Information. ......................................................... 8

     B.    Pemco Did Not Introduce Sufficient Evidence That Boeing Misused Its Proprietary Information. ...................................................................................... 13

     C.    Pemco Did Not Present Sufficient Evidence Of Damages Under Count III. ....... 14

**CONCLUSION** ...................................................................................................................... 15

**INTRODUCTION**

Boeing's Rule 50(b) motion identified a series of specific evidentiary deficiencies that require the jury verdict to be set aside.  Pemco's response takes a blunderbuss approach, pointing to an array of evidence admitted at trial on a wide range of issues, but never grappling with the critical shortcomings in its proof on the core issues underpinning the jury's verdict.  The evidence Pemco points to on Count I is either irrelevant to its claim for breach of the MOA, or insufficient to support it.  Pemco's response on Count III is more of the same, cataloguing irrelevant evidence but neglecting to address Pemco's failures of proof on the actual elements of its claim for breach of the NDA.  Moreover, Pemco simply ignores uncontroverted admissions from its leadership and other unrebutted evidence that conclusively show that in fact, it was ***Pemco*** that used ***Boeing's*** proprietary information to compete against Boeing.  Finally, Pemco effectively concedes that it failed to substantiate its theory of damages on Count III, which alone requires judgment in Boeing's favor on that claim.  In light of Pemco's failure to introduce evidence sufficient to establish all the elements of its claims at trial, judgment in Pemco's favor should be vacated, and Boeing respectfully requests that judgment be entered in its favor as a matter of law.

**ARGUMENT**

**I.      Pemco Failed To Introduce Sufficient Evidence To Satisfy Its Burden Under Count I.**

Rather than confronting the numerous failures of proof identified in Boeing's opening brief, Pemco's response raises irrelevant points and argues that, in the aggregate, they provide sufficient evidence that Boeing wrongfully terminated the MOA.  Indeed, Pemco spends much of its brief discussing extraneous background information, quoting irrelevant MOA provisions, and addressing drafts of the MOA that no witness ever tied to Pemco's understanding of the final agreement.  Pemco makes arguments attempting to defend its myopic focus on the definition of "Program," to transfer its burden of proof to Boeing on the issue of financial viability, and to

salvage its jury verdict with insufficient evidence that Boeing breached the implied promise of good faith and fair dealing.  None of these arguments—individually or collectively—establishes that Pemco put forth sufficient evidence to prove that Boeing wrongfully terminated the MOA.

*First*, Pemco cannot support its claim that Boeing breached the MOA by pointing to irrelevant background information about Pemco's business and its disappointment that Boeing terminated under Section 5.0(c).  Pemco argues that the jury could find in its favor on Count I because Pemco presented testimony that the KC-135 PDM program was "important" to Pemco, that "Pemco never intended to bid on its own," that Pemco had certain "goals" when drafting the MOA, and that Pemco board members were upset when Boeing terminated the MOA.  Doc. 597 at 5-6, 12.  Such evidence merely shows that Pemco wanted to team with Boeing and was disappointed when the MOA was terminated.  But none of those background facts informs in any way whether termination was contrary to the MOA.

*Second*, Pemco purports to have made its case by pointing to various MOA provisions, but these provisions are irrelevant to the question whether Boeing breached Section 5.0(c).  Pemco principally argues that the Workshare Agreement ("WSA") "helped demonstrate the parties['] intent" with respect to Section 5.0(c) because it "required that Pemco get at least 50% of the KC-135 inductions awarded."  Doc. 597 at 11 (citing PX 58 at TBC-00115454).  But Pemco ignores that the WSA applied only "***[u]pon successful award of a contract***."  PX 58 at TBC-00115454 (emphasis added).  As this Court has already held, because the Air Force never awarded a contract to the Boeing/Pemco team, the WSA never came into effect.  *See* Doc. 445 (Summ. J. Op.) at 33 (holding that the WSA obligations "did not survive the termination of the MOA").  Because the WSA was to have applied only after the Boeing/Pemco team received a contract award, and because Pemco introduced no evidence that the parties understood the WSA obligations to inform

2

the meaning of Section 5.0(c), Pemco's entire discussion of the WSA is beside the point.

Similarly, Section 4.1 of the MOA applies only after contract award and therefore has no relevance to termination.   Section 4.1 provides that "if [Boeing] *is awarded a contract* in connection with the Program as a 'Recompete Effort,' [Boeing] will award a subcontract to Pemco."   PX 58 at TBC-00115448 (emphasis added).   Pemco cites to testimony from Skip Bowling that, under Section 4.1, the parties intended that "if Boeing got a contract, Pemco was going to get a subcontract."   2/14/20 Trial Tr. (Bowling) at 81:20-82:3.   In so testifying, Mr. Bowling merely expressed an assumption that *if* the MOA was *not* terminated and the Boeing/Pemco team was awarded the Recompete contract, Boeing would award a subcontract to Pemco.   Neither Section 4.1 nor Mr. Bowling's general testimony address what would happen if, as actually happened, the MOA was terminated before contract award.   Section 4.1 and Mr. Bowling's testimony are therefore irrelevant.

Pemco cites yet more MOA provisions that do not pertain to MOA termination.   Section 3.5 governs changes to the "Subcontract Statement of Work or workshare."   PX 58 at TBC-00115448.   Because the WSA never went into effect and was never changed, the provisions in Section 3.5 that would govern changes to the WSA are inapplicable.   Pemco also cites to the "Fifth Whereas clause" and Section 1.1 of the MOA, but those sections merely provide for exclusive teaming while the MOA is in effect.   *Id.* at TBC-00115445-46.   They have nothing to do with termination or what happens after termination.   Finally, Section 1.2.1 addresses Boeing's duty to consult with Pemco only in the context of "technical and programmatic input."   *Id.* at TBC-00115446.   Nothing in Section 1.2.1 obligates Boeing to consult with Pemco regarding a potential decision to terminate the MOA.   The MOA provisions on which Pemco relies simply are not applicable, and Pemco points to no testimony explaining how they informed the parties'

understanding of the termination provision of Section 5.0(c).  *See* Doc. 597 at 10-11.

   ***Third***, although Pemco places great weight on rejected MOA drafts, it points to no evidence that anyone thought those drafts informed the parties' understanding of the final version of the termination provision.  Pemco does not dispute that it attempted to develop its theory of breach by pointing witnesses to prior drafts of the MOA.  Indeed, Pemco concedes that much of its case focused on those drafts.  *Id.* at 6-8.  But Pemco presented no testimony from a witness with personal knowledge regarding the course of the MOA negotiations.  Pemco cites testimony only from Ronald Aramini and Doris Sewell.  *Id.* at 7-8.  It presented no evidence that Ms. Sewell was involved in MOA negotiations, and Mr. Aramini "wasn't the prime in the negotiations," nor was he "at the table anytime during the negotiations."  Doc. 592-2 (Aramini Dep. Des.) at 90:10-22.  Further, while Pemco claims that Ms. Sewell testified "that Pemco intended Section 5.0(c) to mean that Boeing could not terminate based on a reduction of the BEQ," Doc. 597 at 8, Ms. Sewell provided no such testimony.  Ms. Sewell merely testified that Pemco wanted to remove references to the phrase "anticipated quantity" because the phrase "doesn't mean anything to us.  That's a subjective phrase.  I don't know who determines anticipated quantity."  2/19/20 Trial Tr. (Sewell) at 145:1-6.

   Rather than attempt to connect the drafts to the parties' understanding of the final Section 5.0(c), Pemco points to unrelated facts in the trial record that do not support its position.  For example, Pemco inaccurately describes an April 2005 white paper from Mr. Witte as support for the proposition "that the MOA could not be terminated based on a reduction in BEQ."  Doc. 597 at 7.  But this is attorney argument unsupported by the record; Mr. Witte never even mentions BEQ in the white paper.  Rather, in that white paper, he paraphrases portions of the WSA that would take effect ***after*** contract award, noting that "Pemco will be the sole source of repair IF

4

quantities will not support two sources and IF Pemco performs as expected." DX 2 at TBC-00084095. He says nothing regarding who will get any reduced number of planes **before** contract award. Indeed, nothing Pemco cites is evidence sufficient to establish that the parties understood Section 5.0(c) to preclude termination based on a BEQ reduction.

*Fourth*, Pemco fails to substantiate its claim that the defined term "Program" in Section 5.0(c) precluded a party from submitting a solo bid if it terminated under that provision. Pemco cited to no witness testimony regarding why or how the contractual definition of "Program" barred Boeing from submitting a solo bid under a new RFP, and thus effectively concedes that point. *See* Doc. 597 at 9-10. Although Pemco briefly suggests that "Pemco's witnesses did much more than merely read the text of prior drafts," no citations to any witness testimony follow that claim. *Id.* And Pemco points to selective, incomplete portions of Boeing witness testimony to try to obscure what the witnesses *actually* testified: "Program" refers to the Boeing/Pemco Team's joint pursuit of the KC-135 PDM Recompete Contract. One telling example is Pemco's citation to Roger Witte's testimony. Pemco cites a selective portion, arguing that Mr. Witte testified that "participation in the Program" in Section 5.0(c) "refers to pursuit of the KC-135 PDM contract." Doc. 597 at 9 (citing 2/14/20 Trial Tr. (Witte) at 36:22-25.) But Pemco omits the next question and answer: "Q. And when you say pursuit, do you mean as – what do you mean by that? A. We team together in the pursuit of winning the KC-135 PDM contract from the Air Force." 2/14/20 Trial Tr. (Witte) at 37:1-4.

Pemco is also unsuccessful in trying to avoid Missouri's well-settled canon that contract provisions are construed against the drafter. Citing *Koch Engineering Co. v. Gibraltar Casualty Co.*, Pemco argues that the canon "does not apply to sophisticated contractors." Doc. 597 at 16 (citing *Koch Eng'g Co. v. Gibraltar Cas. Co.*, 878 F. Supp. 1286, 1288 (E.D. Mo. 1995)). But this

decision by a federal district court does not accord with Missouri Supreme Court cases, which

have consistently affirmed the "well-settled rule that '[i]f ambiguous, [a contract] will be construed

against the drafter." *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 811 (Mo. banc 2015) (citing

*Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005)); *see also, e.g.*, *Suburban

Bus. Prods., Inc. v. Granite City Cmty. Unit Sch. Dist. No. 9*, 2012 WL 6738496, at *3 (E.D. Mo.

Dec. 31, 2012) (holding that ambiguous language must be construed against plaintiff because

plaintiff was the drafter and could have included clarifying language); *Monsanto Co. v. Genesis

Ag, Ltd.*, 2007 WL 9809048, at *4 (E.D. Mo. May 14, 2007) (same).  While this doctrine "is

applied 'more rigorously in insurance contracts than in other contracts' in Missouri," *Burns v.

Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010) (quoting *Mansion Hills Condominium Assoc. v. Am.

Family Mut. Ins. Co.*, 62 S.W.3d 633, 637 (Mo. Ct. App. 2001)), it is not limited to insurance

contracts, nor has the Supreme Court drawn the distinction Pemco argues as to sophisticated

parties.  *See*, *e.g.*, *Triarch*, 158 S.W.3d 772, 773 (contract between a painter and a manufacturer);

*Hewitt*, 461 S.W.3d at 803 (employment contract); *Byrne v. Arthur J. Gallagher & Co.*, 2015 WL

2238945, at *2 (E.D. Mo. May 12, 2015) (purchase agreement); *Suburban Bus. Prods.*, 2012 WL

6738496, at *1 (agreements between business and school district).  That well-settled principle of

law only further supports the conclusion that Pemco did not satisfy its burden to establish that

Boeing breached the MOA.[1]

---

[1]  Boeing did not abandon this argument by failing to request a jury instruction on it, as Pemco suggests.  Boeing requested the model instruction under Missouri law.  And the "Eleventh Circuit focuses on whether the district court and the non-moving party had been put on notice of the claimed deficiency by the moving party and whether the non-movant was able to respond before jury deliberations commenced." *See Registe v. Linkamerica Exp., Inc.*, 2015 WL 1288138, at *3 (M.D. Fla. Mar. 19, 2015), *aff'd sub nom. Registe v. LinkAmerica Express, Inc.*, 668 F. App'x 882 (11th Cir. 2016).  Boeing met that standard by repeatedly eliciting testimony on this issue and arguing that the termination provision should be construed against Pemco as the drafter.  *See, e.g.*, 2/14/20 Trial Tr. (Witte) at 32:1-2 ("Q. Who drafted this language? A. That was Pemco."); *id.* at 40:17-19 ("Q. Mr. Witte, where did the language in paragraph 12 come from? A. The language in paragraph 12 was proposed and provided by Pemco."); *see also* 2/27/20 Trial Tr. (Boeing Closing Argument) at 93-95, 113-14.

*Fifth*, Pemco effectively concedes that it introduced insufficient evidence to prove that Boeing's financial viability analysis was flawed. *See* Doc. 597 at 13-14. Pemco principally argues that "Boeing failed to produce *any* evidence" that the basis for its financial viability analysis "was ever broached, negotiated, or discussed with Pemco during MOA negotiations." *Id*. Accordingly, Pemco contends, "[t]he jury was free to consider Boeing's lack of evidence on this fabricated after-the-fact rationale." *Id*. at 14. But that argument turns the burden of proof on its head: it was *Pemco's* burden to introduce sufficient evidence to refute Boeing's financial viability analysis, not *Boeing's* burden to justify it. Pemco cannot rely on a purported lack of evidence by Boeing to prove Pemco's own case in chief.

*Finally*, the evidence Pemco uses to support its argument that Boeing breached the implied promise of good faith and fair dealing is legally insufficient under Missouri law. Missouri law requires Pemco to prove that Boeing's conduct was made "in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion." *Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 891-92 (E.D. Mo. 2013) (internal quotation marks omitted). "Examples of bad faith resulting in breaches of the covenant include willfully rendering imperfect performance, abusing power in the specification of terms, or wrongfully interfering with or failing to cooperate with the other party's performance." *Rock Port Market, Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 190 (Mo. Ct. App. 2017) (citation and quotation marks omitted). No such conduct exists here. Boeing terminated the MOA within 15 days of the date when the Air Force amended the RFP to reduce the BEQ, *see* DX 60 (terminating on June 6, 2006, following RFP amendment on May 31, 2006), and that timing cannot possibly amount to a breach of the implied promise under Missouri law. *See Reliance Bank v. Paramount Props., LLC*, 425 S.W.3d 202, 208 (Mo. Ct. App. 2014) ("[A] party [does not] breach its implied duty of good faith and fair dealing by ending

7

a contractual relationship in the manner provided by the contract."). The purported evidence that Pemco points to on this issue is not evidence of bad faith or abuse of discretion. Section 3.5 of the MOA by its own terms is inapplicable, *see supra* at 3. And neither the fact that Boeing anticipated in 2004 (before it signed the MOA) that a BEQ reduction might require it to part ways with Pemco at some point in the future, Doc. 597 at 14-15, nor that Boeing inserted the innocuous, clarifying phrase "pursuant to the MOA" in its termination letter, amounts to sufficient evidence that Boeing acted in bad faith or abused its discretion.[2]

**II.      Pemco Failed To Introduce Sufficient Evidence To Satisfy Its Burden Under Count III.**

    **A.      Pemco Fails To Rebut The Overwhelming Evidence Of Pemco's Actual Misuse Of Boeing's Proprietary Information.**

Confronted with compelling evidence of its own misuse of Boeing proprietary information, Pemco fails to offer any meaningful response. Pemco points to no evidence to contest that it possessed Boeing's joint bid prime pricing. Multiple senior Pemco witnesses confirmed Pemco knew it was not supposed to have that information and that Boeing never would have shared its prime pricing with Pemco because it was proprietary. Nor does Pemco contest that it actually used Boeing's prime price for the competitive purpose of determining its own prime price. Instead, Pemco offers nonresponsive arguments and citations to unrelated evidence. Because Pemco has failed to demonstrate the existence of any facts that nullify its own clear breach of the NDA, Boeing is entitled to judgment as a matter of law on Count III.

*First*, Pemco's contention that it complied with the NDA because it established a firewall and took a "broad approach" to what Pemco considered Boeing proprietary information ignores

---

[2] Pemco failed to introduce sufficient evidence of breach of the implied promise as to both Count I and Count III. *See* Doc. 587 at 22-24. Pemco's failure to argue in its opposition brief that it introduced sufficient evidence of breach of the implied promise on Count III amounts to a concession that it failed to do so.

the terms of the NDA.  Doc. 597 at 22.  The plain text of the NDA states that "Proprietary Information shall … not otherwise be used for the benefit of the recipient."  PX 58 at TBC-00115456.  The evidence is clear that Pemco used Boeing's proprietary information for its own benefit.  *See* Doc. 587 at 11-18.  Steps Pemco took to safeguard other Boeing proprietary information are no answer to this undisputed evidence of Pemco's actual misuse of Boeing's prime price from the joint bid.

*Second*, Pemco attempts to justify its misuse by arguing without evidence that it was "permitted to have" the Air Force document containing Boeing's proprietary information because Pemco obtained it from the Air Force, a third party.  Doc. 597 at 23.  Pemco cites no evidence in the trial record from which the jury could infer that the Air Force actually gave Pemco this information.  No Pemco witness was able to explain how the Air Force document found its way into the files of Pemco's bid proposal manager, Tim Walker.  In fact, the uncontroverted record establishes that Pemco was "asked to leave the room" for the pricing portion of the meeting with the Air Force where this document was discussed.  *See* 2/21/20 Trial Tr. (Dunmire) at 85:9-15; *see also* 2/18/20 Trial Tr. (Emery) at 84:13-17 ("When Pemco was a subcontractor to Boeing, if there was a briefing … about the costs of the contract or dollars and cents, Pemco would have been asked to leave."); Doc. 592-4 (Hess Dep. Des.) at 120:22-121:3 ("[W]hen I would go to joint meetings with the Air Force and Boeing, when Boeing information was presented, we were excused from the meeting.").[3]

In any event, ***how*** Pemco came to possess Boeing's proprietary information is beside the

---

[3]  Pemco relies heavily on the testimony of its proposal manager, Gil McSheehy, who testified that he was at the meeting where the Air Force document was presented, and "assume[d]" that Pemco took the presentation back to Pemco after the meeting had concluded.  Doc. 612-1 (McSheehy Dep. Des.) at 168:3-4.  Nothing in Mr. McSheehy's testimony contradicts the testimony of numerous witnesses who recalled that Pemco would have been asked to leave during the portion of the meeting where Boeing's prime prices were discussed, and nothing in the cited testimony supports the notion that Pemco had permission from the Air Force to take this document out of the room and back to its offices so that Pemco could break down Boeing's bid price for its own competitive gain.

point.  Even if Pemco had offered evidence at trial to prove that it had obtained Boeing's prime

pricing from the Air Force (and it did not), that evidence would not absolve Pemco of its obligation

under Section 4(a) of the NDA to refrain from improperly using Boeing's proprietary information.

Nothing in Section 4(e)(3) permits Pemco to circumvent the stated purpose and explicit language

of the NDA by obtaining proprietary information from alternate sources.  Section 4(e)(3) of the

NDA permits disclosure or use of proprietary information from third parties only if such

information becomes known to Pemco "*without breach of this Agreement by the recipient*."  PX

58 at TBC-00115456 (emphasis added).  But Pemco's breach was clear: by using Boeing

proprietary information, which was clearly labelled "SOURCE SELECTION SENSITIVE – FOR

OFFICIAL USE ONLY," for its own competitive gain, Pemco plainly breached the NDA.  Indeed,

Pemco's CEO Ron Aramini admitted as much when he was asked if breaking down Boeing's solo

bid price was "*consistent with [Pemco's] agreements with Boeing*."  Doc. 612-2 (Aramini Dep.

Des.) at 253:3-23 (emphasis added).  Mr. Aramini testified, "*No.*  Because they told us they would

never provide us pricing." *Id.* (emphasis added).  Accordingly, it does not matter where or how

Pemco acquired the pricing material; its misuse of that information to develop its prime price was

a clear, admitted breach of the NDA.  Boeing is therefore entitled to judgment as a matter of law.

   ***Third***, Pemco argues that the pricing information in the Air Force document is not

proprietary to Boeing because it is a "government-evaluated price."  Doc. 597 at 23.  Pemco's

attempt to recharacterize Boeing's prime pricing information is refuted by the evidentiary record.

The record indisputably demonstrates that the numbers in the Air Force document match, dollar

for dollar, Boeing's actual joint bid pricing submitted to the Air Force, which is labelled "Boeing

Proprietary."  *Compare* DX 30 *with* DX 268.  Boeing never shared those prices with Pemco, and

no Pemco witness has ever testified that they were not proprietary to Boeing.  *See* Doc. 612-1

(McSheehy Dep. Des.) at 178:20-25.[4]  The trial record is patently clear that the pricing in the Air Force presentation was Boeing's exact prime pricing—not a separate number prepared by the government—and no reasonable jury could conclude otherwise.

Nor does it save Pemco's argument that "the largest component of the Boeing Group's cost price was Pemco's PDM price."  Doc. 597 at 22.  As multiple witnesses confirmed, the fact that Boeing's prime price incorporated Pemco's price as a subcontractor does not alter the proprietary nature of the prime price as a whole.  *See* 2/12/20 Trial Tr. (Finneran) at 132:15-19; 2/14/20 Trial Tr. (Witte) at 50:20-51:8; 2/19/20 Trial Tr. (Shealy) at 125:2-5, 125:12-22.  Every single Boeing and Pemco witness who was asked about prime pricing testified unequivocally that Boeing would *never* share its prime pricing with Pemco, or any other government contractor, because the ultimate number that Boeing submitted in its bid was proprietary to Boeing.  *See* 2/21/20 Trial Tr. (Dunmire) at 85:9-11, 85:16-20; 2/14/20 Trial Tr. (Bowling) at 122:20-123:1; Doc. 612-2 (Aramini Dep. Des.) at 253:19-23.  There is simply no evidentiary basis from which a jury could have concluded to the contrary.

*Fourth*, Pemco attempts to justify its misuse by claiming that it broke down Boeing's bid price in an attempt to offer Boeing its "lowest and best price."  Doc. 597 at 8, 24.  Even if that position made logical sense, the fact that Pemco articulated additional reasons for attempting to break down Boeing's bid price during the joint bid phase is irrelevant.  Pemco's own witnesses have admitted that one of the reasons Pemco broke down Boeing's bid price was to *compete* as a

---

[4] Pemco falsely asserts that Boeing witness Jerry Dunmire testified that the government evaluation was "in error by $190 million, and that Boeing reached out to the USAF to inform them of this mistake."  Doc. 597 at 23-24.  In support, Pemco cites three pages of testimony from Mr. Dunmire regarding an unrelated exhibit and consisting primarily of attorney argument.  *See* 2/21/20 Trial Tr. (Dunmire) at 191:15-194:2.  In fact, Mr. Dunmire testified that the Air Force document reflects "the price that we [Boeing] presented to the Air Force in our proposal for conducting the PDMs under the recompete."  *Id.* at 84:18-19.  Mr. Dunmire has never testified that this number was erroneous or that it did not match exactly Boeing's solo bid prime price.

solo bidder.  *See* Doc. 612-2 (Aramini Dep. Des.) at 250:20-24 ("It would have been nice to know
… what our competition would be if they cut us loose."); Doc. 612-1 (McSheehy Dep. Des.) at
187:13-21 (testifying that Pemco "believed that there was a good [chance] that we would be pushed
off the team," so Pemco "decided to start looking at what it would take for us to compete.").  The
NDA expressly forbids Pemco from using Boeing's proprietary information to compete against
Boeing.  *See* PX 58 at TBC-00115456 ("Proprietary Information shall be used solely for the
purpose stated in Article I and shall not otherwise be used for the benefit of the recipient or
others.").  By breaking down Boeing's prime price in an attempt to "look[] at what it would take
for [Pemco] to compete," Doc. 612-1 (McSheehy Dep. Des.) at 187:13-21—facts that Pemco never
addresses or contests in its opposition—Pemco affirmatively breached the NDA.

     *Finally*, recognizing that it cannot dispute the factual predicates for its own misuse, Pemco
argues that it did not breach the NDA because "despite [its] best efforts," Pemco was ultimately
"unable to ascertain Boeing's part of the bid price" and "did not use" any Boeing proprietary
information in Pemco's solo bid.  Doc. 597 at 25.  The record plainly establishes, however, that
Pemco ***obtained*** and ***used*** Boeing's proprietary information to compete with Boeing, and that
alone conclusively establishes that Pemco failed to perform under the NDA.  Whether Pemco was
actually successful in using Boeing's information in its solo bid (or elsewhere) is beside the point,
and unnecessary to show breach of the NDA.

     Nowhere in its opposition does Pemco dispute what its documents clearly show and what
its witnesses admitted:  that Pemco possessed Boeing's proprietary prime pricing information and
subsequently used that very information for the purpose of competing against Boeing.  In doing
so, Pemco failed to perform under the NDA, and Boeing is entitled to judgment as a matter of law
on Count III on this ground alone.

**B.**    **Pemco Did Not Introduce Sufficient Evidence That Boeing Misused Its Proprietary Information.**

Pemco's opposition also confirms that it did not introduce sufficient evidence to establish that Boeing misused Pemco's proprietary information.   Pemco's claims of Boeing misuse— whether it be the "Apples to Apples" spreadsheet, allegedly making "adjustments" to assumptions to its prime pricing, or supposedly developing "estimations" of Pemco's prime pricing—all are supported only with testimony from its expert, James Check.   *See* Doc. 597 at 17-19.   And Mr. Check's testimony on this issue was entirely speculative, amounting, at most, to his belief that the evidence was "consistent with" misuse or that misuse was a possibility.   *See, e.g.*, 2/19/20 Trial Tr. (Check) at 194:20-196:20 (testifying that the Apples to Apples presentation was "consistent with" Boeing's misuse); 2/25/20 Trial Tr. (Check) at 66:5-7 (conceding that the "adjustments in assumptions" that Boeing made it its final prime price could be made by Boeing "using its own data").   Speculative expert testimony of this kind is insufficient as a matter of law to contradict the direct testimony from Boeing's witnesses that they did not misuse Pemco's proprietary information.   *See DW Data, Inc. v. C. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1053 (N.D. Ill. 2013) ("evidence that is equally consistent with two competing hypotheses is insufficient to prove the point for which it is offered"); *In re Fosamax Prods. Liab. Litig.*, 647 F. Supp. 2d 265, 278–79 (S.D.N.Y. 2009) (expert cannot establish causation by testifying only that a condition is "consistent with" a result); *Boehm v. Pernoud*, 24 S.W.3d 759, 762 (Mo. Ct. App. 2000) (expert testimony that a course of action is "consistent with" the standard of care does not necessarily show that a different course of action constitutes a deviation from the standard of care).

None of Pemco's factual evidence regarding Boeing's purported conduct is sufficient to support a claim for breach of the NDA, because Boeing's actions were fully consistent with the parties' agreement.   Specifically, the overlap of Boeing employees between the joint and solo bid

13

teams cannot establish that Boeing breached the NDA.  Paragraph 12 of the NDA expressly allowed overlap.  *See* PX 58 at TBC-00115458 ¶ 12.  And contrary to Pemco's assertions, no witness testified that Boeing nevertheless "recognized that it should not use" certain people on both teams.  Doc. 597 at 20; *see, e.g.*, 2/13/20 Trial Tr. (Finneran) at 51:10-11 ("the NDA is pretty clear about the fact that members of the joint team could be part of the solo bid.").  Pemco obviously interpreted the NDA in the same way, as "at least five Pemco employees … substantially participated in both the joint recompete bid with Boeing and Pemco's solo bid."  2/19/20 Trial Tr. (Sewell) at 167:3-6.  Likewise, Pemco suggests that Boeing's mere possession of proprietary information in the "Apples to Apples" spreadsheet is sufficient to establish breach, but the NDA prohibits only *misuse* of another party's proprietary information, *see* PX 58 at TBC-00115458 ¶ 12, and possession is not the equivalent of misuse.  Indeed, if mere possession were enough to violate the NDA, then Pemco would also be in breach, which independently would foreclose its claim against Boeing for breach of the NDA.  *See supra* at 12.  None of the evidence on which Pemco relies suffices to establish that Boeing actually misused Pemco's information in preparing Boeing's solo bid, and Boeing is thus entitled to judgment as a matter of law on Count III.

### C.      Pemco Did Not Present Sufficient Evidence Of Damages Under Count III.

Finally, Pemco fails to address the complete lack of evidence to establish a necessary prerequisite for damages on Count III:  that Pemco would not have submitted a solo bid had it known Boeing was using its proprietary information in the solo bid.  As the Court instructed, Pemco's damages claim required Pemco to prove "that their efforts to engage in the solo bid after the parties parted ways were futile and they should be able to recover their costs regarding the solo bid for that reason."  2/21/20 Trial Tr. (Court's Preliminary Instruction) at 124:10-23.  Pemco brushes aside its failure to prove this element on the ground that "asking witnesses whether Pemco would have still bid if it had known Boeing misused its PI would have been entirely speculative."

14

Doc. 597 at 27.  But Pemco's position—stated in a single sentence with no supporting authority—effectively concedes that Pemco did not satisfy its burden to establish causation.  Pemco called numerous witnesses who could have testified from personal knowledge whether Pemco would have continued with its solo bid if it believed Boeing was using its proprietary information, and the jury would have been free to credit or discredit that evidence.  *See, e.g.*, *FDIC v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 2013 WL 1830806, at *3 (M.D. Fla. May 1, 2013).  Pemco did not elicit any such evidence and therefore failed to establish that Boeing's alleged breach caused its claimed injury, as a matter of law.

Pemco's other excuses for failing to put on evidence to support its damages theory fare no better.  Pemco confusingly suggests that the jury could have inferred from the evidence that "Pemco would have brought a lawsuit right then in 2006 for improper MOA termination if Boeing's PI misuse had been revealed to Pemco, and could also have sought to have Boeing barred from competing due to procurement integrity law violations."  Doc. 597 at 28 (emphasis omitted). But these suggestions do not establish that Pemco would not have submitted a solo bid.  At most, that argument suggests only that there were other remedies Pemco might have considered; it does nothing to establish whether Pemco would have submitted a solo bid.  Likewise, the evidence Pemco points to from Doris Sewell about how Pemco wanted to "ensure that Boeing was complying with the NDA" is a far cry from evidence showing that Pemco would not have submitted a solo bid if it knew that Boeing was not complying with NDA.  Doc. 597 at 27. Accordingly, Pemco's failure to introduce sufficient evidence to support its claimed damages independently requires judgment as a matter of law in favor of Boeing on Count III.

## CONCLUSION

For the foregoing reasons, the Court should set aside the jury's verdict and grant Boeing judgment as a matter of law on both Counts I and III.

*/s/  R. Thomas Warburton*
One of the Attorneys for Defendants

**OF COUNSEL**
R. Thomas Warburton
J. Thomas Richie
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Craig S. Primis, P.C. (*pro hac vice*)
Erin C. Johnston, P.C. (*pro hac vice*)
Tia T. Trout-Perez (*pro hac vice*)
Kasdin Miller Mitchell
Alexia Brancato *(pro hac vice)*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave, N.W.
Washington, DC  20004
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to the following recipients:

J. Michael Rediker
Meredith J. Lees
Peter J. Tepley
R. Scott Williams
Rebecca A. Beers
RUMBERGER, KIRK & CALDWELL, P.C.
Renesant Place, Suite 1300
2001 Park Place North
Birmingham, AL 35203

Joshua D. Lerner
RUMBERGER, KIRK & CALDWELL, P.C.
Brickell Bayview Centre, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037

Laurie Webb Daniel
HOLLAND & KNIGHT LLP
1180 West Peachtree Street, NW
Suite 1800
Atlanta, GA 30309

/s/  R. Thomas Warburton
R. Thomas Warburton